**Appx00001-Appx03660**

No. 2025-1787

# United States Court of Appeals
# For the Federal Circuit

STA Group LLC,
*Appellant*

v.

Motorola Solutions, Inc.,
*Appellee*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2023-01295

## JOINT APPENDIX

April 29, 2026

Jason A. Engel
K&L Gates LLP
70 W. Madison St., Suite 3300
Chicago, IL 60602
Phone: 312-807-4236
Email: jason.engel@klgates.com

Nicholas F. Lenning
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: 206-370-6685
Email: nicholas.lenning@klgates.com

*[additional counsel on inside cover]*

Erik J. Halverson
K&L Gates LLP
4 Embarcadero Center
San Francisco, CA 94111
Phone: 415-882-8238
Email: erik.halverson@klgates.com

**COUNSEL FOR APPELLANT
STA GROUP LLC**

Lauren J. Dreyer
Eliot D. Williams
Katharine M. Burke
Baker Botts L.L.P.
700 K Street, NW
Washington, DC 20001

Robert L. Maier
Baker Botts L.L.P.
30 Rockefeller Plaza
New York, NY 10112

Clarke Stavinoha
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201

Lori Ding
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002

**COUNSEL FOR APPELLEE
MOTOROLA SOLUTIONS INC.**

# TABLE OF CONTENTS

| Description | Appendix Page No. |
|---|---|
| Final Written Decision - 35 U.S.C. §318(a) IPR2023-01295, 3/17/2025 (Paper No. 39) | Appx00001 |
| U.S. Patent No. 8,994,830 B2 to Shaffer et al. 3/31/2015 (Exhibit 1001) | Appx00089 |
| Certified List | Appx00111 |
| Excerpts from Motorola Solutions Inc.'s Petition for *Inter Partes* Review of Claims 1-5, 7-19, 21-24 of U.S. Patent No. 8994,830 B2, 8/21/2023 (Paper 1) | Appx00210 |
| Institution Decision, 3/21/2024 (Paper 11) | Appx00416 |
| Excerpts from Patent Owner's Response, 7/2/2024 (Paper 18) | Appx00512 |
| Excerpts from Petitioner's Reply to Patent Owner's Response, 9/27/2024 (Paper 26) | Appx00613 |
| Excerpts from Patent Owner Sur-Reply, 11/8/2024 (Paper 32) | Appx00675 |
| Patent Owner's Notice of Appeal (Paper 42) | Appx00796 |

i

| Description | Appendix Page No. |
|---|---|
| Excerpts from Declaration of Nathaniel Polish, Ph. D. in Support of Petition for *Inter Partes* Review of the '830 Patent (Exhibit 1002) | Appx00891 |
| Excerpts from Prosecution File History of the '830 Patent (Exhibit 1003) | Appx01027 |
| U.S. Patent App. No. 2006/0281471 (published Dec. 14, 2006) (Exhibit 1004) | Appx01407 |
| U.S. Patent App. No. 2007/0036100 (published Feb. 15, 2007) (Exhibit 1005) | Appx01420 |
| U.S. Patent No. 7,113,090 (issued Sept. 26, 2006) ("Saylor") (Exhibit 1011) | Appx01498 |
| Excerpts from Petitioner's Demonstratives for Oral Argument (Exhibit 1039) | Appx03215 |
| Excerpts from Declaration of Robert Akl, Ph.D. (Exhibit 2006) | Appx03461 |
| Excerpts from Deposition Transcript of Nathaniel Polish, Ph.D. dated June 19, 2024 (Exhibit 2008) | Appx03589 |

Trials@uspto.gov
571-272-7822

Paper: 39
Date: March 17, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

IPR2023-01295
Patent 8,994,830 B2

Before MICHAEL J. FITZPATRICK, DAVID C. McKONE, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-01295
Patent 8,994,830 B2

## I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) (2018) and 37 C.F.R. § 42.73 (2019). For the reasons discussed herein, we determine that Petitioner, Motorola Solutions, Inc. ("Petitioner") has shown by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 (the "challenged claims") of U.S. Patent No. 8,994,830 B2 (Ex. 1001, "the '830 patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## II. BACKGROUND

### A. *Procedural History*

Petitioner filed a Petition, Paper 1 ("Pet." or "Petition"), requesting *inter partes* review of the challenged claims. STA Group LLC ("Patent Owner") timely filed a Preliminary Response, Paper 7 ("Prelim. Resp."). With our approval, Petitioner filed a Preliminary Reply (Paper 9, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-reply (Paper 10, "Prelim. Sur-reply"). Based on the record at that time, we issued a Decision granting *inter partes* review. Paper 11 ("Dec." or "Institution Decision").

After institution, Patent Owner filed a Response (Paper 18, "PO Resp." or "Resp."), Petitioner filed a Reply (Paper 26, "Pet. Reply" or "Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply" or "Sur-reply").

On January 21, 2025, an oral hearing was held. A transcript of the hearing is made part of the record. Paper 38.

2

IPR2023-01295
Patent 8,994,830 B2

## B. Related Proceedings

According to the parties, the '830 patent is the subject of the following actions: *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.) filed Sept. 30, 2022 (the "Related Litigation"); and *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 4-22-cv-00840 (E.D. Tex.) filed Sept. 30, 2022, and administratively closed Oct. 6, 2022. Pet. 1; Paper 4, 1; Paper 6, 4–5; Paper 8, 4–5.

## C. Real Party in Interest

Petitioner identifies itself as the real party in interest. Pet. 1. Patent Owner identifies itself as the real party in interest. Paper 4, 1.

## D. The '830 Patent (Ex. 1001)

The '830 patent issued on March 31, 2015, and "relates to providing access to video streams associated with communication channels in a communication network." Ex. 1001, 1:7–9. Figure 1B of the '830 patent is reproduced below.



*FIG. 1B*

3

IPR2023-01295
Patent 8,994,830 B2

Figure 1B, above, is a diagram of communication system 150, including "a public switched telephone network (PSTN) 102, cellular network 104, and various networked computing devices," which is configured to communicate with, for example, "telephones 106, computers 112, Voice over Internet Protocol (VoIP) phones 110, mobile phones 108, gateways 116, routers 118, switches, transmission systems, relay systems, and other communication devices." *Id*. at 2:34–40; *see also id*. at 3:30–36. "The communication system 150 further includes a radio network 152 configured to communicate with one or more mobile communication devices (e.g., one or more push-to-talk (PTT) radios)." *Id*. at 3:37–40. According to the '830 patent, "[a] plurality of cameras 122 provide video feeds that . . . are associated with communication channels (e.g., communication channels providing Virtual Talk Groups (VTGs))." *Id*. at 2:40–43.

Figure 4 of the '830 patent is reproduced below.



*FIG. 4*

IPR2023-01295
Patent 8,994,830 B2

Figure 4, above, is a flow diagram of method 400 "for associating video feeds with a communication channel associated [with] a plurality of mobile communication devices." *Id*. at 6:18–21. Referring to Figure 3, the '830 patent discloses that "a user interface may optionally be presented to a user (e.g., the user 305.1–305.q or 307.1–307.r) to allow the user to select a communication channel 302.1–302.n to which his/her mobile communication device 304.1–304.q or 306.1–306.r is to be set or tuned to." *Id*. at 6:24–28. At block 402, the method 400 "may then monitor selection of a communication channel by the user 305.1–305.q, 307.1–307.r of an associated mobile communication device 304.1–304.n, 306.1–306.r." *Id*. at 6:28–32. At block 404, "[a]t least one video feed associated with the selected channel . . . may be identified." *Id*. at 6:35–36. "Once the particular channel has been selected and the at least one video feed associated with the channel has been identified, the method 400 may then provide any mobile communication device 305.1–305.q or 307.1–307.r that is set to the particular channel with access to the at least one video feed." *Id*. at 6:57–62. At block 408, "the video feed may be then communicated to the mobile communication device." *Id*. at 7:1–3.

5

IPR2023-01295
Patent 8,994,830 B2

Figure 9 of the '830 patent is reproduced below.



*FIG. 9*

Figure 9, above, depicts a graphic user interface (GUI) 900 "to allow a user to select a communication frequency associated with a communication channel." *Id.* at 9:60–62. For example, "a user may select a specific VTG by selecting one of the channels 902.1–902.s," and then "a frequency associated with a region in which the user is located may be selected using the drop-down menus." *Id.* at 10:13–16. "Thus, in an example embodiment, a radio frequency of a given base station in a specific geographical region may be selected, thereby automatically providing access to video feeds associated with the selected frequency." *Id.* at 10:20–24.

## E. Illustrative Claim

Petitioner challenges claims 1–5, 7–19, and 21–24 of the '830 patent. Pet. 9–10. Claims 1 and 15 are independent. Claim 1 is generally illustrative and is reproduced below.

6

IPR2023-01295
Patent 8,994,830 B2

1. [pre][1] A method comprising:

[a] monitoring a selection of a communication channel by a user of a mobile communication device;

[b] providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone

[c] from which a plurality of video feeds associated with the geographic zone are sourced;

[d] monitoring a selection of a radio frequency of the plurality of radio frequencies by the user[;][2]

[e] identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,

[f] the one or more video feeds being independent of the selected communication channel; and

[g] providing access to the identified at least one video feed to the mobile communication device based on the user policy.

Ex. 1001, 12:18–39.

*F. Evidence*

Petitioner relies upon the following evidence:

(1) U.S. Patent Application Publication No. US 2006/0281471 A1, published December 14, 2006 ("Shaffer") (Ex. 1004);

(2) U.S. Patent No. 7,113,090 B1, issued September 26, 2006 ("Saylor") (Ex. 1011);

---

[1] Bracketed letter designations added.
[2] Here, the '830 patent appears to have a typographical error. Instead of a semicolon, it has a period. *See* Ex. 1001, 12:27.

7

IPR2023-01295
Patent 8,994,830 B2

(3) U.S. Patent Application Publication No. US 2007/0173273 A1, published July 26, 2007 ("Gogic") (Ex. 1006); and

(4) U.S. Patent No. 8,090,388 B1, filed March 20, 2007, and issued January 3, 2012 ("Opitz") (Ex. 1007).

Petitioner also relies on the declaration of Nathaniel Polish, Ph.D. (Ex. 1002).

Patent Owner relies on the declaration of Robert Akl, Ph.D. (Ex. 2006).

*G. Asserted Grounds of Unpatentability*

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–5, 7–19, 21–24 | 103(a)[3] | Shaffer, Saylor |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz |

Pet. 10.

## III. ANALYSIS

*A. Applicable Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

---

[3] Because the application from which the '830 patent issued has an effective filing date before March 16, 2013 (Ex. 1001, code (22)), citations to 35 U.S.C. § 103 are to the pre-AIA version. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29 § 3(n).

8

IPR2023-01295
Patent 8,994,830 B2

factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17– 18 (1966).  Neither party has presented evidence on the fourth *Graham* factor.

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness.  *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417.  Reaching this conclusion, however, "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim."  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention."  *Id.*

#### B.  Level of Ordinary Skill

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention.  *Graham*, 383 U.S. at 17.  "The importance of resolving the level of ordinary skill in the art lies in the necessity of

9

IPR2023-01295
Patent 8,994,830 B2

maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as a person having "at least (a) a bachelor's degree in computer science, electrical engineering, or a similar field, and (b) approximately 2 years industry experience in networking or communication systems, including interoperating different types of networks that include video feeds." Pet. 13 (citing Ex. 1002 ¶¶ 45–47). Patent Owner does not dispute Petitioner's description of a person of ordinary skill in the art. PO Resp. 13.

Petitioner's description of a person of ordinary skill is consistent with the subject matter of the '830 patent. This is supported by the testimony of Petitioner's declarant, Dr. Polish. Ex. 1002 ¶ 46. Patent Owner's declarant, Dr. Akl, does not dispute Petitioner's description. Ex. 2006 ¶ 30. We, therefore, continue to use the same description that we adopted in our Institution Decision, as it is consistent with the challenged patent and the asserted art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art itself may reflect an appropriate level of skill).

## C. Claim Construction

A claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R.

10

IPR2023-01295
Patent 8,994,830 B2

§ 42.100. Thus, we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art. *Id.* at 1312–17. "In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995). Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Phillips* at 1315. Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* at 1317.

Petitioner contends that the term "video stream association module" recited in claim 15 may invoke pre-AIA 35 U.S.C. § 112 ¶ 6[4] and proposes the following construction:

---

[4] Because the application from which the '830 patent issued has an effective filing date before September 16, 2012 (Ex. 1001, code (22)), citations to 35 U.S.C. § 112 are to the pre-AIA version. AIA § 4(e).

11

IPR2023-01295
Patent 8,994,830 B2

| Elements | Function and Structure |
|---|---|
| 15[b] "video stream association module" | <u>Function</u>: monitoring a selection of a communication channel. . ., providing a plurality of radio frequencies on a display. . ., monitoring a selection of a radio frequency. . ., identifying at least one video feed. . ., providing access to the identified at least one video feed. . .<br><br><u>Structure</u>: "a variety of software applications and/or hardware that can monitor and process communications between the communication devices," as described at Ex[1001], 3:46–49 and FIGs. 2–4, 89, 11 and associated text. |

Pet. 14–15.

In its Response, Patent Owner argues that "[t]he E.D. Tex. rejected this construction, undermining Petitioner's challenge to claim 15." PO Resp. 11.

According to Patent Owner, the parties agreed on the following constructions in the Related Litigation:

| Term | Agreed Construction |
|---|---|
| Order of Steps (Claim 1) | The "monitoring a selection of a communication channel" step must be performed before the "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds" step. |
| "Push-to-Talk (PTT) channel in a PTT communication network" (Claim 5) | "A channel for transmitting half-duplex communications in a Push-to-Talk communication network" |

PO Resp. 9–10 (citing Ex. 2001, 7, 9–10).

Patent Owner states that "[t]he Eastern District of Texas further construed certain claims as follows:

12

IPR2023-01295
Patent 8,994,830 B2

| Term | E.D. Tex. Construction |
|---|---|
| "wherein the at least one video feed is associated with the selected communication channel . . . the one or more video feeds being independent of the selected communication channel" (Claim 1) | "the one or more video feeds being capable of being associated with more than the selected communication channel" |
| "video stream association module" (Claim 15) | Plain and ordinary meaning; not subject to 35 U.S.C. § 112 ¶ 6 |

PO Resp. 10–11 (citing Ex. 2005, 17–31).

In its Reply, Petitioner argues that "[t]he obviousness grounds in the Petition apply under the district court's constructions," and that Patent Owner's "assertion that the court's plain and ordinary meaning construction of video stream association module' 'undermin[es]' Petitioner's challenge to claim 15 has no support or explanation." Pet. Reply 1 (quoting PO Resp. 11) (alteration in original). Petitioner argues that "Shaffer-Saylor and Gogic teach these limitations under that court's construction." Pet. Reply 2.

For purposes of this Decision, we adopt the claim construction agreed to by the parties as well as the claim construction provided by the district court. We otherwise use the ordinary and customary meaning of the claim terms as they would be understood by a person of ordinary skill in the art at the time of the claimed invention.

### D. Relevant Prior Art

#### 1. Shaffer (Ex. 1004)

Shaffer is a U.S. Patent Application Publication published on December 14, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1004, code (43).

13

IPR2023-01295
Patent 8,994,830 B2

Shaffer relates to "a method and system for communicating using position information." Ex. 1004 ¶ 1.  According to Shaffer, a method for communicating using position information includes:

> communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location.

> adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.

*Id*. ¶ 5; *see also id*. at Fig. 5, ¶¶ 49–50.  "The first and second communication parameters may comprise a frequency, a modulation method and/or an encryption key."  *Id*. ¶ 6.  According to Shaffer, "[t]echnical advantages of particular embodiments include providing a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys."  *Id*. ¶ 8.

Shaffer's Figure 3 is shown below:

14

IPR2023-01295
Patent 8,994,830 B2



FIG. 3

Shaffer's Figure 3 illustrates "[c]ommunication system 100, [that] includes communication networks 110–114, interoperability system (IS) 120 and endpoints 122." Ex. 1004 ¶ 37. "[C]ommunication network 110 comprises a radio or wireless network, communication network 111 comprises a LAN, communication network 112 comprises a [Public Switched Telephone Network] (PSTN), communication network 113 comprises a radio network and communication network 114 comprises an [Internet Protocol] (IP) network." *Id.* According to Shaffer, "communication system 100 may comprise any number of IP or non-IP communication networks of any wireless or wireline form capable of communicating audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages." *Id.*

15

IPR2023-01295
Patent 8,994,830 B2

Shaffer explains that "[c]ommunication networks 110–113 may comprise networks of particular groups or agencies (e.g., a municipality's police department network), whether operational with respect to a particular area or otherwise." *Id.* For example, "endpoints 122 comprise a PC (endpoint 122a), a [personal digital assistant] (PDA endpoint 122b) and an IP phone 122c)." *Id.* Interoperability system "120 may be configured to communicate with any type of communication endpoint." *Id.*

Shaffer's Figure 2 is shown below:



*FIG. 2*

Shaffer's Figure 2 depicts "communication system 50 for communicating using position information," which "includes a plurality of geographic regions 52–55, communication networks 60–64, endpoints 70 and 74 and CCP [communication control post] 80." *Id.* ¶ 26. "Communication networks 60–64 each may communicate information (e.g., signals, data or messages) over assigned radio frequencies, modulation methods and/or various encryption keys to support communication among

16

IPR2023-01295
Patent 8,994,830 B2

network communication devices." *Id.* ¶ 27. According to Shaffer, "frequencies, modulation methods and/or encryption keys utilized by the various communication networks 60–64 may be embedded in memory of mobile endpoints" such that "as mobile endpoint 70 (e.g., a LMR in a safety vehicle) moves between geographic areas, the endpoint may use GPS information to pin-point its location and automatically adjust its current communication radio frequency, modulation method and/or encryption key settings to allow the user of the endpoint to communicate with local safety and security forces in the area in which the endpoint is currently located." *Id.* ¶ 31.

Shaffer's Figure 4 is shown below:



| LOCATION | NETWORK | FREQUENCY (Hz) | ENCRYPTION KEY |
|----------|---------|----------------|----------------|
| CITY A | POLICE | X | J |
| CITY A | FIRE | Y | K |
| CITY B | POLICE | Z | L |
| STATE C | POLICE | P | M |
| COUNTRY D | POLICE | Q | N |

*FIG. 4*

17

IPR2023-01295
Patent 8,994,830 B2

Shaffer's Figure 4 illustrates mobile endpoint 200 including "a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.* ¶¶ 43, 44.  According to Shaffer, "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200 and receives and transmits voice and other data between endpoint 200 and other network devices and components." *Id.* ¶ 44.  Shaffer discloses that "[u]ser interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices," and "may comprise a keypad, display, touch screen, audio input or any other suitable interface." *Id.*  "For example, through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (e.g., radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*

### 2. *Saylor (Ex. 1011)*

Saylor is a U.S. Patent that issued on September 26, 2006, more than one year before the earliest priority date of the '830 patent.  Ex. 1001, code (22); Ex. 1011, code (45).

Saylor describes "a security network where a user may set up personalized alarms and alert services; identify various methods of contact; order at which to be contacted; individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information." Ex. 1011, Abstr.  Saylor's "security system [may be] connected to a wireless communication system which enables communication with a subscribed user when an alarm (or other defined) situation occurs." *Id.* at 2:10–13.  Saylor describes "a personal security network where one or more security devices related to a subscriber may be

18

IPR2023-01295
Patent 8,994,830 B2

connected to a central security network over wireless communication,"
where the central security network "may monitor those security devices and
alert a user when an alert situation occurs." *Id.* at 2:20–26.

Figure 1 of Saylor is shown below.



FIG. 1

Saylor's Figure 1 depicts "a graphical representation of a central
security network system 100." *Id.* at 5:63–64. According to Saylor,
"[a]larm situations may be detected by a control panel 120, 122, 124
associated with and preferably local to each security device and/or system
(e.g., property, personal property, individual, or combination)," wherein
"[c]ontrol panels 120, 122, 124 may transmit alarm information to central
security network 130." *Id.* at 6:1–6; *see also id.* at 7:29–40. "Central
security server 130 may then alert users and other identified entities via
wireless and/or other devices, such as mobile device 240, via a voice alarm,
text message and other notifications." *Id.* at 7:40–43; *see also id.* at 6:19–
25. According to Saylor, "[c]ontact individuals and/or entities $161_1$–$162_N$

19

IPR2023-01295
Patent 8,994,830 B2

identified by the user may also receive alert notification in an order determined by the user," and "the user may select contact order and/or other actions through menu options at the time of alarm situation notification." *Id.* at 6:25–30. Saylor also discloses that "[d]atabases 140, 142, 144 and 146 may store relevant information for personalized alarm services." *Id.* at 6:9–10.

> Saylor explains that

> [c]entral security network 130 may process the alarm situation. User profile information may be retrieved from user database 140. User database 140 may contain user information, such as profile information, user preferences, contact information, special instructions and/or other information. User profile information may include one or more of name, identification information, address information, and other profile information. User preferences may include mode of communication, order of communication, contact information and other preferences. User preference information may be associated with each security device, group of devices, systems or other combinations. For example, different alarm situations that may be detected in various locations or systems may warrant different levels of response. In addition, a user may maintain a personal address book where contact information (e.g., phone, pager, mobile device, etc.) associated with various individuals may be stored and accessed based on various identified alarm situations and/or potential alarm situations. Special instructions may include information to be conveyed to entities reacting to the alarm for a particular location or object. For example, when a fire detector is activated, the user may want to inform the fire department that the user has two pets living at the user's primary residence. Other instructions for different registered locations, objects and/or individuals may be stored and conveyed to entities reacting to the alarm situation per the user's instructions or preferences.

*Id.* at 8:34–60.

20

IPR2023-01295
Patent 8,994,830 B2

Saylor also explains that "[b]ased on user information retrieved from one or more databases 140, 142, 144 and 146, central security network 130 may contact one or more users 160 or other identified contacts $162_1$–$162_N$ as specified by the user. Other identified contacts may include neighbors, family members, personal doctors, emergency entities 164, such as the police, fire department, hospital and others." *Id.* at 9:22–28.

For example, Saylor explains that

> when a smoke alarm goes off, a user may instruct a central security network to first contact the user's home to verify the alarm. If no one is home or the emergency situation was confirmed by someone at home, the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency.

*Id.* at 12:15–21.

Saylor further describes "a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected by comparing images" such that "[w]hen a change in images (indicating motion) is detected, an alarm may be signaled." *Id*. at 2:45–50.

Figure 10 of Saylor is set out below.

21

IPR2023-01295
Patent 8,994,830 B2



Figure 10 is a flowchart illustrating a process for accessing video images provided by a central system network. According to Saylor, "[u]sers may monitor an identified location by using video or other similar recording device. The video feature of the central security network . . . may compare images. For example, if a change between images is detected, a recording may be triggered. The video clips of movement may be stored or sent to a server of a central security network. The user may then be notified according to predefined notification methods." *Id.* at 16:41–51.

22

IPR2023-01295
Patent 8,994,830 B2

E.    *Obviousness Over Shaffer and Saylor (Ground 1)*

Petitioner contends that claims 1–5, 7–19, and 21–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor.  Pet. 23–54. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 82–152.  Patent Owner disputes aspects of Petitioner's evidence and arguments.  PO Resp. 14–38.  Patent Owner submits the testimony of Dr. Akl in support of its contentions.  Ex. 2006 ¶¶ 46–103.  We first consider whether Petitioner establishes a rationale to combine the asserted prior art.

1.  *Rationale to Combine Shaffer and Saylor*

Petitioner contends that a person of ordinary skill in the art "would have been motivated to combine Shaffer and Saylor . . . to connect Saylor's central security network as an input to Shaffer's IS [Interoperability System]."  Pet. 25–26.  Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the proposed combination.



23

IPR2023-01295
Patent 8,994,830 B2

Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27. According to Petitioner, "[i]n the combined system ('Shaffer-Saylor'), the IS in Shaffer ([120 boxed in] red) facilitates communications from Saylor's central security network to the relevant personnel and authorities in a different network (*e.g.*, a building's security personnel or local police)." *Id.* at 26 (citing Ex. 1002 ¶ 84).

"For example," Petitioner explains,

the IS assigns a multicast IP address (communication channel) to a particular endpoint or a group of endpoints in advance (*e.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses)) and provides that multicast IP address to store in Saylor's databases. Ex[1002], ¶85. When Saylor's central security network detects an alarm situation, it queries its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor ([shown in] blue) to the relevant recipients ([shown in] purple). Ex[1011], 9:22–28, 11:67–12:6, 13:51–54; Ex[1002], ¶85.

*Id.*

Petitioner contends that the motivation for a person of ordinary skill in the art to make this combination

is found in both references. For example, as Shaffer describes, IS 120 is designed to connect various types of networks, including a PTT radio network (typically used by security or emergency personnel) and a local area network (LAN) or public switched telephone network (PSTN) (typically used by sensors in homes and businesses). Ex[1004], ¶0037; Ex[1002], ¶86. In addition, Shaffer describes that the networks can be associated with locations such as business and campuses. Ex[1004], ¶0027. In view of these disclosures, a POSITA would have recognized that Shaffer's IS is well-suited to connect a network,

24

IPR2023-01295
Patent 8,994,830 B2

> such as a video security system designed to monitor particular buildings, with a different network that responds to incidents in those buildings, such as a security or emergency network. Ex[1002], ¶86.

*Id.* at 27.

> Petitioner goes on to explain that

> Saylor discloses the type of network well-suited to work with Shaffer's IS. Ex[1002], ¶87. For example, Saylor describes a packet-based central security network (using "TCP/IP") that receives alarms from sensors in buildings and other facilities. Ex[1011], 17:10–21, FIG. 11, 6:33–43. That central security network processes the alarms and, according to rules and preferences, transmits notifications and information to relevant recipients in *other* networks, including security or emergency personnel in other types of networks with other communication protocols. *Id.*, 6:33–43, 8:18–33, 9:25–28; Ex[1002], ¶87. The notifications and information can include audio, video, or other data. Ex[1011], 16:41–51, 8:52–60. To implement these communications, Saylor describes that the central security network can identify relevant recipients in an "address book," (*id.*, 7:48–52), but does not explain *how* to convey notifications to recipients in different networks. Ex[1002], ¶88. Shaffer's IS system provides the needed mechanism for interoperable communications to achieve Saylor's goals; using Shaffer's IS, security personnel or other responders could directly and seamlessly receive communications and information from surveillance cameras in an alarming building. *Id.*

Pet. 28. Petitioner's arguments are supported by Dr. Polish's testimony. *See* Ex. 1002 ¶¶ 82–88.

Petitioner also argues that a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the references in the manner described." Pet. 28 (citing Ex. 1002 ¶ 89). Petitioner asserts that, "[i]n the combination, Saylor's central security network sends communications to another network via Shaffer's IS in the manner already envisioned by both references—namely, by a first network sending a packet-

25

IPR2023-01295
Patent 8,994,830 B2

based communication through an intermediary network to a second network also connected to the same intermediary network." Pet. 28–29 (citing Ex. 1011, 6:22–25, Fig. 1; Ex. 1004 ¶ 20; Ex. 1002 ¶ 89). According to Petitioner, a person of ordinary skill in the art "would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor." Pet. 29 (citing Ex. 1002 ¶ 90; Ex. 1004 ¶¶ 39–40).

Patent Owner contests Petitioner's evidence and arguments directed to a rationale to combine the teachings of Shaffer and Saylor. *See* PO Resp. 16–29. Patent Owner argues that "Shaffer and Saylor are directed to vastly distinct systems that a POSITA would not have considered combining." PO Resp. 16 (citing Ex. 2006 ¶ 46). Patent Owner claims that "[t]he structural differences between the references, the existing disclosure of each reference, and the lack of any detail regarding the combination evidences the lack of a motivation to combine Shaffer with Saylor." PO Resp. 16.

Patent Owner first argues that "Shaffer and Saylor are structurally distinct," and that they "present two ways of structuring networks that are incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references." *Id.* at 17 (citing Ex. 2006 ¶ 47). Patent Owner argues that Shaffer, "where endpoints move between locations and adjust communication parameters as they enter different locations, is markedly distinct from the teachings of Saylor." *Id.* at 18. "In contrast," Patent Owner argues, "Saylor handles all communications for a variety of systems of security devices at a specific premises regardless of a

26

IPR2023-01295
Patent 8,994,830 B2

location of a user relative to the premises." *Id.* (citing Ex. 2006 ¶ 49). Patent Owner argues that "[b]ecause Saylor's system establishes communication with owners/users and authorized entities in a location agnostic manner, and provides the mechanisms to establish those communications, there would be no need to combine Saylor with Shaffer's transient endpoints." PO Resp. 19 (citing Ex. 2006 ¶¶ 50, 82–89; Ex. 2008, 60:19–61:1, 71:20–72:3). According to Patent Owner, "Saylor's location-agnostic security system would not be a relevant input to Shaffer's location-specific endpoint communication network," and "[t]he structural differences between Shaffer and Saylor discourage the combination." PO Resp. 20–21 (citing Ex. 2006 ¶¶ 51, 54).

Petitioner counters that Patent Owner's position "is contradicted by Saylor's actual disclosure that '[n]etwork alerts may be based on alert notifications associated with property, personal property and/or individuals within a ***defined area or locality***.'" Pet. Reply 6 (quoting Ex. 1011, 10:62–11:3) (emphasis by Petitioner). "Indeed," Petitioner argues, "on cross-examination Dr. Akl admitted that this example in Saylor is not agnostic to location." Pet. Reply 6 (citing Ex. 1036, 68:3–69:8) (emphasis omitted). Petitioner points out that "Shaffer's endpoints are also not all 'transient' as [Patent Owner] suggests. Shaffer's endpoints include a 'personal [desktop] computer' and 'command center' that are not mobile." Pet. Reply 6 (citing Ex. 1004 ¶ 25; Ex. 1002 ¶ 71; Ex. 1036, 65:3–66:10). Petitioner notes that "Shaffer discloses other stationary, non-transient, endpoints such as those in 'buildings, campuses, municipalities, counties, states, countries or any other particular geographical area.'" Pet. Reply 6 (citing Ex. 1004 ¶¶ 25–27). Petitioner also points out that "Saylor expressly describes providing alarms to transient 'emergency entities' such as 'the police, fire department . . . and

27

IPR2023-01295
Patent 8,994,830 B2

others.'"  Pet. Reply 7 (citing Ex. 1011, 1:17–22, 9:22–28) (alteration in original).

In its Sur-reply, Patent Owner argues that the "two communication regimes" of Saylor and Shaffer, "alerts sent to a predetermined list of recipients (*i.e.*, a closed group of recipients) versus creating communication groups based on endpoint position information (*i.e.*, an open group of participants)—are fundamentally at odds with one another such that a POSITA would not have been motivated to combine these references."  PO Sur-reply 10 (citing Ex. 2006 ¶¶ 47–54).

We agree with Petitioner and disagree with Patent Owner.  Despite differences between Saylor and Shaffer, it does not follow necessarily that they are "fundamentally at odds with one another" such that a person of ordinary skill in the art would consider them "incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references" as Patent Owner argues.  PO Resp. 17; PO Sur-reply 10.  Indeed, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *KSR*, 550 U.S. at 420.

Here, Dr. Polish testifies, and we agree, that a person of ordinary skill in the art would "have recognized that Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network."  Ex. 1002 ¶ 86.  We credit Dr. Polish's testimony that a person of ordinary skill in the art "would have understood that Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and

28

IPR2023-01295
Patent 8,994,830 B2

information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Indeed, the Federal Circuit has "repeatedly held that an implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, *or more efficient*." *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (emphasis added). Dr. Polish's testimony that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network," specifically describes the desirable benefit of efficiency a person of ordinary skill in the art would have reasonably expected to obtain from Petitioner's proposed combination. Ex. 1002 ¶ 88.

Patent Owner next argues that Shaffer and Saylor provide "redundant disclosures," i.e., "redundant mechanisms for sending communications between networks." *See* PO Resp. 23–26. Patent Owner argues that "there would be no need to combine the teachings of Shaffer with Saylor because Saylor already includes everything it needs to send notifications to recipients in different networks." PO Resp. 25. Patent Owner argues that "[b]ecause Saylor is replete with instructions regarding how to convey notifications to recipients across a wide range of communication mediums, there would be no need to incorporate this with Shaffer's IS, and therefore no need to combine these references." *Id.* at 26 (citing Ex. 2006 ¶ 64).

29

IPR2023-01295
Patent 8,994,830 B2

In its Reply, Petitioner argues that Patent Owner "conflates whether the combined references are redundant with the question of whether they are analogous." Pet. Reply 8. According to Petitioner, Saylor's disclosure of "different possible '[m]ethods of notification' is not redundant of using Shaffer's IS approach to implement communications among devices on different networks." *Id.* at 8–9 (citing Ex. 1002 ¶¶ 87–88). Petitioner explains that "Shaffer's IS specifically provides the mechanism by which the different '[m]ethods of notification' in Saylor can be used to communicate alarms from sensors in buildings/facilities to emergency services across different networks in different regions, including different buildings." Pet. Reply 9 (citing Ex. 1004 ¶¶ 39–40, 46; Ex. 1002 ¶¶ 84–85; Pet. 25–26, 28).

We agree with Petitioner. Dr. Polish specifically testifies that "the IS [Interoperability System] in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. Dr. Polish explains that in the combined system,

> the IS of Shaffer would assign a multicast IP address (communication channel) to a particular endpoint or a group of endpoints requiring notification of a particular type of event. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses). That IP address would have then been stored in Saylor's databases for retrieval and use to contact entities outside of the security system upon occurrence of an event. For example, in the combined system, when an alarm is triggered in Saylor's central security network, the security network could query its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor (blue) to the relevant recipients (purple).

IPR2023-01295
Patent 8,994,830 B2

Ex. 1002 ¶ 85 (citing Ex. 1011, 9:22–28, 11:67–12:6, 13:51–54).

Petitioner's combined Shaffer-Saylor system is shown below.

Petitioner's annotated Shaffer-Saylor system depicts Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. The clear complementation, interoperability, and benefits of Petitioner's combined Shaffer-Saylor system directly contradicts Patent Owner's argument that Shaffer and Saylor provide "redundant disclosures," and that "there would be no need to combine the teachings of Shaffer with Saylor." PO Resp. 25.

Finally, Patent Owner argues that "the Petition presents hindsight-ridden 'motivations' that fail to consider the context of the art." PO Resp. 26. In particular, Patent Owner argues that "[t]he Petition fails to provide any reason to deviate from Shaffer's disclosure regarding storing IP addresses in the endpoints to enable them to communicate locally while travelling between geographic areas," and "[t]here would be no reason to

31

IPR2023-01295
Patent 8,994,830 B2

store these addresses in Saylor's stationary network." PO Resp. 28 (citing Ex. 1004 ¶¶ 40, 8; Ex. 2006 ¶ 68).

We disagree with Patent Owner. As noted above, Dr. Polish testifies that "the IS in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. According to Dr. Polish, "Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network." *Id.* ¶ 86. Dr. Polish further testifies, and we agree, that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art at the time of the claimed invention would have had a reasoned basis to combine the teachings of Shaffer and Saylor in the manner described in the Petition and would have had a reasonable expectation of success in that endeavor.

### 2. *Independent Claim 1*

Petitioner contends that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor. Pet. 29–42. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 91–110. Patent Owner disputes certain aspects of Petitioner's evidence and arguments with respect to claim 1, in particular limitations 1[b], 1[d],

IPR2023-01295
Patent 8,994,830 B2

and 1[e].  *See* PO Resp. 14–16, 29–35.  Patent Owner does not contest Petitioner's evidence and arguments with respect to claim 1's preamble and limitations [1a], [1c], [1f], and [1g].  *See id.*  We consider all of Petitioner's evidence and arguments directed to claim 1, and we address in detail Patent Owner's arguments directed to the contested limitations.

### a.  *Preamble: A method comprising:*

Petitioner asserts that "Shaffer-Saylor discloses "*[a] method, comprising.*"  Pet. 29 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 91).  Indeed, the abstract of Shaffer describes "[a] method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network."  Ex. 1004, Abstr.  Patent Owner does not contest this evidence.  *See* PO Resp. 14–35.  Based on the complete record, we determine that Shaffer's disclosure meets the preamble of independent claim 1.

### b.  *Limitation 1[a]*

Limitation 1[a] recites: "*monitoring a selection of a communication channel by a user of a mobile communication device.*"  Ex. 1001, 12:19–20.  Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[a].  Pet. 29–31.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation.  *See* PO Resp. 14–35.

Petitioner asserts that, "in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located."  Pet. 29.  Petitioner asserts that "Shaffer discloses a communication channel as described in the '830 patent—namely, a 'particular IP address' for hosting a 'virtual talk

33

IPR2023-01295
Patent 8,994,830 B2

group.'" *Id.* at 28–29 (citing Ex. 1001, 2:59–62, 4:22–28; Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

To illustrate this, Petitioner refers to Figure 3 of Shaffer, shown below. Pet. 30.



*FIG. 3*

With respect to Shaffer's Figure 3, Petitioner explains that it "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." *Id.* (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). "In particular," Petitioner explains that "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38– 39). "For example," Petitioner explains, "communication channels

IPR2023-01295
Patent 8,994,830 B2

(multicast IP addresses) may exist for 'local safety and security agencies.'" Pet. 30 (citing Ex. 1004 ¶ 40).

"Second," Petitioner asserts, "Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel." Pet. 31 (citing Ex. 1002 ¶ 94). "For example," Petitioner explains, "Shaffer discloses that a police officer 'such as a state highway patrol officer, may be provided with a PC with a touch screen' where the 'PC comprises a mobile endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 40). According to Petitioner, "[t]he officer can use the touchscreen to select 'local safety and security forces' by selecting '[i]cons on the touch screen' to 'join communication sessions.'" Pet. 31 (citing Ex. 1004 ¶ 34). Petitioner explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" *Id.*; *see also id.* ¶ 41 (describing that IS stores multicast addresses "utilized by various agencies"). Petitioner asserts that "[t]he communication parameters identified by IS 120 include a 'multicast address' identifying the communication channel for the VTG for 'local safety and security forces.'" Pet. 31 (citing Ex. 1004 ¶¶ 40–41). According to Petitioner, "[t]his allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke." Pet. 31 (citing Ex. 1004 ¶ 40).

"Finally," Petitioner asserts, "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

35

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on Shaffer's teaching of a communication channel similar to one described in the '830 patent—namely, a particular IP address for hosting a virtual talk group. *See* Pet. 29–30 (citing Ex. 1001, 2:59–62 ("The gateway 116 may provide voice interoperability between computer and non-computer networks, such as the PSTN 102, by bridging telephone transmissions to Internet Protocol (IP) multicast streams."), 4:22–28 ("The radio network 152 may communicate with the computer network 114 by way of a gateway 160, which provides voice and control interoperability between the radio network 152 and the computer network 114 by bridging media and control transmissions to Internet Protocol (IP) multicast and/or Unicast (e.g., Session Initiation Protocol (SIP)) streams."); Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

Petitioner refers to Shaffer's Figure 3 and explains that Shaffer "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." Pet. 28 (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). In particular, Petitioner points out that Shaffer's "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38–39).

Petitioner also explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 41. In addition, Petitioner explains that "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other

36

IPR2023-01295
Patent 8,994,830 B2

data' with other devices."  Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a communication channel by a user of a mobile communication device*"  as recited in limitation 1[a].

### c.  Limitation 1[b]

Limitation 1[b] recites: "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone.*"  Ex. 1001, 12:21–23.

Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[b].  Pet. 32–35.  Patent Owner disagrees.  PO Resp. 29–31.

Petitioner asserts that "in Shaffer, mobile security personnel can select a frequency associated with a nearby building" and "Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones."  Pet. 32 (citing Ex. 1004, Fig. 4).  To illustrate this capability, Petitioner provides an annotated version of Shaffer's Figure 4, shown below.

37

IPR2023-01295
Patent 8,994,830 B2



FIG. 4

Petitioner's annotated version of Shaffer's Figure 4 depicts an example of mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210, "which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location." Pet. 33; Ex. 1004 ¶¶ 44, 46.

Petitioner explains that Shaffer's Figure 4 "shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210." Pet. 32 (citing Ex. 1004 ¶¶ 43, 46–47). According to Petitioner, "these parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q)." Pet. 32 (citing Ex. 1004 ¶¶ 43–48, Fig. 4) (emphasis by Petitioner).

IPR2023-01295
Patent 8,994,830 B2

Petitioner asserts that, in Shaffer, "the mobile device stores 'radio frequencies' of 'communication networks by location.'" Pet. 33 (citing Ex. 1004 ¶ 46). Petitioner explains that in Figure 4, "each radio frequency is also specifically associated with a 'location' such as City A, City B, State C, or Country D." Pet. 33 (citing Ex. 1004, Fig. 4). Petitioner also points out that "Shaffer explains the locations can also be 'buildings' and 'campuses,' in addition to municipalities." Pet. 33 (citing Ex. 1004 ¶ 27). "For example," Petitioner explains, Figure 2 of Shaffer shows "different geographic regions (52, 53, 54, 55) 'may correspond to buildings, campuses, municipalities . . . or any other particular geographical area,'" and "[e]ach geographic region may also contain one or more communication networks (60–64), each of which may have a different 'assigned radio frequenc[ies].'" Pet. 33–34 (citing Ex. 1004 ¶ 27; *see also id.* ¶¶ 20–22, 26, 34–35; Ex. 1002 ¶¶ 97–98). Shaffer's Figure 2 is shown below.



*FIG. 2*

Shaffer's Figure 2 depicts system 50 for communicating using position information that includes a plurality of geographic regions 52–55,

IPR2023-01295
Patent 8,994,830 B2

communication networks 60–64, endpoints 70, 74, and communication control post (CCP) 80.  Ex. 1004 ¶ 26, Fig. 2.

Petitioner asserts that "Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device."  Pet. 34 (citing Ex. 1002 ¶ 99).  "For example," Petitioner explains, "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface."  Pet. 34 (citing Ex. 1004 ¶ 44 (emphasis by Petitioner).

According to Petitioner, "[t]he display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network."  Pet. 34–35 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶ 3, 8 (describing, as background, known functionality for using a handbook to look up local frequencies by location)).  "For example," Petitioner explains with reference to Shaffer's Figure 4, "if a user enters city A, there are two possible frequencies, X and Y.  Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the 'pressing' of a touch screen 'key stroke."  Pet. 35 (citing Ex. 1004 ¶¶ 35–36, 44).

Petitioner argues that a person of ordinary skill in the art "would at least have recognized that displaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' would have been obvious and one of a finite number of predictable options for selecting on the touch screen all available frequencies in an area."  Pet. 35 (citing Ex.

40

IPR2023-01295
Patent 8,994,830 B2

1002 ¶ 100).  "Such an implementation," Petitioner asserts, "uses a known technique (touchscreen display and selection) with known benefits (selection using a single 'stroke') according to its established function, and is therefore obvious."  *Id.*

Patent Owner argues that "Shaffer notably lacks disclosure of any radio frequency being presented on the user interface (or any display), much less a plurality of radio frequencies presented on a display of the mobile communication device as claimed."  PO Resp. 29.  Patent Owner also argues that "[t]here is nothing in Shaffer that suggests interface 204 provides, on a display, any of the "several different communication parameter listings 210" that are stored in memory module 208, much less a plurality of these listings."  *Id.* at 30 (citing Pet. 32; Ex. 1004 ¶ 46).  According to Patent Owner, "[t]he assumption that Shaffer discloses providing a plurality of the stored communication parameter listings on a display highlights that the Petition uses hindsight biased reasoning to arrive at the claimed invention."  PO Resp. 30.  Patent Owner also asserts that "it is unclear why Shaffer's 'instructions regarding adjustment of the end point's communication settings' would provide a plurality of radio frequencies on a display."  PO Resp. 30 (citing Ex. 1004 ¶ 44).

We agree with Petitioner and disagree with Patent Owner.  Shaffer explains that

> [i]n some cases the endpoint may be set to automatically switch communication settings upon such a move once the endpoint enters an area of a different or particular communication network.  *In some cases such a switch may occur through a user interface, such as a user pressing a button to enable the switch.  For example, specific buttons may be used to switch communication settings.*

41

IPR2023-01295
Patent 8,994,830 B2

Ex. 1004 ¶ 32 (emphasis added).  Shaffer explains that these "communication settings" include "radio frequency and encryption key."  *Id.* ¶ 31.

Shaffer's Figure 4 illustrates mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210.  Ex. 1004 ¶ 44, Fig. 4.  Parameter listing 200 provides a call-out table populated with a list of geographic locations of different networks along with their related frequencies (in Hz) and encryption keys.  Parameter listing 200 shows different geographic zones (City A, City B, State C, Country D) and associated radio frequencies (frequencies X, Y, Z, P, Q).  Shaffer explains that user interface 204 "may comprise a keypad, *display, touch screen*, audio input *or any other suitable interface*."  *Id.* ¶ 44 (emphasis added).

Although Figure 4 represents the frequencies of the different geographic zones by letters (X, Y, Z, P, Q), the column heading of the display clearly indicates that they represent a "FREQUENCY" in Hertz (HZ).  We credit Dr. Polish's testimony on this point.  *See* Ex. 1002 ¶ 97 ("These parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q") (citing Ex. 1004 ¶¶ 43–48, Fig. 4)).

We also credit Dr. Polish's testimony with respect to Figure 2 that Shaffer's geographic regions "may correspond to buildings, campuses, municipalities . . . or any other particular geographical area."  Ex. 1002 ¶ 98 (citing Ex. 1004 ¶ 27).  Dr. Polish testifies, and we agree, that each "geographic region may also contain one or more communication networks (60–64), each of which may have different "assigned radio frequenc[ies]."  *Id.*; *see also id.* ¶¶ 20–22, 26, 34–35.

42

IPR2023-01295
Patent 8,994,830 B2

We credit Dr. Polish's testimony that "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface," such that the "display presents multiple frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network.'" Ex. 1002 ¶ 99 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).

We further credit Dr. Polish's testimony that

> [d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA. When there are multiple frequencies available for communication in a particular area, as in Shaffer, and when a user's device can include a touch screen, as in Shaffer, presenting for selection on the touch screen all available frequencies in an area a user enters would have been one of a finite number of predictable options for selecting a frequency.

Ex. 1002 ¶ 100.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone*," as recited in limitation 1[b].

### d. Limitation 1[c]

Limitation 1[c] recites: "*from which a plurality of video feeds associated with the geographic zone are sourced*." Ex. 1001,12:23–25. Petitioner contends that the combination of Shaffer and Saylor teaches the

43

IPR2023-01295
Patent 8,994,830 B2

subject matter recited in limitation 1[c].  Pet. 35–36.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "Shaffer-Saylor discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds."  Pet. 35 (citing Ex. 1002 ¶ 101). "For example," Petitioner explains, "Saylor discloses 'video cameras' located in a geographic zone (*e.g.*, a building of a 'business')."  Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10).  "In particular," Petitioner points out, "'an identified location may be monitored by a video or other recording device,' and, if motion is detected, 'video clips' maybe sent to a 'central security network.'"  Pet. 35–36 (citing Ex. 1011, 16:52–17:9; *see also id.* at 11:64–12:6).

With respect to video feeds associated with geographic zones, the '830 patent explains that "[i]n an example embodiment, one or more of the cameras . . . are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations)."  Ex. 1001, 3:17–21.  The '830 patent also explains that

> [a]s one or more users . . . approach a location from which specific video feed is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading, the policy module 312 may automatically associate the video feed from the relevant camera 122 with the communication channels of the fire truck and render access to this video feed to all other members of a fire-truck VTG [virtual talk group].

*Id.* at 6:4–11.

44

IPR2023-01295
Patent 8,994,830 B2

Dr. Polish testifies that by 2008 "video surveillance systems were ubiquitous. They addressed the well-known need to monitor areas of interest, providing eyes on scene, without the need for the physical presence of personnel." Ex. 1002 ¶ 66 (citing Ex. 1029 ¶ 17) ("The subject invention is directed to an IP-network-based surveillance and monitoring system wherein video captured from a number of remotely located security cameras may be digitized, compressed, and networked for access, review and control at a remote monitoring station.").

Saylor also teaches that "[t]he security system may be applied to a user's home, office, vacation house or other location." Ex. 1011 2:13–15. Saylor explains that such a system may "provide a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected," and that "[t]he user may also view the images (e.g., video clips) remotely via the web or other remote access methods." *Id.* at 2:53–55.

The term "geographic zone" is not defined in the '830 patent and neither party has proffered any special meaning for it. *See* Pet. 14–15; PO Resp. 9–12. These examples from the '830 patent and the prior art indicate that a person of ordinary skill in the art would understand that a "geographic zone" may be a particular location or area where a camera producing a video feed is located, such as a traffic intersection, along a freeway, or at some other public or non-public location, such as a building, business location, or home.

Thus, Petitioner's assertion that "a building or a campus" may be considered a "geographic zone," is consistent with the examples provided in '830 patent and the prior art. Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10; *see*

45

IPR2023-01295
Patent 8,994,830 B2

*also* Ex. 1002 ¶ 101).  Patent Owner does not challenge Petitioner's understanding of this term.  *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*from which a plurality of video feeds associated with the geographic zone are sourced*" as recited in limitation 1[c].

### e.  Limitation 1[d]

Limitation 1[d] recites: "*monitoring a selection of a radio frequency of the plurality of radio frequencies by the user.*"  Ex. 1001, 12:26–27.

Petitioner contends that Shaffer teaches the subject matter recited in limitation 1[d].  Pet. 36 (citing Ex. 1002 ¶ 102).  Patent Owner disagrees.  PO Resp. 31–32.

Petitioner asserts that "[a]s discussed with respect to limitation 1[b], Shaffer discloses and renders obvious that the [radio] frequencies are provided on the display of a mobile communication device for *selection* by the user."  Pet. 36.  "For example," Petitioner points out, "Shaffer explains that the display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency. . .)."  *Id.* (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).  According to Petitioner, "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices."  Pet. 36 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47).  Petitioner argues that "[d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen

46

IPR2023-01295
Patent 8,994,830 B2

would at least have been obvious, as described for limitation 1[b]." Pet. 36 (citing Ex. 1002 ¶ 102).

Patent Owner argues that "[b]ecause Shaffer fails to provide a plurality of radio frequencies on a display, a user cannot select a radio frequency from a plurality of radio frequencies." PO Resp. 31 (citing Ex. 2006 ¶ 79). Patent Owner also argues that although "Shaffer teaches a user inputting 'instructions regarding adjustment of the endpoint's communication settings . . . *upon entering a new communication network*,'" when "[r]ead in context, Shaffer's 'instructions' do not monitor for the selection of a radio frequency from a plurality of radio frequencies provided to a user, but instead prescribe how to change networks as the endpoint moves between locations." PO Resp. 31–32 (citing Ex. 2006 ¶ 80).

We agree with Petitioner and disagree with Patent Owner. Patent Owner's argument is based on the false premise that "Shaffer fails to provide a plurality of radio frequencies on a display." This is demonstrably incorrect, as discussed above in connection with Shaffer's disclosure of parameter listings, include ***radio frequencies***, identified in Hertz (listed as X, Y, Z, P, Q) in Shaffer's Figure 4. *See supra,* Sec. IV.E.2.b.

Patent Owner's argument appears to be that because Shaffer's Figure 4 presents a list of frequencies as letters (X, Y, Z, P, Q) instead of numbers that a person of ordinary skill in the art would not understand that Shaffer's letters represent different radio frequencies. This argument is unpersuasive, especially given that the table heading in Shaffer's Figure 4 clearly reads "FREQUENCY (Hz)."

Moreover, the level of information provided in Shaffer's Figure 4 is similar to the level of information provided in Figure 9 of the '830 patent, shown below.

IPR2023-01295
Patent 8,994,830 B2



FIG. 9

Figure 9 of the '830 patent illustrates a graphic user interface (GUI) of a mobile communication device "to allow a user to select a communication frequency associated with a communication channel." Ex. 1001, 9:61–62. Notably, GUI 900 does not list any of its frequencies in Hertz, but merely labels them as Frequency 1 thru Frequency k, apparently assuming that a person of ordinary skill in the art would understand that these labels represent actual radio frequencies.

Equally unpersuasive is Patent Owner's other argument that Shaffer's instructions do not monitor for the selection of a radio frequency, but instead "prescribe how to change networks as the endpoint moves between locations." PO Resp. 31–32. We find more persuasive Dr. Polish's testimony that "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices," and "[d]isplaying the

48

IPR2023-01295
Patent 8,994,830 B2

multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen would at least have been obvious to a POSITA, for the reasons described for limitation 1[b]." Ex. 1002 ¶ 102 (citing Ex. 1004 ¶¶ 44–47).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a radio frequency of the plurality of radio frequencies by the user*," as recited in limitation 1[d].

### f.  Limitation 1[e]

Limitation 1[e] recites: "[1] *identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, [2] wherein the at least one video feed is associated with the selected communication channel [3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" Ex. 1001, 12:28–32.[5]

Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[e]. Pet. 36–41. According to Petitioner "the Shaffer-Saylor system identifies a video feed associated with the *geographic zone*, and that feed is also associated with a multicast IP address (*selected communication channel*) based on a user preferences database entry (*user policy*) that identifies video feeds relevant to security personnel (*users*) when they access the communication channel." Pet. 36–37 (citing Ex. 1002 ¶ 103). Patent Owner disagrees. PO Resp. 14–16, 32–35.

---

[5] Bracketed numbers suggested by Petitioner. *See* Pet. 36–37.

IPR2023-01295
Patent 8,994,830 B2

> i.    *[1]identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone*

Petitioner asserts that "Saylor's central security network [1] *identifies and selects a video feed associated with the geographic zone.*"  Pet. 37 (citing Ex. 1002 ¶ 104).

Petitioner relies on Saylor's Figure 10, which is shown below.



Saylor's Figure 10 is a flowchart illustrating a process for accessing video images provided by a security system.  Ex. 1011, 4:58–59.  According to Petitioner, "in step 1010, Saylor's central security network monitors a specific video feed in an 'identified location' of a building (*the geographic zone*) and, in steps 1012, 1014, 1016, and 1020, selects and identifies that

50

IPR2023-01295
Patent 8,994,830 B2

feed when a 'trigger[]' event occurs, such as 'motion.'" Pet. 37 (citing Ex. 1011, 16:52–60, 34:6–10). In steps 1022 and 1024, Petitioner asserts that "a 'video clip[]' from that feed is processed to determine whether certain 'conditions are met for alarm triggers' or '[n]otifications.'" Pet. 37 (citing Ex. 1011, 17:1–5). Petitioner points out that "in steps 1026 and 1028, an 'image may be automatically transmitted' to recipients." Pet. 37 (citing Ex. 1011, 17:8–9; *see also id.* at 34:1–9 (describing that a subscriber can be sent a "video clip" from a camera near the front door if the "front door opens" or "when an unrecognized person enters").

Patent Owner contends that "[t]he Petition fails to address the portion of limitation 1[e] in which the video feed is selected 'from the plurality of video feeds.'" PO Resp. 14. Patent Owner argues that "[t]he video monitored at the identified location that sends video clips to a central security network after motion is detected does not teach 'identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds' because the identified location is not reviewing a plurality of video feeds." *Id.* at 15 (citing Ex. 2006 ¶¶ 72–73). Patent Owner argues that "[w]ith each video device monitoring its own feed, Saylor fails to disclose any element that **selects** a video feed from the plurality of video feeds." PO Resp. 16 (citing Ex. 2006 ¶ 72).

In its Reply, Petitioner argues that "[t]he Petition describes the plurality of feeds in Shaffer-Saylor for limitation 1[c]—namely, a 'plurality of video feeds' from 'video cameras' (plural) located in 'each geographic region' (e.g., a 'building or campus') that the system monitors." Pet. Reply 2–3 (citing Pet. 35–37; Ex. 1011, 10:32–41, Fig. 10). Petitioner points out that Patent Owner "does not dispute that Shaffer-Saylor discloses the plurality of video feeds in limitation 1[c] . . . [n]or does PO explain why

51

IPR2023-01295
Patent 8,994,830 B2

those video feeds do not meet limitation 1[e]." Pet. Reply 3 (citing PO Resp. 14–20). Petitioner contends that Patent Owner's "argument depends on [Patent Owner's] narrow interpretation of 'selecting' as limited to a specific, unclaimed process in which video feeds are received at a central server that then selects one feed." Pet. Reply 3.

In its Sur-reply, Patent Owner argues that "all Shaffer-Saylor accomplishes is individual video monitoring devices that are capable of identifying and selecting its own, non-plural video feed." PO Sur-reply 4 (citing Ex. 2006 ¶¶ 70–71). According to Patent Owner, "Shaffer in combination with Saylor fails to teach identifying and selecting a video feed from a plurality of video feeds because each video monitoring device merely identifies and selects its single, *i.e.*, non-plural, video feed." PO Sur-reply 4 (citing Ex. 2006 ¶ 73; Ex. 1011, 16:52–60). According to Patent Owner, "Siloed cameras do not select a video feed from a plurality of video feeds, and thus cannot render obvious a claim that expressly requires the identification and selection of at least one video feed from a plurality of video feeds." PO Sur-reply 6.

We agree with Petitioner and disagree with Patent Owner. The limitation at issue recites "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone.*" The claim does not limit how the identifying and selecting takes place. Patent Owner concedes this point in its Sur-reply. *See* PO Sur-reply 6 ("the means of identification and selection are not limited by the claim").

According to the '830 patent, a "geographic zone" may, for example, be a section of freeway, a traffic intersection, or some other public or non-public location such as a building with surveillance cameras. *See, e.g.,* Ex.

52

IPR2023-01295
Patent 8,994,830 B2

1001, 3:17–21 ("In an example embodiment, one or more of the cameras

122 are independent video surveillance cameras (e.g., surveillance cameras

installed along freeways, at traffic intersections or and public and non-public

locations).").

The identifying and selecting of a video feed may also occur because

of some event, trigger, or condition being satisfied. The '830 patent

explains, for example, that

> the method 600 monitors an audio signal generated in proximity
> to a video camera providing a video feed. For example, the
> audio signal may be a gunshot requiring a response by an ERT.
> As shown at block 604, the method 600 may process the audio
> signal to identify an audio event (e.g., the gunshot). Once the
> audio event had been identified, the identified video feed from
> the surveillance camera may be associated with a
> communication channel associated with the ERT.

Ex. 1001, 8:39–47.

Similarly, Saylor explains how its security system "may be applied to

a user's home, office, vacation house or other location." Ex. 1011, 2:13–15.

Saylor explains that "within a house, a user may have window and door

contacts, smoke detectors and motion sensors, *video cameras*, key chain

control, temperature monitors, CO and other gas detectors, vibration sensors,

and other" sensors or detectors. *Id.* at 10:31–34 (emphasis added). Saylor

explains that its invention "provides a personal security network *where one*

*or more security devices* related to a subscriber *may be connected to a*

*central security network over wireless communication*. The central security

network . . . *may monitor those security devices* and alert a user when an

alert situation occurs." *Id.* at 2:20–26 (emphasis added). Saylor further

explains that its invention may provide "*a monitoring system for providing*

*images* (e.g., photos, pictures, *video*, diagrams, illustrations, etc.) where an

53

IPR2023-01295
Patent 8,994,830 B2

alarm situation may be detected by comparing images. When a change in images (indicating motion) is detected, an alarm may be signaled." *Id.* at 2:45–50 (emphasis added).

Thus, Saylor expressly teaches how multiple "video cameras" may be used at a particular location, such as "home, office, vacation house or other location" to provide a local security network that may be connected to a central network over wireless communication. *Id.* at 2:13–15, 10:31–34. In particular, Saylor explains how "an identified location may be monitored by a video or other recording device," and, if, for example, motion is detected, "video clips" maybe sent to a "central security network" for further processing and action. *Id.* at 11:64–12:6, 16:52–17:9. Saylor also explains how "the user may select the appropriate one or more actions. For example, the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action." *Id.* at 16:23–28.

As Petitioner points out, Saylor teaches "personalized alarm services" and stores user policies at a central server for determining which triggered video feeds received by the central server should be selected and conveyed to particular entities. *See, e.g.*, Pet. 38–39, 25 (describing Saylor's "user preferences" set to inform entities of certain alarms), 26 (describing Saylor's database to determine whether to notify users regarding an alarm), 28 (describing how Saylor's "central security network processes the alarms and, according to rules and preferences, transmits notifications and information"). Thus, the Petition adequately explains how Saylor's central server receives multiple video feeds (e.g., where motion is detected) and selects one or more of those feeds to send to a user/entity based on stored rules/preferences.

IPR2023-01295
Patent 8,994,830 B2

The Petition is supported by Dr. Polish's testimony. Dr. Polish testifies that

> Saylor discloses a security system including "monitoring system" that provide "photos, pictures, [and] video" to an end user. Ex[1011], 2:45–55. The security system notifies a recipient, including emergency personnel, when it detects an "alert situation." *Id.*, 5:37–42. For example, the notification can include "video clips" from video surveillance cameras. *Id.*, 2:49–55, 11:67–12:6, 13:51–54. A central security network (FIG. 1 below) may alert "identified entities via wireless and/or other devices, such as mobile devices." *Id.*, 7:40-–42. For example, when an alarm is detected, the central security network can send relevant information "via the Internet 150" or other methods to "[a]n emergency entity 164" or other entities 161–162. *Id.*, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.*, 11:24–28 (identifying mobile devices receiving notifications).

Ex. 1002 ¶ 74.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone*," as recited in limitation 1[e][1].

> ii.    [2] wherein the at least one video feed is associated with the selected communication channel

For this portion of the limitation, Petitioner asserts that "Shaffer-Saylor accesses a user preferences database that [2] *associates the video feed with the selected communication channel*." Pet. 38 (citing Ex. 1002 ¶ 105). Petitioner points out that "Saylor's databases already store 'relevant information for personalized alarm services.'" Pet. 38 (citing Ex. 1011, 6:9–10). "For example," Petitioner explains, "[u]ser database 140 may contain 'user preferences' that may indicate how 'different alarm situations that may

55

IPR2023-01295
Patent 8,994,830 B2

be detected in various locations or systems may warrant different levels of response' and '[s]pecial instructions' that may 'include information to be conveyed to entities reacting to the alarm for a particular location or object.'" Pet. 38–39 (citing Ex. 1011, 8:34–60).

Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the combination.



Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27.

Petitioner explains that "when an event occurs (such as motion), the central security network can send relevant information (such as video clips) 'via the Internet 150' to '[a]n emergency entity 164.'" Pet. 39 (citing Ex. 1011, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.* at 11:24–28 (identifying mobile devices receiving notifications), 12:34–35 ("the user

56

IPR2023-01295
Patent 8,994,830 B2

may specify when emergency dispatch is to occur."). "For example," Petitioner explains, "the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency." Pet. 39 (citing Ex. 1011, 12:17–21).

Petitioner also explains that "to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage." Pet. 39 (citing Ex. 1004 ¶¶ 39–40 (describing assigning and storing multicast IP addresses at an endpoint); Ex. 1002 ¶ 106). Petitioner further explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to this portion of the limitation. *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*wherein the at least one video feed is associated with the selected communication channel*," as recited in limitation 1[e][2].

> iii. *[3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*

For this portion of the limitation, Petitioner asserts that "the association between video feed and communication channel is [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" Pet. 40

57

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1002 ¶ 103).  According to Petitioner, "[t]he user policy is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them."  Pet. 40 (citing Ex. 1011, 8:34–60,  Abstr. (identifying "individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information"), 11:48–63 ("user-defined conditions" determine which entity to notify and how to send the notification), 12:26–29).  Petitioner asserts that "[t]he preferences identify which alarms are relevant to the users (and are designed, e.g., to filter out 'false alarms')."  Pet. 40–41 (citing Ex. 1011, 12:34–41).

> Petitioner explains that

> Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address.  Ex[1002], ¶107.  Accordingly, when the security personnel selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer.

Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

Patent Owner argues that Petitioner's combination "fails to teach identification of 'video feeds that are relevant to the user *when the user accesses* the selected communication channel.'"  PO Resp. 32 (emphasis by Patent Owner).  Patent Owner argues that "[i]dentifying when to notify users and what to send them does not disclose identifying video feeds that are relevant to a user when the user accesses a selected communication channel."  PO Resp. 32 (citing Ex. 2006 ¶¶ 90–91).  According to Patent Owner, Petitioner does not provide "identification of the one or more video feeds that are relevant to the user at all, much less relevant specifically *when the user accesses the communication channel* as claimed."  PO Resp. 33

58

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 2006 ¶ 92) (emphasis by Patent Owner).  Patent Owner contends that "[p]redetermined notifications based on alarm conditions differ substantially from the claimed 'user policy that identifies one or more video feeds that are relevant to the user *when the user accesses* the selected communication channel.'"  PO Resp. 34 (citing Ex. 2006 ¶ 94) (emphasis by Patent Owner).  Patent Owner contends that the claims "require user access to a communication channel before video feeds relevant to a user at the time of access are identified."  PO Resp. 34 (citing Ex. 2006 ¶¶ 93–94).

> In its Reply, Petitioner argues that

> the Shaffer-Saylor combination works in the same way as disclosed by the '830 Patent.  Saylor's databases implement a user policy that identifies relevant video feeds in Saylor's security system (*e.g.*, a video feed associated with a triggered alarm) for users associated with a specific communication channel (IP address) provided by Shaffer's IS.  Ex[1002], ¶¶84-85, 104–106.  The IS makes the video feeds accessible to a user when that user selects the relevant communication channel associated with the IP address.

Pet. Reply 15 (citing Ex. 1002 ¶¶ 86, 103 & n.3, 107).

> Petitioner also argues that

> dependent claim 6 of the '830 Patent confirms that identification of video feeds associated with a user in claim 1 can be accomplished via a database before the user selects the channel.  Ex[1001], cl. 6.  The embodiment in FIG. 3 also discloses a user policy that associates video feeds (308.1–308.m) with a communication channel (first channel 302.1) and makes those video feeds accessible "when any user 305.1–305.q" in a group associated with that channel sets his device "to the first channel."

IPR2023-01295
Patent 8,994,830 B2

Pet. Reply 15 (citing Ex. 1001, 5:23–53, Fig. 3).[6]

Patent Owner does not address Petitioner's arguments and evidence on this issue in its Sur-reply. *See* PO Sur-reply 3–14.

We agree with Petitioner and disagree with Patent Owner. In our view, Petitioner provides sufficient explanation as to how the proposed Shaffer-Saylor combination would operate. Petitioner explains that Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. Pet. 39 (citing Ex. 1004 ¶¶ 39–40; Ex. 1002 ¶ 106). Petitioner also explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Petitioner further explains that the association between a video feed and a communication channel is based on a "user policy," which "is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." *Id.* at 40 (citing Ex. 1002 ¶ 103; Ex. 1011, 8:34–60, Abstr., 11:48–63, 12:26–29). Petitioner points out that "Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address." Pet. 41 (citing Ex. 1002 ¶ 107). "Accordingly," Petitioner explains, "when the security personnel selects a communication channel associated with the

---

[6] Claim 6 recites: The method of claim 1, further comprising: accessing a database to identify a group of video feeds associated with the user; and when the user selects the communication channel, providing access to the group of video feeds associated with the user to one or more other users of the communication channel. Ex. 1001, 12:61–67.

IPR2023-01295
Patent 8,994,830 B2

multicast IP address . . . the officer can access the transmitted communications, as described in Shaffer." Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

The Petition is supported by Dr. Polish's testimony. For example, Dr. Polish testifies that

> Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses at an endpoint). Accordingly, when an event occurs that requires sending a video clip to security forces, Saylor's central security network can look up the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel.

Ex. 1002 ¶ 106.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,*" as recited in limitation 1[e][3].

### g. Limitation 1[f]

Limitation 1[f] recites: "*the one or more video feeds being independent of the selected communication channel.*" Ex. 1001, 12:34–36. Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[f]. Pet. 41–42. Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "the '830 patent specification describes 'independent video surveillance cameras' as those installed at 'public and

61

IPR2023-01295
Patent 8,994,830 B2

non-public locations,' and that Shaffer-Saylor describes the same type of video feeds." Pet. 41 (citing Ex. 1001, 3:17–21; Ex. 1002 ¶ 108). "For example," Petitioner points out, "the video feed selected by Saylor's central security network are video surveillance cameras at a building or home." Pet. 41 (citing Ex. 1011, 10:31–34, 10:43–44). "In the combined system," Petitioner asserts, "Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel." Pet. 41–42 (citing Ex. 1002 ¶ 109).

> Dr. Polish testifies that

> the video feed selected by Saylor's central security network are video surveillance cameras independently installed at a building or home and independent of the security forces communication channel. Ex[1011], 10:31–34, 10:43–44 ("[T]he central security network of the present invention may also support users who already have an alarm system in their home, or want to buy a system from an alarm dealer and have it professionally installed."). It would have been obvious to a POSITA that in the combined system, Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel.

Ex. 1002 ¶ 109.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*the one or more video feeds being independent of the selected communication channel*" as recited in limitation 1[f].

62

IPR2023-01295
Patent 8,994,830 B2

### h. Limitation 1[g]

Limitation 1[g] recites: "*providing access to the identified at least one video feed to the mobile communication device based on the user policy.*" Ex. 1001, 12:37–39.  Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[g].  Pet. 42.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation.  *See* PO Resp. 14–35.

Petitioner explains that "Saylor's central security network sends video clips to mobile devices of security forces (users) based on the user policy stored in databases."  Pet. 42 (citing Ex. 1011, 11:24–28 (notifications to cell phones, etc.), 11:56–63, 35:15–33; Ex. 1002 ¶ 110).  "For example," Petitioner explains, "when a particular event in a particular building occurs, the user policy describes what notifications are sent and to whom."  Pet. 42 (citing Ex. 1011, 6:9–32, 8:34–60, 9:22–28; Ex. 1002 ¶ 110).  According to Petitioner, "[i]f a notification is sent to the selected communication channel (multicast address), the group members can access it."  Pet. 42 (citing Ex. 1004 ¶ 39 (interoperability system (IS 120) may communicate "with endpoints using multicast IP addresses"); Ex. 1002 ¶ 110).

We agree with Petitioner that Saylor's central security network sending video to the mobile devices of users based on user policies stored in databases meets the recited limitation.  Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing access to the identified at least one video feed to the mobile communication device based on the user policy*" as recited in limitation 1[g].

63

IPR2023-01295
Patent 8,994,830 B2

### i. Conclusion as to Independent Claim 1

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 1.  Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 1 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### 3. Independent Claim 15

Independent claim 15 is substantially similar to independent clam 1.  Claim 15, however, is directed to an apparatus while claim 1 is directed to a method.  Moreover, claim 15 contains two limitations, 15[a] and 15[b], that are not recited in claim 1.  We now consider the evidence and arguments directed to claim 15.

### a. 15[pre] An apparatus, comprising:

For the preamble, Petitioner contends that "Shaffer-Saylor discloses "*[a]n apparatus.*"  Pet. 50 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 136).  Paragraph 1 of Shaffer explains that "[t]his invention relates in general to communication systems and, more particularly, to a method and system for communicating using position information."  Ex. 1004 ¶ 1.  Patent Owner does not contest Petitioner's showing with respect to claim 15's preamble. *See* PO Resp. 14–35.

### b. 15[a] at least one processor

For this limitation, Petitioner asserts that "Shaffer-Saylor discloses '*at least one processor.*'"  Pet. 51.  "For example," Petitioner explains, "Shaffer describes a processor in the mobile communication device, and in the IS.  *Id.*

64

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1004 ¶¶ 38, 44–45, 48).  According to Petitioner, "Saylor also discloses a server for 'processing' alarm information in the central security network."  Pet. 51 (citing Ex. 1011, 35:45–48; Ex. 1002 ¶ 137).

Petitioner's position is supported by the testimony of Dr. Polish.  *See* Ex. 1002 ¶ 137.  Patent Owner does not contest Petitioner's showing with respect to this limitation.  *See* PO Resp. 14–35.

> c. *15[b] a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor; the video stream association module being executed by the at least one processor to cause operations to be performed, the operations comprising:*

For this limitation, Petitioner contends that Shaffer-Saylor discloses "*a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor, the video stream association module being executed by the at least one processor to cause operations to be performed.*" Pet. 51 (citing Ex. 1002 ¶ 138).

According to Petitioner, "Shaffer discloses a memory at the mobile communication device and the IS for communicating with the processor," and "Saylor discloses a memory, including databases, communicating with a processor."  Pet. 51 (citing Ex. 1004, ¶¶ 31, 36, 38, 40, 44–46, 48; Ex. 1011, Fig. 1, 6:9–32, 8:34–9:21; Ex. 1002 ¶¶ 138–139).

Petitioner asserts that "Shaffer-Saylor also disclose[s] the claimed 'video stream association module.'  If not construed as a means-plus-function limitation, it is simply stored in the memory in Shaffer's mobile device and IS and Saylor's central security network and databases and perform the recited operations, as described for claim 1."  Pet. 51 (citing Ex.

65

IPR2023-01295
Patent 8,994,830 B2

1001, 4:34–39 (video feed association module may be at a "central node and/or distributed nodes"), 3:21–27; Ex. 1002 ¶¶ 140–142). "If construed as a means-plus-function term," Petitioner argues that "the video stream association module includes (1) Shaffer's mobile communication device, (2) Shaffer's IS, and (3) Saylor's central security server and databases." Pet. 52.

Petitioner asserts that "[t]he functions of these elements disclose the functions of the video stream association module, as above with respect to limitations 1[a]-1[g]. In addition, Shaffer-Saylor discloses each element of the 'video feed association module' described in the '830 patent." Pet. 52.

Petitioner's position is supported by the testimony of Dr. Polish. *See* Ex. 1002 ¶¶ 138–143. Patent Owner does not contest Petitioner's showing with respect to this limitation. *See* PO Resp. 14–35.

### d. *Limitations 15[d]–15[i]*

For these limitations, Petitioner relies on the same evidence and arguments it relied upon for limitations 1[a]–1[g]. *See* Pet. 54 (citing Ex. 1002 ¶ 144).

### e. *Conclusion as to Independent Claim 15*

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 15. Based on the complete record, including the reasons discussed above with respect to independent claim 1, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 15 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

66

IPR2023-01295
Patent 8,994,830 B2

### 4. *Dependent Claims 2–5, 7–14, 16–19, and 21–24*

Petitioner argues that the combination of Shaffer and Saylor teaches or suggests the limitations of dependent claims 2–5, 7–14, 16–19, and 21–24. *See* Pet. 42–50, 54. Petitioner provides explanations as to how the combination of Shaffer and Saylor teaches or suggests each claim limitation as well as a rationale for combining the art in the manner proffered. *See* Pet. 42–43 (claim 2), 43–44 (claim 3), 44 (claim 4), 44–45 (claim 5), 45–46 (claim 7), 46–47 (claim 8), 47 (claims 9 and 10), 48–49 (claim 11), 49 (claim 12), 49–50 (claim 13), 50 (claim 14), and 54 (claims 16–19 and 22–24). Dr. Polish provides supporting testimony for Petitioner's contentions. *See* Ex. 1002 ¶¶ 111–135, 145–152.

Patent Owner specifically contests Petitioner's evidence and arguments directed to dependent claims 3, 7, 17, and 21. *See* PO Resp. 35–38. Patent Owner, however, does not separately contest Petitioner's evidence and arguments directed to challenged dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24. *See id.* Instead, Patent Owner relies on its previous evidence and arguments made with respect to independent claims 1 and 15 to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable." PO Resp. 35. We address contested dependent claims 3, 7, 17, and 21 first.

### f. *Contested Dependent Claims 3, 17*[7]

Dependent claim 3 recites: 3[a][8] *The method of claim 1, further comprising: accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile*

---

[7] Claim 17 depends from independent claim 15 and recites limitations similar to dependent claim 3.

[8] Bracketed designations proposed by Petitioner. *See* Pet. 4, 43–44.

67

IPR2023-01295
Patent 8,994,830 B2

*communication device; and* 3[b] *presenting a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.*

With respect to limitation 3[a], Petitioner contends that Shaffer-Saylor discloses this limitation.  Pet. 43.  Petitioner asserts that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel."  *Id.* (citing Ex. 1002 ¶ 114).

With respect to limitation 3[b], Petitioner asserts that "video streams may be associated with a communication channel, and team," and that "[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds, via thumbnails or a drop-down menu for selection."  Pet. 44 (citing Ex. 1002 ¶ 115; Ex. 1004 ¶ 25).

In its Response, Patent Owner asserts with respect to limitation 3[a] that "[n]one of [Petitioner's] analysis explains how Saylor's database is accessed 'to identify a plurality of members of an emergency response team.'"  PO Resp. 35–36 (citing Ex. 2006 ¶¶ 96–98).

Patent Owner also asserts with respect to limitation 3[b] that Petitioner's analysis "regarding the claimed step of 'presenting a plurality of available video feeds on the display of the mobile communication device' starts and stops with Dr. Polish's unsupported assertion that '[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds.'"  PO Resp. 36 (citing Pet. 44).

In its Reply, Petitioner points out with respect to limitation 3[a] that the Petition "explains that 'Saylor's database' that 'associates video feeds with the user's selected multicast IP address' meets this limitation because

IPR2023-01295
Patent 8,994,830 B2

Saylor's database contains information to identify members of an emergency response team associated with a communication channel." Pet. Reply 16 (citing Pet. 42–43).

With respect to limitation 3[b], Petitioner points to testimony and other evidence in Dr. Polish's declaration that supports Dr. Polish's opinion that "by 2008, it would have been obvious for a mobile device to display multiple video feeds from a security network." Pet. Reply 16–17 (citing Ex. 1002 ¶¶ 66–68).

In its Sur-reply, Patent Owner argues with respect to limitation 3[a] that "[n]othing in [Petitioner's] analysis explains how Saylor's database, or Shaffer's IS, renders obvious 'accessing a database to identify a plurality of members of an emergency response team.'" PO Sur-reply 15.

With respect to limitation 3[b], Patent Owner reiterates its argument that "[t]he only evidence in support of the element 'presenting a plurality of video feeds on the display of the mobile communication device' is the unsupported testimony of Dr. Polish." *Id.*

We agree with Petitioner and disagree with Patent Owner. With respect to limitation 3[a], "*accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile communication device*," Petitioner explains that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel." Pet. 43 (citing Ex. 1002 ¶ 114). There, Petitioner explains that

> Shaffer discloses that the IS can act as a centralized communication control post (CCP) to track GPS information of users. Ex[1004], ¶¶0016, 0041. It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the

69

IPR2023-01295
Patent 8,994,830 B2

> central security network can notify users on the audio
> communication channel of an event, *e.g.*, by sending a video
> clip, when any user associated with the channel is within the
> designated location.

Pet. 43 (citing Ex. 1002 ¶ 113).

With respect to limitation 3[b], Petitioner and Dr. Polish did not specifically cite to Paragraphs 66–68 of Dr. Polish's declaration and the particular references discussed therein when discussing dependent claims 3 and 17.  These paragraphs, however, are found in Section VIII of Dr. Polish's declaration, titled "KNOWLEDGE OF A POSITA," and in particular, Section D describing "Video Surveillance Systems Transmitting Video Feeds."  There Dr. Polish opines that "[b]y 2008, video surveillance systems were ubiquitous" and references as support, for example, a September 2005 U.S. Patent Application Publication describing in its abstract "[a] system for capturing, encoding and transmitting continuous video from a camera to a display monitor via a network" that "supports a plurality of cameras."  Ex. 1002 ¶ 66 (citing Ex. 1029).  In this section of his declaration, Dr. Polish testifies that "surveillance video feeds could be provided to mobile devices and could be accompanied with other information such as the location from which the video feed is sourced."  Ex. 1002 ¶ 67 (citing Ex. 1029 ¶¶ 17, 20; Ex. 1028 ¶¶ 7–15, 20–22, 27; Ex. 1030 ¶¶ 27–28, 31, 36, 44).  One of these references, for example, describes "a system for providing secure streaming multimedia data via a wireless network from a first response unit such as a patrol car, to one or more remote playing devices in response to a trigger."  Ex. 1028 ¶ 10.

It is clear when considering Dr. Polish's declaration testimony as a whole that that these paragraphs and the references discussed therein provide Dr. Polish's understanding of the background skill of the art at the time of

70

IPR2023-01295
Patent 8,994,830 B2

the claimed invention and what a person of ordinary skill would have understood about video surveillance systems transmitting video feeds at that time. We are not inclined to disregard this testimony. This testimony was specifically identified in Petitioner's Reply as part of the support for Dr. Polish's opinion (*see* Pet. Reply 16–17), but it was not addressed by Patent Owner in its Sur-reply (*see* PO Sur-reply 14–16).

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 3 and 17 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### g. Contested Dependent Claims 7, 21[9]

7[a] *The method of claim 1, further comprising: monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed*;

7[b] *processing the audio signal to identify an audio event; and*

7[c] *based on the identified audio event, providing access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.*

---

[9] Claim 21 depends from independent claim 15 and recites limitations similar to dependent claim 7.

71

IPR2023-01295
Patent 8,994,830 B2

Petitioner contends that Shaffer-Saylor renders dependent claim 7 obvious. With respect to limitation 7[a], Petitioner asserts that

> Saylor discloses that the central security network may include various types of sensors, including "sound" sensors, Ex[1011], 14:17–20, Which could have been located in "proximity" to the camera providing video notifications. Ex[1002], ¶119; §VIII.A.2.f. As Saylor already describes, the video camera may monitor a specific area, such as the front door of a building, Ex[1011], 16:41–51, and a camera near that door can identify motion. *Id.*; Ex[1002], ¶119. It would have been obvious that a "sound" sensor could also be installed by the door to detect breaking glass, or another sign of a break-in, in addition to movement.

Pet. 45 (citing Ex. 1002 ¶¶ 119–120).

With respect to limitation 7[b], Petitioner asserts that "[a]s described for limitation 7[a], it would have been obvious for Saylor's central security network to process the output of the sound sensor, to determine if there was an audio event, such as breaking glass." Pet. 46 (citing Ex. 1002 ¶ 121).

With respect to limitation 7[c], Petitioner asserts that

> Saylor's central security network sends a notification, including with a video clip, to a group of users upon the occurrence of events. Ex[1011], 17:1-–9, 5:58–62, 8:54–60. It would have been obvious that Saylor's central security network could send a video clip from a camera near the front door when a sound of breaking glass is detected near the front door. Ex[1002], ¶122. In this scenario, the group (security personnel) would include any mobile users selecting the relevant communication channel.

Pet. 46 (citing Ex. 1002 ¶ 122).

In its Response, Patent Owner asserts that "Petitioner relies on its declarant to create a notification logic structure that is not actually taught in the prior art references." PO Resp. 37. Patent Owner asserts that "Dr. Polish admitted in his deposition that some teachings did not come

72

IPR2023-01295
Patent 8,994,830 B2

from the prior art references and were simply 'a statement about general knowledge in the art.'" *Id.* (citing Ex. 2006 ¶ 101; Ex. 2008, 79:9–15).

In its Reply, Petitioner asserts that Patent Owner "ignores Dr. Polish's declaration, which cites [Ex.] 1008 for this exact point." Pet. Reply 17 (citing Ex. 1002 ¶ 120 ("[s]ound sensors (or audio sensors) were well known at the time and it would have been obvious to place the sensor nearby a camera that is in an area of interest.").

In its Sur-reply, Patent Owner asserts that "[l]ike Shaffer and Saylor, Exhibit 1008 is devoid of any logical structure where access to a video feed is provided in response to an audio event being identified, as recited in claims 7 and 21." PO Sur-reply 17.

We agree with Petitioner and disagree with Patent Owner. Saylor explains that "[t]he present invention may provide a security system where a user may personalize alert notifications for various security devices and/or systems." Ex. 1011, 5:19–21. Saylor explains that

> [t]he central security network may access the user's personal preferences, profile information and/or other information which may be used to execute notifications in the manner specified by the user. For example, the user may identify various personal preferences, which may include contact information, contact individuals, *methods of communication*, order of contact, special instructions and other information.

*Id.* at 5:29–36 (emphasis added). Saylor goes on to explain that

> [b]ased on user preferences and other information, *the user may be notified via various methods of communication*, as specified in the user's profile and preferences information. Alert notification may be communicated via the Internet 150, POTS 152, wireless communication portals, voice portals, and/or other methods.

*Id.* at 6:19–25 (emphasis added). Saylor further explains that the security system may be applied to the user's property, which "may include user's

73

IPR2023-01295
Patent 8,994,830 B2

home, office, vacation house, or other locations." *Id.* at 6:37–38. Saylor explains that "[f]or property . . . security devices may include sensors, detectors and/or other devices for detecting alarm situations." *Id.* at 6:46–48.

Saylor also explains that "a user may integrate still or motion video into an alarm system through the use of a broadband landline (e.g., cable or DSL) for image transmission with a wireless connection to send alarm data." *Id.* at 8:8–12. Saylor explains that "[t]he user may also have the option to view photographs and/or video clips at the time of the alarm incident." *Id.* at 13:51–53. Saylor further explains that "[b]ased on user defined preferences, a user may be notified before the sounding of an alarm and before contacting an emergency entity (e.g., police, ambulance, etc.) to reduce false alarm penalties and fees." *Id.* at 8:18–21.

Saylor provides an example to explain how the system may work. Saylor explains that

> the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action. For example, if the user views an image of a pet knocking over a lamp which falls and breaks a window, the user may cancel the alarm and emergency notification. Thus, police resources may be conserved and the user may avoid a penalty fine for a false alarm.

*Id.* at 16:24–32.

Saylor provides another example linking the sending of a video clip in response to some other alarm trigger, in this case the opening of a front door (contact sensor). Saylor explains that

> a subscriber may request notification when a front door opens, and request that the notification include a video clip of the front

74

IPR2023-01295
Patent 8,994,830 B2

> door at the time it was opened.  The subscriber may also request a video link or other image data when an unrecognized person enters.  According to another example, if an internal motion is triggered but no door has opened and video analysis suggests that a human is inside, the subscriber may request an alert notification with a single frame clip.

*Id.* at 34:1–9.

Based on our review of Saylor, we credit Dr. Polish's testimony where he explains that "Saylor discloses that the central security network may include various types of sensors, including 'sound' sensors" and "[i]t would have been obvious to locate the 'sound' sensor in 'proximity' to the video camera providing video clip notifications."  Ex. 1002 ¶ 119 (citing Ex. 1011, 14:17–20) ("Type of device may include smoke, heat, CO, radon, temperature, contact, motion, camera, breakage, sound, panic button, control, light, and others.").  This is consistent with Saylor's description of sending a video clip (video confirmation) whenever a front door opens (contact sensor triggered).

Dr. Polish's understanding of Saylor is consistent with ours, where he explains that

> Saylor describes that the video camera may monitor a specific area, such as the front door of a building.  Ex[1011], 16:41–51.  A camera near the front door can identify motion indicating possible unknown entrants or break-ins.  *Id.*  It would have been obvious to a POSITA that a "sound" sensor could also be installed by the front door to detect breaking glass, or another sign of a break-in, in addition to movement.

Ex. 1002 ¶ 120.  We therefore agree with Dr. Polish that "[i]t would have been obvious to a POSITA that Saylor's central security network could implement a rule to send to a video clip from a camera near the front door to security personnel when a sound of breaking glass is detected near the front door" and that "this is an obvious design choice that would have enabled

75

IPR2023-01295
Patent 8,994,830 B2

timely delivery of relevant information." *Id.* ¶ 122.

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 7 and 21 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### h. Uncontested Dependent Claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24

Petitioner contends that each of dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, and 22–24 are obvious over the combined teachings of Shaffer and Saylor. *See* Pet. 42–54. Patent Owner does not separately contest Petitioner's evidence or arguments with respect to these dependent claims other than to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable." PO Resp. 35. We consider Petitioner's evidence and arguments with respect to these dependent claims.

### i. Dependent Claims 2, 16

Dependent claim 2 recites: "*The method of claim 1, wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.*" Ex. 1001, 12:40–45. Dependent claim 16 recites similar claim language with respect to independent claim 15. *See id.* at 14:10–15.

76

IPR2023-01295
Patent 8,994,830 B2

With respect to claim 2, Petitioner asserts that

Saylor's database associates video feeds with the user's selected multicast IP address (an audio communication channel). Ex[1004], ¶0039 (describing audio communications); Ex[1003], p. 240; *see* Ground 1, limitation 1[e]; Ex[1002], ¶112. It would have been obvious to also associate video feeds with the particular user selecting the channel based on the user's location. For example, Saylor discloses that the system can be configured to send notifications to users based on a defined area. Ex[1011], 5:49. Shaffer discloses that the IS can act as a centralized communication control post (CCP) to track GPS information of users. Ex[1004], ¶¶0016, 0041. It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the central security network can notify users on the audio communication channel of an event, *e.g.*, by sending a video clip, when any user associated with the channel is within the designated location. Ex[1002], ¶113. This would have been a simple and predictable modification to Shaffer-Saylor motivated by how both Shaffer and Saylor are designed and would have been reasonably expected to succeed.

Pet. 42–43 (citing Ex. 1002 ¶ 113). Petitioner relies upon this evidence and argument with respect to claim 16 as well. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 111–113, 145. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 2 and 16. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 2 and 16.

### ii.    Dependent Claims 4, 18

Dependent claim 4 recites: "*The method of claim 3, wherein the available video feeds are sourced from a group of surveillance cameras.*"

IPR2023-01295
Patent 8,994,830 B2

Ex. 1001, 12:55–56. Dependent claim 18 recites similar claim language. *See id.* at 14:26–27.

With respect to claim 4, Petitioner relies on the evidence and arguments it made with respect to limitation 1[f]. *See* Pet. 44 (citing Ex. 1002 ¶ 116; Pet. Sec. VIII.A.2.g. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 116, 147. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 4 and 18. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 4 and 18.

### iii. Dependent Claims 5, 19

Dependent claim 5 recites: "*The method of claim 1, wherein: the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio.*" Ex. 1001, 12:57–60. Dependent claim 19 recites similar claim language. *See id.* at 14:28–31.

With respect to claim 5, Petitioner asserts that

> Shaffer renders obvious "wherein the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio," under any party's proposed construction. Shaffer expressly discloses a PTT communication channel in a PTT communication network, where the device is a PTT radio. Ex[1004], ¶0037. Shaffer also describes that the user of a mobile endpoint can access a communication channel "manually with, for example, a single key stroke. . . ." Ex[1004], ¶0040. A POSITA would have understood that this single keystroke can be a PTT key, and the channel can transmit

78

IPR2023-01295
Patent 8,994,830 B2

> half-duplex communications. Ex[1002], ¶¶117–18. Before the
> '830 patent, numerous systems had disclosed a PTT key to
> access IP messages on "half-duplex" PTT channels. Ex[1011],
> ¶¶0026–0027; Ex[1013], ¶¶0022–0024, 0041, 0048; *see also*
> Ex[1003], pp. 135, 189, 243, 290 (examiner noting that a
> POSITA would have "recognize[d] PTT as a widely used type
> of communication device").

Pet. 44–45. Petitioner relies on this same evidence and argument for claim 19. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 117–118, 148. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 5 and 19. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 5 and 19.

### iv.    *Dependent Claims 8, 22*

Dependent claim 8 recites: "*The method of claim 1, wherein the communication channel is associated with a Virtual Talk Group (VTG)*." Ex. 1001, 13:12–13. Dependent claim 22 recites similar claim language. *See id.* at 14:52–53.

> With respect to claim 8, Petitioner asserts that

> Shaffer discloses "*wherein the communication channel is
> associated with a Virtual Talk Group (VTG)*," under any party's
> proposed construction. As described for limitation 1[a], the
> selected communication channel (*e.g.*, multicast address) in
> Shaffer is for a virtual talk group, which communicates using
> the IP multicast address.

Pet. 46–47 (citing Ex. 1004 ¶¶ 27, 34, 37–39; Pet. Sec. VIII.A.2.b; Ex. 1002 ¶ 123).

79

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on this same evidence and argument for claim 22. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 123, 151. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 8 and 22. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 8 and 22.

*v.    Dependent Claims 9, 10, 23*

Dependent claim 9 recites: "*The method of claim 1, wherein providing access to the video feeds depends on a video association policy.*" Ex. 1001, 13:14–15. Dependent claim 10 recites: "*The method of claim 9, wherein the video association policy includes a role of the user defined in a policy database.*" *Id.* at 13:16–17. Dependent claim 23 recites similar claim language. *See id.* at 14:54–57.

With respect to claims 9 and 10, Petitioner asserts that

> Shaffer-Saylor discloses "*wherein providing access to the video feeds depends on a video association policy.*" The '830 patent does not use the term "video association policy" but does describe a "video feed association module" that "associate[s] one or more video feeds with one or more communication channels." Ex[1001], 4:29–33. The specification also describes policies that "governs the association of video streams with communication channels and VTGs," as well as policies that identify "available feeds" based on a "particular role" associated with the user. *Id.*, 9:45–48, 10:61–65; *see also id.*, 6:3–17, 8:16–33.
>
> In Shaffer-Saylor, the preferences and rules stored in the central security system databases associate video feeds with communication channels (as described for limitation 1[e]) using

80

IPR2023-01295
Patent 8,994,830 B2

the same types of policies. Ex[1002], ¶¶124–25. For example, in the combined system, the databases store rules and preferences that associate video streams with communication channels (*e.g.*, multicast IP addresses) for users with particular roles (*e.g.*, security or police). *See* §§VIII.A.1, VIII.A.2.f.

For the same reasons described for claim 9, Shaffer-Saylor discloses "wherein the video association policy includes a role of the user defined in a policy database." Ex[1002], ¶126.

Pet. 47

Petitioner relies on this same evidence and argument for claim 23. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 124–126, 213. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 9, 10, and 23. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 9, 10 and 23.

*vi.    Dependent Claims 11, 24*

Dependent claim 11 recites:

> *The method of claim 1, further comprising: identifying a geographical location of the user's mobile communication device using a Global Positioning System; identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*

Ex. 1001, 13:18–28. Dependent claim 24 recites similar claim language. *See id.* at 14:58–15:2.

81

IPR2023-01295
Patent 8,994,830 B2

With respect to claim 11, Petitioner asserts that

Shaffer-Saylor discloses "*identifying a geographical location of the user's mobile communication device using a Global Positioning System.*"  For example, Shaffer expressly describes using GPS for identifying a geographical location of a user's mobile communication device.  *E.g.*, Ex[1004], ¶¶0040–0041, 0044, 0046–0047; Ex[1002], ¶127.

Shaffer-Saylor [also] discloses "*identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*"  Ex[1002], ¶¶128–29.

Shaffer-Saylor [further] discloses that each geographic location in Shaffer (*e.g.*, a building or a campus) can also be the source of a plurality of video feeds.  *Id.*  For example, Saylor discloses "video cameras" located in a geographic area (*e.g.*, a building of a "business").  Ex[1011], 10:32–34, FIG. 10. Further, the  video feeds in that geographical location are associated with a communication channel, such as a multicast IP address associated with security forces as described in limitation 1[e]. §VIII.A.2.f.  Any device accessing that multicast IP address (including other mobile devices) will automatically have access to the video feeds associated with that channel.  *Id.*; Ex[1002], ¶129.

Pet. 48–49.

Petitioner relies on this same evidence and argument for claim 24. *See id.* at 54.  Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 127–129, 152.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 11 and 24.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has

82

IPR2023-01295
Patent 8,994,830 B2

established that the combined teachings of Shaffer and Saylor meet the

subject matter recited in dependent claims 11 and 24.

<i>vii.    Dependent Claims 12, 13, 14</i>

Dependent claim 12 recites:

*The method of claim 1, wherein the selected communication channel is a selected audio communication channel that is selected from a plurality of audio communication channels, the at least one video feed being associated with the selected audio communication channel, and the user policy identifying the one or more video feeds that are relevant to the user when the user accesses the selected audio communication channel.*

Ex. 1001, 13:29–36.  With respect to claim 12, Petitioner asserts that

> As discussed for limitation 1[a] and claim 2, Shaffer discloses that the selected communication channel can be an "audio communication channel," which the user selected from a plurality as the user moves from one location to another. §§VIII.A.2.b, VIII.A.3; Ex[1004], ¶0040; Ex[1002], ¶131.  As also discussed for limitations 1[e] and 1[g], Shaffer-Saylor discloses a user policy stored in a database that identifies the relevant video feeds to a user of a particular group, associates the relevant video feeds with the audio communication channel for that group, and provides those feeds to the user when the user accesses that channel.

Pet. 49 (citing Pet. Secs. VIII.A.1, VIII.A.2.f, VIII.A.2.h; Ex. 1002 ¶ 131).

Dependent claim 13 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel based on the geographic zone from which the at least one video feed is sourced and a device group that includes the user's communication device.*"  Ex. 1001, 13:37–41.  With respect to claim 13, Petitioner asserts that

> [a]s described for claims 1 and 12, Shaffer-Saylor discloses a user policy that associates at least one video feed with the selected communication channel.  §§VIII.A.1,

83

<u>Appx00083</u>

IPR2023-01295
Patent 8,994,830 B2

> VIII.A.2.f.  Moreover, as described for claims 2 and 9, Shaffer-Saylor discloses or renders obvious that the user policy can be based on the geographic zone from which the at least one video feed is sourced and the device group that includes the user's device.

Pet. 50 (citing Ex. 1011, 10:62–67; Pet. Secs. VIII.A.1, VIII.A.2.f; Ex. 1002 ¶¶ 133–134).

Dependent claim 14 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel by comparing a first geographic zone from which the at least one video feed is sourced with a second geographic zone corresponding to a location of the user's communication device.*"  Ex. 1001, 13:42–47.  With respect to claim 14, Petitioner asserts that "[a]s described for claim 2, it would have been obvious for Saylor's database to track the location of users and compare user location with the location of a device providing a video feed before associating the video feed with the communication channel including that user."  Pet. 50 (citing Pet. Sec. VIII.A.3; Ex. 1002 ¶ 135).

Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 130–135.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 12–14.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 12, 13, and 14.

> viii.    *Conclusion as to Dependent Claims 2–5, 7–14, 16–19, and 21–24*

We have considered all of the evidence and the arguments provided by the parties with respect to dependent claims 2–5, 7–14, 16–19, and 21–

84

IPR2023-01295
Patent 8,994,830 B2

24, as well as the testimony of Dr. Polish and Dr. Akl.  Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of these dependent claims and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### F.  Obviousness Over Gogic and Opitz (Ground 2)

Petitioner contends that claims 1–5, 8–19, and 22–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Gogic and Opitz.  Pet. 55–81.

We have, however, determined that these claims are unpatentable over the combined teachings of Shaffer and Saylor (Ground 1).  *See* Section III.E. Accordingly, we need not address Petitioner's alternative Ground 2 based on Gogic and Opitz.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

85

IPR2023-01295
Patent 8,994,830 B2

## IV. CONCLUSION[10]

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable on the bases set forth in the following table.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 7–19, 21–24 | 103(a) | Shaffer, Saylor | 1–5, 7–19, 21–24 | |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz | | |
| **Overall Outcome** | | | 1–5, 7–19, 21–24 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2023-01295
Patent 8,994,830 B2

## V. ORDER

Upon consideration of the record before us, it is

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

87

IPR2023-01295
Patent 8,994,830 B2

*PETITIONER:*

Eliot Williams
Michael Knierim
Clarke Stavinoha
Joseph Cahill
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
michael.knierim@bakerbotts.com
clarke.stavinoha@bakerbotts.com
joe.cahill@bakerbotts.com

PATENT OWNER:

Jason Engel
Katherine Allor
Nolan Hubbard
Samuel Richey
Kyle Kantarek
K&L GATES LLP
jason.engel.ptab@klgates.com
katy.allor@klgates.com
nolan.hubbard@klgates.com
samuel.richey@klgates.com
kyle.kantarek@kirkland.com

88



US008994830B2

# (12) United States Patent
## Shaffer et al.

(10) **Patent No.:** **US 8,994,830 B2**
(45) **Date of Patent:** **Mar. 31, 2015**

(54) **ACCESS TO VIDEO STREAMS ON MOBILE COMMUNICATION DEVICES**

(75) Inventors: **Shmuel Shaffer**, Palo Alto, CA (US); **Zeeshan Rahman Khan**, Fremont, CA (US)

(73) Assignee: **Cisco Technology, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1382 days.

(21) Appl. No.: **12/188,982**

(22) Filed: **Aug. 8, 2008**

(65) **Prior Publication Data**

US 2010/0033580 A1     Feb. 11, 2010

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 17/02* | (2006.01) |
| *H04N 21/61* | (2011.01) |
| *H04N 21/2381* | (2011.01) |
| *H04N 21/414* | (2011.01) |
| *H04N 21/45* | (2011.01) |
| *H04N 21/647* | (2011.01) |

(52) **U.S. Cl.**
CPC ....... *H04N 21/6131* (2013.01); *H04N 21/2381* (2013.01); *H04N 21/41407* (2013.01); *H04N 21/4524* (2013.01); *H04N 21/64707* (2013.01)
USPC ......................................... **348/192**

(58) **Field of Classification Search**
CPC ................... G08B 13/19608; G08B 13/19645; G08B 13/19656; H04M 11/04; H04M 2242/14; H04M 3/56; H04N 7/157; H04N 7/181

USPC ........................... 348/192; 455/416, 518, 521
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,499,719 B2 * | 3/2009 | Rengaraju et al. | ........... | 455/518 |
| 7,783,316 B1 * | 8/2010 | Mitchell | ...................... | 455/521 |
| 7,864,716 B1 * | 1/2011 | Manroa et al. | ............... | 370/260 |
| 2002/0137462 A1 * | 9/2002 | Rankin | ........................ | 455/41 |
| 2005/0232352 A1 * | 10/2005 | Siemens et al. | ......... | 375/240.12 |
| 2006/0293073 A1 * | 12/2006 | Rengaraju et al. | ............ | 455/518 |
| 2007/0015518 A1 * | 1/2007 | Winter et al. | ............. | 455/456.1 |
| 2007/0270172 A1 * | 11/2007 | Kalley et al. | ............... | 455/518 |
| 2008/0036851 A1 * | 2/2008 | Patel | .............................. | 348/21 |
| 2008/0108339 A1 * | 5/2008 | Shaffer et al. | ............... | 455/416 |
| 2009/0082038 A1 * | 3/2009 | McKiou et al. | ........... | 455/456.6 |

* cited by examiner

*Primary Examiner* — Aung S Moe
*Assistant Examiner* — Amy Hsu

(57) **ABSTRACT**

A method and apparatus to provide access to video streams associated with communication channels in a communication network are described. The method may comprise monitoring selection of a communication channel by a user of a mobile communication device, identifying at least one video feed associated with the selected channel, and providing access to the mobile communication device to the selected at least one video feed. Providing access may comprise associating the selected video stream with the mobile communication device.

**30 Claims, 12 Drawing Sheets**





FIG. 1A

Appx00090    Motorola Solutions, Inc., Ex1001, p. 2



FIG. 1B

Motorola Solutions, Inc., Ex1001, p. 3

APPARATUS 200

OPERATING SYSTEM/APPLICATION SOFTWARE 202

VIDEO FEED ASSOCIATION MODULE  120

CHANNEL IDENTIFIER MODULE 204

VIDEO FEED IDENTIFIER MODULE 206

GRAPHIC USER INTERFACE MODULE 208

POLICY MODULE 210

COMMUNICATION MODULE 212

*FIG. 2*

    Motorola Solutions, Inc., Ex1001, p. 4



FIG. 3

Appx00093    Motorola Solutions, Inc., Ex1001, p. 5



FIG. 4

Appx00094    Motorola Solutions, Inc., Ex1001, p. 6



*FIG. 5*

Appx00095     Motorola Solutions, Inc., Ex1001, p. 7



FIG. 6

Appx00096    Motorola Solutions, Inc., Ex1001, p. 8



*FIG. 7*

Appx00097     Motorola Solutions, Inc., Ex1001, p. 9



*FIG. 8*

Appx00098    Motorola Solutions, Inc., Ex1001, p. 10



FIG. 9



*FIG. 10*

Appx00100    Motorola Solutions, Inc., Ex1001, p. 12



*FIG. 11*

   Motorola Solutions, Inc., Ex1001, p. 13

US 8,994,830 B2

**1**

# ACCESS TO VIDEO STREAMS ON MOBILE COMMUNICATION DEVICES

## FIELD

The present disclosure relates generally to communication systems. In an example embodiment, the disclosure relates to providing access to video streams associated with communication channels in a communication network.

## BACKGROUND

In general, a communication system is a collection of communications networks, transmission systems, relay stations, tributary stations, and data terminal equipment usually capable of interconnection and interoperation to form an integrated whole. Communication devices may communicate audio signals on different communication channels. Video feeds may also be communicated in the communication system.

## BRIEF DESCRIPTION OF DRAWINGS

The present disclosure is illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. 1A depicts a simplified diagram of communication system, in accordance with an example embodiment, including full-duplex communication devices;

FIG. 1B depicts a simplified diagram of a further communication system, in accordance with an example embodiment, including both full- and half-duplex communication devices;

FIG. 2 depicts a simplified block diagram of an apparatus, in accordance with an example embodiment, to associate video feeds with a communication channel associated a plurality of mobile communication devices;

FIG. 3 depicts a schematic diagram of a system, in accordance with an example embodiment, wherein video feeds are associated with a communication channel;

FIG. 4 depicts a flow diagram of a general overview of a method, in accordance with an example embodiment, for associating video feeds with a communication channel that is associated a plurality of mobile communication devices;

FIG. 5 depicts a flow diagram of a general overview of a method, in accordance with an example embodiment, for identifying channels with which to associate video feeds;

FIG. 6 depicts a flow diagram of a general overview of a method, in accordance with an example embodiment, for associating video feeds with communication channels based on an audio event;

FIG. 7 depicts a flow diagram of a general overview of a method, in accordance with an example embodiment, for associating video feeds with communication channels based on geographical location data;

FIGS. 8-10 depict schematic views of graphical user interfaces, in accordance with an example embodiment, for associating video feeds with communication channels; and

FIG. 11 is a simplified block diagram of a machine in the example form of a computing system within which a set of instructions, for causing the machine to perform any one or more of the methodologies discussed herein, may be executed.

## DESCRIPTION OF EXAMPLE EMBODIMENTS

The description that follows includes illustrative systems, methods, techniques, instruction sequences, and computing

**2**

machine program products that embody the present invention. In the following description, for purposes of explanation, numerous specific details are set forth to provide an understanding of various embodiments of the inventive subject matter. It will be evident, however, to one skilled in the art that embodiments of the inventive subject matter may be practiced without these specific details. In general, well-known instruction instances, protocols, structures, and techniques have not been shown in detail.

Overview

A method and apparatus to provide access to video streams associated with communication channels in a communication network are described. The method may comprise monitoring selection of a communication channel by a user of a mobile communication device, identifying at least one video feed associated with the selected channel, and providing access to the mobile communication device to the selected at least one video feed. Providing access may comprise associating the selected video stream with the mobile communication device. In an example embodiment, a plurality of available video feeds is presented on a display of the mobile communication device, the plurality of available video feeds being available for communication to the mobile communication device. Selection of at least one video feed from the plurality of available video feeds may be monitored and the selected feed may be associated with the mobile communication device.

### Example Embodiments

FIG. 1A depicts a simplified diagram of a communication system 100 in accordance with an example embodiment. The communication system 100 is shown by way of example to include a public switched telephone network (PSTN) 102, a cellular network 104, and various networked computing devices. Examples of communication devices include telephones 106, computers 112, Voice over Internet Protocol (VoIP) phones 110, mobile phones 108, gateways 116, routers 118, switches, transmission systems, relay systems, and other communication devices. A plurality of cameras 122 provide video feeds that, in an example embodiment, are associated with communication channels (e.g., communication channels providing Virtual Talk Groups (VTGs)).

In general, the computer network 114 is a collection of interconnected computing devices that communicate using wired or wireless mediums. Examples of computer networks, such as the computer network 114, include Local Area Networks (LANs) and/or Wide Area Networks (WANs), such as the Internet. It should be understood that a communication device, as referred to herein, includes any equipment used in communication and associated with, or attached to, a communication network.

The PSTN 102 may include a Plain Old Telephone System (POTS). The PSTN 102 includes a collection of interconnected systems operated by telephone companies. The PSTN 102 may, for example, include the telephones 106, switches, and other systems and elements. The PSTN 102 may communicate with the computer network 114 via the gateway 116. The gateway 116 may provide voice interoperability between computer and non-computer networks, such as the PSTN 102, by bridging telephone transmissions to Internet Protocol (IP) multicast streams.

The PSTN 102 is also shown to communicate with the cellular network 104. The cellular network 104 includes a type of radio network with a full duplex system. Examples of the cellular network 104 include code division multiple access (CDMA), time division multiple access (TDMA), and

Appx00102    Motorola Solutions, Inc., Ex1001, p. 14

US 8,994,830 B2

3

other cellular networks. The mobile phones 108 may communicate via the cellular network 104.

As illustrated by way of example in FIG. 1A, the communication devices may host a video feed association module 120. As explained in more detail below, the video feed association module 120 may be configured to associate one or more video feeds (e.g., media streams from one or more of the cameras 122) transmitted over the computer network 114 with one or more communication channels (e.g., audio channels in a radio network). In an example embodiment, the video feed association module 120 may act as filter removing or filtering video feeds accessible by, or provided to, a communication device. Accordingly, in an example embodiment, only those video feeds that are of particular interest to a user of the communication are presented to the user. The user may thus not be bombarded with a host of video feeds that are not relevant in a specific circumstance. In an example embodiment, one or more of the cameras 122 are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations). In the example system 100, the communication devices are shown by way of example to include the video feed association module 120 and thus association of the feeds is shown, by way of example, to be performed at endpoints in a communication network. It will however be appreciated that the association can be performed, in addition or instead, at a central location. The association may be done between independent voice communication devices and independent video surveillance cameras (e.g., the cameras 122).

FIG. 1B depicts a communication system 150, in accordance with an example embodiment, in which one or more video feeds are associated with one or more communication channels at a central location. The communication system 150 is similar to the communication system 100 and, accordingly, like reference numerals are used to indicate the same or similar features.

The communication system 150 further includes a radio network 152 configured to communicate with one or more mobile communication devices (e.g., one or more push-to-talk (PTT) radios). The communication system 150 may thus include full-duplex communication devices (e.g., the telephones 106, the mobile phones 108, the VoIP phones 110 and the computer 112), as well as half-duplex communication devices (e.g., the PTT radios 154). The communication service 156 may be provided to facilitate communication in the communication system 150. The communication service 156 may include a variety of software applications and/or hardware that can monitor and process communications between the communication devices. The communication service 156 can be hosted on one or more server computers and, as explained in more detail below, may be configured to facilitate communication of media streams on a plurality of communication channels. An example of communication service 156 is the IP Interoperability and Collaboration System (IPICS) network available from Cisco Systems of California that facilitates communication interoperability amongst different communication paradigms. A communication paradigm (or a communication modality) includes a mode of communication amongst a collection of interrelated communication devices. The communication paradigm can be distinguished by data format, type of signal, physical link or infrastructure, or other communication characteristics (e.g., half duplex or full duplex communications). For example, the communication system 150 may facilitate communication between the PTT radios 154 (e.g., ultra high frequency (UHF) radios, very high frequency (VHF) radios, and other push-to-talk radios) via the radio network 152 and telephony endpoints (e.g., the

4

telephones 106) of the PSTN 102. In another example embodiment, the communication system 150 can facilitate communication between the push-to-talk radio 154 of the radio network 152 and the VoIP phones 110 or a software client residing on the computers 112. The communication system 150 may control the media and signaling of radio and VoIP systems, resulting in a direct communication between the different communication devices (e.g., between the PTT radios 154 and the VoIP phones 110).

It should be appreciated that radio network 152 may be a collection of communication devices that communicate over radio waves, such as ultra high frequency (UHF) and very high frequency (VHF). The radio network 152 includes, for example, a land-mobile-radio (LMR) network. Examples of communication devices included in radio network 152 include the PTT radios 154 (e.g., UHF radios, VHF radios, and other radio network-based communication devices). It should be noted that PTT radios 154 or other communication devices included in radio network 152 may be push-to-talk radios that operate in half duplex mode, which is in contrast to the communication devices (e.g., the telephones 106) that operate in full duplex mode. The radio network 152 may communicate with the computer network 114 by way of a gateway 160, which provides voice and control interoperability between the radio network 152 and the computer network 114 by bridging media and control transmissions to Internet Protocol (IP) multicast and/or Unicast (e.g., Session Initiation Protocol (SIP)) streams.

The communication service 156 (e.g., an IPICS) is shown to include a video feed association module 158 to associate one or more video feeds with one or more communication channels and thus facilitate access to the video feed by a user of a mobile device having video capabilities.

In the example embodiment shown in FIG. 1B, further video feed association modules 120 may be optionally provided at the communication devices. Thus, association of the video streams with the communication channels (e.g., voice channels) may take place at a central node and/or distributed nodes.

FIG. 2 depicts a simplified block diagram of an apparatus 200, in accordance with an example embodiment, to associate video feeds with a communication channel associated a plurality of mobile communication devices. The apparatus 200 may be deployed in the communication networks 100, 150 and, accordingly, is described by way of example with reference thereto.

The apparatus 200 includes memory for storing and operating system and application software 202 that, when executed, performs the methodologies described herein. The apparatus 200 includes a video feed association module 120 shown to include a channel identifier module 204, a video feed identifier module 206, a graphic user interface (GUI) module 208, a policy module 210, and a communication module 212. As described by way of example in more detail below, the apparatus 200 allows a user to select one of a plurality of communication channels wherein each communication channel may have a plurality of video feeds automatically associated with the communication channel. The communication channel may host a VTG. Operation of the apparatus 200 is described by way of example below.

FIG. 3 depicts a schematic diagram of a system 300, in accordance with an example embodiment, wherein video feeds are associated with a communication channel. The system 300 may include the apparatus 200 and may be deployed in the communication systems 100, 150. The system 300 is described by way of example with reference to the systems 100, 150.

Appx00103    Motorola Solutions, Inc., Ex1001, p. 15

US 8,994,830 B2

5

The system 300 is shown to include a voice communication network 302 including a plurality of communication channels 302.1-302.n. Each communication channel 302.1-302.n may host a virtual talk group (VTG) hosted by the communication systems 100, 150.

Various communication endpoints (e.g., the telephones 106, the mobile phones 108, the VoIP phones 110, the PTT radios 154, and the computers 112) may participate in communications in a particular virtual talk group (VTG). The communication endpoints may be grouped, for example, into emergency response teams. Accordingly, the system 300 is shown by way of example to include a first group 304 comprising communication endpoints 304.1-304.q. Users 305.1-305.q are respectively associated with endpoint 304.1-304.q. In the example embodiment, the users 305.1-305.q have their communication endpoints set to a channel 1. Likewise, in the example system 300 shown in FIG. 3, a second group 306 is shown to comprise communication endpoints 306.1-306.r. In a similar fashion to the first group 304, the endpoints 306.1-306.r are each associated with a user 307.1-307.r, respectively. The users 307.1-307.r are shown to have their mobile communication devices 306.1-306.r set to channel n.

In addition to the audio channels 302.1-302.n, the system 300 includes a plurality of video feeds 303. The video feeds 303 are shown by way of example to be grouped into a first group 308 and a second group 310. Each group 308, 310 may be associated with one or more communication channels. Accordingly as shown by way of example in FIG. 3, the first group 308 is shown to be associated with the first channel 302.1 and a second group 310 is associated with third channel 302.3. The first group 308 is shown to include video feeds 308.1-308.m and the second group 310 is shown to include video feeds 310.1-310.p. The first group 308 may be associated with an emergency response team (e.g. a fire department emergency response team, a police emergency response team, or the like). The second group 310 may, for example, be associated with a different emergency response team.

As described in more detail below, video feeds 308.1-308.m may be automatically associated with the first channel 302.1 so that, in use, when any user 305.1-305.q sets an associated mobile communication device 304.1-304.q, respectively, to the first channel 302.1 the video feeds 308.1-308.m are made accessible to the users 305.1-305.q. In the example embodiment, the video feeds 310.1-310.p are shown not to be presented to the users 305.1-305.q and thus, for example, video feeds that may not be relevant to a particular VTG may thus not be made accessible to the users 305.1-305.q. Thus, in an example embodiment, the users 305.1-305.q are not presented with video feeds that are not relevant to their particular group 304. The group 304 may correspond to the group 308. As a result, in an example embodiment the users 305.1-305.q may focus their attention to video feeds that are relevant to their operation.

In an example embodiment, a dispatcher may render access to a particular user(s) (e.g., the user 305.1) to a specific channel or a specific VTG. When the dispatcher renders access to a specific channel or VTG, the system 300 may automatically render access to the associated video feeds 308.1-308.m to the user (e.g., the 305.1).

The system 300 is also shown, by way of example, to include a policy module 312. The policy module 312 may automatically associate video feeds with a particular group of video feeds, automatically associate groups of feeds with channels, VTGs, or the like based on policy data. In an example embodiment, the policy module 312 may also determine which video feeds in a group of video feeds are viewable by any one or more of the users 305.1-305.q. For example,

6

certain video feeds may not be rendered to one or more of the mobile communication devices 304.1-304.q.

In an example embodiment, the policy module 312 may analyze a current location of the users 305.1-305.q. As one or more users 305.1-305.q approach a location from which specific video feed is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading, the policy module 312 may automatically associate the video feed from the relevant camera 122 with the communication channels of the fire truck and render access to this video feed to all other members of a fire-truck VTG. In an example embodiment, the policy module 312 may include one or more of the following policies: a policy that may be set by the user, a policy that may be set by the dispatcher or administrator, a policy that governs only a specific user, or a policy that may govern all users of the system 300.

FIG. 4 depicts a flow diagram of a general overview of a method 400, in accordance with an example embodiment, for associating video feeds with a communication channel associated a plurality of mobile communication devices. The method 400 may be performed by the apparatus 200 (see FIG. 2) and, accordingly, is described by way of example with reference thereto. In the method 400, a user interface may optionally be presented to a user (e.g., the user 305.1-305.q or 307.1-307.r) to allow the user to select a communication channel 302.1-302.n to which his/her mobile communication device 304.1-304.q or 306.1-306.r is to be set or tuned to. The method 400, as shown at block 402, may then monitor selection of a communication channel by the user 305.1-305.q, 307.1-307.r of an associated mobile communication device 304.1-304.n, 306.1-306.r. Thereafter, as shown at block 404, the apparatus 200 may identify which particular channel has been selected (e.g., see the channel identifier module 204 in FIG. 2). At least one video feed associated with the selected channel (see block 404) may be identified (e.g., by the video feed identifier module 206). It will be appreciated that, one or more of the communication devices 304.1-304.n, 306.1-306.r, may not receive any feeds. Thus, in an example embodiment, a dispatcher may control what video feeds 308.1-308.m, if any, are made available to one or more of the users 305.1-305.q, 307.1-307.r.

It should be noted that the rendering of access to the video feeds 308.1-308.m is not limited to operations or selections performed on the mobile communication device 304.1-304.q or 306.1-306.r. In addition or instead, the user interface may be presented to a dispatcher who may then configure the nature of the access made available to the users (e.g., the user 305.1-305.q or 307.1-307.r). For example, the dispatcher may configure which channels or VTGs a user 305.1-305.q or 307.1-307.r) may access. In this example embodiment, since the video feeds may be associated with a given channel or VTG, as the dispatcher renders the access to specific channel or VTG to a given user, the user is automatically also presented with access to the associated video feeds which may be relevant to his/her operation.

Once the particular channel has been selected and the at least one video feed associated with the channel has been identified, the method 400 may then provide any mobile communication device 305.1-305.q or 307.1-307.r that is set to the particular channel with access to the at least one video feed. In an example embodiment, a plurality of different video feeds is associated with each channel in an automatic manner so that the feeds are made available to a user of a mobile communication device that is set to the associated channel. In an example embodiment, a GUI is optionally provided to the user to select one, or a subset, of the plurality

US 8,994,830 B2

7    8

of video feeds, whereafter, as shown at block 408, the video feed may be then communicated to the mobile communication device.

FIG. 5 depicts a flow diagram of a general overview of a method 500, in accordance with an example embodiment, for identifying channels with which to associate video feeds. As shown at block 502, access to a plurality of available video feeds, associated with a communication channel, may be provided on a display of the mobile communication device (e.g., the mobile communication devices 304.1-304.q, 306.1-306.r). In an example embodiment, as only a limited number of relevant video feeds may be provided to a user, selection of an appropriate video feed may be facilitated. For example, in the system 300 shown in FIG. 3, the video feeds 308.1-308.m are associated with the first channel 302.1. When the mobile communication devices 304.1-304.q are set to have access to the first channel 302.1, the operation in block 502 may enable access to video feeds 308.1-308.m to the users 305.1-305.q.

As shown at block 504, the method 500 may then monitor selection of at least one video feed from the plurality of available feeds (e.g., the video feeds 308.1-308.m) and associate the selected at least one video feed with the one or more of the communication channels 302.1-302.n. or one or more specific VTG. When the system 300 renders to a specific mobile communication devices 304.1-304.q, 306.1-306.r the ability to access a specific channel 302.1-302.n. or a specific VTG, the system 300 may automatically render to the same communication device 304.1-304.q, 306.1-306.r the ability to access the associated video feed. The associated video feed may be streamed to the mobile communication device if the user selects the associated video feed from a sub-set of video feeds to which he/she was provided access to. In an example embodiment, the video feeds may be stored at a central location and, upon selection of the video feed by the user, they may then be streamed to the mobile communication device 304.1-304.q, 306.1-306.r. In addition, or instead, the video feeds may be live video feeds streamed in real time.

In an example embodiment, the video feeds may be video feeds sourced from a video surveillance camera. Thus, the methods and apparatus described herein may be used by public safety and first responders (PSFR) and by emergency response teams (ERT). In an example embodiment, the methods 400, 500 and apparatus 200 are deployed in an IPICS system as described by way of example with reference to FIG. 1B. Accordingly, in an example embodiment, the communication channels are communication channels in the PTT network. Only a limited number of video feeds may be associated with a VTG and video feeds that are not relevant to operations associated with a particular VTG may be filtered. Accordingly, in an example embodiment, the example methods described herein may provide automated control of access by PSFR and ERT team members to video surveillance streams. In an example embodiment, by controlling the video feeds to which ERT personnel have access, the system 300 may automatically facilitate access only to relevant video streams while reducing the information overload to the end user. By limiting the access to non-relevant video streams, information overload is at least reduced thus enhancing the efficiency of ERT personnel.

In an example embodiment which includes a communication system with trunk radio, base stations may be provided that a system administrator can use to facilitate communication with different teams which utilize specific communication channels. For example, users may select a specific region with which they may want to communicate and within the specific region, a specific radio base station may be requested to tune itself to a specific frequency associated with a predetermined communication channel. A user of the mobile communication device 304.1-304.q, 306.1-306.r may select a specific region from a set of regions. By selecting the specific region the user may gain access to the radio base station associated with the said region. When a user selects a particular region, the user may be presented with communication channels (see channels 302.1-302.n) where each channel 302.1-302.n is associated with a specific region and as such with a specific radio base station. Thus, in one example embodiment the first group 308 in the system 300 shown in FIG. 3 may be associated with one geographical region and the second group 310 may be associated with a second geographical region. In a similar fashion to the GUI to select channels on a mobile communication device, a GUI may be provided to select regions.

In an example embodiment, when a user selects a specific VTG hosted by a particular channel, the system 300 provides him/her with access to a set of surveillance cameras. The set of surveillance cameras may, for example, be associated with a specific ERT and, as a result, the user selecting the specific VTG would then receive or have access to all video feeds associated with the particular VTG. In an example embodiment, the association between the video feeds and a communication channel may be configured at a central location. For example, the association may be statically configured in an IPICS database. The configuration may also be based on a policy or the roles the individual users may play in an emergency operation. In one example embodiment, a policy module (e.g., the policy module 312) has access to the GPS information (not shown) of the users (e.g., the users 305.1-305.q or 307.1-307.r). The policy module then may, for example, automatically facilitate access to video streams relevant to the locations of ERT team members.

FIG. 6 shows a flow diagram of a general overview of a method 600, in accordance with an example embodiment, for associating video feeds with communication channels based on an audio event. In one example embodiment, the method 600 described below may be implemented at least in part by the policy module 312. As shown at block 602, the method 600 monitors an audio signal generated in proximity to a video camera providing a video feed. For example, the audio signal may be a gunshot requiring a response by an ERT. As shown at block 604, the method 600 may process the audio signal to identify an audio event (e.g., the gunshot). Once the audio event had been identified, the identified video feed from the surveillance camera may be associated with a communication channel associated with the ERT. Thus, based on an identified audio event, access to a video feed may be provided to a plurality of mobile communication devices in a group of mobile communications associated with the event (see block 606).

FIG. 7 depicts a flow diagram of a general overview of a method 700, in accordance with an example embodiment, for associating video feeds with communication channels based on geographical location data. As shown at block 702, a geographical location of a local mobile communication device may be identified using a global positioning system (GPS). Thereafter, as shown at block 704, the method 700 may identify at least one video feed associated with the identified geographical location. In one example embodiment, based on a specific policy governing the policy module 312, the identified video feed may then be automatically associated with other mobile communication devices set to the same channel as the local communication device. (See block 706).

When the method 700 is deployed in the system 300, a control center (e.g., an IPICS) may dynamically access a GPS location of each mobile communication device. 304.1-304.q,

Appx00105    Motorola Solutions, Inc., Ex1001, p. 17

US 8,994,830 B2

9 · 10

306.1-306.r. The control center may also maintain information about, or have access to, a range of views covered by video cameras provided at various geographical locations. In an example embodiment, a matching module may be provided to match mobile communication devices 304.1-304.q, 306.1-306.r and, accordingly, associate users 305.1-305.q, 307.1-307.r with one or more video streams. For example, mobile communication devices 304.1-304.q, 306.1-306.r within a given radius of a particular video camera may be identified. Thus, when a mobile communication device 304.1-304.q, 306.1-306.r is located within the aforementioned radius, access to video feeds within the radius may be provided to the users 305.1-305.q, 307.1-307.r an associated mobile communication device 304.1-304.q, 306.1-306.r.

In an example embodiment, when two or more users are placed into a common VTG, and hence associated with a common communication channel, the list or group of available video streams to which each user has access may be automatically updated to include video feeds seen by all members of a particular team associated with the common communication channel. Thus, in an example embodiment, all team members having their mobile communication devices 304.1-304.q, 306.1-306.r set to a common communication channel may share the same video information.

FIG. 8 shows an example GUI 800, in accordance with an example embodiment, to allow a user to select a video feed associated with a communication channel. For example, the GUI 800 may be provided on one or more of the mobile communication devices 304.1-304.q, 306.1-306.r. In an example embodiment, the GUI 800 may be generated by the graphical user interface module 208 of the apparatus 200 (see FIG. 2).

The GUI 800 is shown to include a channels zone 802 and available video feed zone 804. The channel zone 802 shows a plurality of communication channels 802.1-802.n to which the mobile communication device 304.1-304.q, 306.1-306.r may be set. Associated with each channel 802.1-802.n is a video feed drop-down menu 803.n to allow a user to select one of a plurality of video feeds automatically associated with an associated channel 802.1-802.n. In the example GUI 800 shown in FIG. 8, video feeds 804.1-804.m are shown to be available from the video dropdown menu 803.1. Thus, using the GUI 800, a user may thus select a video feed for viewing on the communication device.

In an example embodiment, the available feeds may be based on an access policy or a particular role (e.g., coordinator, response team member, or the like) that is associated with the user of a mobile communication device. Thus, in an example embodiment, the policy rules 806 associated with the communication channel of a specific zone are displayed. Accordingly, in an example embodiment, the GUI 800 allows a user to select one of a plurality of channels and, when a particular channel is selected, videos associated with the channel are available for viewing by the user. It should be noted that while the system 300 may automatically facilitate viewing of the associated video feeds, it may also prevent the user from accessing video feeds which are not required to fulfill his/her duties, thus at least reducing the user from experiencing unnecessary information overload.

FIG. 9 shows a GUI 900 in accordance with an example embodiment, to allow a user to select a communication frequency associated with a communication channel. The GUI 900 is shown to include a plurality of channel identifiers 902.1-902.s, each of which has an associated frequency drop-down menu (see drop-down menu 904.s). For example, when a user selects a drop-down menu associated with the first channel 902.1, it is expanded to provide a plurality of available frequencies to which channel 1 may be tuned (see expanded drop-down menu 906). The expanded drop-down menu 906 is shown to include a first frequency 906.1 associated with a first zone, a second frequency 906.2 associated with a second zone and so on. In an example embodiment, the frequencies may however, in addition or instead, be associated with one or more emergency response teams. When a particular frequency is selected from the expanded drop-down menu 906, the transmission and receiving frequency of the associated radio base station may be changed accordingly and access to the associated video stream may be granted to the user.

In an example embodiment, a user may select a specific VTG by selecting one of the channels 902.1-902.s. Thereafter, a frequency associated with a region in which the user is located may be selected using the drop-down menus. Thereafter, in an automated manner without human intervention, groups of video feeds (e.g., surveillance cameras) may then be accessible by the user. Thus, in an example embodiment, a radio frequency of a given base station in a specific geographical region may be selected, thereby automatically providing access to video feeds associated with the selected frequency.

For example, the frequency 906.1 may be associated with ERT 1 and the second frequency 906.2 may be associated with ERT 2. Accordingly, when a user alters the frequency of the radio base station from the first frequency 906.1 to the second frequency 906.2, the list of available video feeds changes from video feeds associated with ERT 1 to video streams associated with ERT 2. Accordingly, in an example embodiment, a specific user may only receive those video feeds that are relevant to a particular ERT and, accordingly, not be presented with a plurality of video feeds that are not, under the circumstances, relevant to the specific user. In an example embodiment, a dispatcher at a control center may associate a set of video feeds with a given channel (e.g., one of the channels 902.1-902.s). In yet another example embodiment, a dispatcher at an operations center may make the selection of channel and/or the frequency that are made available to a user.

When the user accesses or sets his/her mobile communication device to a channel 902.1-902.s, associated video feeds are automatically accessible by the user. In an example embodiment, the channels 902.1-902.s are PPT channels in a PTT communication network.

FIG. 10 shows a GUI 1000, in accordance with an example embodiment, to allow an administrator to associate one or more video feeds with a communication channel. In an example embodiment, the GUI 1000 may be provided at a central control facility where an administrator console is provided. It will be appreciated that the GUI 1000 may have various different drop-down menus to configure channels, frequencies, and associated video streams. The GUI 1000 is shown in a state where an administrator has chosen a first frequency associated with a first zone or ERT (see also the GUI 900 of FIG. 9). The GUI 1000 reflects a situation where the administrator has associated video feeds 1000.1-1000.4 with the first frequency. It will, however, be appreciated that the GUI 1000 could be configured to allow selection of any different video feeds with a particular frequency. It should be noted that in an example embodiment, an administrator or dispatcher in a central control facility may script or configure a policy which governs the association of video streams with communication channels and VTGs. The system 300 (e.g., in the policy module 312) may automatically associate the video feeds with an appropriate channel and VTG. The system 300

   Motorola Solutions, Inc., Ex1001, p. 18

US 8,994,830 B2

11 12

may then automatically provide access to the video streams to the users of the channel and/or VTG.

FIG. 11 is a simplified block diagram of a machine in the example form of a computing system within which a set of instructions for causing the machine to perform any one or more of the methodologies discussed herein may be executed. In alternative embodiments, the machine may be connected (e.g., networked) to other machines. In a networked deployment, the machine may operate in the capacity of a server or a client machine in a server-client network environment, or as a peer machine in a peer-to-peer (or distributed) network environment. The machine may be a personal computer (PC), a tablet PC, a set-top box (STB), a Personal Digital Assistant (PDA), a cellular telephone, a web appliance, or any machine capable of executing a set of instructions (sequential or otherwise) that specify actions to be taken by that machine. Further, while only a single machine is illustrated, the term "machine" shall also be taken to include any collection of machines that individually or jointly execute a set (or multiple sets) of instructions to perform any one or more of the methodologies discussed herein.

The example computing system 1100 includes a processor 1102 (e.g., a central processing unit (CPU), a graphics processing unit (GPU) or both), main memory 1104 and static memory 1106, which communicate with each other via bus 1108. The computing system 1100 may further include video display unit 1110 (e.g., a plasma display, a liquid crystal display (LCD) or a cathode ray tube (CRT)). The computing system 1100 also includes alphanumeric input device 1112 (e.g., a keyboard), user interface (UI) navigation device 1114 (e.g., a mouse), disk drive unit 1116, signal generation device 1118 (e.g., a speaker), and network interface device 1120.

A disk drive unit 1116 includes machine-readable medium 1122 on which is stored one or more sets of instructions and data structures (e.g., software 1124) embodying or used by any one or more of the methodologies or functions described herein. Software 1124 may also reside, completely or at least partially, within main memory 1104 and/or within the processor 1102 during execution thereof by the computing system 1100, with the main memory 1104 and the processor 1102 also constituting machine-readable, tangible media. Software 1124 may further be transmitted or received over a network 1126 via a network interface device 1120 using any one of a number of well-known transfer protocols (e.g., Hypertext Transfer Protocol (HTTP)).

While the machine-readable medium 1122 is shown in an example embodiment to be a single medium, the term "machine-readable medium" should be taken to include a single medium or multiple media (e.g., a centralized or distributed database, and/or associated caches) that store the one or more sets of instructions. The term "machine-readable medium" shall also be taken to include any medium that is capable of storing, encoding or carrying a set of instructions for execution by the machine and that causes the machine to perform any one or more of the methodologies of the present application, or that is capable of storing, encoding or carrying data structures utilized by or associated with such a set of instructions. The term "machine-readable medium" shall accordingly be taken to include, but not be limited to, solid-state memories, optical and magnetic media, and carrier wave signals.

While the invention(s) is (are) described with reference to various implementations and exploitations, it will be understood that these embodiments are illustrative and that the scope of the invention(s) is not limited to them. In general, techniques for embedding priorities in multimedia streams may be implemented with facilities consistent with any hardware system(s) defined herein. Many variations, modifications, additions, and improvements are possible.

Plural instances may be provided for components, operations, or structures described herein as a single instance. Finally, boundaries between various components, operations, and data stores are somewhat arbitrary, and particular operations are illustrated in the context of specific illustrative configurations. Other allocations of functionality are envisioned and may fall within the scope of the invention(s). In general, structures and functionality presented as separate components in the exemplary configurations may be implemented as a combined structure or component. Similarly, structures and functionality presented as a single component may be implemented as separate components. These and other variations, modifications, additions, and improvements fall within the scope of the invention(s).

What is claimed is:

1. A method comprising:
monitoring a selection of a communication channel by a user of a mobile communication device;
providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone from which a plurality of video feeds associated with the geographic zone are sourced;
monitoring a selection of a radio frequency of the plurality of radio frequencies by the user;
identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel, the one or more video feeds being independent of the selected communication channel; and
providing access to the identified at least one video feed to the mobile communication device based on the user policy.

2. The method of claim 1, wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.

3. The method of claim 1, further comprising:
accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile communication device; and
presenting a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.

4. The method of claim 3, wherein the available video feeds are sourced from a group of surveillance cameras.

5. The method of claim 1, wherein the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio.

6. The method of claim 1, further comprising:
accessing a database to identify a group of video feeds associated with the user; and
when the user selects the communication channel, providing access to the group of video feeds associated with the user to one or more other users of the communication channel.

 Motorola Solutions, Inc., Ex1001, p. 19

US 8,994,830 B2

13 / 14

7. The method of claim 1, further comprising:

monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed;

processing the audio signal to identify an audio event; and

based on the identified audio event, providing access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.

8. The method of claim 1, wherein the communication channel is associated with a Virtual Talk Group (VTG).

9. The method of claim 1, wherein providing access to video feeds depends on a video association policy.

10. The method of claim 9, wherein the video association policy includes a role of the user defined in a policy database.

11. The method of claim 1, further comprising:

identifying a geographical location of the user's mobile communication device using a Global Positioning System;

identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and

automatically rendering access to the at least one video feed to the other mobile communication devices.

12. The method of claim 1, wherein the selected communication channel is a selected audio communication channel that is selected from a plurality of audio communication channels, the at least one video feed being associated with the selected audio communication channel, and the user policy identifying the one or more video feeds that are relevant to the user when the user accesses the selected audio communication channel.

13. The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel based on the geographic zone from which the at least one video feed is sourced and a device group that includes the user's communication device.

14. The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel by comparing a first geographic zone from which the at least one video feed is sourced with a second geographic zone corresponding to a location of the user's communication device.

15. An apparatus, comprising:

at least one processor; and

a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor, and the video stream association module being executed by the at least one processor to cause operations to be performed, the operations comprising:

monitoring a selection of a communication channel by a user of a mobile communication device;

providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone from which a plurality of video feeds associated with the geographic zone are sourced;

monitoring a selection of a radio frequency of the plurality of radio frequencies by the user;

identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel, the one or more video feeds being independent of the selected communication channel; and

providing access to the identified at least one video feed to the mobile communication device based on the user policy.

16. The apparatus of claim 15, wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.

17. The apparatus of claim 15, wherein the operations further comprise:

accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile communication device; and

presenting a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.

18. The apparatus of claim 17, wherein the available video feeds are sourced from a group of surveillance cameras.

19. The apparatus of claim 15, wherein the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio.

20. The apparatus of claim 15, wherein the operations further comprise:

accessing a database to identify a group of video feeds associated with the user; and

when the user selects the communication channel, providing access to the group of video feeds associated with the user to one or more other users of the communication channel.

21. The apparatus of claim 15, wherein the operations further comprise:

monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed;

processing the audio signal to identify an audio event; and

based on the identified audio event, providing access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.

22. The apparatus of claim 15, wherein the communication channel is associated with a Virtual Talk Group (VTG).

23. The apparatus of claim 15, wherein providing access to the video feed depends on a video association policy, the video association policy including a role of the user defined in a policy database.

24. The apparatus of claim 15, wherein the operations further comprise:

identifying a geographical location of the user's mobile communication device using a Global Positioning System;

identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and

US 8,994,830 B2

15

automatically rendering access to the at least one video feed to the other mobile communication devices.

25. An apparatus comprising:

a monitor module to monitor a selection of an audio communication channel by a user of a mobile communication device and to monitor selection of a radio frequency of a plurality of radio frequencies by the user;

a graphical user interface to display the plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone from which a plurality of video feeds associated with the geographic zone are sourced; and

a channel identifier module to identify at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected audio communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected audio communication channel, the one or more video feeds being independent of the selected communication channel; and

means for providing access to the identified at least one video feed to the mobile communication device based on the user policy.

26. The apparatus of claim 25, wherein the means for providing access associates the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.

27. The apparatus of claim 25, further comprising means for accessing a database to identify a plurality of members of

16

an emergency response team including the user of the mobile communication device, and wherein the graphical user interface displays a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.

28. The apparatus of claim 25, further comprising:

means for monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed;

means for processing the audio signal to identify an audio event; and

based on the identified audio event, the means for providing access provides access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.

29. The apparatus of claim 25, further comprising a policy module to associate the user policy with the at least one video feed with the selected communication channel based on the geographic zone from which the at least one video feed is sourced and a device group that includes the user's communication device.

30. The apparatus of claim 25, further comprising a policy module to associate the user policy with the at least one video feed with the selected communication channel by comparing a first geographic zone from which the at least one video feed is sourced with a second geographic zone corresponding to a location of the user's communication device.

* * * * *

Appx00109    Motorola Solutions, Inc., Ex1001, p. 21

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,994,830 B2                                      Page 1 of 1
APPLICATION NO.   : 12/188982
DATED             : March 31, 2015
INVENTOR(S)       : Shmuel Shaffer et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

    In the claims,

    Column 12, Line 27, after the word "user" change "." to --;--

Signed and Sealed this
Eighth Day of March, 2016

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

Appx00110    Motorola Solutions, Inc., Ex1001, p. 22

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**STA GROUP LLC,**
**Patent Owner/Appellant**

**Appeal No. 2025-1787**

**v.**

**MOTOROLA SOLUTIONS, INC.,**
**Petitioner/Appellee**

**Proceeding No.: IPR2023-01295**

_____

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely

filed May 14, 2025, in the United States Patent and Trademark Office in connection with the above

identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being

forwarded to the Federal Circuit.

Respectfully submitted,

Date:  June 25, 2025

By: *Macia L. Fletcher*

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

Acting Under Secretary of Commerce for Intellectual Property and
Acting Director of the United States Patent and Trademark Office

Appx00111

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 25th day of June, 2025, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Paul Skiermont<br>Charles Christian Koole<br>SKIERMONT DERBY LLP<br>pskiermont@skiermontderby.com<br>ckoole@skiermontderby.com | Lauren J. Dreyer<br>Lori Ding<br>Robert Lawrence Maier<br>Clarke Stavinoha<br>Eliot Damon Williams<br>BAKER BOTTS LLP<br>lauren.dreyer@bakerbotts.com<br>Lori.Ding@bakerbotts.com<br>robert.maier@bakerbotts.com<br>clarke.stavinoha@bakerbotts.com<br>eliot.williams@bakerbotts.com |

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

Appx00112

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**June 25, 2025**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**MOTOROLA SOLUTIONS, INC.,**
**Petitioner,**

v.

**STA GROUP LLC,**
**Patent Owner.**

**Case: IPR2023-01295**
**Patent No. 8,994,830 B2**
By authority of the

**ACTING DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



**Prosecution History ~ IPR2023-01295**

| Date | Document |
|---|---|
| 8/21/2023 | Petition for Inter Partes Review |
| 8/21/2023 | Petitioner's Power of Attorney |
| 9/13/2023 | Patent Owner's Power of Attorney |
| 9/13/2023 | Patent Owner's Mandatory Notices |
| 9/25/2023 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 12/5/2023 | Petitioner's Updated Mandatory Notices |
| 12/26/2023 | Patent Owner's Preliminary Response |
| 12/28/2023 | Petitioner's Updated Mandatory Notices |
| 1/18/2024 | Petitioner's Authorized Reply to Patent Owner's Preliminary Response |
| 1/25/2024 | Patent Owner's Sur-Reply to Petitioner's Authorized Reply |
| 3/21/2024 | Decision - Institution of Inter Partes Review |
| 3/22/2024 | Scheduling Order |
| 4/4/2024 | Petitioner's Objections to Patent Owner's Evidence |
| 5/7/2024 | Notice of Stipulation of Change to Due Dates 1-3 |
| 5/15/2024 | Patent Owner's Updated Mandatory Notices |
| 6/5/2024 | Notice of Deposition - Polish |
| 6/11/2024 | Patent Owner's Updated Mandatory Notices |
| 7/2/2024 | Patent Owner's Response |
| 7/9/2024 | Petitioner's Objections to Evidence Submitted with Patent Owner's Response |
| 8/26/2024 | Notice of Deposition - Akl |
| 8/30/2024 | Motion for Pro Hac Vice Admission - O'Donohue |
| 9/6/2024 | Order - Pro Hac Vice Admission - O'Donohue |
| 9/6/2024 | Petitioner's Updated Mandatory Notices |
| 9/6/2024 | Petitioner's Updated Power of Attorney |
| 9/18/2024 | Second Notice of Stipulation of Change to Due Dates 2-3 |
| 9/27/2024 | Petitioner's Reply to Patent Owner's Response |
| 9/27/2024 | Petitioner's Unopposed Motion for Entry of Default Protective Order and Motion to Seal |
| 10/3/2024 | Patent Owner's Objections to Petitioner's Evidence Filed with Petitioner's Reply |
| 10/7/2024 | Order - Motion to Seal and Entry of Protective Order |
| 11/6/2024 | Petitioner's Request for Oral Argument |
| 11/7/2024 | Patent Owner's Request for Oral Argument |
| 11/8/2024 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 11/12/2024 | Order - Setting Oral Argument |
| 12/18/2024 | Order - Patent Owner's LEAP Request |
| 1/8/2025 | Order - Amending Date of Oral Argument |
| 1/15/2025 | Petitioner's Updated Exhibit List |
| 1/15/2025 | Patent Owner's Updated Exhibit list |
| 1/30/2025 | Oral Hearing Transcript |
| 3/17/2025 | Final Written Decision |

**Prosecution History ~ IPR2023-01295**

| Date | Document |
|------|----------|
| 4/29/2025 | Petitioner's Unopposed Motion to Expunge Confidential Information |
| 5/1/2025 | Order - Petitioner's Motion to Expunge |

Trials@uspto.gov                                                    Paper: 39
571-272-7822                                          Date: March 17, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

———————————

IPR2023-01295
Patent 8,994,830 B2

———————————

Before MICHAEL J. FITZPATRICK, DAVID C. McKONE, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-01295
Patent 8,994,830 B2

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) (2018) and 37 C.F.R. § 42.73 (2019). For the reasons discussed herein, we determine that Petitioner, Motorola Solutions, Inc. ("Petitioner") has shown by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 (the "challenged claims") of U.S. Patent No. 8,994,830 B2 (Ex. 1001, "the '830 patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

# II. BACKGROUND

## A. *Procedural History*

Petitioner filed a Petition, Paper 1 ("Pet." or "Petition"), requesting *inter partes* review of the challenged claims. STA Group LLC ("Patent Owner") timely filed a Preliminary Response, Paper 7 ("Prelim. Resp."). With our approval, Petitioner filed a Preliminary Reply (Paper 9, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-reply (Paper 10, "Prelim. Sur-reply"). Based on the record at that time, we issued a Decision granting *inter partes* review. Paper 11 ("Dec." or "Institution Decision").

After institution, Patent Owner filed a Response (Paper 18, "PO Resp." or "Resp."), Petitioner filed a Reply (Paper 26, "Pet. Reply" or "Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply" or "Sur-reply").

On January 21, 2025, an oral hearing was held. A transcript of the hearing is made part of the record. Paper 38.

2

IPR2023-01295
Patent 8,994,830 B2

## B. Related Proceedings

According to the parties, the '830 patent is the subject of the following actions: *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.) filed Sept. 30, 2022 (the "Related Litigation"); and *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 4-22-cv-00840 (E.D. Tex.) filed Sept. 30, 2022, and administratively closed Oct. 6, 2022. Pet. 1; Paper 4, 1; Paper 6, 4–5; Paper 8, 4–5.

## C. Real Party in Interest

Petitioner identifies itself as the real party in interest. Pet. 1. Patent Owner identifies itself as the real party in interest. Paper 4, 1.

## D. The '830 Patent (Ex. 1001)

The '830 patent issued on March 31, 2015, and "relates to providing access to video streams associated with communication channels in a communication network." Ex. 1001, 1:7–9. Figure 1B of the '830 patent is reproduced below.



*FIG. 1B*

3

IPR2023-01295
Patent 8,994,830 B2

Figure 1B, above, is a diagram of communication system 150, including "a public switched telephone network (PSTN) 102, cellular network 104, and various networked computing devices," which is configured to communicate with, for example, "telephones 106, computers 112, Voice over Internet Protocol (VoIP) phones 110, mobile phones 108, gateways 116, routers 118, switches, transmission systems, relay systems, and other communication devices." *Id.* at 2:34–40; *see also id.* at 3:30–36. "The communication system 150 further includes a radio network 152 configured to communicate with one or more mobile communication devices (e.g., one or more push-to-talk (PTT) radios)." *Id.* at 3:37–40. According to the '830 patent, "[a] plurality of cameras 122 provide video feeds that . . . are associated with communication channels (e.g., communication channels providing Virtual Talk Groups (VTGs))." *Id.* at 2:40–43.

Figure 4 of the '830 patent is reproduced below.



*FIG. 4*

4

IPR2023-01295
Patent 8,994,830 B2

Figure 4, above, is a flow diagram of method 400 "for associating video feeds with a communication channel associated [with] a plurality of mobile communication devices." *Id*. at 6:18–21.  Referring to Figure 3, the '830 patent discloses that "a user interface may optionally be presented to a user (e.g., the user 305.1–305.q or 307.1–307.r) to allow the user to select a communication channel 302.1–302.n to which his/her mobile communication device 304.1–304.q or 306.1–306.r is to be set or tuned to." *Id*. at 6:24–28.  At block 402, the method 400 "may then monitor selection of a communication channel by the user 305.1–305.q, 307.1–307.r of an associated mobile communication device 304.1–304.n, 306.1–306.r." *Id*. at 6:28–32.  At block 404, "[a]t least one video feed associated with the selected channel . . . may be identified." *Id*. at 6:35–36.  "Once the particular channel has been selected and the at least one video feed associated with the channel has been identified, the method 400 may then provide any mobile communication device 305.1–305.q or 307.1–307.r that is set to the particular channel with access to the at least one video feed." *Id*. at 6:57–62.  At block 408, "the video feed may be then communicated to the mobile communication device." *Id*. at 7:1–3.

5

IPR2023-01295
Patent 8,994,830 B2

Figure 9 of the '830 patent is reproduced below.



*FIG. 9*

Figure 9, above, depicts a graphic user interface (GUI) 900 "to allow a user to select a communication frequency associated with a communication channel." *Id.* at 9:60–62. For example, "a user may select a specific VTG by selecting one of the channels 902.1–902.s," and then "a frequency associated with a region in which the user is located may be selected using the drop-down menus." *Id.* at 10:13–16. "Thus, in an example embodiment, a radio frequency of a given base station in a specific geographical region may be selected, thereby automatically providing access to video feeds associated with the selected frequency." *Id.* at 10:20–24.

## E. Illustrative Claim

Petitioner challenges claims 1–5, 7–19, and 21–24 of the '830 patent. Pet. 9–10. Claims 1 and 15 are independent. Claim 1 is generally illustrative and is reproduced below.

6

IPR2023-01295
Patent 8,994,830 B2

1. [pre][1] A method comprising:

[a] monitoring a selection of a communication channel by a user of a mobile communication device;

[b] providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone

[c] from which a plurality of video feeds associated with the geographic zone are sourced;

[d] monitoring a selection of a radio frequency of the plurality of radio frequencies by the user[;][2]

[e] identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,

[f] the one or more video feeds being independent of the selected communication channel; and

[g] providing access to the identified at least one video feed to the mobile communication device based on the user policy.

Ex. 1001, 12:18–39.

*F. Evidence*

Petitioner relies upon the following evidence:

(1) U.S. Patent Application Publication No. US 2006/0281471 A1, published December 14, 2006 ("Shaffer") (Ex. 1004);

(2) U.S. Patent No. 7,113,090 B1, issued September 26, 2006 ("Saylor") (Ex. 1011);

---

[1] Bracketed letter designations added.
[2] Here, the '830 patent appears to have a typographical error. Instead of a semicolon, it has a period. *See* Ex. 1001, 12:27.

IPR2023-01295
Patent 8,994,830 B2

(3) U.S. Patent Application Publication No. US 2007/0173273 A1, published July 26, 2007 ("Gogic") (Ex. 1006); and

(4) U.S. Patent No. 8,090,388 B1, filed March 20, 2007, and issued January 3, 2012 ("Opitz") (Ex. 1007).

Petitioner also relies on the declaration of Nathaniel Polish, Ph.D. (Ex. 1002).

Patent Owner relies on the declaration of Robert Akl, Ph.D. (Ex. 2006).

*G. Asserted Grounds of Unpatentability*

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–5, 7–19, 21–24 | 103(a)[3] | Shaffer, Saylor |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz |

Pet. 10.

## III. ANALYSIS

*A. Applicable Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

---

[3] Because the application from which the '830 patent issued has an effective filing date before March 16, 2013 (Ex. 1001, code (22)), citations to 35 U.S.C. § 103 are to the pre-AIA version. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29 § 3(n).

8

IPR2023-01295
Patent 8,994,830 B2

factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Neither party has presented evidence on the fourth *Graham* factor.

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. Reaching this conclusion, however, "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

## B. Level of Ordinary Skill

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of

9

Appx00124

IPR2023-01295
Patent 8,994,830 B2

maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as a person having "at least (a) a bachelor's degree in computer science, electrical engineering, or a similar field, and (b) approximately 2 years industry experience in networking or communication systems, including interoperating different types of networks that include video feeds." Pet. 13 (citing Ex. 1002 ¶¶ 45–47). Patent Owner does not dispute Petitioner's description of a person of ordinary skill in the art. PO Resp. 13.

Petitioner's description of a person of ordinary skill is consistent with the subject matter of the '830 patent. This is supported by the testimony of Petitioner's declarant, Dr. Polish. Ex. 1002 ¶ 46. Patent Owner's declarant, Dr. Akl, does not dispute Petitioner's description. Ex. 2006 ¶ 30. We, therefore, continue to use the same description that we adopted in our Institution Decision, as it is consistent with the challenged patent and the asserted art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art itself may reflect an appropriate level of skill).

### C. Claim Construction

A claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R.

10

IPR2023-01295
Patent 8,994,830 B2

§ 42.100.  Thus, we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art.  *Id.* at 1312–17.  "In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims."  *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995).  Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term.  *Phillips* at 1315.  Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Id.* at 1317.

Petitioner contends that the term "video stream association module" recited in claim 15 may invoke pre-AIA 35 U.S.C. § 112 ¶ 6[4] and proposes the following construction:

---

[4] Because the application from which the '830 patent issued has an effective filing date before September 16, 2012 (Ex. 1001, code (22)), citations to 35 U.S.C. § 112 are to the pre-AIA version.  AIA § 4(e).

IPR2023-01295
Patent 8,994,830 B2

| Elements | Function and Structure |
|---|---|
| 15[b] "video stream association module" | <u>Function</u>: monitoring a selection of a communication channel. . ., providing a plurality of radio frequencies on a display. . ., monitoring a selection of a radio frequency. . ., identifying at least one video feed. . ., providing access to the identified at least one video feed. . .<br><br><u>Structure</u>: "a variety of software applications and/or hardware that can monitor and process communications between the communication devices," as described at Ex[1001], 3:46–49 and FIGs. 2–4, 89, 11 and associated text. |

Pet. 14–15.

In its Response, Patent Owner argues that "[t]he E.D. Tex. rejected this construction, undermining Petitioner's challenge to claim 15." PO Resp. 11.

According to Patent Owner, the parties agreed on the following constructions in the Related Litigation:

| Term | Agreed Construction |
|---|---|
| Order of Steps (Claim 1) | The "monitoring a selection of a communication channel" step must be performed before the "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds" step. |
| "Push-to-Talk (PTT) channel in a PTT communication network" (Claim 5) | "A channel for transmitting half-duplex communications in a Push-to-Talk communication network" |

PO Resp. 9–10 (citing Ex. 2001, 7, 9–10).

Patent Owner states that "[t]he Eastern District of Texas further construed certain claims as follows:

12

IPR2023-01295
Patent 8,994,830 B2

| Term | E.D. Tex. Construction |
|---|---|
| "wherein the at least one video feed is associated with the selected communication channel . . . the one or more video feeds being independent of the selected communication channel" (Claim 1) | "the one or more video feeds being capable of being associated with more than the selected communication channel" |
| "video stream association module" (Claim 15) | Plain and ordinary meaning; not subject to 35 U.S.C. § 112 ¶ 6 |

PO Resp. 10–11 (citing Ex. 2005, 17–31).

In its Reply, Petitioner argues that "[t]he obviousness grounds in the Petition apply under the district court's constructions," and that Patent Owner's "assertion that the court's plain and ordinary meaning construction of video stream association module' 'undermin[es]' Petitioner's challenge to claim 15 has no support or explanation." Pet. Reply 1 (quoting PO Resp. 11) (alteration in original). Petitioner argues that "Shaffer-Saylor and Gogic teach these limitations under that court's construction." Pet. Reply 2.

For purposes of this Decision, we adopt the claim construction agreed to by the parties as well as the claim construction provided by the district court. We otherwise use the ordinary and customary meaning of the claim terms as they would be understood by a person of ordinary skill in the art at the time of the claimed invention.

## D. Relevant Prior Art

### 1. Shaffer (Ex. 1004)

Shaffer is a U.S. Patent Application Publication published on December 14, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1004, code (43).

13

IPR2023-01295
Patent 8,994,830 B2

Shaffer relates to "a method and system for communicating using position information." Ex. 1004 ¶ 1. According to Shaffer, a method for communicating using position information includes:

> communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location.

> adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.

*Id*. ¶ 5; *see also id*. at Fig. 5, ¶¶ 49–50. "The first and second communication parameters may comprise a frequency, a modulation method and/or an encryption key." *Id*. ¶ 6. According to Shaffer, "[t]echnical advantages of particular embodiments include providing a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys." *Id*. ¶ 8.

Shaffer's Figure 3 is shown below:

14

IPR2023-01295
Patent 8,994,830 B2



FIG. 3

Shaffer's Figure 3 illustrates "[c]ommunication system 100, [that] includes communication networks 110–114, interoperability system (IS) 120 and endpoints 122." Ex. 1004 ¶ 37. "[C]ommunication network 110 comprises a radio or wireless network, communication network 111 comprises a LAN, communication network 112 comprises a [Public Switched Telephone Network] (PSTN), communication network 113 comprises a radio network and communication network 114 comprises an [Internet Protocol] (IP) network." *Id.* According to Shaffer, "communication system 100 may comprise any number of IP or non-IP communication networks of any wireless or wireline form capable of communicating audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages." *Id.*

15

IPR2023-01295
Patent 8,994,830 B2

Shaffer explains that "[c]ommunication networks 110–113 may comprise networks of particular groups or agencies (e.g., a municipality's police department network), whether operational with respect to a particular area or otherwise." *Id.* For example, "endpoints 122 comprise a PC (endpoint 122a), a [personal digital assistant] (PDA endpoint 122b) and an IP phone 122c)." *Id.* Interoperability system "120 may be configured to communicate with any type of communication endpoint." *Id.*

Shaffer's Figure 2 is shown below:



Shaffer's Figure 2 depicts "communication system 50 for communicating using position information," which "includes a plurality of geographic regions 52–55, communication networks 60–64, endpoints 70 and 74 and CCP [communication control post] 80." *Id.* ¶ 26. "Communication networks 60–64 each may communicate information (e.g., signals, data or messages) over assigned radio frequencies, modulation methods and/or various encryption keys to support communication among

16

IPR2023-01295
Patent 8,994,830 B2

network communication devices." *Id*. ¶ 27. According to Shaffer, "frequencies, modulation methods and/or encryption keys utilized by the various communication networks 60–64 may be embedded in memory of mobile endpoints" such that "as mobile endpoint 70 (e.g., a LMR in a safety vehicle) moves between geographic areas, the endpoint may use GPS information to pin-point its location and automatically adjust its current communication radio frequency, modulation method and/or encryption key settings to allow the user of the endpoint to communicate with local safety and security forces in the area in which the endpoint is currently located." *Id*. ¶ 31.

Shaffer's Figure 4 is shown below:



| LOCATION | NETWORK | FREQUENCY (Hz) | ENCRYPTION KEY |
|---|---|---|---|
| CITY A | POLICE | X | J |
| CITY A | FIRE | Y | K |
| CITY B | POLICE | Z | L |
| STATE C | POLICE | P | M |
| COUNTRY D | POLICE | Q | N |

*FIG. 4*

17

<u>Appx00132</u>

IPR2023-01295
Patent 8,994,830 B2

Shaffer's Figure 4 illustrates mobile endpoint 200 including "a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.* ¶¶ 43, 44. According to Shaffer, "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200 and receives and transmits voice and other data between endpoint 200 and other network devices and components." *Id.* ¶ 44. Shaffer discloses that "[u]ser interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices," and "may comprise a keypad, display, touch screen, audio input or any other suitable interface." *Id.* "For example, through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (e.g., radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*

   2. *Saylor (Ex. 1011)*

Saylor is a U.S. Patent that issued on September 26, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1011, code (45).

Saylor describes "a security network where a user may set up personalized alarms and alert services; identify various methods of contact; order at which to be contacted; individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information." Ex. 1011, Abstr. Saylor's "security system [may be] connected to a wireless communication system which enables communication with a subscribed user when an alarm (or other defined) situation occurs." *Id.* at 2:10–13. Saylor describes "a personal security network where one or more security devices related to a subscriber may be

18

IPR2023-01295
Patent 8,994,830 B2

connected to a central security network over wireless communication,"
where the central security network "may monitor those security devices and
alert a user when an alert situation occurs." *Id*. at 2:20–26.

Figure 1 of Saylor is shown below.



FIG. 1

Saylor's Figure 1 depicts "a graphical representation of a central
security network system 100." *Id*. at 5:63–64. According to Saylor,
"[a]larm situations may be detected by a control panel 120, 122, 124
associated with and preferably local to each security device and/or system
(e.g., property, personal property, individual, or combination)," wherein
"[c]ontrol panels 120, 122, 124 may transmit alarm information to central
security network 130." *Id*. at 6:1–6; *see also id*. at 7:29–40. "Central
security server 130 may then alert users and other identified entities via
wireless and/or other devices, such as mobile device 240, via a voice alarm,
text message and other notifications." *Id*. at 7:40–43; *see also id*. at 6:19–
25. According to Saylor, "[c]ontact individuals and/or entities $161_1$–$162_N$

19

IPR2023-01295
Patent 8,994,830 B2

identified by the user may also receive alert notification in an order determined by the user," and "the user may select contact order and/or other actions through menu options at the time of alarm situation notification." *Id*. at 6:25–30. Saylor also discloses that "[d]atabases 140, 142, 144 and 146 may store relevant information for personalized alarm services." *Id*. at 6:9–10.

> Saylor explains that

> [c]entral security network 130 may process the alarm situation. User profile information may be retrieved from user database 140. User database 140 may contain user information, such as profile information, user preferences, contact information, special instructions and/or other information. User profile information may include one or more of name, identification information, address information, and other profile information. User preferences may include mode of communication, order of communication, contact information and other preferences. User preference information may be associated with each security device, group of devices, systems or other combinations. For example, different alarm situations that may be detected in various locations or systems may warrant different levels of response. In addition, a user may maintain a personal address book where contact information (e.g., phone, pager, mobile device, etc.) associated with various individuals may be stored and accessed based on various identified alarm situations and/or potential alarm situations. Special instructions may include information to be conveyed to entities reacting to the alarm for a particular location or object. For example, when a fire detector is activated, the user may want to inform the fire department that the user has two pets living at the user's primary residence. Other instructions for different registered locations, objects and/or individuals may be stored and conveyed to entities reacting to the alarm situation per the user's instructions or preferences.

*Id.* at 8:34–60.

20

IPR2023-01295
Patent 8,994,830 B2

Saylor also explains that "[b]ased on user information retrieved from one or more databases 140, 142, 144 and 146, central security network 130 may contact one or more users 160 or other identified contacts $162_1$–$162_N$ as specified by the user. Other identified contacts may include neighbors, family members, personal doctors, emergency entities 164, such as the police, fire department, hospital and others." *Id.* at 9:22–28.

For example, Saylor explains that

> when a smoke alarm goes off, a user may instruct a central security network to first contact the user's home to verify the alarm. If no one is home or the emergency situation was confirmed by someone at home, the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency.

*Id.* at 12:15–21.

Saylor further describes "a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected by comparing images" such that "[w]hen a change in images (indicating motion) is detected, an alarm may be signaled." *Id*. at 2:45–50.

Figure 10 of Saylor is set out below.

21

IPR2023-01295
Patent 8,994,830 B2



Figure 10 is a flowchart illustrating a process for accessing video images provided by a central system network. According to Saylor, "[u]sers may monitor an identified location by using video or other similar recording device. The video feature of the central security network . . . may compare images. For example, if a change between images is detected, a recording may be triggered. The video clips of movement may be stored or sent to a server of a central security network. The user may then be notified according to predefined notification methods." *Id.* at 16:41–51.

22

IPR2023-01295
Patent 8,994,830 B2

E.      *Obviousness Over Shaffer and Saylor (Ground 1)*

Petitioner contends that claims 1–5, 7–19, and 21–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor.  Pet. 23–54.  Petitioner submits the testimony of Dr. Polish in support of its contentions.  Ex. 1002 ¶¶ 82–152.  Patent Owner disputes aspects of Petitioner's evidence and arguments.  PO Resp. 14–38.  Patent Owner submits the testimony of Dr. Akl in support of its contentions.  Ex. 2006 ¶¶ 46–103.  We first consider whether Petitioner establishes a rationale to combine the asserted prior art.

### 1.  Rationale to Combine Shaffer and Saylor

Petitioner contends that a person of ordinary skill in the art "would have been motivated to combine Shaffer and Saylor . . . to connect Saylor's central security network as an input to Shaffer's IS [Interoperability System]."  Pet. 25–26.  Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the proposed combination.



23

IPR2023-01295
Patent 8,994,830 B2

Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27. According to Petitioner, "[i]n the combined system ('Shaffer-Saylor'), the IS in Shaffer ([120 boxed in] red) facilitates communications from Saylor's central security network to the relevant personnel and authorities in a different network (*e.g.*, a building's security personnel or local police)." *Id.* at 26 (citing Ex. 1002 ¶ 84).

"For example," Petitioner explains,

> the IS assigns a multicast IP address (communication channel) to a particular endpoint or a group of endpoints in advance (*e.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses)) and provides that multicast IP address to store in Saylor's databases. Ex[1002], ¶85. When Saylor's central security network detects an alarm situation, it queries its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor ([shown in] blue) to the relevant recipients ([shown in] purple). Ex[1011], 9:22–28, 11:67–12:6, 13:51–54; Ex[1002], ¶85.

*Id*.

Petitioner contends that the motivation for a person of ordinary skill in the art to make this combination

> is found in both references. For example, as Shaffer describes, IS 120 is designed to connect various types of networks, including a PTT radio network (typically used by security or emergency personnel) and a local area network (LAN) or public switched telephone network (PSTN) (typically used by sensors in homes and businesses). Ex[1004], ¶0037; Ex[1002], ¶86. In addition, Shaffer describes that the networks can be associated with locations such as business and campuses. Ex[1004], ¶0027. In view of these disclosures, a POSITA would have recognized that Shaffer's IS is well-suited to connect a network,

24

IPR2023-01295
Patent 8,994,830 B2

> such as a video security system designed to monitor particular
> buildings, with a different network that responds to incidents in
> those buildings, such as a security or emergency network.
> Ex[1002], ¶86.

*Id.* at 27.

> Petitioner goes on to explain that

> Saylor discloses the type of network well-suited to work with
> Shaffer's IS. Ex[1002], ¶87. For example, Saylor describes a
> packet-based central security network (using "TCP/IP") that
> receives alarms from sensors in buildings and other facilities.
> Ex[1011], 17:10–21, FIG. 11, 6:33–43. That central security
> network processes the alarms and, according to rules and
> preferences, transmits notifications and information to relevant
> recipients in *other* networks, including security or emergency
> personnel in other types of networks with other communication
> protocols. *Id.*, 6:33–43, 8:18–33, 9:25–28; Ex[1002], ¶87. The
> notifications and information can include audio, video, or other
> data. Ex[1011], 16:41–51, 8:52–60. To implement these
> communications, Saylor describes that the central security
> network can identify relevant recipients in an "address book,"
> (*id.*, 7:48–52), but does not explain *how* to convey notifications
> to recipients in different networks. Ex[1002], ¶88. Shaffer's IS
> system provides the needed mechanism for interoperable
> communications to achieve Saylor's goals; using Shaffer's IS,
> security personnel or other responders could directly and
> seamlessly receive communications and information from
> surveillance cameras in an alarming building. *Id.*

Pet. 28. Petitioner's arguments are supported by Dr. Polish's testimony. *See*
Ex. 1002 ¶¶ 82–88.

Petitioner also argues that a person of ordinary skill in the art "would
have had a reasonable expectation of success in combining the references in
the manner described." Pet. 28 (citing Ex. 1002 ¶ 89). Petitioner asserts
that, "[i]n the combination, Saylor's central security network sends
communications to another network via Shaffer's IS in the manner already
envisioned by both references—namely, by a first network sending a packet-

25

IPR2023-01295
Patent 8,994,830 B2

based communication through an intermediary network to a second network also connected to the same intermediary network." Pet. 28–29 (citing Ex. 1011, 6:22–25, Fig. 1; Ex. 1004 ¶ 20; Ex. 1002 ¶ 89). According to Petitioner, a person of ordinary skill in the art "would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor." Pet. 29 (citing Ex. 1002 ¶ 90; Ex. 1004 ¶¶ 39–40).

Patent Owner contests Petitioner's evidence and arguments directed to a rationale to combine the teachings of Shaffer and Saylor. *See* PO Resp. 16–29. Patent Owner argues that "Shaffer and Saylor are directed to vastly distinct systems that a POSITA would not have considered combining." PO Resp. 16 (citing Ex. 2006 ¶ 46). Patent Owner claims that "[t]he structural differences between the references, the existing disclosure of each reference, and the lack of any detail regarding the combination evidences the lack of a motivation to combine Shaffer with Saylor." PO Resp. 16.

Patent Owner first argues that "Shaffer and Saylor are structurally distinct," and that they "present two ways of structuring networks that are incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references." *Id.* at 17 (citing Ex. 2006 ¶ 47). Patent Owner argues that Shaffer, "where endpoints move between locations and adjust communication parameters as they enter different locations, is markedly distinct from the teachings of Saylor." *Id.* at 18. "In contrast," Patent Owner argues, "Saylor handles all communications for a variety of systems of security devices at a specific premises regardless of a

26

IPR2023-01295
Patent 8,994,830 B2

location of a user relative to the premises." *Id.* (citing Ex. 2006 ¶ 49). Patent Owner argues that "[b]ecause Saylor's system establishes communication with owners/users and authorized entities in a location agnostic manner, and provides the mechanisms to establish those communications, there would be no need to combine Saylor with Shaffer's transient endpoints." PO Resp. 19 (citing Ex. 2006 ¶¶ 50, 82–89; Ex. 2008, 60:19–61:1, 71:20–72:3). According to Patent Owner, "Saylor's location-agnostic security system would not be a relevant input to Shaffer's location-specific endpoint communication network," and "[t]he structural differences between Shaffer and Saylor discourage the combination." PO Resp. 20–21 (citing Ex. 2006 ¶¶ 51, 54).

Petitioner counters that Patent Owner's position "is contradicted by Saylor's actual disclosure that '[n]etwork alerts may be based on alert notifications associated with property, personal property and/or individuals within a ***defined area or locality***.'" Pet. Reply 6 (quoting Ex. 1011, 10:62–11:3) (emphasis by Petitioner). "Indeed," Petitioner argues, "on cross-examination Dr. Akl admitted that this example in Saylor is not agnostic to location." Pet. Reply 6 (citing Ex. 1036, 68:3–69:8) (emphasis omitted). Petitioner points out that "Shaffer's endpoints are also not all 'transient' as [Patent Owner] suggests. Shaffer's endpoints include a 'personal [desktop] computer' and 'command center' that are not mobile." Pet. Reply 6 (citing Ex. 1004 ¶ 25; Ex. 1002 ¶ 71; Ex. 1036, 65:3–66:10). Petitioner notes that "Shaffer discloses other stationary, non-transient, endpoints such as those in 'buildings, campuses, municipalities, counties, states, countries or any other particular geographical area.'" Pet. Reply 6 (citing Ex. 1004 ¶¶ 25–27). Petitioner also points out that "Saylor expressly describes providing alarms to transient 'emergency entities' such as 'the police, fire department . . . and

27

IPR2023-01295
Patent 8,994,830 B2

others.'"  Pet. Reply 7 (citing Ex. 1011, 1:17–22, 9:22–28) (alteration in original).

In its Sur-reply, Patent Owner argues that the "two communication regimes" of Saylor and Shaffer, "alerts sent to a predetermined list of recipients (*i.e.*, a closed group of recipients) versus creating communication groups based on endpoint position information (*i.e.*, an open group of participants)—are fundamentally at odds with one another such that a POSITA would not have been motivated to combine these references."  PO Sur-reply 10 (citing Ex. 2006 ¶¶ 47–54).

We agree with Petitioner and disagree with Patent Owner.  Despite differences between Saylor and Shaffer, it does not follow necessarily that they are "fundamentally at odds with one another" such that a person of ordinary skill in the art would consider them "incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references" as Patent Owner argues.  PO Resp. 17; PO Sur-reply 10.  Indeed, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *KSR*, 550 U.S. at 420.

Here, Dr. Polish testifies, and we agree, that a person of ordinary skill in the art would "have recognized that Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network."  Ex. 1002 ¶ 86.  We credit Dr. Polish's testimony that a person of ordinary skill in the art "would have understood that Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and

28

IPR2023-01295
Patent 8,994,830 B2

information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Indeed, the Federal Circuit has "repeatedly held that an implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, *or more efficient*." *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (emphasis added). Dr. Polish's testimony that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network," specifically describes the desirable benefit of efficiency a person of ordinary skill in the art would have reasonably expected to obtain from Petitioner's proposed combination. Ex. 1002 ¶ 88.

Patent Owner next argues that Shaffer and Saylor provide "redundant disclosures," i.e., "redundant mechanisms for sending communications between networks." *See* PO Resp. 23–26. Patent Owner argues that "there would be no need to combine the teachings of Shaffer with Saylor because Saylor already includes everything it needs to send notifications to recipients in different networks." PO Resp. 25. Patent Owner argues that "[b]ecause Saylor is replete with instructions regarding how to convey notifications to recipients across a wide range of communication mediums, there would be no need to incorporate this with Shaffer's IS, and therefore no need to combine these references." *Id.* at 26 (citing Ex. 2006 ¶ 64).

29

IPR2023-01295
Patent 8,994,830 B2

In its Reply, Petitioner argues that Patent Owner "conflates whether the combined references are redundant with the question of whether they are analogous." Pet. Reply 8. According to Petitioner, Saylor's disclosure of "different possible '[m]ethods of notification' is not redundant of using Shaffer's IS approach to implement communications among devices on different networks." *Id.* at 8–9 (citing Ex. 1002 ¶¶ 87–88). Petitioner explains that "Shaffer's IS specifically provides the mechanism by which the different '[m]ethods of notification' in Saylor can be used to communicate alarms from sensors in buildings/facilities to emergency services across different networks in different regions, including different buildings." Pet. Reply 9 (citing Ex. 1004 ¶¶ 39–40, 46; Ex. 1002 ¶¶ 84–85; Pet. 25–26, 28).

We agree with Petitioner. Dr. Polish specifically testifies that "the IS [Interoperability System] in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. Dr. Polish explains that in the combined system,

> the IS of Shaffer would assign a multicast IP address (communication channel) to a particular endpoint or a group of endpoints requiring notification of a particular type of event. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses). That IP address would have then been stored in Saylor's databases for retrieval and use to contact entities outside of the security system upon occurrence of an event. For example, in the combined system, when an alarm is triggered in Saylor's central security network, the security network could query its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor (blue) to the relevant recipients (purple).

30

IPR2023-01295
Patent 8,994,830 B2

Ex. 1002 ¶ 85 (citing Ex. 1011, 9:22–28, 11:67–12:6, 13:51–54).

Petitioner's combined Shaffer-Saylor system is shown below.

Petitioner's annotated Shaffer-Saylor system depicts Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. The clear complementation, interoperability, and benefits of Petitioner's combined Shaffer-Saylor system directly contradicts Patent Owner's argument that Shaffer and Saylor provide "redundant disclosures," and that "there would be no need to combine the teachings of Shaffer with Saylor." PO Resp. 25.

Finally, Patent Owner argues that "the Petition presents hindsight-ridden 'motivations' that fail to consider the context of the art." PO Resp. 26. In particular, Patent Owner argues that "[t]he Petition fails to provide any reason to deviate from Shaffer's disclosure regarding storing IP addresses in the endpoints to enable them to communicate locally while travelling between geographic areas," and "[t]here would be no reason to

31

IPR2023-01295
Patent 8,994,830 B2

store these addresses in Saylor's stationary network." PO Resp. 28 (citing Ex. 1004 ¶¶ 40, 8; Ex. 2006 ¶ 68).

We disagree with Patent Owner. As noted above, Dr. Polish testifies that "the IS in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. According to Dr. Polish, "Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network." *Id.* ¶ 86. Dr. Polish further testifies, and we agree, that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art at the time of the claimed invention would have had a reasoned basis to combine the teachings of Shaffer and Saylor in the manner described in the Petition and would have had a reasonable expectation of success in that endeavor.

### 2. *Independent Claim 1*

Petitioner contends that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor. Pet. 29–42. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 91–110. Patent Owner disputes certain aspects of Petitioner's evidence and arguments with respect to claim 1, in particular limitations 1[b], 1[d],

32

IPR2023-01295
Patent 8,994,830 B2

and 1[e].  *See* PO Resp. 14–16, 29–35.  Patent Owner does not contest Petitioner's evidence and arguments with respect to claim 1's preamble and limitations [1a], [1c], [1f], and [1g].  *See id.*  We consider all of Petitioner's evidence and arguments directed to claim 1, and we address in detail Patent Owner's arguments directed to the contested limitations.

### a.  Preamble: A method comprising:

Petitioner asserts that "Shaffer-Saylor discloses "*[a] method, comprising.*"  Pet. 29 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 91).  Indeed, the abstract of Shaffer describes "[a] method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network."  Ex. 1004, Abstr.  Patent Owner does not contest this evidence.  *See* PO Resp. 14–35.  Based on the complete record, we determine that Shaffer's disclosure meets the preamble of independent claim 1.

### b.  Limitation 1[a]

Limitation 1[a] recites: "*monitoring a selection of a communication channel by a user of a mobile communication device.*"  Ex. 1001, 12:19–20.  Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[a].  Pet. 29–31.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation.  *See* PO Resp. 14–35.

Petitioner asserts that, "in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located."  Pet. 29.  Petitioner asserts that "Shaffer discloses a communication channel as described in the '830 patent—namely, a 'particular IP address' for hosting a 'virtual talk

33

IPR2023-01295
Patent 8,994,830 B2

group.'" *Id.* at 28–29 (citing Ex. 1001, 2:59–62, 4:22–28; Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

To illustrate this, Petitioner refers to Figure 3 of Shaffer, shown below.  Pet. 30.



*FIG. 3*

With respect to Shaffer's Figure 3, Petitioner explains that it "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." *Id.* (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37).  "In particular," Petitioner explains that "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'"  Pet. 30 (citing Ex. 1004 ¶¶ 38–39).  "For example," Petitioner explains, "communication channels

34

IPR2023-01295
Patent 8,994,830 B2

(multicast IP addresses) may exist for 'local safety and security agencies.'" Pet. 30 (citing Ex. 1004 ¶ 40).

"Second," Petitioner asserts, "Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel." Pet. 31 (citing Ex. 1002 ¶ 94). "For example," Petitioner explains, "Shaffer discloses that a police officer 'such as a state highway patrol officer, may be provided with a PC with a touch screen' where the 'PC comprises a mobile endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 40). According to Petitioner, "[t]he officer can use the touchscreen to select 'local safety and security forces' by selecting '[i]cons on the touch screen' to 'join communication sessions.'" Pet. 31 (citing Ex. 1004 ¶ 34). Petitioner explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" *Id.*; *see also id.* ¶ 41 (describing that IS stores multicast addresses "utilized by various agencies"). Petitioner asserts that "[t]he communication parameters identified by IS 120 include a 'multicast address' identifying the communication channel for the VTG for 'local safety and security forces.'" Pet. 31 (citing Ex. 1004 ¶¶ 40–41). According to Petitioner, "[t]his allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke." Pet. 31 (citing Ex. 1004 ¶ 40).

"Finally," Petitioner asserts, "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

35

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on Shaffer's teaching of a communication channel similar to one described in the '830 patent—namely, a particular IP address for hosting a virtual talk group. *See* Pet. 29–30 (citing Ex. 1001, 2:59–62 ("The gateway 116 may provide voice interoperability between computer and non-computer networks, such as the PSTN 102, by bridging telephone transmissions to Internet Protocol (IP) multicast streams."), 4:22–28 ("The radio network 152 may communicate with the computer network 114 by way of a gateway 160, which provides voice and control interoperability between the radio network 152 and the computer network 114 by bridging media and control transmissions to Internet Protocol (IP) multicast and/or Unicast (e.g., Session Initiation Protocol (SIP)) streams."); Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

Petitioner refers to Shaffer's Figure 3 and explains that Shaffer "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." Pet. 28 (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). In particular, Petitioner points out that Shaffer's "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38–39).

Petitioner also explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 41. In addition, Petitioner explains that "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other

36

IPR2023-01295
Patent 8,994,830 B2

data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a communication channel by a user of a mobile communication device*" as recited in limitation 1[a].

### c. *Limitation 1[b]*

Limitation 1[b] recites: "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone.*" Ex. 1001, 12:21–23.

Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[b]. Pet. 32–35. Patent Owner disagrees. PO Resp. 29–31.

Petitioner asserts that "in Shaffer, mobile security personnel can select a frequency associated with a nearby building" and "Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones." Pet. 32 (citing Ex. 1004, Fig. 4). To illustrate this capability, Petitioner provides an annotated version of Shaffer's Figure 4, shown below.

37

IPR2023-01295
Patent 8,994,830 B2



FIG. 4

Petitioner's annotated version of Shaffer's Figure 4 depicts an example of mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210, "which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location."  Pet. 33; Ex. 1004 ¶¶ 44, 46.

Petitioner explains that Shaffer's Figure 4 "shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210."  Pet. 32 (citing Ex. 1004 ¶¶ 43, 46–47).  According to Petitioner, "these parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q)."  Pet. 32 (citing Ex. 1004 ¶¶ 43–48, Fig. 4) (emphasis by Petitioner).

38

IPR2023-01295
Patent 8,994,830 B2

Petitioner asserts that, in Shaffer, "the mobile device stores 'radio frequencies' of 'communication networks by location.'" Pet. 33 (citing Ex. 1004 ¶ 46). Petitioner explains that in Figure 4, "each radio frequency is also specifically associated with a 'location' such as City A, City B, State C, or Country D." Pet. 33 (citing Ex. 1004, Fig. 4). Petitioner also points out that "Shaffer explains the locations can also be 'buildings' and 'campuses,' in addition to municipalities." Pet. 33 (citing Ex. 1004 ¶ 27). "For example," Petitioner explains, Figure 2 of Shaffer shows "different geographic regions (52, 53, 54, 55) 'may correspond to buildings, campuses, municipalities . . . or any other particular geographical area,'" and "[e]ach geographic region may also contain one or more communication networks (60–64), each of which may have a different 'assigned radio frequenc[ies].'" Pet. 33–34 (citing Ex. 1004 ¶ 27; *see also id.* ¶¶ 20–22, 26, 34–35; Ex. 1002 ¶¶ 97–98). Shaffer's Figure 2 is shown below.



*FIG. 2*

Shaffer's Figure 2 depicts system 50 for communicating using position information that includes a plurality of geographic regions 52–55,

39

IPR2023-01295
Patent 8,994,830 B2

communication networks 60–64, endpoints 70, 74, and communication control post (CCP) 80.  Ex. 1004 ¶ 26, Fig. 2.

Petitioner asserts that "Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device."  Pet. 34 (citing Ex. 1002 ¶ 99).  "For example," Petitioner explains, "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface."  Pet. 34 (citing Ex. 1004 ¶ 44 (emphasis by Petitioner).

According to Petitioner, "[t]he display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network."  Pet. 34–35 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶ 3, 8 (describing, as background, known functionality for using a handbook to look up local frequencies by location)).  "For example," Petitioner explains with reference to Shaffer's Figure 4, "if a user enters city A, there are two possible frequencies, X and Y.  Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the 'pressing' of a touch screen 'key stroke.'"  Pet. 35 (citing Ex. 1004 ¶¶ 35–36, 44).

Petitioner argues that a person of ordinary skill in the art "would at least have recognized that displaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' would have been obvious and one of a finite number of predictable options for selecting on the touch screen all available frequencies in an area."  Pet. 35 (citing Ex.

40

IPR2023-01295
Patent 8,994,830 B2

1002 ¶ 100). "Such an implementation," Petitioner asserts, "uses a known technique (touchscreen display and selection) with known benefits (selection using a single 'stroke') according to its established function, and is therefore obvious." *Id.*

Patent Owner argues that "Shaffer notably lacks disclosure of any radio frequency being presented on the user interface (or any display), much less a plurality of radio frequencies presented on a display of the mobile communication device as claimed." PO Resp. 29. Patent Owner also argues that "[t]here is nothing in Shaffer that suggests interface 204 provides, on a display, any of the "several different communication parameter listings 210" that are stored in memory module 208, much less a plurality of these listings." *Id.* at 30 (citing Pet. 32; Ex. 1004 ¶ 46). According to Patent Owner, "[t]he assumption that Shaffer discloses providing a plurality of the stored communication parameter listings on a display highlights that the Petition uses hindsight biased reasoning to arrive at the claimed invention." PO Resp. 30. Patent Owner also asserts that "it is unclear why Shaffer's 'instructions regarding adjustment of the end point's communication settings' would provide a plurality of radio frequencies on a display." PO Resp. 30 (citing Ex. 1004 ¶ 44).

We agree with Petitioner and disagree with Patent Owner. Shaffer explains that

> [i]n some cases the endpoint may be set to automatically switch communication settings upon such a move once the endpoint enters an area of a different or particular communication network. *In some cases such a switch may occur through a user interface, such as a user pressing a button to enable the switch. For example, specific buttons may be used to switch communication settings.*

41

IPR2023-01295
Patent 8,994,830 B2

Ex. 1004 ¶ 32 (emphasis added).  Shaffer explains that these "communication settings" include "radio frequency and encryption key."  *Id.* ¶ 31.

Shaffer's Figure 4 illustrates mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210.  Ex. 1004 ¶ 44, Fig. 4.  Parameter listing 200 provides a call-out table populated with a list of geographic locations of different networks along with their related frequencies (in Hz) and encryption keys.  Parameter listing 200 shows different geographic zones (City A, City B, State C, Country D) and associated radio frequencies (frequencies X, Y, Z, P, Q).  Shaffer explains that user interface 204 "may comprise a keypad, *display, touch screen*, audio input *or any other suitable interface*."  *Id.* ¶ 44 (emphasis added).

Although Figure 4 represents the frequencies of the different geographic zones by letters (X, Y, Z, P, Q), the column heading of the display clearly indicates that they represent a "FREQUENCY" in Hertz (HZ).  We credit Dr. Polish's testimony on this point.  *See* Ex. 1002 ¶ 97 ("These parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q") (citing Ex. 1004 ¶¶ 43–48, Fig. 4)).

We also credit Dr. Polish's testimony with respect to Figure 2 that Shaffer's geographic regions "may correspond to buildings, campuses, municipalities . . . or any other particular geographical area."  Ex. 1002 ¶ 98 (citing Ex. 1004 ¶ 27).  Dr. Polish testifies, and we agree, that each "geographic region may also contain one or more communication networks (60–64), each of which may have different "assigned radio frequenc[ies]."  *Id.*; *see also id.* ¶¶ 20–22, 26, 34–35.

42

IPR2023-01295
Patent 8,994,830 B2

We credit Dr. Polish's testimony that "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface," such that the "display presents multiple frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network.'" Ex. 1002 ¶ 99 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).

We further credit Dr. Polish's testimony that

> [d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA. When there are multiple frequencies available for communication in a particular area, as in Shaffer, and when a user's device can include a touch screen, as in Shaffer, presenting for selection on the touch screen all available frequencies in an area a user enters would have been one of a finite number of predictable options for selecting a frequency.

Ex. 1002 ¶ 100.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone*," as recited in limitation 1[b].

### d. Limitation 1[c]

Limitation 1[c] recites: "*from which a plurality of video feeds associated with the geographic zone are sourced*." Ex. 1001,12:23–25. Petitioner contends that the combination of Shaffer and Saylor teaches the

43

IPR2023-01295
Patent 8,994,830 B2

subject matter recited in limitation 1[c]. Pet. 35–36. Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "Shaffer-Saylor discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds." Pet. 35 (citing Ex. 1002 ¶ 101). "For example," Petitioner explains, "Saylor discloses 'video cameras' located in a geographic zone (*e.g.*, a building of a 'business')." Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10). "In particular," Petitioner points out, "'an identified location may be monitored by a video or other recording device,' and, if motion is detected, 'video clips' maybe sent to a 'central security network.'" Pet. 35–36 (citing Ex. 1011, 16:52–17:9; *see also id.* at 11:64–12:6).

With respect to video feeds associated with geographic zones, the '830 patent explains that "[i]n an example embodiment, one or more of the cameras . . . are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations)." Ex. 1001, 3:17–21. The '830 patent also explains that

> [a]s one or more users . . . approach a location from which specific video feed is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading, the policy module 312 may automatically associate the video feed from the relevant camera 122 with the communication channels of the fire truck and render access to this video feed to all other members of a fire-truck VTG [virtual talk group].

*Id.* at 6:4–11.

44

IPR2023-01295
Patent 8,994,830 B2

Dr. Polish testifies that by 2008 "video surveillance systems were ubiquitous. They addressed the well-known need to monitor areas of interest, providing eyes on scene, without the need for the physical presence of personnel." Ex. 1002 ¶ 66 (citing Ex. 1029 ¶ 17) ("The subject invention is directed to an IP-network-based surveillance and monitoring system wherein video captured from a number of remotely located security cameras may be digitized, compressed, and networked for access, review and control at a remote monitoring station.").

Saylor also teaches that "[t]he security system may be applied to a user's home, office, vacation house or other location." Ex. 1011 2:13–15. Saylor explains that such a system may "provide a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected," and that "[t]he user may also view the images (e.g., video clips) remotely via the web or other remote access methods." *Id.* at 2:53–55.

The term "geographic zone" is not defined in the '830 patent and neither party has proffered any special meaning for it. *See* Pet. 14–15; PO Resp. 9–12. These examples from the '830 patent and the prior art indicate that a person of ordinary skill in the art would understand that a "geographic zone" may be a particular location or area where a camera producing a video feed is located, such as a traffic intersection, along a freeway, or at some other public or non-public location, such as a building, business location, or home.

Thus, Petitioner's assertion that "a building or a campus" may be considered a "geographic zone," is consistent with the examples provided in '830 patent and the prior art. Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10; *see*

45

IPR2023-01295
Patent 8,994,830 B2

*also* Ex. 1002 ¶ 101).  Patent Owner does not challenge Petitioner's understanding of this term.  *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*from which a plurality of video feeds associated with the geographic zone are sourced*" as recited in limitation 1[c].

### e.  Limitation 1[d]

Limitation 1[d] recites: "*monitoring a selection of a radio frequency of the plurality of radio frequencies by the user.*"  Ex. 1001, 12:26–27.

Petitioner contends that Shaffer teaches the subject matter recited in limitation 1[d].  Pet. 36 (citing Ex. 1002 ¶ 102).  Patent Owner disagrees.  PO Resp. 31–32.

Petitioner asserts that "[a]s discussed with respect to limitation 1[b], Shaffer discloses and renders obvious that the [radio] frequencies are provided on the display of a mobile communication device for *selection* by the user."  Pet. 36.  "For example," Petitioner points out, "Shaffer explains that the display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency. . .).'"  *Id.* (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).  According to Petitioner, "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices."  Pet. 36 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47).  Petitioner argues that "[d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen

46

IPR2023-01295
Patent 8,994,830 B2

would at least have been obvious, as described for limitation 1[b]." Pet. 36 (citing Ex. 1002 ¶ 102).

Patent Owner argues that "[b]ecause Shaffer fails to provide a plurality of radio frequencies on a display, a user cannot select a radio frequency from a plurality of radio frequencies." PO Resp. 31 (citing Ex. 2006 ¶ 79). Patent Owner also argues that although "Shaffer teaches a user inputting 'instructions regarding adjustment of the endpoint's communication settings . . . *upon entering a new communication network*,'" when "[r]ead in context, Shaffer's 'instructions' do not monitor for the selection of a radio frequency from a plurality of radio frequencies provided to a user, but instead prescribe how to change networks as the endpoint moves between locations." PO Resp. 31–32 (citing Ex. 2006 ¶ 80).

We agree with Petitioner and disagree with Patent Owner. Patent Owner's argument is based on the false premise that "Shaffer fails to provide a plurality of radio frequencies on a display." This is demonstrably incorrect, as discussed above in connection with Shaffer's disclosure of parameter listings, include ***radio frequencies***, identified in Hertz (listed as X, Y, Z, P, Q) in Shaffer's Figure 4. *See supra,* Sec. IV.E.2.b.

Patent Owner's argument appears to be that because Shaffer's Figure 4 presents a list of frequencies as letters (X, Y, Z, P, Q) instead of numbers that a person of ordinary skill in the art would not understand that Shaffer's letters represent different radio frequencies. This argument is unpersuasive, especially given that the table heading in Shaffer's Figure 4 clearly reads "FREQUENCY (Hz)."

Moreover, the level of information provided in Shaffer's Figure 4 is similar to the level of information provided in Figure 9 of the '830 patent, shown below.

47

Appx00162

IPR2023-01295
Patent 8,994,830 B2



*FIG. 9*

Figure 9 of the '830 patent illustrates a graphic user interface (GUI) of a mobile communication device "to allow a user to select a communication frequency associated with a communication channel." Ex. 1001, 9:61–62. Notably, GUI 900 does not list any of its frequencies in Hertz, but merely labels them as Frequency 1 thru Frequency k, apparently assuming that a person of ordinary skill in the art would understand that these labels represent actual radio frequencies.

Equally unpersuasive is Patent Owner's other argument that Shaffer's instructions do not monitor for the selection of a radio frequency, but instead "prescribe how to change networks as the endpoint moves between locations." PO Resp. 31–32. We find more persuasive Dr. Polish's testimony that "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices," and "[d]isplaying the

48

IPR2023-01295
Patent 8,994,830 B2

multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen would at least have been obvious to a POSITA, for the reasons described for limitation 1[b]."  Ex. 1002 ¶ 102 (citing Ex. 1004 ¶¶ 44–47).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a radio frequency of the plurality of radio frequencies by the user*," as recited in limitation 1[d].

### f.  Limitation 1[e]

Limitation 1[e] recites: "[1] *identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, [2] wherein the at least one video feed is associated with the selected communication channel [3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*."  Ex. 1001, 12:28–32.[5]

Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[e].  Pet. 36–41.  According to Petitioner "the Shaffer-Saylor system identifies a video feed associated with the *geographic zone*, and that feed is also associated with a multicast IP address (*selected communication channel*) based on a user preferences database entry (*user policy*) that identifies video feeds relevant to security personnel (*users*) when they access the communication channel."  Pet. 36–37 (citing Ex. 1002 ¶ 103).  Patent Owner disagrees.  PO Resp. 14–16, 32–35.

---

[5] Bracketed numbers suggested by Petitioner.  *See* Pet. 36–37.

IPR2023-01295
Patent 8,994,830 B2

> i. [1]identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone

Petitioner asserts that "Saylor's central security network [1] *identifies and selects a video feed associated with the geographic zone*." Pet. 37 (citing Ex. 1002 ¶ 104).

Petitioner relies on Saylor's Figure 10, which is shown below.



Saylor's Figure 10 is a flowchart illustrating a process for accessing video images provided by a security system. Ex. 1011, 4:58–59. According to Petitioner, "in step 1010, Saylor's central security network monitors a specific video feed in an 'identified location' of a building (*the geographic zone*) and, in steps 1012, 1014, 1016, and 1020, selects and identifies that

50

IPR2023-01295
Patent 8,994,830 B2

feed when a 'trigger[]' event occurs, such as 'motion.'" Pet. 37 (citing Ex. 1011, 16:52–60, 34:6–10). In steps 1022 and 1024, Petitioner asserts that "a 'video clip[]' from that feed is processed to determine whether certain 'conditions are met for alarm triggers' or '[n]otifications.'" Pet. 37 (citing Ex. 1011, 17:1–5). Petitioner points out that "in steps 1026 and 1028, an 'image may be automatically transmitted' to recipients." Pet. 37 (citing Ex. 1011, 17:8–9; *see also id.* at 34:1–9 (describing that a subscriber can be sent a "video clip" from a camera near the front door if the "front door opens" or "when an unrecognized person enters").

Patent Owner contends that "[t]he Petition fails to address the portion of limitation 1[e] in which the video feed is selected 'from the plurality of video feeds.'" PO Resp. 14. Patent Owner argues that "[t]he video monitored at the identified location that sends video clips to a central security network after motion is detected does not teach 'identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds' because the identified location is not reviewing a plurality of video feeds." *Id.* at 15 (citing Ex. 2006 ¶¶ 72–73). Patent Owner argues that "[w]ith each video device monitoring its own feed, Saylor fails to disclose any element that *selects* a video feed from the plurality of video feeds." PO Resp. 16 (citing Ex. 2006 ¶ 72).

In its Reply, Petitioner argues that "[t]he Petition describes the plurality of feeds in Shaffer-Saylor for limitation 1[c]—namely, a 'plurality of video feeds' from 'video cameras' (plural) located in 'each geographic region' (e.g., a 'building or campus') that the system monitors." Pet. Reply 2–3 (citing Pet. 35–37; Ex. 1011, 10:32–41, Fig. 10). Petitioner points out that Patent Owner "does not dispute that Shaffer-Saylor discloses the plurality of video feeds in limitation 1[c] . . . [n]or does PO explain why

51

IPR2023-01295
Patent 8,994,830 B2

those video feeds do not meet limitation 1[e]." Pet. Reply 3 (citing PO Resp. 14–20). Petitioner contends that Patent Owner's "argument depends on [Patent Owner's] narrow interpretation of 'selecting' as limited to a specific, unclaimed process in which video feeds are received at a central server that then selects one feed." Pet. Reply 3.

In its Sur-reply, Patent Owner argues that "all Shaffer-Saylor accomplishes is individual video monitoring devices that are capable of identifying and selecting its own, non-plural video feed." PO Sur-reply 4 (citing Ex. 2006 ¶¶ 70–71). According to Patent Owner, "Shaffer in combination with Saylor fails to teach identifying and selecting a video feed from a plurality of video feeds because each video monitoring device merely identifies and selects its single, *i.e.*, non-plural, video feed." PO Sur-reply 4 (citing Ex. 2006 ¶ 73; Ex. 1011, 16:52–60). According to Patent Owner, "Siloed cameras do not select a video feed from a plurality of video feeds, and thus cannot render obvious a claim that expressly requires the identification and selection of at least one video feed from a plurality of video feeds." PO Sur-reply 6.

We agree with Petitioner and disagree with Patent Owner. The limitation at issue recites "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone.*" The claim does not limit how the identifying and selecting takes place. Patent Owner concedes this point in its Sur-reply. *See* PO Sur-reply 6 ("the means of identification and selection are not limited by the claim").

According to the '830 patent, a "geographic zone" may, for example, be a section of freeway, a traffic intersection, or some other public or non-public location such as a building with surveillance cameras. *See, e.g.,* Ex.

52

IPR2023-01295
Patent 8,994,830 B2

1001, 3:17–21 ("In an example embodiment, one or more of the cameras 122 are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations).").

The identifying and selecting of a video feed may also occur because of some event, trigger, or condition being satisfied. The '830 patent explains, for example, that

> the method 600 monitors an audio signal generated in proximity to a video camera providing a video feed. For example, the audio signal may be a gunshot requiring a response by an ERT. As shown at block 604, the method 600 may process the audio signal to identify an audio event (e.g., the gunshot). Once the audio event had been identified, the identified video feed from the surveillance camera may be associated with a communication channel associated with the ERT.

Ex. 1001, 8:39–47.

Similarly, Saylor explains how its security system "may be applied to a user's home, office, vacation house or other location." Ex. 1011, 2:13–15. Saylor explains that "within a house, a user may have window and door contacts, smoke detectors and motion sensors, *video cameras*, key chain control, temperature monitors, CO and other gas detectors, vibration sensors, and other" sensors or detectors. *Id.* at 10:31–34 (emphasis added). Saylor explains that its invention "provides a personal security network *where one or more security devices* related to a subscriber *may be connected to a central security network over wireless communication*. The central security network . . . *may monitor those security devices* and alert a user when an alert situation occurs." *Id.* at 2:20–26 (emphasis added). Saylor further explains that its invention may provide "*a monitoring system for providing images* (e.g., photos, pictures, *video*, diagrams, illustrations, etc.) where an

53

IPR2023-01295
Patent 8,994,830 B2

alarm situation may be detected by comparing images. When a change in images (indicating motion) is detected, an alarm may be signaled." *Id.* at 2:45–50 (emphasis added).

Thus, Saylor expressly teaches how multiple "video cameras" may be used at a particular location, such as "home, office, vacation house or other location" to provide a local security network that may be connected to a central network over wireless communication. *Id.* at 2:13–15, 10:31–34. In particular, Saylor explains how "an identified location may be monitored by a video or other recording device," and, if, for example, motion is detected, "video clips" maybe sent to a "central security network" for further processing and action. *Id.* at 11:64–12:6, 16:52–17:9. Saylor also explains how "the user may select the appropriate one or more actions. For example, the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action." *Id.* at 16:23–28.

As Petitioner points out, Saylor teaches "personalized alarm services" and stores user policies at a central server for determining which triggered video feeds received by the central server should be selected and conveyed to particular entities. *See, e.g.*, Pet. 38–39, 25 (describing Saylor's "user preferences" set to inform entities of certain alarms), 26 (describing Saylor's database to determine whether to notify users regarding an alarm), 28 (describing how Saylor's "central security network processes the alarms and, according to rules and preferences, transmits notifications and information"). Thus, the Petition adequately explains how Saylor's central server receives multiple video feeds (e.g., where motion is detected) and selects one or more of those feeds to send to a user/entity based on stored rules/preferences.

54

IPR2023-01295
Patent 8,994,830 B2

The Petition is supported by Dr. Polish's testimony. Dr. Polish testifies that

> Saylor discloses a security system including "monitoring system" that provide "photos, pictures, [and] video" to an end user. Ex[1011], 2:45–55. The security system notifies a recipient, including emergency personnel, when it detects an "alert situation." *Id.*, 5:37–42. For example, the notification can include "video clips" from video surveillance cameras. *Id.*, 2:49–55, 11:67–12:6, 13:51–54. A central security network (FIG. 1 below) may alert "identified entities via wireless and/or other devices, such as mobile devices." *Id.*, 7:40-–42. For example, when an alarm is detected, the central security network can send relevant information "via the Internet 150" or other methods to "[a]n emergency entity 164" or other entities 161–162. *Id.*, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.*, 11:24–28 (identifying mobile devices receiving notifications).

Ex. 1002 ¶ 74.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone*," as recited in limitation 1[e][1].

> ii.   *[2] wherein the at least one video feed is associated with the selected communication channel*

For this portion of the limitation, Petitioner asserts that "Shaffer-Saylor accesses a user preferences database that [2] *associates the video feed with the selected communication channel*." Pet. 38 (citing Ex. 1002 ¶ 105). Petitioner points out that "Saylor's databases already store 'relevant information for personalized alarm services.'" Pet. 38 (citing Ex. 1011, 6:9–10). "For example," Petitioner explains, "[u]ser database 140 may contain 'user preferences' that may indicate how 'different alarm situations that may

55

IPR2023-01295
Patent 8,994,830 B2

be detected in various locations or systems may warrant different levels of response' and '[s]pecial instructions' that may 'include information to be conveyed to entities reacting to the alarm for a particular location or object.'"  Pet. 38–39 (citing Ex. 1011, 8:34–60).

Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the combination.



Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right.  Pet. 27.

Petitioner explains that "when an event occurs (such as motion), the central security network can send relevant information (such as video clips) 'via the Internet 150' to '[a]n emergency entity 164.'"  Pet. 39 (citing Ex. 1011, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.* at 11:24–28 (identifying mobile devices receiving notifications), 12:34–35 ("the user

56

IPR2023-01295
Patent 8,994,830 B2

may specify when emergency dispatch is to occur."). "For example," Petitioner explains, "the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency." Pet. 39 (citing Ex. 1011, 12:17–21).

Petitioner also explains that "to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage." Pet. 39 (citing Ex. 1004 ¶¶ 39–40 (describing assigning and storing multicast IP addresses at an endpoint); Ex. 1002 ¶ 106). Petitioner further explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to this portion of the limitation. *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*wherein the at least one video feed is associated with the selected communication channel*," as recited in limitation 1[e][2].

> iii.  *[3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*

For this portion of the limitation, Petitioner asserts that "the association between video feed and communication channel is [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" Pet. 40

57

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1002 ¶ 103).  According to Petitioner, "[t]he user policy is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them."  Pet. 40 (citing Ex. 1011, 8:34–60,  Abstr. (identifying "individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information"), 11:48–63 ("user-defined conditions" determine which entity to notify and how to send the notification), 12:26–29).  Petitioner asserts that "[t]he preferences identify which alarms are relevant to the users (and are designed, e.g., to filter out 'false alarms')."  Pet. 40–41 (citing Ex. 1011, 12:34–41).

> Petitioner explains that
>
> Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address.  Ex[1002], ¶107.  Accordingly, when the security personnel selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer.

Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

Patent Owner argues that Petitioner's combination "fails to teach identification of 'video feeds that are relevant to the user *when the user accesses* the selected communication channel.'"  PO Resp. 32 (emphasis by Patent Owner).  Patent Owner argues that "[i]dentifying when to notify users and what to send them does not disclose identifying video feeds that are relevant to a user when the user accesses a selected communication channel."  PO Resp. 32 (citing Ex. 2006 ¶¶ 90–91).  According to Patent Owner, Petitioner does not provide "identification of the one or more video feeds that are relevant to the user at all, much less relevant specifically *when the user accesses the communication channel* as claimed."  PO Resp. 33

58

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 2006 ¶ 92) (emphasis by Patent Owner).  Patent Owner contends that "[p]redetermined notifications based on alarm conditions differ substantially from the claimed 'user policy that identifies one or more video feeds that are relevant to the user *when the user accesses* the selected communication channel.'"  PO Resp. 34 (citing Ex. 2006 ¶ 94) (emphasis by Patent Owner).  Patent Owner contends that the claims "require user access to a communication channel before video feeds relevant to a user at the time of access are identified."  PO Resp. 34 (citing Ex. 2006 ¶¶ 93–94).

> In its Reply, Petitioner argues that

> the Shaffer-Saylor combination works in the same way as disclosed by the '830 Patent.  Saylor's databases implement a user policy that identifies relevant video feeds in Saylor's security system (*e.g.*, a video feed associated with a triggered alarm) for users associated with a specific communication channel (IP address) provided by Shaffer's IS.  Ex[1002], ¶¶84-85, 104–106.  The IS makes the video feeds accessible to a user when that user selects the relevant communication channel associated with the IP address.

Pet. Reply 15 (citing Ex. 1002 ¶¶ 86, 103 & n.3, 107).

> Petitioner also argues that

> dependent claim 6 of the '830 Patent confirms that identification of video feeds associated with a user in claim 1 can be accomplished via a database before the user selects the channel.  Ex[1001], cl. 6.  The embodiment in FIG. 3 also discloses a user policy that associates video feeds (308.1–308.m) with a communication channel (first channel 302.1) and makes those video feeds accessible "when any user 305.1–305.q" in a group associated with that channel sets his device "to the first channel."

59

IPR2023-01295
Patent 8,994,830 B2

Pet. Reply 15 (citing Ex. 1001, 5:23–53, Fig. 3).[6]

Patent Owner does not address Petitioner's arguments and evidence on this issue in its Sur-reply. *See* PO Sur-reply 3–14.

We agree with Petitioner and disagree with Patent Owner. In our view, Petitioner provides sufficient explanation as to how the proposed Shaffer-Saylor combination would operate. Petitioner explains that Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. Pet. 39 (citing Ex. 1004 ¶¶ 39–40; Ex. 1002 ¶ 106). Petitioner also explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Petitioner further explains that the association between a video feed and a communication channel is based on a "user policy," which "is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." *Id.* at 40 (citing Ex. 1002 ¶ 103; Ex. 1011, 8:34–60, Abstr., 11:48–63, 12:26–29). Petitioner points out that "Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address." Pet. 41 (citing Ex. 1002 ¶ 107). "Accordingly," Petitioner explains, "when the security personnel selects a communication channel associated with the

---

[6] Claim 6 recites: The method of claim 1, further comprising: accessing a database to identify a group of video feeds associated with the user; and when the user selects the communication channel, providing access to the group of video feeds associated with the user to one or more other users of the communication channel. Ex. 1001, 12:61–67.

60

IPR2023-01295
Patent 8,994,830 B2

multicast IP address . . . the officer can access the transmitted communications, as described in Shaffer." Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

The Petition is supported by Dr. Polish's testimony. For example, Dr. Polish testifies that

> Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses at an endpoint). Accordingly, when an event occurs that requires sending a video clip to security forces, Saylor's central security network can look up the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel.

Ex. 1002 ¶ 106.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,*" as recited in limitation 1[e][3].

### g. *Limitation 1[f]*

Limitation 1[f] recites: "*the one or more video feeds being independent of the selected communication channel.*" Ex. 1001, 12:34–36. Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[f]. Pet. 41–42. Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "the '830 patent specification describes 'independent video surveillance cameras' as those installed at 'public and

61

IPR2023-01295
Patent 8,994,830 B2

non-public locations,' and that Shaffer-Saylor describes the same type of video feeds." Pet. 41 (citing Ex. 1001, 3:17–21; Ex. 1002 ¶ 108). "For example," Petitioner points out, "the video feed selected by Saylor's central security network are video surveillance cameras at a building or home." Pet. 41 (citing Ex. 1011, 10:31–34, 10:43–44). "In the combined system," Petitioner asserts, "Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel." Pet. 41–42 (citing Ex. 1002 ¶ 109).

> Dr. Polish testifies that
>
> the video feed selected by Saylor's central security network are video surveillance cameras independently installed at a building or home and independent of the security forces communication channel. Ex[1011], 10:31–34, 10:43–44 ("[T]he central security network of the present invention may also support users who already have an alarm system in their home, or want to buy a system from an alarm dealer and have it professionally installed."). It would have been obvious to a POSITA that in the combined system, Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel.

Ex. 1002 ¶ 109.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*the one or more video feeds being independent of the selected communication channel*" as recited in limitation 1[f].

62

IPR2023-01295
Patent 8,994,830 B2

### h. Limitation 1[g]

Limitation 1[g] recites: "*providing access to the identified at least one video feed to the mobile communication device based on the user policy.*" Ex. 1001, 12:37–39. Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[g]. Pet. 42. Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner explains that "Saylor's central security network sends video clips to mobile devices of security forces (users) based on the user policy stored in databases." Pet. 42 (citing Ex. 1011, 11:24–28 (notifications to cell phones, etc.), 11:56–63, 35:15–33; Ex. 1002 ¶ 110). "For example," Petitioner explains, "when a particular event in a particular building occurs, the user policy describes what notifications are sent and to whom." Pet. 42 (citing Ex. 1011, 6:9–32, 8:34–60, 9:22–28; Ex. 1002 ¶ 110). According to Petitioner, "[i]f a notification is sent to the selected communication channel (multicast address), the group members can access it." Pet. 42 (citing Ex. 1004 ¶ 39 (interoperability system (IS 120) may communicate "with endpoints using multicast IP addresses"); Ex. 1002 ¶ 110).

We agree with Petitioner that Saylor's central security network sending video to the mobile devices of users based on user policies stored in databases meets the recited limitation. Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing access to the identified at least one video feed to the mobile communication device based on the user policy*" as recited in limitation 1[g].

63

IPR2023-01295
Patent 8,994,830 B2

### i. Conclusion as to Independent Claim 1

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 1. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 1 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### 3. Independent Claim 15

Independent claim 15 is substantially similar to independent clam 1. Claim 15, however, is directed to an apparatus while claim 1 is directed to a method. Moreover, claim 15 contains two limitations, 15[a] and 15[b], that are not recited in claim 1. We now consider the evidence and arguments directed to claim 15.

### a. 15[pre] An apparatus, comprising:

For the preamble, Petitioner contends that "Shaffer-Saylor discloses "*[a]n apparatus.*" Pet. 50 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 136). Paragraph 1 of Shaffer explains that "[t]his invention relates in general to communication systems and, more particularly, to a method and system for communicating using position information." Ex. 1004 ¶ 1. Patent Owner does not contest Petitioner's showing with respect to claim 15's preamble. *See* PO Resp. 14–35.

### b. 15[a] at least one processor

For this limitation, Petitioner asserts that "Shaffer-Saylor discloses '*at least one processor.*'" Pet. 51. "For example," Petitioner explains, "Shaffer describes a processor in the mobile communication device, and in the IS. *Id.*

64

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1004 ¶¶ 38, 44–45, 48). According to Petitioner, "Saylor also discloses a server for 'processing' alarm information in the central security network." Pet. 51 (citing Ex. 1011, 35:45–48; Ex. 1002 ¶ 137).

Petitioner's position is supported by the testimony of Dr. Polish. *See* Ex. 1002 ¶ 137. Patent Owner does not contest Petitioner's showing with respect to this limitation. *See* PO Resp. 14–35.

> c. *15[b] a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor; the video stream association module being executed by the at least one processor to cause operations to be performed, the operations comprising:*

For this limitation, Petitioner contends that Shaffer-Saylor discloses "*a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor, the video stream association module being executed by the at least one processor to cause operations to be performed.*" Pet. 51 (citing Ex. 1002 ¶ 138).

According to Petitioner, "Shaffer discloses a memory at the mobile communication device and the IS for communicating with the processor," and "Saylor discloses a memory, including databases, communicating with a processor." Pet. 51 (citing Ex. 1004, ¶¶ 31, 36, 38, 40, 44–46, 48; Ex. 1011, Fig. 1, 6:9–32, 8:34–9:21; Ex. 1002 ¶¶ 138–139).

Petitioner asserts that "Shaffer-Saylor also disclose[s] the claimed 'video stream association module.' If not construed as a means-plus-function limitation, it is simply stored in the memory in Shaffer's mobile device and IS and Saylor's central security network and databases and perform the recited operations, as described for claim 1." Pet. 51 (citing Ex.

65

IPR2023-01295
Patent 8,994,830 B2

1001, 4:34–39 (video feed association module may be at a "central node and/or distributed nodes"), 3:21–27; Ex. 1002 ¶¶ 140–142). "If construed as a means-plus-function term," Petitioner argues that "the video stream association module includes (1) Shaffer's mobile communication device, (2) Shaffer's IS, and (3) Saylor's central security server and databases." Pet. 52.

Petitioner asserts that "[t]he functions of these elements disclose the functions of the video stream association module, as above with respect to limitations 1[a]-1[g]. In addition, Shaffer-Saylor discloses each element of the 'video feed association module' described in the '830 patent." Pet. 52.

Petitioner's position is supported by the testimony of Dr. Polish. *See* Ex. 1002 ¶¶ 138–143. Patent Owner does not contest Petitioner's showing with respect to this limitation. *See* PO Resp. 14–35.

### d. *Limitations 15[d]–15[i]*

For these limitations, Petitioner relies on the same evidence and arguments it relied upon for limitations 1[a]–1[g]. *See* Pet. 54 (citing Ex. 1002 ¶ 144).

### e. *Conclusion as to Independent Claim 15*

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 15. Based on the complete record, including the reasons discussed above with respect to independent claim 1, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 15 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

66

IPR2023-01295
Patent 8,994,830 B2

### 4. Dependent Claims 2–5, 7–14, 16–19, and 21–24

Petitioner argues that the combination of Shaffer and Saylor teaches or suggests the limitations of dependent claims 2–5, 7–14, 16–19, and 21–24. *See* Pet. 42–50, 54. Petitioner provides explanations as to how the combination of Shaffer and Saylor teaches or suggests each claim limitation as well as a rationale for combining the art in the manner proffered. *See* Pet. 42–43 (claim 2), 43–44 (claim 3), 44 (claim 4), 44–45 (claim 5), 45–46 (claim 7), 46–47 (claim 8), 47 (claims 9 and 10), 48–49 (claim 11), 49 (claim 12), 49–50 (claim 13), 50 (claim 14), and 54 (claims 16–19 and 22–24). Dr. Polish provides supporting testimony for Petitioner's contentions. *See* Ex. 1002 ¶¶ 111–135, 145–152.

Patent Owner specifically contests Petitioner's evidence and arguments directed to dependent claims 3, 7, 17, and 21. *See* PO Resp. 35–38. Patent Owner, however, does not separately contest Petitioner's evidence and arguments directed to challenged dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24. *See id.* Instead, Patent Owner relies on its previous evidence and arguments made with respect to independent claims 1 and 15 to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable." PO Resp. 35. We address contested dependent claims 3, 7, 17, and 21 first.

### f. Contested Dependent Claims 3, 17[7]

Dependent claim 3 recites: 3[a][8] *The method of claim 1, further comprising: accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile*

---

[7] Claim 17 depends from independent claim 15 and recites limitations similar to dependent claim 3.

[8] Bracketed designations proposed by Petitioner. *See* Pet. 4, 43–44.

IPR2023-01295
Patent 8,994,830 B2

*communication device; and* 3[b] *presenting a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.*

With respect to limitation 3[a], Petitioner contends that Shaffer-Saylor discloses this limitation. Pet. 43. Petitioner asserts that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel." *Id.* (citing Ex. 1002 ¶ 114).

With respect to limitation 3[b], Petitioner asserts that "video streams may be associated with a communication channel, and team," and that "[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds, via thumbnails or a drop-down menu for selection." Pet. 44 (citing Ex. 1002 ¶ 115; Ex. 1004 ¶ 25).

In its Response, Patent Owner asserts with respect to limitation 3[a] that "[n]one of [Petitioner's] analysis explains how Saylor's database is accessed 'to identify a plurality of members of an emergency response team.'" PO Resp. 35–36 (citing Ex. 2006 ¶¶ 96–98).

Patent Owner also asserts with respect to limitation 3[b] that Petitioner's analysis "regarding the claimed step of 'presenting a plurality of available video feeds on the display of the mobile communication device' starts and stops with Dr. Polish's unsupported assertion that '[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds.'" PO Resp. 36 (citing Pet. 44).

In its Reply, Petitioner points out with respect to limitation 3[a] that the Petition "explains that 'Saylor's database' that 'associates video feeds with the user's selected multicast IP address' meets this limitation because

68

IPR2023-01295
Patent 8,994,830 B2

Saylor's database contains information to identify members of an emergency response team associated with a communication channel." Pet. Reply 16 (citing Pet. 42–43).

With respect to limitation 3[b], Petitioner points to testimony and other evidence in Dr. Polish's declaration that supports Dr. Polish's opinion that "by 2008, it would have been obvious for a mobile device to display multiple video feeds from a security network." Pet. Reply 16–17 (citing Ex. 1002 ¶¶ 66–68).

In its Sur-reply, Patent Owner argues with respect to limitation 3[a] that "[n]othing in [Petitioner's] analysis explains how Saylor's database, or Shaffer's IS, renders obvious 'accessing a database to identify a plurality of members of an emergency response team.'" PO Sur-reply 15.

With respect to limitation 3[b], Patent Owner reiterates its argument that "[t]he only evidence in support of the element 'presenting a plurality of video feeds on the display of the mobile communication device' is the unsupported testimony of Dr. Polish." *Id.*

We agree with Petitioner and disagree with Patent Owner. With respect to limitation 3[a], "*accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile communication device*," Petitioner explains that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel." Pet. 43 (citing Ex. 1002 ¶ 114). There, Petitioner explains that

> Shaffer discloses that the IS can act as a centralized
> communication control post (CCP) to track GPS information of
> users. Ex[1004], ¶¶0016, 0041. It would have been obvious to
> a POSITA that Shaffer's IS could provide the tracked location
> information to Saylor's central security network, so that the

69

IPR2023-01295
Patent 8,994,830 B2

> central security network can notify users on the audio
> communication channel of an event, *e.g.*, by sending a video
> clip, when any user associated with the channel is within the
> designated location.

Pet. 43 (citing Ex. 1002 ¶ 113).

With respect to limitation 3[b], Petitioner and Dr. Polish did not specifically cite to Paragraphs 66–68 of Dr. Polish's declaration and the particular references discussed therein when discussing dependent claims 3 and 17. These paragraphs, however, are found in Section VIII of Dr. Polish's declaration, titled "KNOWLEDGE OF A POSITA," and in particular, Section D describing "Video Surveillance Systems Transmitting Video Feeds." There Dr. Polish opines that "[b]y 2008, video surveillance systems were ubiquitous" and references as support, for example, a September 2005 U.S. Patent Application Publication describing in its abstract "[a] system for capturing, encoding and transmitting continuous video from a camera to a display monitor via a network" that "supports a plurality of cameras." Ex. 1002 ¶ 66 (citing Ex. 1029). In this section of his declaration, Dr. Polish testifies that "surveillance video feeds could be provided to mobile devices and could be accompanied with other information such as the location from which the video feed is sourced." Ex. 1002 ¶ 67 (citing Ex. 1029 ¶¶ 17, 20; Ex. 1028 ¶¶ 7–15, 20–22, 27; Ex. 1030 ¶¶ 27–28, 31, 36, 44). One of these references, for example, describes "a system for providing secure streaming multimedia data via a wireless network from a first response unit such as a patrol car, to one or more remote playing devices in response to a trigger." Ex. 1028 ¶ 10.

It is clear when considering Dr. Polish's declaration testimony as a whole that that these paragraphs and the references discussed therein provide Dr. Polish's understanding of the background skill of the art at the time of

70

IPR2023-01295
Patent 8,994,830 B2

the claimed invention and what a person of ordinary skill would have understood about video surveillance systems transmitting video feeds at that time. We are not inclined to disregard this testimony. This testimony was specifically identified in Petitioner's Reply as part of the support for Dr. Polish's opinion (*see* Pet. Reply 16–17), but it was not addressed by Patent Owner in its Sur-reply (*see* PO Sur-reply 14–16).

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 3 and 17 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### g. *Contested Dependent Claims 7, 21*[9]

7[a] *The method of claim 1, further comprising: monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed*;

7[b] *processing the audio signal to identify an audio event; and*

7[c] *based on the identified audio event, providing access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.*

---

[9] Claim 21 depends from independent claim 15 and recites limitations similar to dependent claim 7.

IPR2023-01295
Patent 8,994,830 B2

Petitioner contends that Shaffer-Saylor renders dependent claim 7 obvious. With respect to limitation 7[a], Petitioner asserts that

> Saylor discloses that the central security network may include various types of sensors, including "sound" sensors, Ex[1011], 14:17–20, Which could have been located in "proximity" to the camera providing video notifications. Ex[1002], ¶119; §VIII.A.2.f. As Saylor already describes, the video camera may monitor a specific area, such as the front door of a building, Ex[1011], 16:41–51, and a camera near that door can identify motion. *Id.*; Ex[1002], ¶119. It would have been obvious that a "sound" sensor could also be installed by the door to detect breaking glass, or another sign of a break-in, in addition to movement.

Pet. 45 (citing Ex. 1002 ¶¶ 119–120).

With respect to limitation 7[b], Petitioner asserts that "[a]s described for limitation 7[a], it would have been obvious for Saylor's central security network to process the output of the sound sensor, to determine if there was an audio event, such as breaking glass." Pet. 46 (citing Ex. 1002 ¶ 121).

With respect to limitation 7[c], Petitioner asserts that

> Saylor's central security network sends a notification, including with a video clip, to a group of users upon the occurrence of events. Ex[1011], 17:1-–9, 5:58–62, 8:54–60. It would have been obvious that Saylor's central security network could send a video clip from a camera near the front door when a sound of breaking glass is detected near the front door. Ex[1002], ¶122. In this scenario, the group (security personnel) would include any mobile users selecting the relevant communication channel.

Pet. 46 (citing Ex. 1002 ¶ 122).

In its Response, Patent Owner asserts that "Petitioner relies on its declarant to create a notification logic structure that is not actually taught in the prior art references." PO Resp. 37. Patent Owner asserts that "Dr. Polish admitted in his deposition that some teachings did not come

72

IPR2023-01295
Patent 8,994,830 B2

from the prior art references and were simply 'a statement about general knowledge in the art.'" *Id.* (citing Ex. 2006 ¶ 101; Ex. 2008, 79:9–15).

In its Reply, Petitioner asserts that Patent Owner "ignores Dr. Polish's declaration, which cites [Ex.] 1008 for this exact point." Pet. Reply 17 (citing Ex. 1002 ¶ 120 ("[s]ound sensors (or audio sensors) were well known at the time and it would have been obvious to place the sensor nearby a camera that is in an area of interest.").

In its Sur-reply, Patent Owner asserts that "[l]ike Shaffer and Saylor, Exhibit 1008 is devoid of any logical structure where access to a video feed is provided in response to an audio event being identified, as recited in claims 7 and 21." PO Sur-reply 17.

We agree with Petitioner and disagree with Patent Owner. Saylor explains that "[t]he present invention may provide a security system where a user may personalize alert notifications for various security devices and/or systems." Ex. 1011, 5:19–21. Saylor explains that

> [t]he central security network may access the user's personal preferences, profile information and/or other information which may be used to execute notifications in the manner specified by the user. For example, the user may identify various personal preferences, which may include contact information, contact individuals, *methods of communication*, order of contact, special instructions and other information.

*Id.* at 5:29–36 (emphasis added). Saylor goes on to explain that

> [b]ased on user preferences and other information, *the user may be notified via various methods of communication*, as specified in the user's profile and preferences information. Alert notification may be communicated via the Internet 150, POTS 152, wireless communication portals, voice portals, and/or other methods.

*Id.* at 6:19–25 (emphasis added). Saylor further explains that the security system may be applied to the user's property, which "may include user's

73

IPR2023-01295
Patent 8,994,830 B2

home, office, vacation house, or other locations." *Id.* at 6:37–38. Saylor explains that "[f]or property . . . security devices may include sensors, detectors and/or other devices for detecting alarm situations." *Id.* at 6:46–48.

Saylor also explains that "a user may integrate still or motion video into an alarm system through the use of a broadband landline (e.g., cable or DSL) for image transmission with a wireless connection to send alarm data." *Id.* at 8:8–12. Saylor explains that "[t]he user may also have the option to view photographs and/or video clips at the time of the alarm incident." *Id.* at 13:51–53. Saylor further explains that "[b]ased on user defined preferences, a user may be notified before the sounding of an alarm and before contacting an emergency entity (e.g., police, ambulance, etc.) to reduce false alarm penalties and fees." *Id.* at 8:18–21.

Saylor provides an example to explain how the system may work. Saylor explains that

> the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action. For example, if the user views an image of a pet knocking over a lamp which falls and breaks a window, the user may cancel the alarm and emergency notification. Thus, police resources may be conserved and the user may avoid a penalty fine for a false alarm.

*Id.* at 16:24–32.

Saylor provides another example linking the sending of a video clip in response to some other alarm trigger, in this case the opening of a front door (contact sensor). Saylor explains that

> a subscriber may request notification when a front door opens, and request that the notification include a video clip of the front

74

IPR2023-01295
Patent 8,994,830 B2

> door at the time it was opened.  The subscriber may also request
> a video link or other image data when an unrecognized person
> enters.  According to another example, if an internal motion is
> triggered but no door has opened and video analysis suggests
> that a human is inside, the subscriber may request an alert
> notification with a single frame clip.

*Id.* at 34:1–9.

Based on our review of Saylor, we credit Dr. Polish's testimony where he explains that "Saylor discloses that the central security network may include various types of sensors, including 'sound' sensors" and "[i]t would have been obvious to locate the 'sound' sensor in 'proximity' to the video camera providing video clip notifications."  Ex. 1002 ¶ 119 (citing Ex. 1011, 14:17–20) ("Type of device may include smoke, heat, CO, radon, temperature, contact, motion, camera, breakage, sound, panic button, control, light, and others.").  This is consistent with Saylor's description of sending a video clip (video confirmation) whenever a front door opens (contact sensor triggered).

Dr. Polish's understanding of Saylor is consistent with ours, where he explains that

> Saylor describes that the video camera may monitor a specific
> area, such as the front door of a building.  Ex[1011], 16:41–51.
> A camera near the front door can identify motion indicating
> possible unknown entrants or break-ins.  *Id.*  It would have been
> obvious to a POSITA that a "sound" sensor could also be
> installed by the front door to detect breaking glass, or another
> sign of a break-in, in addition to movement.

Ex. 1002 ¶ 120.  We therefore agree with Dr. Polish that "[i]t would have been obvious to a POSITA that Saylor's central security network could implement a rule to send to a video clip from a camera near the front door to security personnel when a sound of breaking glass is detected near the front door" and that "this is an obvious design choice that would have enabled

IPR2023-01295
Patent 8,994,830 B2

timely delivery of relevant information." *Id.* ¶ 122.

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 7 and 21 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### h. Uncontested Dependent Claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24

Petitioner contends that each of dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, and 22–24 are obvious over the combined teachings of Shaffer and Saylor. *See* Pet. 42–54. Patent Owner does not separately contest Petitioner's evidence or arguments with respect to these dependent claims other than to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable." PO Resp. 35. We consider Petitioner's evidence and arguments with respect to these dependent claims.

### i. Dependent Claims 2, 16

Dependent claim 2 recites: "*The method of claim 1, wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.*" Ex. 1001, 12:40–45. Dependent claim 16 recites similar claim language with respect to independent claim 15. *See id.* at 14:10–15.

76

IPR2023-01295
Patent 8,994,830 B2

> With respect to claim 2, Petitioner asserts that
>
> Saylor's database associates video feeds with the user's selected multicast IP address (an audio communication channel). Ex[1004], ¶0039 (describing audio communications); Ex[1003], p. 240; *see* Ground 1, limitation 1[e]; Ex[1002], ¶112. It would have been obvious to also associate video feeds with the particular user selecting the channel based on the user's location. For example, Saylor discloses that the system can be configured to send notifications to users based on a defined area. Ex[1011], 5:49. Shaffer discloses that the IS can act as a centralized communication control post (CCP) to track GPS information of users. Ex[1004], ¶¶0016, 0041. It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the central security network can notify users on the audio communication channel of an event, *e.g.*, by sending a video clip, when any user associated with the channel is within the designated location. Ex[1002], ¶113. This would have been a simple and predictable modification to Shaffer-Saylor motivated by how both Shaffer and Saylor are designed and would have been reasonably expected to succeed.

Pet. 42–43 (citing Ex. 1002 ¶ 113). Petitioner relies upon this evidence and argument with respect to claim 16 as well. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 111–113, 145. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 2 and 16. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 2 and 16.

### ii. *Dependent Claims 4, 18*

Dependent claim 4 recites: "*The method of claim 3, wherein the available video feeds are sourced from a group of surveillance cameras.*"

77

IPR2023-01295
Patent 8,994,830 B2

Ex. 1001, 12:55–56.  Dependent claim 18 recites similar claim language. *See id.* at 14:26–27.

With respect to claim 4, Petitioner relies on the evidence and arguments it made with respect to limitation 1[f].  *See* Pet. 44 (citing Ex. 1002 ¶ 116; Pet. Sec. VIII.A.2.g.  Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 116, 147.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 4 and 18.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 4 and 18.

### iii.    *Dependent Claims 5, 19*

Dependent claim 5 recites: "*The method of claim 1, wherein: the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio.*"  Ex. 1001, 12:57–60.  Dependent claim 19 recites similar claim language.  *See id.* at 14:28–31.

With respect to claim 5, Petitioner asserts that

> Shaffer renders obvious "wherein the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio," under any party's proposed construction.  Shaffer expressly discloses a PTT communication channel in a PTT communication network, where the device is a PTT radio. Ex[1004], ¶0037.  Shaffer also describes that the user of a mobile endpoint can access a communication channel "manually with, for example, a single key stroke. . . ." Ex[1004], ¶0040.  A POSITA would have understood that this single keystroke can be a PTT key, and the channel can transmit

78

IPR2023-01295
Patent 8,994,830 B2

> half-duplex communications. Ex[1002], ¶¶117–18. Before the
> '830 patent, numerous systems had disclosed a PTT key to
> access IP messages on "half-duplex" PTT channels. Ex[1011],
> ¶¶0026–0027; Ex[1013], ¶¶0022–0024, 0041, 0048; *see also*
> Ex[1003], pp. 135, 189, 243, 290 (examiner noting that a
> POSITA would have "recognize[d] PTT as a widely used type
> of communication device").

Pet. 44–45. Petitioner relies on this same evidence and argument for claim

19. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See*

Ex. 1002 ¶¶ 117–118, 148. Patent Owner does not specifically contest

Petitioner's evidence and arguments with respect to dependent claims 5 and

19. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above

with respect to independent claims 1 and 15, we find that Petitioner has

established that the combined teachings of Shaffer and Saylor meet the

subject matter recited in dependent claims 5 and 19.

<em>iv.     Dependent Claims 8, 22</em>

Dependent claim 8 recites: "*The method of claim 1, wherein the*

*communication channel is associated with a Virtual Talk Group (VTG).*"

Ex. 1001, 13:12–13. Dependent claim 22 recites similar claim language.

*See id.* at 14:52–53.

> With respect to claim 8, Petitioner asserts that
>
> Shaffer discloses "*wherein the communication channel is*
> *associated with a Virtual Talk Group (VTG),*" under any party's
> proposed construction. As described for limitation 1[a], the
> selected communication channel (*e.g.*, multicast address) in
> Shaffer is for a virtual talk group, which communicates using
> the IP multicast address.

Pet. 46–47 (citing Ex. 1004 ¶¶ 27, 34, 37–39; Pet. Sec. VIII.A.2.b; Ex.
1002 ¶ 123).

79

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on this same evidence and argument for claim 22. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 123, 151. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 8 and 22. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 8 and 22.

> *v.    Dependent Claims 9, 10, 23*

Dependent claim 9 recites: "*The method of claim 1, wherein providing access to the video feeds depends on a video association policy.*" Ex. 1001, 13:14–15. Dependent claim 10 recites: "*The method of claim 9, wherein the video association policy includes a role of the user defined in a policy database.*" *Id.* at 13:16–17. Dependent claim 23 recites similar claim language. *See id.* at 14:54–57.

With respect to claims 9 and 10, Petitioner asserts that

> Shaffer-Saylor discloses "*wherein providing access to the video feeds depends on a video association policy.*" The '830 patent does not use the term "video association policy" but does describe a "video feed association module" that "associate[s] one or more video feeds with one or more communication channels." Ex[1001], 4:29–33. The specification also describes policies that "governs the association of video streams with communication channels and VTGs," as well as policies that identify "available feeds" based on a "particular role" associated with the user. *Id.*, 9:45–48, 10:61–65; *see also id.*, 6:3–17, 8:16–33.
>
> In Shaffer-Saylor, the preferences and rules stored in the central security system databases associate video feeds with communication channels (as described for limitation 1[e]) using

80

IPR2023-01295
Patent 8,994,830 B2

the same types of policies. Ex[1002], ¶¶124–25. For example, in the combined system, the databases store rules and preferences that associate video streams with communication channels (*e.g.*, multicast IP addresses) for users with particular roles (*e.g.*, security or police). *See* §§VIII.A.1, VIII.A.2.f.

For the same reasons described for claim 9, Shaffer-Saylor discloses "wherein the video association policy includes a role of the user defined in a policy database." Ex[1002], ¶126.

Pet. 47

Petitioner relies on this same evidence and argument for claim 23. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 124–126, 213. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 9, 10, and 23. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 9, 10 and 23.

### vi. *Dependent Claims 11, 24*

Dependent claim 11 recites:

*The method of claim 1, further comprising: identifying a geographical location of the user's mobile communication device using a Global Positioning System; identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*

Ex. 1001, 13:18–28. Dependent claim 24 recites similar claim language. *See id.* at 14:58–15:2.

81

IPR2023-01295
Patent 8,994,830 B2

With respect to claim 11, Petitioner asserts that

> Shaffer-Saylor discloses "*identifying a geographical location of the user's mobile communication device using a Global Positioning System.*"  For example, Shaffer expressly describes using GPS for identifying a geographical location of a user's mobile communication device.  *E.g.*, Ex[1004], ¶¶0040–0041, 0044, 0046–0047; Ex[1002], ¶127.

> Shaffer-Saylor [also] discloses "*identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*"  Ex[1002], ¶¶128–29.

> Shaffer-Saylor [further] discloses that each geographic location in Shaffer (*e.g.*, a building or a campus) can also be the source of a plurality of video feeds.  *Id.*  For example, Saylor discloses "video cameras" located in a geographic area (*e.g.*, a building of a "business").  Ex[1011], 10:32–34, FIG. 10.  Further, the  video feeds in that geographical location are associated with a communication channel, such as a multicast IP address associated with security forces as described in limitation 1[e]. §VIII.A.2.f.  Any device accessing that multicast IP address (including other mobile devices) will automatically have access to the video feeds associated with that channel.  *Id.*; Ex[1002], ¶129.

Pet. 48–49.

Petitioner relies on this same evidence and argument for claim 24.

*See id.* at 54.  Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 127–129, 152.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 11 and 24.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has

IPR2023-01295
Patent 8,994,830 B2

established that the combined teachings of Shaffer and Saylor meet the

subject matter recited in dependent claims 11 and 24.

> ### vii.    Dependent Claims 12, 13, 14

Dependent claim 12 recites:

> *The method of claim 1, wherein the selected communication channel is a selected audio communication channel that is selected from a plurality of audio communication channels, the at least one video feed being associated with the selected audio communication channel, and the user policy identifying the one or more video feeds that are relevant to the user when the user accesses the selected audio communication channel.*

Ex. 1001, 13:29–36.  With respect to claim 12, Petitioner asserts that

> As discussed for limitation 1[a] and claim 2, Shaffer discloses that the selected communication channel can be an "audio communication channel," which the user selected from a plurality as the user moves from one location to another. §§VIII.A.2.b, VIII.A.3; Ex[1004], ¶0040; Ex[1002], ¶131.  As also discussed for limitations 1[e] and 1[g], Shaffer-Saylor discloses a user policy stored in a database that identifies the relevant video feeds to a user of a particular group, associates the relevant video feeds with the audio communication channel for that group, and provides those feeds to the user when the user accesses that channel.

Pet. 49 (citing Pet. Secs. VIII.A.1, VIII.A.2.f, VIII.A.2.h; Ex. 1002 ¶ 131).

Dependent claim 13 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel based on the geographic zone from which the at least one video feed is sourced and a device group that includes the user's communication device.*"  Ex. 1001, 13:37–41.  With respect to claim 13, Petitioner asserts that

> [a]s described for claims 1 and 12, Shaffer-Saylor discloses a user policy that associates at least one video feed with the selected communication channel.  §§VIII.A.1,

83

IPR2023-01295
Patent 8,994,830 B2

> VIII.A.2.f.  Moreover, as described for claims 2 and 9, Shaffer-Saylor discloses or renders obvious that the user policy can be based on the geographic zone from which the at least one video feed is sourced and the device group that includes the user's device.

Pet. 50 (citing Ex. 1011, 10:62–67; Pet. Secs. VIII.A.1, VIII.A.2.f; Ex. 1002 ¶¶ 133–134).

Dependent claim 14 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel by comparing a first geographic zone from which the at least one video feed is sourced with a second geographic zone corresponding to a location of the user's communication device.*"  Ex. 1001, 13:42–47.  With respect to claim 14, Petitioner asserts that "[a]s described for claim 2, it would have been obvious for Saylor's database to track the location of users and compare user location with the location of a device providing a video feed before associating the video feed with the communication channel including that user."  Pet. 50 (citing Pet. Sec. VIII.A.3; Ex. 1002 ¶ 135).

Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 130–135.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 12–14.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 12, 13, and 14.

> *viii.*    *Conclusion as to Dependent Claims 2–5, 7–14, 16–19, and 21–24*

We have considered all of the evidence and the arguments provided by the parties with respect to dependent claims 2–5, 7–14, 16–19, and 21–

84

IPR2023-01295
Patent 8,994,830 B2

24, as well as the testimony of Dr. Polish and Dr. Akl. Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of these dependent claims and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### F. Obviousness Over Gogic and Opitz (Ground 2)

Petitioner contends that claims 1–5, 8–19, and 22–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Gogic and Opitz. Pet. 55–81.

We have, however, determined that these claims are unpatentable over the combined teachings of Shaffer and Saylor (Ground 1). *See* Section III.E. Accordingly, we need not address Petitioner's alternative Ground 2 based on Gogic and Opitz. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

85

IPR2023-01295
Patent 8,994,830 B2

## IV. CONCLUSION[10]

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable on the bases set forth in the following table.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 7–19, 21–24 | 103(a) | Shaffer, Saylor | 1–5, 7–19, 21–24 | |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz | | |
| **Overall Outcome** | | | 1–5, 7–19, 21–24 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2023-01295
Patent 8,994,830 B2

## V. ORDER

Upon consideration of the record before us, it is

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

87

IPR2023-01295
Patent 8,994,830 B2

*PETITIONER:*

Eliot Williams
Michael Knierim
Clarke Stavinoha
Joseph Cahill
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
michael.knierim@bakerbotts.com
clarke.stavinoha@bakerbotts.com
joe.cahill@bakerbotts.com

PATENT OWNER:

Jason Engel
Katherine Allor
Nolan Hubbard
Samuel Richey
Kyle Kantarek
K&L GATES LLP
jason.engel.ptab@klgates.com
katy.allor@klgates.com
nolan.hubbard@klgates.com
samuel.richey@klgates.com
kyle.kantarek@kirkland.com

88

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MOTOROLA SOLUTIONS INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner

CASE: IPR2023-01295
U.S. PATENT NO. 8,994,830 B2

**PATENT OWNER'S NOTICE OF APPEAL**

Pursuant to 35 U.S.C. §§ 141 and 142, and 37 C.F.R. §§ 90.2 and 90.3, STA Group LLC, ("Patent Owner") hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's ("Board") Final Written Decision Determining All Challenged Claims Unpatentable entered on March 17, 2025, (Paper 39, "Final Written Decision") in the above-captioned mater regarding U.S. Patent No. 8,994,830 ("the '830 Patent"). A copy of the Final Written Decision is attached hereto as Exhibit A.  This notice of appeal is timely filed within 63 days of the Final Written Decision.  37 C.F.R. § 90.3(a)(1).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner states that the issues on appeal may include all findings of unpatentability by the Board in the Final Written Decision, including but not limited to, the Board's determination that the challenged claims of the '830 Patent are unpatentable, and any related issues, findings, or determinations, leading thereto or underlying that decision.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2(a), this Notice is being filed with the Patent Trial and Appeal Board.  In addition, a copy of this Notice and the required docketing fees are being filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit via CM/ECF.

Respectfully submitted,

Dated: May 14, 2025

/Jason A. Engel/
Jason A. Engel (Reg. No. 51,654)
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602

Jason.Engel.PTAB@klgates.com
T: (312) 807-4236
F: (312) 827-8145

*Counsel for Patent Owner*

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, in addition to being electronically filed through P-TACTS, a true and correct copy of the above-captioned **PATENT OWNER'S NOTICE OF APPEAL** is also being filed pursuant to 37 C.F.R § 90.2(a) with the Director of the United States Patent and Trademark Office, on May 14, 2025, by electronic mail to efileSO@uspto.gov, which is the e-mail address indicated on the United States Patent and Trademark Office's web page for the Office of the General Counsel, <https://www.uspto.gov/about-us/organizational-offices/office-general-counsel>.

I also hereby certify that, on May 14, 2025, a true and correct copy of the foregoing Patent Owner's Notice of Appeal, and the filing fee, were filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit, via CM/ECF.

Respectfully submitted,

/Jason A. Engel/
Jason A. Engel
Reg. No. 51,654
K&L Gates LLP

4

Appx00207

Case IPR2023-01295<br>U.S. Patent 8,994,830 B2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing documents were served by electronic service, via e-mail on May 14, 2025 in its entirety on the following:

Eliot D. Williams
Baker Botts L.L.P.
eliot.williams@bakerbotts.com

Katharine Burke
Baker Botts L.L.P.
katharine.burke@bakerbotts.com

Michael Knierim
Baker Botts L.L.P.
michael.knierim@bakerbotts.com

Clarke W. Stavinoha
Baker Botts L.L.P.
clarke.stavinoha@bakerbotts.com

Joseph B. Cahill
Baker Botts L.L.P
Joe.cahill@bakerbotts.com

Stephen O'Donohue
Baker Bott L.L.P.
Stephen.odonohue@bakerbotts.com

dlbbstamsiiprs@bakerbotts.com

5

Dated May 14, 2025

Respectfully submitted,

/Jason A. Engel/
Jason A. Engel
Reg. No. 51,654
K&L Gates LLP

6

<u>Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830</u>

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MOTOROLA SOLUTIONS, INC.,

Petitioner,

v.

STA GROUP LLC,

Patent Owner.

———————

IPR2023-01295
U.S. Patent No.: 8,994,830 B2

———————

**PETITION FOR *INTER PARTES* REVIEW OF CLAIMS 1-5, 7-19, 21-24 OF U.S. PATENT NO. 8,994,830 B2**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
PO Box 1450
Alexandria, Virginia 22313-1450
*Submitted Electronically*

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830

| Ground | '830 Patent Claims | Basis for Challenge |
|--------|--------------------|--------------------|
| 1 | 1-5, 7-19, 21-24 | Obvious under §103 based on Shaffer in view of Saylor |
| 2 | 1-5, 8-19, 22-24 | Obvious under §103 based on Gogic in view of Opitz |

## III.    THE '830 PATENT

The '830 patent concerns "providing access to video streams associated with communication channels in a communication network." Ex[1001], 1:8-9.

The disclosed communication system (below) includes "communication channels" connecting devices used by "public safety and first responders" (*e.g.*, radios, phones, and cameras) in a "virtual talk group" ("VTG"). *Id.*, 2:31-44; 3:37-44, 6:18-21, 7:39-42; FIGs.1a-1b. The '830 patent does not claim to have invented a VTG or a communication channel. Ex[1002], ¶¶37-42. To the contrary, the patent describes an exemplary VTG as simply a combination of like endpoints (*e.g.*, an "emergency response team") grouped together for communications. Ex[1001], 5:6-11, 5:33-37. Similarly, a communication channel is described as any (1) audio channel in a "radio network" (152); *or* (2) an IP channel over a computer network (114) that uses an interoperability service (150) to connect different types of devices and networks (*e.g.*, a radio in a "radio network" 152 and a phone in a cellular network 104). Ex[1001], 3:5-10, 3:39-4:9, Figs.1a-1b; *see also id.*, 2:40-43, 4:22-28.

stations and frequencies associated with each location. Ex[1007], 1:32-43, FIG.1. In

Opitz, the radio has a position locator, such as GPS, a processor that can track and

display the changing frequencies between regions in which the radio is located, and

an interface that allows a user to select a frequency. *Id.*, 5:3-18.



Ex[1007], FIG. 1.

## VIII.  THE ASSERTED GROUNDS OF INVALIDITY

### A.    Ground 1: Claims 1-5, 7-19, 21-24 would have been obvious over Shaffer in view of Saylor

#### 1.    A POSITA would have and could have combined Shaffer with Saylor

Shaffer discloses an "Interoperability System" (IS 120 in FIG. 3, red below)

that allows different networks using different communication protocols (*e.g.*, LAN 111 and radio network 113) to communicate "audio, video, or other data" to each other via an Internet Protocol (IP) network. Ex[1004], ¶¶0021-0022, 0038. The IS can, for example, connect devices in different networks and different regions, including different "buildings, campuses, cities, counties, states, countries or any other particular geographical area." Ex[1004], ¶0046. The IS uses IP to provide interoperability. Ex[1004], ¶¶0039-0040. For example, a "multicast IP address[]" can be assigned to a group of endpoints (such as "local safety and security forces") so that, even if devices are in different networks, they can "communicate with each other through IS 120." *Id.*; *see also id.*, ¶¶0022 (IP networks transmit voice and video data by "placing the data in packets"), 0025.



FIG. 3

Ex[1004], FIG. 3 (annotated).

Saylor discloses a specific type of communications network—namely, a central security network (FIG. 1 below) for a building or facility—that communicates with other networks. Ex[1011], 5:62-65, FIG. 1. In particular, Saylor's network is configured using rules and preferences to "automatically inform" recipients, including security or emergency contacts (blue below), of alarms or emergencies in a monitored building. *Id.*, 1:17-22, 9:22-28. Saylor specifically discloses that the central security network can convey video or other types of data, including video clips of or instructions relating to a monitored location, to entities in other networks over an IP communications network such as the Internet. *Id.*, 2:45-55, 5:27-36, 6:22-32, 17:1-9.



FIG. 1

Ex[1011], FIG. 1 (annotated).

In view of these disclosures, a POSITA would have been motivated to

combine Shaffer and Saylor and, specifically, to connect Saylor's central security network as an input to Shaffer's IS, as illustrated in the marked-up figure below. Ex[1002], ¶84. In the combined system ("Shaffer-Saylor"), the IS in Shaffer (red) facilitates communications from Saylor's central security network to the relevant personnel and authorities in a different network (*e.g.*, a building's security personnel or local police). *Id.* For example, the IS assigns a multicast IP address (communication channel) to a particular endpoint or a group of endpoints in advance (*e.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses)) and provides that multicast IP address to store in Saylor's databases. Ex[1002], ¶85. When Saylor's central security network detects an alarm situation, it queries its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor (blue) to the relevant recipients (purple). Ex[1011], 9:22-28, 11:67-12:6, 13:51-54; Ex[1002], ¶85.

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830



Ex[1011], FIG. 1 (annotated); Ex[1004], FIG. 3 (annotated).

A POSITA's motivation to make this combination is found in both references. For example, as Shaffer describes, IS 120 is designed to connect various types of networks, including a PTT radio network (typically used by security or emergency personnel) and a local area network (LAN) or public switched telephone network (PSTN) (typically used by sensors in homes and businesses). Ex[1004], ¶0037; Ex[1002], ¶86.   In addition, Shaffer describes that the networks can be associated with locations such as business and campuses. Ex[1004], ¶0027. In view of these disclosures, a POSITA would have recognized that Shaffer's IS is well-suited to connect a network, such as a video security system designed to monitor particular buildings, with a different network that responds to incidents in those buildings, such as a security or emergency network. Ex[1002], ¶86.

Appx00244

A POSITA would have recognized that Saylor discloses the type of network well-suited to work with Shaffer's IS. Ex[1002], ¶87. For example, Saylor describes a packet-based central security network (using "TCP/IP") that receives alarms from sensors in buildings and other facilities. Ex[1011], 17:10-21, FIG. 11, 6:33-43. That central security network processes the alarms and, according to rules and preferences, transmits notifications and information to relevant recipients in *other* networks, including security or emergency personnel in other types of networks with other communication protocols. *Id.*, 6:33-43, 8:18-33, 9:25-28; Ex[1002], ¶87. The notifications and information can include audio, video, or other data. Ex[1011], 16:41-51, 8:52-60. To implement these communications, Saylor describes that the central security network can identify relevant recipients in an "address book," (*id.*, 7:48-52), but does not explain *how* to convey notifications to recipients in different networks. Ex[1002], ¶88. Shaffer's IS system provides the needed mechanism for interoperable communications to achieve Saylor's goals; using Shaffer's IS, security personnel or other responders could directly and seamlessly receive communications and information from surveillance cameras in an alarming building. *Id.*

A POSITA would have had a reasonable expectation of success in combining the references in the manner described. Ex[1002], ¶89. In the combination, Saylor's central security network sends communications to another network via Shaffer's IS in the manner already envisioned by both references—namely, by a first network sending a packet-based communication through an intermediary network to a second

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830

network also connected to the same intermediary network. Ex[1011], 6:22-25, FIG. 1; Ex[1004], ¶0020 (describing the IP network could be a wide area network, among other things); Ex[1002], ¶89. A POSITA would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor. Ex[1002], ¶90; *e.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses).

### 2. Claim 1

#### a. 1[pre]:

If the preamble is limiting, Shaffer-Saylor discloses "*[a] method, comprising.*" *E.g.*, Ex[1004], Abstract, ¶0001; Ex[1002], ¶91.

#### b. 1[a]

Shaffer discloses "*monitoring a selection of a communication channel by a user of a mobile communication device,*" under any party's proposed construction. Ex[1002], ¶92. For example, in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located. *Id.*

First, Shaffer discloses a communication channel as described in the '830 patent (Ex[1001], 2:59-62, 4:22-28)—namely, a "particular IP address" for hosting

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830

a "virtual talk group." Ex[1004], ¶0039; Ex[1002], ¶93. FIG. 3 of Shaffer (below), for example, illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form "communication sessions" comprising "audio and/or video telecommunication signals." Ex[1004], ¶¶0020, 0037-0042, FIG. 3; *see also id.*, ¶0016 (describing FIG. 1), ¶0037 (noting that system 100 in FIG. 3 includes similar components and networks as FIG. 1). In particular, Interoperability System (IS) 120 uses "multicast IP addresses" so that the devices can "communicate with each other through IS 120 to provide network interoperability." *Id.*, ¶0039; *see also id.*, ¶0038. For example, communication channels (multicast IP addresses) may exist for "local safety and security agencies." *Id.*, ¶0040.



FIG. 3

Ex[1004], FIG. 3.

Second, Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel. Ex[1002], ¶94. For example, Shaffer discloses that a police officer "such as a state highway patrol officer, may be provided with a PC with a touch screen" where the "PC comprises a mobile endpoint." Ex[1004], ¶¶0034, 0040. The officer can use the touchscreen to select "local safety and security forces" by selecting "[i]cons on the touch screen" to "join communication sessions." Ex[1004], ¶0034. The IS monitors the officer's selection, and "[u]pon receiving instructions from the officer," adjusts "communications parameters used by the endpoint." *Id.*; *see also id.*, ¶0041 (describing that IS stores multicast addresses "utilized by various agencies"). The communication parameters identified by IS 120 include a "multicast address[]" identifying the communication channel for the VTG for "local safety and security forces." *Id.*, ¶¶0040-0041. "This allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke…" *Id.*, ¶0040.

Finally, the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can "receive[] and transmit[] voice and other data" with other devices. *Id.*, ¶0044; *see also id.*, ¶¶0045-0047; Ex[1002], ¶95.

      c.    *1[b]*

Shaffer also discloses "*providing a plurality of radio frequencies on a display of a mobile communication device, each radio frequency being associated with a geographical* zone." Ex[1002], ¶96. For example, in Shaffer, mobile security personnel can select a frequency associated with a nearby building. *Id.*

In particular, Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones. Ex[1004], FIG. 4. For example, FIG. 4 (below) shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210. Ex[1004], ¶¶0043, 0046-0047. These parameter listings include **radio frequencies,** identified in Hertz (listed as X, Y, Z, P, Q). *Id.*, ¶¶0043-0048, FIG. 4.

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830



Radio frequency associated with geographical zone.

| LOCATION | NETWORK | FREQUENCY (Hz) | ENCRYPTION KEY |
|----------|---------|----------------|----------------|
| CITY A | POLICE | X | J |
| CITY A | FIRE | Y | K |
| CITY B | POLICE | Z | L |
| STATE C | POLICE | P | M |
| COUNTRY D | POLICE | Q | N |

*FIG. 4*

Ex[1004], FIG. 4.

As Shaffer describes, the mobile device stores "radio frequencies" of "communication networks by location." *Id.*, ¶0046. As shown in FIG. 4, each radio frequency is also specifically associated with a "location" such as City A, City B, State C, or Country D. *Id.*, FIG. 4. Notably, Shaffer explains the locations can also be "buildings" and "campuses," in addition to municipalities. *Id.*, ¶0027. In FIG. 2, for example, different geographic regions (52, 53, 54, 55) "may correspond to buildings, campuses, municipalities…or any other particular geographical area." *Id.*

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830

Each geographic region may also contain one or more communication networks (60-64), each of which may have a different "assigned radio frequenc[ies]." *Id.*, ¶0027; *see also id.*, ¶¶0020-0022, 0026, 0034-0035; Ex[1002], ¶¶97-98.



*FIG. 2*

Ex[1004], FIG. 2.

Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device. Ex[1002], ¶99. For example, Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen… or any other suitable interface." Ex[1004], ¶0044 (emphasis added). The display presents frequencies to the user so that "through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new

communication network." *Id.*, ¶0044; *see also id.*, ¶¶0035-0036 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶0003, 0008 (describing, as background, known functionality for using a handbook to look up local frequencies by location). For example, as in FIG. 4 above, if a user enters city A, there are two possible frequencies, X and Y.    Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the "pressing" of a touch screen "key stroke."    *Id.*, ¶¶0035-0036, 0044.

A POSITA would at least have recognized that displaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" would have been obvious and one of a finite number of predictable options for selecting on the touch screen all available frequencies in an area. Ex[1002], ¶100. Such an implementation uses a known technique (touchscreen display and selection) with known benefits (selection using a single "stroke") according to its established function, and is therefore obvious. *Id.*.

d.    *1[c]*

Shaffer-Saylor discloses "*from which a plurality of video feeds associated with the geographic zone are sourced.*" Ex[1002], ¶101. Shaffer-Saylor discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds. *Id.* For example, Saylor discloses "video cameras" located in a geographic zone (*e.g.*, a building of a "business"). Ex[1011], 10:32-34, FIG. 10. In particular "an identified location may

be monitored by a video or other recording device," and, if motion is detected, "video clips" maybe sent to a "central security network." *Id.*, 16:52-17:9; *see also id.*, 11:64-12:6.

### e.    *1[d]*

Shaffer discloses "*monitoring a selection of a radio frequency of a plurality of radio frequencies by a user.*" Ex[1002], ¶102. As discussed with respect to limitation 1[b], Shaffer discloses and renders obvious that the frequencies are provided on the display of a mobile communication device for *selection* by the user. *Id.* For example, Shaffer explains that the display presents frequencies to the user so that "through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency…)." Ex[1004], ¶0044; *see also id.*, ¶¶0035-0036 (describing a "pressing of a key stroke" to change endpoint communication setting). The user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can "receive[] and transmit[] voice and other data" with other devices. *Id.*, ¶0044; *see also id.*, ¶¶0045-0047. Displaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious, as described for limitation 1[b]. Ex[1002], ¶102.

### f.    *1[e]*

Shaffer-Saylor discloses "[1] *identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the*

*geographic zone*, *wherein* [2] *the at least one video feed is associated with the selected communication channel* [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*," under any party's proposed construction. Ex[1002], ¶103.

For example, the Shaffer-Saylor system identifies a video feed associated with the *geographic zone*, and that feed is also associated with a multicast IP address (*selected communication channel*) based on a user preferences database entry (*user policy*) that identifies video feeds relevant to security personnel (*users*) when they access the communication channel. *Id.*

First, Saylor's central security network [1] *identifies and selects a video feed associated with the geographic zone*. Ex[1002], ¶104. In particular, as shown in FIG. 10 (below), in step 1010, Saylor's central security network monitors a specific video feed in an "identified location" of a building (*the geographic zone*) and, in steps 1012, 1014, 1016, and 1020, selects and identifies that feed when a "trigger[]" event occurs, such as "motion." Ex[1011], 16:52-60, 34:6-10, FIG. 10. In steps 1022 and 1024, a "video clip[]" from that feed is processed to determine whether certain "conditions are met for alarm triggers" or "[n]otifications." *Id.*, 17:1-5. Then in, steps 1026 and 1028, an "image may be automatically transmitted" to recipients. *Id.*, 17:8-9; *see also, e.g.*, *id.*, 34:1-9 (describing that a subscriber can be sent a "video clip" from a camera near the front door if the "front door opens" or "when an unrecognized person enters").

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830



FIG. 10

Ex[1011], FIG. 10.

Second, Shaffer-Saylor accesses a user preferences database that [2] *associates the video feed with the selected communication channel*. Ex[1002], ¶105. Saylor's databases already store "relevant information for personalized alarm services." Ex[1011], 6:9-10. For example, "[u]ser database 140 may contain "user

preferences" that may indicate how "different alarm situations that may be detected in various locations or systems may warrant different levels of response" and "[s]pecial instructions" that may "include information to be conveyed to entities reacting to the alarm for a particular location or object." *Id.*, 8:34-60. Accordingly, when an event occurs (such as motion), the central security network can send relevant information (such as video clips) "via the Internet 150" to "[a]n emergency entity 164." *Id.*, 6:22-32, 7:40-48, 9:23-29, 11:46-55; *see also id.*, 11:24-28 (identifying mobile devices receiving notifications), 12:34-35 ("the user may specify when emergency dispatch is to occur."). For example, "the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency." Ex[1011], 12:17-21.

As described in §VII.A, to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. *E.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses at an endpoint); Ex[1002], ¶106. Accordingly, when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel, as shown below. *Id.*

Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830



Ex[1011], FIG. 1 (annotated); Ex[1004], FIG. 3 (annotated).

Finally, Shaffer-Saylor discloses that the association between video feed and communication channel is [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.* Ex[1002], ¶103. The user policy is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them. *Id.*; *see also* Ex[1011], 8:34-60, Abstract (identifying "individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information"), 11:48-63 ("user-defined conditions" determine which entity to notify and how to send the notification), 12:26-29. The preferences identify which alarms are relevant to the users (and are

designed, *e.g.*, to filter out "false alarms"). *Id.*, 12:34-41. Moreover, in Shaffer-Saylor, Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address. Ex[1002], ¶107. Accordingly, when the security personnel selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer. Ex[1002], ¶107; Ex[1004], ¶¶0040-0042.

### g.    *1[f]*

Shaffer-Saylor discloses that "*the one or more video feeds being independent of the selected communication channel.*"[3] Ex[1002], ¶108. For example, the '830 patent specification describes "independent video surveillance cameras" as those installed at "public and non-public locations." Ex[1001], 3:17-21. Shaffer-Saylor describes the same type of video feeds. Ex[1002], ¶108.

For example, the video feed selected by Saylor's central security network are video surveillance cameras at a building or home. *Id.*; Ex[1011], 10:31-34, 10:43-44. In the combined system, Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the

---

[3] Petitioner compares the combination to the '830 patent specification without conceding that this term satisfies 35 U.S.C. §112.

video feeds to the multicast channel. Ex[1002], ¶109; *see* §VIII.A.1.

h.    *1[g]*

Shaffer-Saylor discloses "*providing access to the identified at least one video feed to the mobile communication device based on the user policy.*" Ex[1002], ¶110. For example, Saylor's central security network sends video clips to mobile devices of security forces (users) based on the user policy stored in databases. Ex[1011], 11:24-28 (notifications to cell phones, etc.), 11:56-63, 35:15-33; Ex[1002], ¶110. For example, when a particular event in a particular building occurs, the user policy describes what notifications are sent and to whom. Ex[1011], 6:9-32, 8:34-60, 9:22-28; Ex[1002], ¶110. If a notification is sent to the selected communication channel (multicast address), the group members can access it. Ex[1004], ¶0039 (IS communicate "with endpoints using multicast IP addresses"); Ex[1002], ¶110.

### 3.    Claim 2

Shaffer-Saylor discloses "*wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.*" Ex[1002], ¶111.

For example, as explained for limitation 1[e], Saylor's database associates video feeds with the user's selected multicast IP address (an audio communication channel). Ex[1004], ¶0039 (describing audio communications); Ex[1003], p. 240;

Trials@uspto.gov
571-272-7822

Paper 11
Date: March 21, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

IPR2023-01295
Patent 8,994,830 B2

Before MICHAEL J. FITZPATRICK, DAVID C. McKONE, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2023-01295
Patent 8,994,830 B2

# I. INTRODUCTION

Motorola Solutions, Inc. ("Petitioner") filed a Petition, Paper 1 ("Pet." or "Petition"), to institute an *inter partes* review of claims 1–5, 7–19, and 21–24 (the "challenged claims") of U.S. Patent No. 8,994,830 B2 (Ex. 1001, "the '830 patent"). STA Group LLC ("Patent Owner") timely filed a Preliminary Response, Paper 7 ("Prelim. Resp."). With our approval, Petitioner filed a Preliminary Reply (Paper 9, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-reply (Paper 10, "Prelim. Sur-reply").

We have authority to determine whether to institute an *inter partes* review. *See* 35 U.S.C. § 314 (2016); 37 C.F.R. § 42.4(a) (2019). The standard for instituting is set forth in § 314(a), which provides that an *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." For the reasons explained below, we institute an *inter partes* review of the '830 patent.

# II. BACKGROUND

## A. Real Party in Interest

Petitioner identifies itself as the real party in interest. Pet. 1. Patent Owner identifies itself as the real party in interest. Paper 4, 1.

## B. Related Proceedings

According to the parties, the '830 patent is and was the subject of the following actions: *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.) filed Sept. 30, 2022 (the "Related Litigation"); and *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 4-22-cv-00840

2

IPR2023-01295
Patent 8,994,830 B2

(E.D. Tex.) filed Sept. 30, 2022, and administratively closed Oct. 6, 2022.

Pet. 1; Paper 4, 1; Paper 6, 4–5; Paper 8, 4–5.

### C. The '830 Patent (Ex. 1001)

The '830 patent issued on March 31, 2015, and "relates to providing access to video streams associated with communication channels in a communication network." Ex. 1001, 1:7–9.  Figure 1B of the '830 patent is reproduced below.



*FIG. 1B*

Figure 1B, above, is a diagram of communication system 150, including "a public switched telephone network (PSTN) 102, cellular network 104, and various networked computing devices," which is configured to communicate with, for example, "telephones 106, computers

3

IPR2023-01295
Patent 8,994,830 B2

112, Voice over Internet Protocol (VoIP) phones 110, mobile phones 108, gateways 116, routers 118, switches, transmission systems, relay systems, and other communication devices." *Id*. at 2:34–40*; see also id*. at 3:30–36. "The communication system 150 further includes a radio network 152 configured to communicate with one or more mobile communication devices (e.g., one or more push-to-talk (PTT) radios)." *Id*. at 3:37–40. According to the '830 patent, "[a] plurality of cameras 122 provide video feeds that . . . are associated with communication channels (e.g., communication channels providing Virtual Talk Groups (VTGs))." *Id*. at 2:40–43.

Figure 4 of the '830 patent is reproduced below.



FIG. 4

4

IPR2023-01295
Patent 8,994,830 B2

Figure 4, above, is a flow diagram of method 400 "for associating video feeds with a communication channel associated [with] a plurality of mobile communication devices." *Id*. at 6:18–21. Referring to Figure 3, the '830 patent discloses that "a user interface may optionally be presented to a user (e.g., the user 305.1–305.q or 307.1–307.r) to allow the user to select a communication channel 302.1–302.n to which his/her mobile communication device 304.1–304.q or 306.1–306.r is to be set or tuned to." *Id*. at 6:24–28. At block 402, the method 400 "may then monitor selection of a communication channel by the user 305.1–305.q, 307.1–307.r of an associated mobile communication device 304.1–304.n, 306.1–306.r." *Id*. at 6:28–32. At block 404, "[a]t least one video feed associated with the selected channel . . . may be identified." *Id*. at 6:35–36. "Once the particular channel has been selected and the at least one video feed associated with the channel has been identified, the method 400 may then provide any mobile communication device 305.1–305.q or 307.1–307.r that is set to the particular channel with access to the at least one video feed." *Id*. at 6:57–62. At block 408, "the video feed may be then communicated to the mobile communication device." *Id*. at 7:1–3.

Figure 9 of the '830 patent is reproduced below.

5

IPR2023-01295
Patent 8,994,830 B2



*FIG. 9*

Figure 9, above, depicts a graphic user interface (GUI) 900 "to allow a user to select a communication frequency associated with a communication channel." *Id.* at 9:60–62. For example, "a user may select a specific VTG by selecting one of the channels 902.1–902.s," and then "a frequency associated with a region in which the user is located may be selected using the drop-down menus." *Id.* at 10:13–16. "Thus, in an example embodiment, a radio frequency of a given base station in a specific geographical region may be selected, thereby automatically providing access to video feeds associated with the selected frequency." *Id.* at 10:20–24.

6

IPR2023-01295
Patent 8,994,830 B2

### D. Challenged Claims

Petitioner challenges claims 1–5, 7–19, and 21–24 of the '830 patent.

Pet. 9–10. Claims 1 and 15 are independent. Claim 1 is generally

illustrative and reproduced below.

> 1. [pre][1] A method comprising:
>
> [a] monitoring a selection of a communication channel by a user of a mobile communication device;
>
> [b] providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone
>
> [c] from which a plurality of video feeds associated with the geographic zone are sourced;
>
> [d] monitoring a selection of a radio frequency of the plurality of radio frequencies by the user[;][2]
>
> [e] identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,
>
> [f] the one or more video feeds being independent of the selected communication channel; and
>
> [g] providing access to the identified at least one video feed to the mobile communication device based on the user policy.

Ex. 1001, 12:18–39.

---

[1] Bracketed letter designations added.

[2] Here, the '830 patent appears to have a typographical error. Instead of a semicolon, it has a period. *See* Ex. 1001, 12:27.

7

IPR2023-01295
Patent 8,994,830 B2

### E. Evidence

Petitioner relies upon the following evidence:

(1) U.S. Patent Application Publication No. US 2006/0281471 A1, published December 14, 2006 ("Shaffer") (Ex. 1004);

(2) U.S. Patent No. 7,113,090 B1, issued September 26, 2006 ("Saylor") (Ex. 1011);

(3) U.S. Patent Application Publication No. US 2007/0173273 A1, published July 26, 2007 ("Gogic") (Ex. 1006); and

(4) U.S. Patent No. 8,090,388 B1, filed March 20, 2007 and issued January 3, 2012 ("Opitz") (Ex. 1007).

Petitioner also relies on the declaration of Nathaniel Polish, Ph.D. (Ex. 1002).

### F. Asserted Grounds of Unpatentability

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–5, 7–19, 21–24 | 103(a)[3] | Shaffer, Saylor |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz |

Pet. 10.

## III. ANALYSIS

### A. 35 U.S.C § 325(d)

"In determining whether to institute or order [an *inter partes* review], the Director may take into account whether, and reject the petition or request

---

[3] Because the application from which the '830 patent issued has an effective filing date before March 16, 2013 (Ex. 1001, code (22)), citations to 35 U.S.C. § 103 are to the pre-AIA version. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

IPR2023-01295
Patent 8,994,830 B2

because, the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d). The Director has delegated this discretion to the Board. 37 C.F.R. § 42.4(a).

Patent Owner contends the Board should deny the Petition pursuant to 35 U.S.C. § 325(d) because "[t]he prior art and arguments relied upon in the Petition are substantially the same prior art and arguments that were previously presented in prosecution." *See* Prelim. Resp. 32–37; Prelim. Sur-reply, 1–2. Petitioner disagrees, and argues that the asserted prior art references were not previously considered. *See* Pet. 85; Prelim. Reply 1–2.

### 1. Framework

In evaluating the exercise of discretion to deny institution under Section 325(d), the Board uses the following two-part framework: (1) determining whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of the first part of the framework is satisfied, determining whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims. *Advanced Bionics, LLC v. Med-El Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential) ("*Advanced Bionics*").

Within this two-part framework, the Board considers a number of non-exclusive factors in evaluating whether to exercise its discretion under § 325(d). *See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017) (precedential as to § III.C.5, first para.) ("*Becton, Dickinson*"); *see also Advanced Bionics,* Paper 6 at 9–11. The factors set forth in *Becton, Dickinson* are as follows:

9

IPR2023-01295
Patent 8,994,830 B2

(a) the similarities and material differences between the asserted art and the prior art involved during examination;

(b) the cumulative nature of the asserted art and the prior art evaluated during examination;

(c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

(d) the extent of the overlap between the arguments made during examination and the manner in which petitioner relies on the prior art or patent owner distinguishes the prior art;

(e) whether petitioner has pointed out sufficiently how the examiner erred in its evaluation of the asserted prior art; and

(f) the extent to which additional evidence and facts presented in the petition warrant reconsideration of the prior art or arguments.

*Becton, Dickinson*, Paper 8 at 17–18. *Becton, Dickinson* factors (a), (b), and (d) relate to whether the art or arguments presented in the Petition are the same or substantially the same as those previously presented to the Office. *Advanced Bionics*, Paper 6 at 10. Factors (c), (e), and (f) "relate to whether the petitioner has demonstrated a material error by the Office" in its prior consideration of that art or arguments. *Id.* Only if the same or substantially the same art or arguments were previously presented to the Office do we consider whether petitioner has demonstrated a material error by the Office. *Id.* "At bottom, this framework reflects a commitment to defer to previous Office evaluations of the evidence of record unless material error is shown." *Id.* at 9.

### 2. *Analysis*

Petitioner points out that Patent Owner "does not dispute that the art in the Petition's grounds was ***not*** considered during prosecution." Prelim.

10

IPR2023-01295
Patent 8,994,830 B2

Reply 1 (citing Prelim. Resp. 32–37). "Moreover," Petitioner argues, "the Petition's art and arguments are substantially *different* from those considered by the Examiner." Prelim. Reply 1 (emphasis by Petitioner). Petitioner argues that Patent Owner "simply ignores *numerous* limitations, including all of the "radio frequencies" limitations (1[b], 1[d], 15[d], 15[f]), the addition of which led to allowance of the claims." *Id.* (citing Ex. 1003, 108, 111, 137; Pet. 13). According to Petitioner, "[t]he Examiner *never* asserted that Kalley nor Shaffer '339 disclosed these limitations; they do not, and [Patent Owner] does not even assert that Kalley and Shaffer '339 disclose those limitations now." Prelim. Reply 1 (citing Prelim. Resp. 32–37; Ex. 1003, 175, 191, 245, 292). Petitioner argues that Patent Owner ignores Petitioner's reliance on "Shaffer's and Op[it]z's disclosure of the radio frequency limitations and the motivations to combine Shaffer+Saylor and Gogic+Op[it]z, all of which renders Petitioner's art substantially different from Kalley and Shaffer '339." Prelim. Reply 1 (citing Prelim. Resp. 32–37; *see* Pet. 23–29, 32–35, 55, 58–63; Ex 1002 ¶¶ 96–100, 159–166).

Patent Owner responds by arguing that it "addressed each limitation, including the "radio frequencies" limitations, through comparison of the asserted art to the Examiner's rejections over Shaffer '339 and Kalley." Prelim. Sur-reply 1 (citing Prelim. Resp. 34–35). Patent Owner asserts that, "[i]n the Examiner's reference to Kalley, as well as Petitioner's asserted prior art, the common argument is that 'the user may select the virtual talk group or communication channel' (Ex. 1003, 184) through Shaffer's 'PC with a touch screen' (Petition, 34–35), Gogic's 'push-to-talk (PTT) key or switch' (Petition, 57), or Opitz's 'display [that] allows a user to expressly

11

IPR2023-01295
Patent 8,994,830 B2

select from the available channels those channels he or she wishes to scan.'" Prelim. Sur-reply 1 (citing Pet. 59–60).

We disagree with Patent Owner's characterization of the prosecution history. After the Examiner issued a final rejection of then-pending claim 1 (Ex. 1003, 125–138), Applicant amended claim 1 by adding the following limitations:

[1b] "providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone"

[1c] "from which a plurality of video feeds associated with the geographic zone are sourced;"

[1d] "monitoring a selection of a radio frequency of the plurality of radio frequencies by the user;" and

[1e] . . . "by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is" . . . . (id. at 108).

After this amendment, the Examiner issued a Notice of Allowability (id. at 82–85), citing to "Applicant's Remarks dated 11/11/2014" as the Examiner's "reasons for allowance" (id. at 83). In those remarks, Applicant noted that "amended claim 1 includes the subject matter of claim 7, which the Examiner has indicated is allowable subject matter." Id. at 117. The Examiner had previously indicated that "[c]laims 7, 19 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." Id. at 137.

In a previous office action, the Examiner stated with respect to then-pending claim 7 that "Schaffer in view of Kalley . . . *does not teach* a

12

IPR2023-01295
Patent 8,994,830 B2

plurality of radio frequencies on a display of the mobile communication device, each associated with a geographical zone; monitoring selection of a radio frequency of the plurality of radio frequencies by the user; and providing access to a plurality of video feeds associated with the geographical zone." *Id.* at 191 (emphasis added). Based on this record, it appears that the Examiner allowed the current claim 1 after determining that Schaffer '339 and Kalley did not teach the "radio frequencies" limitations that were added to claim 1 from claim 7.

Here, in Ground 1, Petitioner asserts that Shaffer, or a combination of Shaffer and Saylor, teaches limitations [1b]–[1d]. Pet. 32–36. With respect to Ground 2, Petitioner asserts that Gogic, or a combination of Gogic and Opitz, teaches these limitations. Pet. 58–64. Contrary to Patent Owner's argument, Patent Owner's comparison of the asserted art to the previously considered art is directed to limitation [1a] "monitoring a selection of a communication channel by a user of a mobile device," and is not directed to the subject matter of the "radio frequencies" limitations [1b]–[1d] that were added to claim 1 from claim 7. *See* Prelim. Resp. 34–35.

Given that the asserted art is not the same as the art previously considered by the Examiner during prosecution, and given the Examiner's allowance of amended claim 1 because "Schaffer in view of Kalley . . . *does not teach* a plurality of radio frequencies on a display of the mobile communication device, each associated with a geographical zone; monitoring selection of a radio frequency of the plurality of radio frequencies by the user; and providing access to a plurality of video feeds associated with the geographical zone" (Ex. 1003, 191 (emphasis added)), we are persuaded by Petitioner's arguments that the prior art and arguments

13

IPR2023-01295
Patent 8,994,830 B2

presented in the Petition are not the same, or substantially the same, as those considered by the Examiner.

Based on the record before us, we determine that the prior art and arguments presented by the Petition are not the same, or substantially the same, as the prior art and arguments previously presented to the Office. Having determined that Part 1 of the *Advanced Bionics* framework has not been met, we do not reach Part 2 of the framework.

We therefore determine that the circumstances of this case do not warrant the exercise of our discretion under 35 U.S.C. § 325(d).

### B. *35 U.S.C § 314(a)*

Patent Owner contends "[t]he *Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation* (June 21, 2022) ('Interim Procedure'), *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) provides the basis for a discretionary denial in this case." Prelim. Resp. 37. Patent Owner contends "[t]his Petition does not 'present[] compelling evidence of unpatentability' with the Petition failing to provide a 'compelling, meritorious challenge[]' that is 'unrebutted [at] trial.'" *Id.* at 37–38 (quoting Ex. 1032, 2, 4). Patent Owner provides arguments regarding the factors set forth in *Fintiv* in relation to *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.) filed Sept. 30, 2022. *Id.* at 38–42.

The Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("*Fintiv*"), identifies a non-exclusive list of factors the Board considers when addressing whether a related, parallel district court action provides a basis

14

IPR2023-01295
Patent 8,994,830 B2

for discretionary denial under 35 U.S.C. § 314(a). *Fintiv*, Paper 11 at 5–16.

Those factors include:

> 1. whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;
>
> 2. proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;
>
> 3. investment in the parallel proceeding by the court and the parties;
>
> 4. overlap between issues raised in the petition and in the parallel proceeding;
>
> 5. whether the petitioner and the defendant in the parallel proceeding are the same party; and
>
> 6. other circumstances that impact the Board's exercise of discretion, including the merits.

*Id.* at 5–6.

On June 21, 2022, the Director of the United States Patent and Trademark Office issued an *Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation* ("Guidance Memo")[4] to clarify "the [Board's] current application of *Fintiv* to discretionary institutions where there is parallel litigation" and to "confirm[] that the precedential import of *Fintiv* is limited to the facts of that case." Guidance Memo 2. In particular, the Memorandum states that the Board

> will not deny institution of an IPR or PGR under *Fintiv* (i) when a petition presents compelling evidence of unpatentability; (ii) when a request for denial under *Fintiv* is based on a parallel ITC proceeding; **or (iii) where a petitioner stipulates not to pursue in a parallel district court proceeding the same**

---

[4] *Available at:*
*https://www.uspto.gov/sites/default/files/documents/interim_proc_discretion ary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf*

15

IPR2023-01295
Patent 8,994,830 B2

**grounds as in the petition or any grounds that could have reasonably been raised in the petition.**

*Id.* at 9 (emphasis added).

On December 28, 2023, Petitioner filed Updated Mandatory Notices informing the Board of the stipulation Petitioner made to Patent Owner on December 27, 2023. Paper 8, 5 (citing Ex. 1034). The Stipulation reads:

> Motorola Solutions, Inc. stipulates that, if the Patent Trial and Appeal Board institutes an IPR proceeding for U.S. Patent No. 8,994,830 on the grounds presented in the petition in IPR2023-01295, Motorola Solutions, Inc. will not pursue an invalidity defense in the district court action (*STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.)) that the patent claims subject to the instituted IPR are invalid based on grounds that were raised or reasonably could have been raised in the IPR.

*Id.*

Petitioner has filed a stipulation that it "will not pursue an invalidity defense in the district court action (*STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.)) that the patent claims subject to the instituted IPR are invalid based on grounds that were raised or reasonably could have been raised in the IPR." Ex. 1034. Petitioner contends that its "*Sotera* stipulation moots Patent Owner's ('PO') *Fintiv* arguments." Prelim. Repl. 1 (citing Ex. 1034; Ex. 1032, 3). Patent Owner does not respond, in the Preliminary Sur-reply, to Petitioner's Reply argument regarding discretionary denial or argue that we nevertheless should deny the Petition in light of Petitioner's stipulation. *See, generally,* Prelim. Sur-Reply.

Upon consideration of these factors and the parties' arguments, we decline to exercise our discretion to deny the Petition in light of Petitioner's *Sotera* stipulation. *See* Guidance Memo 7.

16

IPR2023-01295
Patent 8,994,830 B2

## C. Level of Ordinary Skill

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as a person having "at least (a) a bachelor's degree in computer science, electrical engineering, or a similar field, and (b) approximately 2 years industry experience in networking or communication systems, including interoperating different types of networks that include video feeds." Pet. 13 (citing Ex. 1002 ¶¶ 45–47). Patent Owner does not dispute Petitioner's description of a person of ordinary skill in the art at this stage of the proceeding. Prelim. Resp. 6–7.

Petitioner's description of a person of ordinary skill appears to be consistent with the subject matter of the '830 patent. This is supported by the testimony of Petitioner's declarant, Dr. Polish. *See* Ex. 1002 ¶ 46. We, therefore, adopt Petitioner's assessment of a person of ordinary skill for purposes of this Decision.

## D. Claim Construction

A claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R.

17

IPR2023-01295
Patent 8,994,830 B2

§ 42.100.  Thus, we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record.  *Phillips*, 415 F.3d at 1312–17.  Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term.  *Id.* at 1315.

Petitioner contends that a term "video stream association module" recited in claim 15 may invoke pre-AIA 35 U.S.C. § 112 ¶ 6 and proposes the following construction:

| Elements | Function and Structure |
|---|---|
| 15[b] "video stream association module" | <u>Function</u>: monitoring a selection of a communication channel…, providing a plurality of radio frequencies on a display…, monitoring a selection of a radio frequency…, identifying at least one video feed…, providing access to the identified at least one video feed… <br><br> <u>Structure</u>: "a variety of software applications and/or hardware that can monitor and process communications between the communication devices," as described at Ex[1001], 3:46–49 and FIGs. 2–4, 89, 11 and associated text. |

Pet. 14–15.

In response to Petitioner's proposed construction, Patent Owner "maintains that the plain and ordinary meaning of the term 'video stream

18

IPR2023-01295
Patent 8,994,830 B2

association module' applies, and does not concede to the term being governed by pre-AIA 35 U.S.C. § 112, ¶ 6." Prelim. Resp. 6.

According to Patent Owner, the parties agreed on the following constructions in the Related Litigation:

| Term | Agreed Construction |
|---|---|
| Order of Steps (Claim 1) | The "monitoring a selection of a communication channel" step must be performed before the "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds" step. |
| "Push-to-Talk (PTT) channel in a PTT communication network" (Claim 5) | "A channel for transmitting half-duplex communications in a Push-to-Talk communication network" |

Prelim. Resp. 5–6 (citing Ex. 2001, 12, 13–14).

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)). It is not necessary for us to resolve the claim construction issues identified by the parties in order for us to determine whether to institute *inter partes* review of the '830 patent. Accordingly, for purposes of this Decision and based upon the preliminary record, we decline to expressly construe any of the claim terms at this point in the proceeding.

This preliminary Decision does not prevent the parties from proposing, presenting evidence, and arguing a same or different construction of the claims during trial. The parties are encouraged to present their claim construction arguments and evidence as permitted by our rules. A final

19

IPR2023-01295
Patent 8,994,830 B2

claim construction of any terms that are in controversy and whose construction are necessary to resolve the controversy will be determined after the close of all the evidence and after any oral hearing in this matter.

### E. Patentability Challenges

As indicated above, Petitioner presents two grounds challenging the patentability of particular claims of the '830 patent under 35 U.S.C. § 103. Petitioner challenges (1) claims 1–5, 7–19, and 21–24 based on the combined teachings of Shaffer and Saylor; and (2) claims 1–5, 8–19, and 22–24 based on the combined teachings of Gogic and Opitz. Pet. 10.

#### 1. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham*, 383 U.S. at 17–18. At this stage, neither party has presented evidence on the fourth *Graham* factor.

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions.

20

IPR2023-01295
Patent 8,994,830 B2

*Id.* at 417.  Reaching this conclusion, however, "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim."  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention."  *Id.*

### 2.  Relevant Prior Art

#### a.  Shaffer (Ex. 1004)

Shaffer is a U.S. Patent Application Publication that published on December 14, 2006, more than one year before the earliest priority date of the '830 patent.  Ex. 1001, code (22); Ex. 1004, code (43).

Shaffer relates to "a method and system for communicating using position information."  Ex. 1004 ¶ 1.  According to Shaffer, a method for communicating using position information includes:

> communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location.
>
> adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.

*Id.* ¶ 5; *see also id.* at FIG. 5, ¶¶ 49–50.  "The first and second communication parameters may comprise a frequency, a modulation method and/or an encryption key."  *Id.* ¶ 6.  According to Shaffer, "[t]echnical advantages of particular embodiments include providing a mobile endpoint user the ability to communicate, while changing locations, with different

21

IPR2023-01295
Patent 8,994,830 B2

communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys." *Id.* ¶ 8.

Shaffer's Figure 2 is shown below:



Shaffer's Figure 2, above, depicts "a communication system 50 for communicating using position information," which "includes a plurality of geographic regions 52–55, communication networks 60–64, endpoints 70 and 74 and CCP [communication control post] 80." *Id.* ¶ 26. "Communication networks 60–64 each may communicate information (e.g., signals, data or messages) over assigned radio frequencies, modulation methods and/or various encryption keys to support communication among network communication devices." *Id.* According to Shaffer, "frequencies, modulation methods and/or encryption keys utilized by the various communication networks 60–64 may be embedded in memory of mobile endpoints" such that "as mobile endpoint 70 (e.g., a LMR in a safety

22

IPR2023-01295
Patent 8,994,830 B2

vehicle) moves between geographic areas, the endpoint may use GPS information to pin-point its location and automatically adjust its current communication radio frequency, modulation method and/or encryption key settings to allow the user of the endpoint to communicate with local safety and security forces in the area in which the endpoint is currently located."
*Id.* ¶ 31.

    Shaffer's Figure 4 is shown below:



FIG. 4

    Shaffer's Figure 4, above, illustrates mobile endpoint 200 including "a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.* ¶¶ 43, 44. According to Shaffer, "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200 and

23

IPR2023-01295
Patent 8,994,830 B2

receives and transmits voice and other data between endpoint 200 and other network devices and components." *Id.* ¶ 44. Shaffer discloses that "[u]ser interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices," and "may comprise a keypad, display, touch screen, audio input or any other suitable interface." *Id.* "For example, through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (e.g., radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*

### b. Saylor (Ex. 1011)

Saylor is a U.S. Patent that issued on September 26, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1011, code (45).

Saylor relates to "a security system connected to a wireless communication system which enables communication with a subscribed user when an alarm (or other defined) situation occurs." Ex. 1011, 2:10–13. Saylor describes "a personal security network where one or more security devices related to a subscriber may be connected to a central security network over wireless communication," where the central security network "may monitor those security devices and alert a user when an alert situation occurs." *Id.* at 2:20–26.

Figure 1 of Saylor is shown below.

24

IPR2023-01295
Patent 8,994,830 B2



FIG. 1

Figure 1 of Saylor, above, provides "a graphical representation of a central security network system 100." *Id.* at 5:63–64. According to Saylor, "[a]larm situations may be detected by a control panel 120, 122, 124 associated with and preferably local to each security device and/or system (e.g., property, personal property, individual, or combination)," wherein "[c]ontrol panels 120, 122, 124 may transmit alarm information to central security network 130." *Id.* at 6:1–6; *see also id.* at 7:29–40. "Central security server 130 may then alert users and other identified entities via wireless and/or other devices, such as mobile device 240, via a voice alarm, text message and other notifications." *Id.* at 7:40–43; *see also id.* at 6:19–25. According to Saylor, "[c]ontact individuals and/or entities $161_1$–$162_N$ identified by the user may also receive alert notification in an order determined by the user," and "the user may select contact order and/or other actions through menu options at the time of alarm situation notification." *Id.* at 6:25–30. Saylor also discloses that "[d]atabases 140, 142, 144 and 146

25

IPR2023-01295
Patent 8,994,830 B2

may store relevant information for personalized alarm services." *Id*. at 6:9–10.

Saylor also describes "a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected by comparing images" such that "[w]hen a change in images (indicating motion) is detected, an alarm may be signaled." *Id*. at 2:45–50.

### c. Gogic (Ex. 1006)

Gogic is a U.S. Patent Application Publication that published on July 26, 2007, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1006, code (43).

Gogic describes "a system and method for providing group communication services to an ad-hoc group formed according to vicinity with other users of communication device(s) (CD), or according to proximity of a given locality, in an existing communication system." Ex. 1006 ¶ 23; *see also id*. ¶ 10. According to Gogic:

> a method of communicating among a communication group of a plurality of wireless communication devices in a communication system includes forming the communication group including transmitting an invitation including group membership location criteria to join the communication group to the plurality of wireless communication devices. The group membership location criteria is evaluated at each of the plurality of wireless communication devices receiving the invitation and the communication group is formed by ones of the plurality of wireless communication devices that meet the group membership location criteria. Permission to transmit to others of the plurality of wireless communication devices of the communication group is granted to one of the wireless communication devices of the communication group.

*Id*.

26

IPR2023-01295
Patent 8,994,830 B2

Figure 4 of Gogic is shown below.



FIG. 4

Figure 4 of Gogic, above, "illustrates the formation of an ad-hoc group in response to an emergency notification, wherein the group is formed on the basis of proximity to a designated location." *Id.* ¶ 57. "A dispatcher 400 identifies the occurrence or presence of an event or condition wherein communications between proximately located users could be beneficial" and "requests 402 the setting of an emergency flag in a commonly monitored channel ('common channel') such as a paging or broadcast channel that is regularly monitored by CDs located in the area of interest." *Id.* "The request from dispatcher 400 including any location criteria is sent to CM ("communication manager") 404 for processing and scheduling in subsequent transmissions." *Id.* ¶ 59. "CM 404 directs 406 the MSC/BS$_N$

27

<u>Appx00442</u>

IPR2023-01295
Patent 8,994,830 B2

408 to transmit a set emergency flag on a common channel in at least an area serviced by a specific base station, designated herein as BSN 408, that services the area surrounding the desired location of users to be included within the ad-hoc group." *Id.*

As shown in Figure 4, "CDs 412, 414, 416 monitor 422, 424, 426 the emergency broadcast channel as broadcast by MSC/$BS_N$ 408 and while monitoring the common channel, recipient CDs 412, 414, 416 recognize the set emergency flag and appropriately respond by actively monitoring 428, 430, 432 a designated or known emergency broadcast channel to obtain further information." *Id.* ¶ 61. In addition, "CDs 412, 414, 416 receive the broad indiscriminant invitation to join the group with the right to accept the invitation being conditional upon the CD qualifying according to the location criteria also transmitted with the broad indiscriminant invitation in the emergency broadcast channel." *Id.* For example, Figure 4 above shows "$CD_1$ 412 as qualifying to join the group and accordingly accepting 440 the invitation which is relayed back to dispatcher 400 through CM 404." *Id.* ¶ 62. "Dispatcher 400 amends 442 the group list to include $CD_1$ 412 as a confirmed member of the group." *Id.*

### d. *Opitz (Ex. 1007)*

Opitz is a U.S. Patent issued from an application filed on March 20, 2007, before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1007, code (22).

Opitz relates to "systems and methods for determining a location relevant to a radio receiver or a location relevant to a user associated with a radio receiver." Ex. 1007, 1:7–9. Figure 2 of Opitz is shown below.

28

IPR2023-01295
Patent 8,994,830 B2



**FIG. 2**

Figure 2 of Opitz, above, depicts "a vehicle 134 that includes an onboard communication system embodied as a scanning radio 136 (or simply 'scanner' 136)." *Id*. at 3:30–32. Figure 2 "shows the position of the vehicle 134 on a map at successive points in time." *Id*. at 3:34–35. According to Opitz, "[t]he path of travel of the vehicle 134 across the map of FIG. 2 is illustrative of various types of channel set changes that can be triggered within the scanner 136 at various points in time." *Id*. at 3:47–50.

> As the vehicle 134 approaches certain geographic regions, the onboard scanner 136 begins receiving signals from sources of wireless transmissions within those regions, and so certain groups, or "systems" of channels, which serve as examples of sources of wireless signals, may be unlocked, and thereby included in the set of channel systems to be scanned by the scanner 136. These will generally include systems of channels having relevance to those geographic regions. Similarly, as the vehicle 134 leaves certain regions, the onboard scanner 136 ceases to receive signals from systems within those regions, and

29

IPR2023-01295
Patent 8,994,830 B2

> so systems of channels may be locked, and thereby not included
> in the set of channel systems scanned.

*Id.* at 3:50–62.

Figure 3 of Opitz is shown below.



**FIG. 3**

Figure 3 of Opitz, above, "shows a block diagram of the scanner 136." *Id.* at 4:58. Opitz discloses that "[t]he scanner 136 is capable of determining its geographic location, or at least the location of the receiver 232 in embodiments where components of the scanner 136 are remotely dispersed, based on a received wireless communication." *Id.* at 4:66–5:2. In addition, "[t]he scanner 136 includes a display 248 that displays identification data corresponding to the channel being monitored by the scanner 136." *Id.* at 5:3–5. "The identification data can include information such as the

IPR2023-01295
Patent 8,994,830 B2

frequency of the transmission, the name of the transmitting party, and the usage type of the transmission." *Id*. at 5:5–7. "In certain embodiments, the display 248 can be used by the scanner 136 to graphically present available channels to the user for review" and "the user can expressly select from the available channels those channels he or she wishes to scan." *Id*. at 5:10–14.

F.    *Obviousness Over Shaffer and Saylor (Ground 1)*

Petitioner contends that claims 1–5, 7–19, and 21–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor. Pet. 23–54. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 82–152. Patent Owner disputes aspects of Petitioner's evidence and arguments. Prelim. Resp. 13–27. We first consider whether Petitioner establishes a rationale to combine the asserted prior art.

1.  *Rationale to Combine Shaffer and Saylor*

Petitioner contends that a person of ordinary skill in the art "would have been motivated to combine Shaffer and Saylor . . . to connect Saylor's central security network as an input to Shaffer's IS [Interoperability System]." Pet. 26. Petitioner provides an annotated version of Shaffer's Figure 3 and Saylor's Figure 1, shown below, to illustrate the proposed combination.

31

IPR2023-01295
Patent 8,994,830 B2

**Shaffer-Saylor System**

FIG. 1 / FIG. 3

Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27. According to Petitioner, "[i]n the combined system ("Shaffer-Saylor"), the IS in Shaffer ([120 boxed in] red) facilitates communications from Saylor's central security network to the relevant personnel and authorities in a different network (*e.g.*, a building's security personnel or local police). *Id.* (citing Ex. 1002 ¶ 84).

> "For example," Petitioner explains,

> the IS assigns a multicast IP address (communication channel) to a particular endpoint or a group of endpoints in advance (*e.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses)) and provides that multicast IP address to store in Saylor's databases. Ex[1002], ¶85. When Saylor's central security network detects an alarm situation, it queries its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor

32

IPR2023-01295
Patent 8,994,830 B2

> ([shown in] blue) to the relevant recipients ([shown in] purple).
> Ex[1011], 9:22–28, 11:67–12:6, 13:51–54; Ex[1002], ¶85.

Pet. 26.

Petitioner contends that the motivation for a person of ordinary skill in

the art to make this combination

> is found in both references. For example, as Shaffer describes,
> IS 120 is designed to connect various types of networks,
> including a PTT radio network (typically used by security or
> emergency personnel) and a local area network (LAN) or public
> switched telephone network (PSTN) (typically used by sensors
> in homes and businesses). Ex[1004], ¶0037; Ex[1002], ¶86. In
> addition, Shaffer describes that the networks can be associated
> with locations such as business and campuses. Ex[1004], ¶0027.
> In view of these disclosures, a POSITA would have recognized
> that Shaffer's IS is well-suited to connect a network, such as a
> video security system designed to monitor particular buildings,
> with a different network that responds to incidents in those
> buildings, such as a security or emergency network. Ex[1002],
> ¶86.

Pet. 27.

> Petitioner goes on to explain that

> Saylor discloses the type of network well-suited to work with
> Shaffer's IS. Ex[1002], ¶87. For example, Saylor describes a
> packet-based central security network (using "TCP/IP") that
> receives alarms from sensors in buildings and other facilities.
> Ex[1011], 17:10–21, FIG. 11, 6:33–43. That central security
> network processes the alarms and, according to rules and
> preferences, transmits notifications and information to relevant
> recipients in *other* networks, including security or emergency
> personnel in other types of networks with other communication
> protocols. *Id.*, 6:33–43, 8:18–33, 9:25–28; Ex[1002], ¶87. The
> notifications and information can include audio, video, or other
> data. Ex[1011], 16:41–51, 8:52–60. To implement these
> communications, Saylor describes that the central security
> network can identify relevant recipients in an "address book,"
> (*id.*, 7:48–52), but does not explain *how* to convey notifications
> to recipients in different networks. Ex[1002], ¶88. Shaffer's IS

33

IPR2023-01295
Patent 8,994,830 B2

> system provides the needed mechanism for interoperable
> communications to achieve Saylor's goals; using Shaffer's IS,
> security personnel or other responders could directly and
> seamlessly receive communications and information from
> surveillance cameras in an alarming building. *Id.*

Pet. 28.

Petitioner also argues that a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the references in the manner described." Pet. 28 (citing Ex. 1002 ¶ 89). Petitioner asserts that, "[i]n the combination, Saylor's central security network sends communications to another network via Shaffer's IS in the manner already envisioned by both references—namely, by a first network sending a packet-based communication through an intermediary network to a second network also connected to the same intermediary network." Pet. 28–29 (citing Ex. 1011, 6:22–25, Fig. 1; Ex. 1004 ¶ 20; Ex. 1002 ¶ 89). According to Petitioner, a person of ordinary skill in the art "would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor." Pet. 29 (citing Ex. 1002 ¶ 90; Ex. 1004 ¶¶ 0039–0040).

Patent Owner does not contest Petitioner's evidence and arguments directed to a rationale to combine the teachings of Shaffer and Saylor. *See* Prelim. Resp. 13–27.

Based upon the present record, we determine that Petitioner has made a sufficient showing, for purposes of institution, that one of ordinary skill in the art would have sufficient reason to combine Shaffer's Interoperability

34

IPR2023-01295
Patent 8,994,830 B2

System (IS) with Saylor's Central Security Network (CSN) to create an integrated communication system in the manner described by Petitioner. We, therefore, find that Petitioner has shown sufficiently for purposes of institution that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine the teachings of Shaffer and Saylor in the manner described, and would have had a reasonable expectation of success in so doing.

### 2. Independent Claim 1

We now consider the evidence and arguments of the parties directed to independent claim 1.

Petitioner contends that claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor. Pet. 29–42. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 91–110. Patent Owner disputes certain aspects of Petitioner's evidence and arguments with respect to claim 1, in particular limitations 1[a]–1[e]. *See* Prelim. Resp. 13–27. Patent Owner does not contest Petitioner's evidence and arguments directed to the preamble and limitations 1[f]–1[g]. *Id.* We consider all of Petitioner's evidence and arguments directed to claim 1, and we address in detail Patent Owner's arguments directed to the claim.

### a. Limitations 1[a]/1[d]: monitoring a selection of a communication channel/radio frequency;

Patent Owner contends that Petitioner's proposed Shaffer-Saylor combination "fails to address the multiple communication channels and multiple radio frequencies claimed in the '830 Patent." Prelim. Resp. 16. "More specifically," Patent Owner argues, "claims 1 and 15 of the '830 Patent each recite 'monitoring a selection of a communication channel' and 'monitoring a selection of a radio frequency,' implicitly requiring that

35

IPR2023-01295
Patent 8,994,830 B2

multiple communication channels and radio frequencies exist or else no selection would be necessary." *Id.* at 15–16.

For limitation 1[a], Petitioner asserts that "Shaffer discloses "*monitoring a selection of a communication channel by a user of a mobile communication device.*" Pet. 29 (citing Ex. 1002 ¶ 92). Petitioner asserts that, "in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located." Pet. 29. Petitioner asserts that "Shaffer discloses a communication channel as described in the '830 patent—namely, a 'particular IP address' for hosting a 'virtual talk group.'" *Id.* at 28–29 (citing Ex. 1001, 2:59–62, 4:22–28; Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

Petitioner refers to Figure 3 of Shaffer, shown below. Pet. 30.



FIG. 3

With respect to Shaffer's Figure 3, Petitioner explains that it "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication

36

IPR2023-01295
Patent 8,994,830 B2

sessions" comprising "audio and/or video telecommunication signals." *Id.* (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). "In particular," Petitioner points out, "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38–39). "For example," Petitioner explains, "communication channels (multicast IP addresses) may exist for 'local safety and security agencies.'" Pet. 30 (citing Ex. 1004 ¶ 40).

"Second," Petitioner asserts, "Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel." Pet. 31 (citing Ex. 1002 ¶ 94). "For example," Petitioner explains, "Shaffer discloses that a police officer 'such as a state highway patrol officer, may be provided with a PC with a touch screen' where the 'PC comprises a mobile endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 40). According to Petitioner, "[t]he officer can use the touchscreen to select 'local safety and security forces' by selecting '[i]cons on the touch screen' to 'join communication sessions.'" Pet. 31 (citing Ex. 1004 ¶ 34). Petitioner explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" *Id.*; *see also id.* ¶ 41 (describing that IS stores multicast addresses "utilized by various agencies"). Petitioner asserts that "[t]he communication parameters identified by IS 120 include a 'multicast address' identifying the communication channel for the VTG for 'local safety and security forces.'" Pet. 31 (citing Ex. 1004 ¶¶ 40–41). According to Petitioner, "[t]his allows the mobile endpoint user to connect with local safety and security forces

37

IPR2023-01295
Patent 8,994,830 B2

manually with, for example, a single key stroke." Pet. 31 (citing Ex. 1004 ¶ 40).

"Finally," Petitioner asserts, "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

For limitation 1[d], Petitioner asserts that "Shaffer discloses "*monitoring a selection of a radio frequency of a plurality of radio frequencies by a user.*" Pet. 36 (citing Ex. 1002 ¶ 102). Petitioner asserts that "[a]s discussed with respect to limitation 1[b], Shaffer discloses and renders obvious that the [radio] frequencies are provided on the display of a mobile communication device for *selection* by the user." *Id.* "For example," Petitioner points out, "Shaffer explains that the display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency. . .)." Pet. 36 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting). According to Petitioner, "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices." Pet. 36 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47). Petitioner argues that "[d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen would at least have been obvious, as described for limitation 1[b]." Pet. 36 (citing Ex. 1002 ¶ 102).

38

IPR2023-01295
Patent 8,994,830 B2

Patent Owner argues that the Petition is deficient "because it fails to include both [communication channels and radio frequencies] in any embodiment or provide any reason to combine the 'communication channels' and 'radio frequencies' supposedly taught b[y] Shaffer in a single embodiment." Prelim. Resp. 18. "Put differently," Patent Owner argues, "the 'multicast IP address' embodiment depicted in Shaffer Fig. 3 (*see* Petition, 30–31) is a distinct embodiment from the 'radio frequency' embodiment depicted in Shaffer Figs. 4 and 2 (*see* Petition, 32–34), and the Petition does nothing to explain how or why a POSA would combine these distinct embodiments." Prelim. Resp. 18–19.

We disagree with Patent Owner. Petitioner relies on Shaffer's teaching of a communication channel similar to one described in the '830 patent—namely, a particular IP address for hosting a virtual talk group. *See* Pet. 28–29 (citing Ex. 1001, 2:59–62 ("The gateway 116 may provide voice interoperability between computer and non-computer networks, such as the PSTN 102, by bridging telephone transmissions to Internet Protocol (IP) multicast streams."), 4:22–28 ("The radio network 152 may communicate with the computer network 114 by way of a gateway 160, which provides voice and control interoperability between the radio network 152 and the computer network 114 by bridging media and control transmissions to Internet Protocol (IP) multicast and/or Unicast (e.g., Session Initiation Protocol (SIP)) streams."); Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

Petitioner refers to Shaffer's Figure 3 and explains that Shaffer "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." Pet. 28 (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). In

39

IPR2023-01295
Patent 8,994,830 B2

particular, Petitioner points out that Shaffer's "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38–39).

Petitioner also refers to Shaffer's Figure 4, and with respect to limitation 1[b] explains that Shaffer's Figure 4 "shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210," and that "[t]hese parameter listings include *radio frequencies,* identified in Hertz (listed as X, Y, Z, P, Q)." Pet. 32 (citing Ex. 1004 ¶¶ 43–48, Fig. 4) (emphasis by Petitioner).

Patent Owner argues that "the 'multicast IP address' embodiment depicted in Shaffer Fig. 3 . . . is a distinct embodiment from the "radio frequency" embodiment depicted in Shaffer Figs. 4 and 2," and that the Petition does not "explain how or why a POSA would combine these distinct embodiments." Prelim. Resp. 18–19. However, Shaffer clearly explains that its "communication settings" include "radio frequency" and that "[t]he present invention contemplates great flexibility in using various interfaces to switch communication settings of an endpoint," such that "communication system 100 may comprise any number of IP or non-IP communication networks of any wireless or wire-line form capable of communicating audio and/or video telecommunication signals, data, and/or messages." Ex. 1004 ¶¶ 31–32, 37. Shaffer also explains that "IS 120 may be configured to communicate with any type of communication endpoint," and that mobile endpoint 200 illustrated in Figure 4 "may be similar to and provide similar functionality to other endpoints described herein." *Id.* ¶ 43.

Contrary to Patent Owner's argument, we find that Shaffer provides sufficient teachings such that a person of ordinary skill in the art would have

40

IPR2023-01295
Patent 8,994,830 B2

had reason and direction to use the endpoints depicted and described with respect to Figures 2 and 4 with communication system 100, in particular interoperability system (IS) 120, as depicted and described with respect to Figure 3, and as described in Petitioner's proposed combination of Shaffer and Saylor.

Accordingly, we find that Petitioner has sufficiently shown for purposes of institution that the asserted prior art teaches "*monitoring a selection of a communication channel by a user of a mobile communication device*" as recited in limitation 1[a] and "*monitoring a selection of a radio frequency of a plurality of radio frequencies by a user*" as recited in limitation 1[d].

### b. Limitations 1[b]/1[c]: providing a plurality of radio frequencies/video feeds

With respect to these limitations, Patent Owner argues that "Petitioner strains the [Shaffer] reference in an attempt to argue that the stored plurality of radio frequencies are ever presented to a user on a display of the endpoint 200." Prelim. Resp. 19–20 (citing Pet. 34). According to Patent Owner. "Shaffer includes no such teaching." Prelim. Resp. 20.

With respect to limitation 1[b], "*providing a plurality of radio frequencies on a display of a mobile communication device, each radio frequency being associated with a geographical* zone," Petitioner asserts that "Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones. Pet. 32 (citing Ex. 1004, Fig. 4). Petitioner provides an annotated version of Shaffer's Figure 4, shown below.

41

IPR2023-01295
Patent 8,994,830 B2



FIG. 4

Petitioner's annotated version of Shaffer's Figure 4 depicts an example of a mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210, "which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location." Ex. 2004 ¶¶ 44, 46.

Petitioner explains that Figure 4 "shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210." Pet. 32 (citing Ex. 1004 ¶¶ 43, 46–47). According to Petitioner, "these parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q)." Pet. 32 (citing Ex. 1004 ¶¶ 43–48, Fig. 4) (emphasis by Petitioner).

42

IPR2023-01295
Patent 8,994,830 B2

Petitioner asserts that, in Shaffer, "the mobile device stores 'radio frequencies' of 'communication networks by location.'" Pet. 33 (citing Ex. 1004 ¶ 46). Petitioner explains that, in Figure 4, "each radio frequency is also specifically associated with a 'location' such as City A, City B, State C, or Country D." Pet. 33 (citing Ex. 1004, Fig. 4). Petitioner also points out that "Shaffer explains the locations can also be 'buildings' and 'campuses,' in addition to municipalities." Pet. 33 (citing Ex. 1004 ¶ 27). "For example," Petitioner explains, in Figure 2 Shaffer shows "different geographic regions (52, 53, 54, 55) 'may correspond to buildings, campuses, municipalities . . . or any other particular geographical area,'" and "[e]ach geographic region may also contain one or more communication networks (60–64), each of which may have a different 'assigned radio frequenc[ies].'" Pet. 33–34 (citing Ex. 1004 ¶ 27; *see also id.* ¶¶ 20–22, 26, 34–35; Ex. 1002 ¶¶ 97–98). Shaffer's Figure 2 is shown below.



Shaffer's Figure 2 depicts a system 50 for communicating using position information that includes a plurality of geographic regions 52–55,

43

IPR2023-01295
Patent 8,994,830 B2

communication networks 60–64, endpoints 70, 74, and communication control post (CCP) 80.  Ex. 1004 ¶ 26, Fig. 2.

Petitioner also asserts that "Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device."  Pet. 34 (citing Ex. 1002 ¶ 99).  "For example," Petitioner explains, "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface."  Pet. 34 (citing Ex. 1004 ¶ 44 (emphasis by Petitioner).  According to Petitioner, "[t]he display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network."  Pet. 34–35 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶ 3, 8 (describing, as background, known functionality for using a handbook to look up local frequencies by location)).  "For example," Petitioner explains with reference to Shaffer's Figure 4, "if a user enters city A, there are two possible frequencies, X and Y.  Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the 'pressing' of a touch screen 'key stroke.'"  Pet. 35 (citing Ex. 1004 ¶¶ 35–36, 44).

Petitioner argues that a person of ordinary skill in the art "would at least have recognized that displaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' would have been obvious and one of a finite number of predictable options for selecting on the touch screen all available frequencies in an area."  Pet. 35 (citing Ex. 1002 ¶ 100).  "Such an implementation," Petitioner asserts, "uses a known

44

IPR2023-01295
Patent 8,994,830 B2

technique (touchscreen display and selection) with known benefits (selection using a single 'stroke') according to its established function, and is therefore obvious." *Id.*

With respect to limitation 1[c], Petitioner asserts that the combination of Shaffer-Saylor teaches the limitation "*from which a plurality of video feeds associated with the geographic zone are sourced.*" Pet. 35 (citing Ex. 1002 ¶ 101). Petitioner asserts that Shaffer-Saylor "discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds." *Id.* "For example," Petitioner explains, "Saylor discloses 'video cameras' located in a geographic zone (*e.g.*, a building of a 'business')." Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10). "In particular," Petitioner points out, "'an identified location may be monitored by a video or other recording device,' and, if motion is detected, 'video clips' may[ ]be sent to a 'central security network.'" Pet. 35–36 (citing Ex. 1011, 16:52–17:9; *see also id.*, 11:64–12:6).

Patent Owner argues, however, that "Shaffer teaches the radio frequencies associated with a geographical zone are stored in memory, and are *automatically* selected when a user enters a geometric zone as determined by the device's GPS radio." Prelim. Resp. 20 (citing Ex. 1004, ¶¶ 47, 35, 50). "In other words," Patent Owner argues, "Shaffer teaches *storing* radio frequencies associated with a geometric area and selecting stored radio frequencies *based on GPS location.*" Prelim. Resp. 21 (citing ¶¶ 46–47).

Patent Owner also argues that Shaffer "merely describes how interface 204 'may comprise a . . . display' and that interface 204 allows a user 'to input instructions regarding adjustment of the endpoint's

45

IPR2023-01295
Patent 8,994,830 B2

communication settings.'" Prelim. Resp. 23 (citing Ex. 1004 ¶ 44). Patent Owner asserts, however, that "Shaffer does not teach providing a plurality of radio frequencies on interface 204." Prelim. Resp. 23. Patent Owner contends that "there is indisputably no teaching in Shaffer that the displayed radio frequencies are associated with a geographical zone." *Id.* Patent Owner argues that "[t]he only disclosure in Shaffer regarding the user interface is in paragraph 44," and that "[t]his lone teaching in Shaffer does not even hint at the display providing a plurality of frequencies each associated with a geographical zone." *Id.* at 24–25. "Instead," Patent Owner argues, "it merely suggests a user can adjust communication settings when a user enters a new communication network." *Id.* at 25.

Although we agree with Patent Owner that Shaffer teaches radio frequencies associated with a geographical zone may be stored in memory, and that they may be selected automatically when a user enters a geographic zone as determined by the device's GPS, consistent with Petitioner's arguments Shaffer teaches more than this. For example, Shaffer explains that

> [i]n some cases the endpoint may be set to automatically switch communication settings upon such a move once the endpoint enters an area of a different or particular communication network. *In some cases such a switch may occur through a user interface, such as a user pressing a button to enable the switch. For example, specific buttons may be used to switch communication settings.*

*Id.* ¶ 32 (emphasis added). Shaffer also explains that these "communication settings" include, for example, "radio frequency and encryption key." *Id.* ¶ 31.

We disagree with each of Patent Owner's contentions that "there is indisputably no teaching in Shaffer that the displayed radio frequencies are

46

IPR2023-01295
Patent 8,994,830 B2

associated with a geographical zone," that "[t]he only disclosure in Shaffer regarding the user interface is in paragraph 44," and that "[t]his lone teaching in Shaffer does not even hint at the display providing a plurality of frequencies each associated with a geographical zone." Prelim. Resp. 23–25. Shaffer's paragraph 44 clearly references Figure 4, which is shown below.



FIG. 4

Shaffer's Figure 4 illustrates mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210. Ex. 2004 ¶ 44, Fig. 4. Parameter listing 200 provides a call-out table populated with a list of geographic locations of different networks along with their related

47

IPR2023-01295
Patent 8,994,830 B2

frequencies (Hz) and encryption keys. Parameter listing 200 shows geographic zones (e.g. City A, City B, State C, Country D) and associated radio frequencies (e.g. frequencies X, Y, Z, P, Q). With respect to Figure 4, Shaffer explains that user interface 204 "may comprise a keypad, *display, touch screen*, audio input *or any other suitable interface*." Ex. 2004 ¶ 44 (emphasis added).

We credit Dr. Polish's testimony with respect to Figure 2 that Shaffer's geographic regions "may correspond to buildings, campuses, municipalities . . . or any other particular geographical area." Ex. 1002 ¶ 98 (citing Ex. 1004 ¶ 27). Dr. Polish testifies, and we agree, that each "geographic region may also contain one or more communication networks (60–64), each of which may have different "assigned radio frequenc[ies]." *Id.; see also id.* ¶¶ 20–22, 26, 34–35.

We also credit Dr. Polish's testimony that "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface," such that the "display presents multiple frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network.'" Ex. 1002 ¶ 99 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).

We further credit Dr. Polish's testimony that

> [d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA. When there are multiple frequencies available for communication in a particular area, as in Shaffer, and when a user's device can include a touch

48

IPR2023-01295
Patent 8,994,830 B2

> screen, as in Shaffer, presenting for selection on the touch screen all available frequencies in an area a user enters would have been one of a finite number of predictable options for selecting a frequency.

Ex. 1002 ¶ 100.

Accordingly, we find that Petitioner has sufficiently shown for purposes of institution that the asserted prior art teaches "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone from which a plurality of video feeds associated with the geographic zone are sourced*," as recited in limitations 1[b] and 1[c].

> c. *Limitation 1[e]: wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*

Patent Owner argues that "Petitioner fails to point to any mechanism by which Saylor's stored preferences are used to identify one or more video feeds that are relevant to the user *when the user accesses the selected communication channel*," and that "neither Shaffer, nor Saylor teaches a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel." Prelim. Resp. 13.

Here, Petitioner relies on the combination of Shaffer-Saylor to teach limitation 1[e]. Pet. 36–41. Petitioner asserts that "Shaffer-Saylor accesses a user preferences database that . . . *associates the video feed with the selected communication channel*." Pet. 38 (citing Ex. 1002 ¶ 105). Petitioner points out that "Saylor's databases already store 'relevant information for personalized alarm services.'" Pet. 38 (citing Ex. 1011, 6:9–

49

IPR2023-01295
Patent 8,994,830 B2

10).  "For example," Petitioner explains, "[u]ser database 140 may contain 'user preferences' that may indicate how 'different alarm situations that may be detected in various locations or systems may warrant different levels of response' and '[s]pecial instructions' that may 'include information to be conveyed to entities reacting to the alarm for a particular location or object.'"  Pet. 38–39 (citing Ex. 1011, 8:34–60).

To illustrate how the Shaffer-Saylor combination would integrate, Petitioner provides an annotated version of Shaffer's Figure 3 and Saylor's Figure 1, shown below.



Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right.  Pet. 40.  Petitioner explains that "to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage."  Pet. 39 (citing Ex. 1004 ¶¶ 39–40

50

IPR2023-01295
Patent 8,994,830 B2

(describing assigning and storing multicast IP addresses at an endpoint); Ex. 1002 ¶ 106). Petitioner further explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Petitioner asserts that the association between a video feed and a communication channel is based on a "user policy," which "is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." *Id.* at 40 (citing Ex. 1002 ¶ 103; *see also* Ex. 1011, 8:34–60, Abstr., 11:48–63, 12:26–29). Petitioner asserts that "[t]he preferences identify which alarms are relevant to the users (and are designed, e.g., to filter out "false alarms"). Pet. 40–41 (citing Ex. 1011, 12:34–41).

> Petitioner explains that
>
> Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address. Ex[1002], ¶107. Accordingly, when the security personnel selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer.

Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

Patent Owner argues that this explanation by Petitioner has "no reference to Saylor, there is no reference to the operation of a user policy, [and] there is no reference to the identification of the one or more video feeds relevant to the user." Prelim. Resp. 16.

We disagree with Patent Owner. In our view, Petitioner provides sufficient explanation as to how the proposed Shaffer-Saylor combination

51

IPR2023-01295
Patent 8,994,830 B2

would operate. Petitioner explains that Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. Pet. 39 (citing Ex. 1004 ¶¶ 39–40; Ex. 1002 ¶ 106). Petitioner also explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Petitioner further explains that the association between a video feed and a communication channel is based on a "user policy," which "is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." *Id.* at 40 (citing Ex. 1002 ¶ 103; Ex. 1011, 8:34–60, Abstr., 11:48–63, 12:26–29). Petitioner points out that "Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address." Pet. 41 (citing Ex. 1002 ¶ 107). "Accordingly," Petitioner explains, "when the security personnel selects a communication channel associated with the multicast IP address . . . the officer can access the transmitted communications, as described in Shaffer." Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

Based on the present record, we find that Petitioner has sufficiently shown for purposes of institution that the asserted prior art teaches "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more*

52

IPR2023-01295
Patent 8,994,830 B2

*video feeds that are relevant to the user when the user accesses the selected communication channel,*" as recited in limitation 1[e].

### d. Conclusion as to Independent Claim 1

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 1. Based on the record before us, we are persuaded that Petitioner has demonstrated sufficiently for purposes of institution that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 1 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### 3. Dependent Claims 2–5, 7–19, and 21–24

Petitioner argues the combination of Shaffer and Saylor teaches or suggests the recited limitations of claims 2–5, 7–19, and 21–24. Petitioner provides explanations as to how the combination of Shaffer and Saylor teaches or suggests each claim limitation as well as a rationale for combining the art in the manner proffered. *See* Pet. 42–43 (claim 2), 43–44 (claim 3), 44 (claim 4), 44–45 (claim 5), 45–46 (claim 7), 46–47 (claim 8), 47 (claims 9 and 10), 48–49 (claim 11), 49 (claim 12), 49–50 (claim 13), 50 (claim 14), 50–54 (claim 15), and 54 (claims 16–19 and 22–24). Dr. Polish provides supporting testimony for Petitioner's contentions. *See* Ex. 1002 ¶¶ 111–152.

Patent Owner does not separately argue any of these challenged claims, but instead relies on its arguments with respect to claim 1 to argue that Petitioner has not shown that the asserted prior art teaches or renders obvious these claims. *See* Prelim. Resp. 13–27.

53

IPR2023-01295
Patent 8,994,830 B2

We have considered all of the evidence and the arguments provided by the parties with respect to claims 2–5, 7–19, and 21–24. Because we determine that Petitioner demonstrates a reasonable likelihood of prevailing in its challenge to independent claim 1 as obvious over Shaffer and Saylor, we are instituting an *inter partes* review on that challenge and we also institute *inter partes* review as to all challenges in the Petition, including Petitioner's challenges to claims 2–5, 7–19, and 21–24. *See PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018).

### G. Obviousness Over Gogic and Opitz (Ground 2)

Petitioner contends that claims 1–5, 8–19, and 22–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Gogic and Opitz. Pet. 55–81. Petitioner provides evidence and arguments as to how the combination of Gogic and Opitz teach or suggest each claim limitation. *See* Pet. 55–69 (claim 1), 69–71 (claim 2), 71–72 (claim 3), 72–73 (claim 4), 73 (claims 5 and 8), 74 (claims 9 and 10), 74–76 (claim 11), 76–77 (claim 12), 77 (claim 13), 77–78 (claim 14), 78–81 (claim 15), and 81 (claims 16–19 and 22–24). Petitioner also provides a rationale to combine Gogic and Opitz. *Id.* at 61–63. Dr. Polish provides supporting testimony for Petitioner's contentions. *See* Ex. 1002 ¶¶ 153–214.

Patent Owner disputes certain of Petitioner's contentions and provides arguments as to how Petitioner fails to demonstrate that the challenged claims are obvious over Gogic and Opitz. *See* Prelim. Resp. 27–32.

#### 1. Independent Claim 1

Petitioner contends that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Gogic and Opitz. Pet. 55–69. Patent Owner disputes Petitioner's contentions, in particular with respect to the

54

IPR2023-01295
Patent 8,994,830 B2

rationale to combine Gogic and Opitz, and limitation 1[e].  Prelim. Resp. 27–32.  We discuss Patent Owner's arguments in detail.

### a. Rationale to Combine Gogic and Opitz

Patent Owner argues that "there is no motivation to combine Opitz's display of a plurality of radio frequencies and monitoring of a selection of a radio frequency with Gogic's monitoring a selection of a communication channel [because] Opitz's radio frequency *is* its communication channel." Prelim. Resp. 32 (emphasis by Patent Owner).  Patent Owner argues that "the '830 Patent clearly requires the communication channel and the radio frequency to be distinct elements," and "Opitz treats the terms 'communication channel' and 'radio frequency' as equivalent." *Id.* at 31.

Petitioner contends that "[i]t would have been obvious to implement Gogic's CDs [communication devices] with the frequency display and selection in Opitz's mobile radio, and a POSITA could have done so with a reasonable expectation of success."  Pet. 61 (citing Ex. 1002 ¶ 164). Petitioner explains that "Gogic's formation of ad-hoc groups *requires* each CD to connect to a base station," and that "Opitz's frequency display and selection is one of a finite number of obvious ways to accomplish this."  *Id.* Petitioner asserts that "[u]sing a display to present frequencies and to allow a user to select one of them had been known for *decades* by the time of the '830 patent—and used, for example, by anyone with a basic car radio."  Pet. 61–62 (citing Ex. 1012, Fig. 3 (depicting in patent filed in 1990 a display on a car radio of geography and corresponding frequency of a station, which can be adjusted via knobs and tuners on the display)).

Petitioner also asserts that a person of ordinary skill in the art "would have been particularly motivated to look to Opitz for a suitable implementation because Opitz, like Gogic, discloses a system relating to

55

IPR2023-01295
Patent 8,994,830 B2

'emergency communication situations' in which a user desires to monitor and communicate with specific groups in specific locations, such as '[p]olice, [e]mergency [c]rews, [f]ire [d]ept. personnel, etc.'" Pet. 62 (citing Ex. 1006 ¶¶ 3, 56; Ex. 1007, 3:3–4, 11:52–67). Petitioner argues that a person of ordinary skill in the art "would have recognized that Opitz's techniques are suitable for application in Gogic's system and would provide the beneficial functionality disclosed in Opitz." Pet. 62 (citing Ex. 1002 ¶ 165).

We note that Patent Owner's position appears to be unsupported attorney argument, which is entitled to little probative weight. *See Icon Health & Fitness, Inc. v. Strava Inc.*, 849 F.3d 1034, 1046 (Fed. Cir. 2017) ("Attorney argument is not evidence or explanation in support of a conclusion."); *In re Payne*, 606 F.2d 303, 315 (CCPA 1979) ("Arguments of counsel unsupported by competent factual evidence of record are entitled to little weight."). At this stage of the proceeding Patent Owner has not provided declaration testimony to support its assertions. As a result, Patent Owner's assertions are based on unsupported attorney argument and the opinions of Petitioner's declarant, Dr. Polish, presently stand unrebutted.

Based upon the present record, we find that Petitioner has made a sufficient showing, for purposes of institution, that one of ordinary skill in the art would have had reason to combine Gogic's communication devices with the frequency display and selection in Opitz's mobile radio in the manner described by Petitioner. Accordingly, we find that Petitioner has shown sufficiently for purposes of institution that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine the teachings of Gogic and Opitz in the manner described, and would have had a reasonable expectation of success in so doing.

56

IPR2023-01295
Patent 8,994,830 B2

> b. *Limitation 1[e]: wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*

Petitioner relies on Gogic to teach this limitation. Pet. 64–68. Patent Owner disputes that Gogic teaches the recited "user policy" of this limitation. Prelim. Resp. 27–29.

Petitioner identifies the recited "*user policy*" as the "group membership location criteria," in Gogic, which Petitioner asserts is "a policy allowing users to join an ad-hoc group only if they are within a certain area." Pet. 65–66 (citing Ex. 1006 ¶ 62). Petitioner relies on Gogic's Figure 4, shown below.



FIG. 4

Gogic's Figure 4 illustrates the formation of an ad-hoc group formed on the basis of proximity to a designated location, and shows dispatcher 400,

IPR2023-01295
Patent 8,994,830 B2

communication manager (CM) 404, mobile switching center (MSC) 408, and communication devices (CD) 412, 414, 415. Ex. 1006 ¶ 19. Petitioner explains that the communication manager (CM)

> sends a message (406) directing a base station (MSC/BSN 408) to implement the user policy by sending an invitation (420) to all CDs in its service area (412, 414, 416). *Id.*, ¶¶0060–0061. The invitation includes the "location criteria" (user policy) for defining an ad-hoc group. *Id.* The CDs receiving the invitation only have the "right to accept the invitation" "conditional upon the CD qualifying according to the location criteria" (user policy). *Id.*, ¶0061. The subgroup of CDs that make up the ad-hoc group based on the user policy is also associated with the selected communication channel (the channel selected by the user associated with the ad-hoc group . . .).

Pet. 66–67 (citing Ex. 1002 ¶ 171).

Petitioner asserts that "the group membership location criteria (user policy) identify one or more video feeds that are relevant to the user when the user accesses the selected communication channel" because "[t]he user of a CD accesses the communication channel for the ad-hoc group when the CD determines that it satisfies the group membership location criteria." Pet. 67 (citing Ex. 1002 ¶ 172; Ex. 1006 ¶ 62). "For example," Petitioner explains, in Figure 4, "CD 412 and 414 pass the location criteria and join [] the group, whereas CD 416 fails the location criteria and does not join the group." Pet. 67. According to Petitioner, "[o]nce a 'group member,' each member 'receives communications from other group members over the common channel' and accesses the selected communication channel." *Id.* (citing Ex. 1006 ¶ 45).

Petitioner further explains that, "when the user accesses the channel, the group membership location criteria (user policy) that exists will identify the other group members (other CDs, including CDS with video streaming

IPR2023-01295
Patent 8,994,830 B2

capability) relevant to the user at the time of access." Pet. 68 (citing Ex. 1002 ¶ 172). Petitioner points out that, in Gogic, "the user policy is selected by a dispatcher who 'identifies the occurrence or presence of an event or condition wherein communications between proximately located users *could be beneficial.*'" Pet. 68 (citing Ex. 1006 ¶ 57 (emphasis by Petitioner). "For example," Petitioner explains, "when the user accesses the communication channel associated with an ad-hoc group relating to a car accident at a particular location, he or she will receive video feeds from police officers or other emergency personnel responding to the same incident." Pet. 68 (citing Ex. 1006 ¶ 9; Ex. 1002 ¶ 172).

Patent Owner argues that "Gogic only applies its location-based criteria to 'allow users to join an ad-hoc group only if they are within a certain area,'" and that "[t]his is not a 'user policy' that identifies one or more video feeds associated with a communication channel that are relevant to a user." Prelim. Resp. 28. Patent Owner also argues that "Gogic fails to describe any selection process for identifying a selection of video feeds as being relevant to a user," and that "Gogic's sole selection process is to identify which users can connect to the communication group based on their geographic location." *Id.* Patent Owner further argues that "Gogic makes no attempt to teach any mechanism for determining which video feeds in a communication channel are relevant to specific users," and therefore "Gogic fails to disclose a user policy that identifies one or more video feeds that are relevant to a user when the user accesses a communication channel." *Id.* at 29.

We disagree with Patent Owner. Dr. Polish explains that "the user policy in Gogic is the 'group membership location criteria,' *e.g.*, a policy allowing users to join an ad-hoc group only if they are within a certain area."

59

IPR2023-01295
Patent 8,994,830 B2

Ex. 1002 ¶ 171 (citing Ex. 1006 ¶ 62). Dr. Polish also explains that "the user policy is selected by a dispatcher who 'identifies the occurrence or presence of an event or condition wherein communications between proximately located users *could be beneficial*.'" Ex. 1002 ¶ 172 (citing Ex. 1006 ¶ 57) (emphasis added by declarant). Dr. Polish further explains that, "for example, when the user accesses the communication channel associated with an ad-hoc group relating to a car accident at a particular location, he or she will receive video feeds from police officers or other emergency personnel responding to the same incident." Ex. 1002 ¶ 172 (citing Ex. 1006 ¶ 9).

At this stage of the proceeding, neither party has directed us to anything in the '830 patent that would preclude geographic location information from being part of "a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel." Indeed, we point out that the '830 patent describes an example embodiment wherein

> policy module 312 may analyze a current location of the users 305.1–305.q. As one or more users 305.1–305.q approach a location from which specific video feed is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading[)], the policy module 312 may automatically associate the video feed from the relevant camera 122 with the communication channels of the fire truck and render access to this video feed to all other members of a fire-truck VTG.

Ex. 1001, 6:3–11. In another example, the '830 patent also explains that "a policy module (e.g., the policy module 312) has access to the GPS information (not shown) of the users (e.g., the users 305.1–305.q or 307.1–307.r). The policy module then may, for example, automatically facilitate

60

IPR2023-01295
Patent 8,994,830 B2

access to video streams relevant to the locations of ERT team members."
Ex. 1001, 8:28–33. These two examples from the '830 patent indicate that
the geographic location information of users is an appropriate consideration
for inclusion in a "*user policy*."

Accordingly, we find that Petitioner has sufficiently shown for
purposes of institution that the asserted prior art teaches "*identifying at least
one video feed by selecting the at least one video feed from the plurality of
video feeds associated with the geographic zone, wherein the at least one
video feed is associated with the selected communication channel based on a
user policy that identifies one or more video feeds that are relevant to the
user when the user accesses the selected communication channel,*" as recited
in limitation 1[e].

### c. Conclusion as to Independent Claim 1

We have considered all of the evidence and arguments presented by
the parties with respect to independent claim 1. Based on the preliminary
record before us, we are persuaded that Petitioner has demonstrated
sufficiently for purposes of institution that the combined teachings of Gogic
and Opitz meet the limitations of independent claim 1 and that a person of
ordinary skill in the art at the time of the claimed invention would have had
reason to combine their teachings in the manner described, and would have
had a reasonable expectation of success in so doing.

### 2. Claims 2–5, 8–19, and 22–24

We have considered all of the evidence and arguments provided by
the parties with respect to claims 2–5, 8–19, and 22–24. Because we
determine that Petitioner demonstrates a reasonable likelihood of prevailing
in its challenge to claim 1 as obvious over Gogic and Opitz, we are
instituting an *inter partes* review on that challenge and we also institute *inter*

IPR2023-01295
Patent 8,994,830 B2

*partes* review as to all other challenges in the Petition, including Petitioner's challenges to claims 2–5, 8–19, and 22–24. *See PGS Geophysical*, <u>891 F.3d at 1360</u>).

## IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one of the challenged claims of the '830 patent. We therefore institute trial as to all challenged claims on all grounds stated in the Petition.

At this preliminary stage of the proceeding, we have not made a final determination as to the patentability of any challenged claim or any factual or legal issue underlying the patentability inquiry. Any final determination will be based on the complete record developed during trial. We place Patent Owner on express notice that any argument not asserted in a timely-filed Response to the Petition, or in another manner permitted during trial, shall be deemed waived, even if that argument was presented in the Preliminary Response.

## V. ORDER

Accordingly, it is

ORDERED that an *inter partes* review is instituted as to all challenged claims on all grounds raised in the Petition; and

FURTHER ORDERED that *inter partes* review is instituted commencing on the entry date of this Order, and pursuant to <u>35 U.S.C. § 314(c)</u> and <u>37 C.F.R. § 42.4</u>, notice is hereby given of the institution of a trial.

IPR2023-01295
Patent 8,994,830 B2

PETITIONER:

Eliot D. Williams
Katharine Burke
Michael Knierim
Clarke W. Stavinoha
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
katharine.burke@bakerbotts.com
michael.knierim@bakerbotts.com

PATENT OWNER:

Jason A. Engel
Katherine L. Allor
Nolan R. Hubbard
Samuel P. Richey
K&L GATES LLP
jason.engel.PTAB@klgates.com
katy.allor.PTAB@klgates.com
nolan.hubbard.PTAB@klgates.com
samuel.richey.PTAB@klgates.com

63

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# PATENT TRIAL AND APPEAL BOARD

---

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

---

Case IPR2023-01295
U.S. Patent No. 8,994,830

---

# PATENT OWNER'S RESPONSE

### B.    Shaffer (Ex. 1004)

Shaffer describes "a method for communicating using position information." Ex. 1004, Abstract, ¶¶ 1, 5. As a user moves from a first location to a second location, Shaffer's system identifies the updated position of the user and automatically adjusts communication parameters to enable the user to join and communicate on a communication network at the second location. *Id.*; Ex. 2006, ¶ 38.

Shaffer describes the migration to a second communication network as occurring automatically when the user moves into a new location. Ex. 1004, ¶¶ 6-7. Shaffer also describes an "endpoint 200" that "includes a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.*, ¶ 44. The "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200" so that the endpoint can join the communication network for the geographic location in which it is located presently. *Id.* "User interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices." *Id.*; Ex. 2006, ¶ 39.

"Memory module 208 includes network communication parameter listings 210 which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location." Ex. 1004, ¶ 46. As the user moves from a first location to a second location, the endpoint 200 finds the

relevant radio frequency and encryption key for the new location and automatically selects those parameters to allow the endpoint to communicate on the communication network of the second location. *Id.*, ¶¶ 49-50, 52 ("As indicated above, technical advantages of particular embodiments of the present invention include utilizing GPS information to adjust parameters of a mobile endpoint and automatically tune its parameters to match local network requirements."); Ex. 2006, ¶ 40.

### C.    Saylor (Ex. 1011)

Saylor "provides a personal security network where an individual's system or systems of security devices may be connected to a central security network." Ex. 1011, Abstract. Saylor allows users to set up "personalized alarms and alert services" that specify who is to be contacted, the order and method of contact, and the type of situation to be alerted of. *Id.*, 2:26-31. The system further monitors images, and if "a change in images (indicating motion) is detected, an alarm may be signaled" along with the images or video clips of the motion. *Id.*, 2:45-55; Ex. 2006, ¶ 41.

Saylor includes a set of databases that "may store relevant information for personalized alarm services." Ex. 1011, 6:9-14. The user's profile can be created to specify how the user is to be notified in the event of a security alert. *Id.*, 6:19-32. Saylor further states that a notification may be sent to "police, fire department, and/or rescue squads." *Id.*, 6:16-32. However, that notification to these emergency services

occurs after the user is notified and has confirmed the existence of the alert to prevent triggering false alarms. *Id.*, 8:16-28, 12:30-41. The user preferences of Saylor relate to determining when, how, and who is contacted in the event of an emergency or security event. *Id.*, 11:4-28; Ex. 2006, ¶ 42.

### D.    Gogic (Ex. 1006)

Gogic describes providing group communication services according to proximity to other users of communication devices (CDs) in a communication system. Ex. 1006, ¶¶ [0010], [0024]. According to Gogic, "a broad or indiscriminant or generalized invitation to join a group [is transmitted] to all recipient CDs…." *Id.*, ¶ [0060]. Devices that meet the location criteria are configured to "accordingly accept" the invitation. *Id.*, ¶¶ [0062], [0011]-[0012]. The invite is sent when a "dispatcher 400 identifies the occurrent or presence of an event or condition wherein communication between proximately located users could be beneficial." *Id.*, ¶ [0057]. The dispatcher sets the "group membership location criteria" that determines which CDs join the communication group. *Id.*, ¶¶ [0010], [0058]; Ex. 2006, ¶ 43.

### E.    Opitz (Ex. 1007)

Opitz is directed to a communication system that uses a received wireless signal to determine a location of the communication system or a component of the communication system. Ex. 1007, Title, Abstract, 1:7-9. Opitz is an alternative to GPS systems, the functionality of which was not present in many communication

In addition, Petitioner's declarant confirmed the video cameras themselves, and not the central security network, monitor the feeds. Ex. 2008, 69:11-22 ("Yeah, I don't think it's the central security server that's doing the monitoring there. I think it's being done by the video or other recording device that's doing the monitoring and then sending out to the remote user."). With each video device monitoring its own feed, Saylor fails to disclose any element that *selects* a video feed from the plurality of video feeds. Ex. 2006, ¶ 72.

Thus, Shaffer-Saylor fails to teach the step of "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone." Because Shaffer-Saylor fails to teach this limitation present in both challenged independent claims, Shaffer-Saylor fails to render any Challenged Claim unpatentable. Ex. 2006, ¶ 75.

**b.      There is no Motivation to Combine Shaffer with Saylor**

Shaffer and Saylor are directed to vastly distinct systems that a POSITA would not have considered combining. Ex. 2006, ¶ 46. The structural differences between the references, the existing disclosure of each reference, and the lack of any detail regarding the combination evidences the lack of a motivation to combine Shaffer with Saylor. Absent any reason to combine these references, Ground 1 fails to render any challenged claim unpatentable. *Id.*

### i.    Shaffer and Saylor are Structurally Distinct

Shaffer and Saylor present two ways of structuring networks that are incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references. Ex. 2006, ¶ 47. First, the endpoint connectivity methods differ between the system described in Shaffer and the system described in Saylor. Additionally, the network structure differs, with Shaffer allowing any device with the credentials to join the network, whereas Saylor describes a closed list of notification recipients.

### (a)    Endpoint Connectivity

The endpoint connectivity methodology provided in Shaffer differs substantially from the endpoint connectivity described in Saylor. Ex. 2006, ¶ 47. More specifically, Shaffer's system relates to "a method and system for communicating using position information." Ex. 1004, ¶ [0001]. Shaffer enables communication using physical position information of a user by "adjusting [] one or more first communication parameters to one or more second communication parameters" as a user endpoint moves from a first location into a second location. *Id.*, Abstract, ¶¶ [0005]-[0006]; Ex. 2006, ¶ 48.

According to Shaffer, this system provides "[t]echnical advantages" including "providing a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different

communication parameters, such as different radio frequencies, modulation methods and/or encryption keys." Ex. 1004, ¶ [0008]. "Accordingly, effort and time associated with determining appropriate communication parameters when moving to a new location are reduced." *Id.*; Ex. 2008, 20:11-17.

This structure, where endpoints move between locations and adjust communication parameters as they enter different locations, is markedly distinct from the teachings of Saylor. In contrast to Shaffer, Saylor handles all communications for a variety of systems of security devices at a specific premises regardless of a location of a user relative to the premises. Ex. 2006, ¶ 49. Per Saylor, it teaches "a security network where a user may set up personalized alarms and alert services; identify various methods of contact; order at which to be contacted; individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information." Ex. 1011, Abstract. Saylor provides "a system and method for connecting a security system to a wireless communication system to automatically inform an owner and other authorized entities in a manner predetermined by the user when alarm situations and/or alarm worthy situations occur." *Id.*, 1:17-22. The location of the "owner and other authorized entities" is immaterial to whether a notification is sent. Ex. 2006, ¶ 50; Ex. 2008, 60:19-61:1 ("Saylor looks at its database and its rules and policies and decides who to reach out

to."), 71:20-72:3 ("So I don't think Saylor talks about specifically notifying or taking into account in notifying somebody where those -- where that somebody is.").

Because Saylor's system establishes communication with owners/users and authorized entities in a location agnostic manner, and provides the mechanisms to establish those communications, there would be no need to combine Saylor with Shaffer's transient endpoints. Ex. 2006, ¶¶ 50, 82-89; Ex. 2008, 60:19-61:1, 71:20-72:3. While Shaffer is concerned with ensuring endpoints are on the appropriate channel for their present location, Saylor's endpoints (i.e., sensors) are stationary and do not move between locations. Ex. 2006, ¶¶ 51-52; Ex. 2008, 22:16-23:8 ("[Shaffer] is more you're trying to have configuration appropriate to the location you've moved to."). Relatedly, Saylor does not provide any instruction to handle notifications to owners differently depending on the owner's location. Ex. 2006, ¶ 50; Ex. 2008, 71:20-72:3 ("So I don't think Saylor talks about specifically notifying or taking into account in notifying somebody where those -- where that somebody is."). If an alarm condition is sensed, the owner and/or authorized entities are alerted according to the preestablished alarm propagation settings. Ex. 1011, 1:17-22, 2:20-31. Saylor does not provide different communication settings based on whether any user or the owner is in a first location or a second location. Ex. 2006, ¶¶ 50, 53; Ex. 2008, 71:20-72:3.

The Petition latches onto the fact that Shaffer describes "different geographic regions 52-55, such as 'buildings, campuses, municipalities, counties, states, countries or any other particular geographical area.'" Petition, 16 (quoting Ex. 1004, ¶¶ [0025]-[0027]), 33-34. This argument ignores the reason those geographic regions exist: to provide communication networks local to those geographic areas to enable endpoints within those networks to communicate. *See, e.g.*, Ex. 1004, ¶¶ [0029] ("geographic areas 52 and 54 may comprise separate municipalities proximate to each other, and communication networks 60 and 63 may support communications for respective police departments of the municipalities on different frequencies and using different modulation methods and encryption keys."), [0027].

Saylor's location-agnostic security system would not be a relevant input to Shaffer's location-specific endpoint communication network. Ex. 2006, ¶ 51. As an example, Saylor could include a security system at a home in City A with the settings such that the system would contact the police department in City B in the case of an alarm condition. *Id.*, ¶ 52; Ex. 2008, 60:19-61:1 ("Saylor looks at its database and its rules and policies and decides who to reach out to."), 71:20-72:3. This is counter to Shaffer's system, which establishes communication on a region-by-region basis. Ex. 2006, ¶ 48; Ex. 2008, 27:10-28:2 (stating that Shaffer's Figure 2's "set up is that the networks that are available to endpoint 70 are 61 and 60 and not 63" because networks 60 and 61 are in the endpoint's geographic zone, while network 63 is not).

Similarly, Shaffer's location-specific communication protocols would be irrelevant in the context of Saylor's location-independent notification scheme. Ex. 2006, ¶ 51. In the case of an alarm condition at Saylor's building, the owner would want to be notified regardless of whether the owner was in the same geographic region (i.e., in the building) or in a different geographic area. *Id.*, ¶ 53. The structural differences between Shaffer and Saylor discourage the combination. *Id.*, ¶ 54.

(b)    Open v. Closed Networks

The makeup of the networks themselves also undermine any alleged motivation to combine Shaffer and Saylor. Shaffer describes an open network in which *any* endpoint with the frequency, modulation method, and encryption key can join the communication channel. Ex. 1004, ¶¶ [0037] (stating the interoperability server "may be configured to communicate with any type of communication endpoint"), [0006], [0008], [0016], [0031], [0035], [0046]. Petitioner's declarant agreed, with the caveat that the endpoint may also need to be authenticated. Ex. 2008, 39:21-40:15. In other words, any communication endpoint could be added to Shaffer's network by simply provisioning the device to communicate on the radio frequency, with the modulation method, using the encryption key as other communication endpoints on that network, and authenticated. Ex. 2006, ¶¶ 55-56.

Saylor's "network," on the other hand, notifies specific individuals/entities "in a manner predetermined by the user." Ex. 1011, 1:17-22. In other words, without

the user modifying the notification regime, there is no way for any device to join Saylor's network. *Id.*, 5:27-36, 8:48-52; Ex. 2006, ¶¶ 57, 85, 86. The user sets up an "address book" to set up the closed list of individuals and entities that can be notified when an alarm is triggered. Ex. 1011, 8:48-52 ("a user may maintain a personal address book where contact information (e.g., phone, pager, 50 mobile device, etc.) associated with various individuals may be stored and accessed based on various identified alarm situations and/or potential alarm situations."), 9:34-35, 9:59-67.

The fixed list of notification recipients at the heart of Saylor's "network" addresses a distinct problem and operates in contrast to the open networks provided in Shaffer. Ex. 2006, ¶ 58. Whereas Shaffer aims to provide communication networks to any endpoint within an area that desires to communicate with other endpoints on that network, Saylor does not. *Id.*, ¶¶ 58, 84. Saylor closes the communications off to the predefined set of recipients, i.e., user 160, contacts $162_1$-$162_N$, and emergency entity 164. Ex. 1011, 9:22-28; Ex. 2006, ¶ 58. The communications sent from Saylor's communication network to the predefined list of recipients would not be provided to Shaffer's open communication stream. Ex. 2006, ¶ 58.

The Petition does not provide additional context as to why these references would be combined, or how the differences between the references would be overcome to enable this combination. Ex. 2006, ¶ 59. The Petition merely asserts "a

POSITA would have been motivated to combine Shaffer and Saylor and, specifically, to connect Saylor's central security network as an input to Shaffer's IS," without explaining how a POSITA would overcome the differences between the references. Petition, 25-26. The Petition further fails to address why a POSITA would have sought out Saylor's self-contained communication network with support for contacting the predetermined list of contacts in the event an alarm condition is met at a single, stationary location, to modify Shaffer's communication network, aimed at enabling transient endpoints to connect to different networks in an ad-hoc manner. Ex. 2006, ¶ 59.

Thus, the significant structural differences between Shaffer and Saylor undermine the alleged motivation to combine these references. *Id.*, ¶ 59.

### ii.    Redundant Disclosure of the References

Both the Petition and Petitioner's declarant acknowledge that Shaffer and Saylor teach redundant mechanisms for sending communications between networks. Petition, 28 (citing Ex. 1002, ¶ 89) ("Saylor's central security network sends communications to another network via Shaffer's IS *in the manner already envisioned by both references.*"). Both the P.T.A.B. and its reviewing court routinely reject obviousness arguments in which the motivation to combine the prior art references fails for redundancy. *See, e.g.*, *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) ("In addition, both of these references

independently accomplish similar functions, namely, draining fluids. Because each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device to drain fluids from a wound, would have no reason to combine the features of both devices into a single device."); *see also Stryker Corp. v. Karl Storz Endoscopy America, Inc.*, IPR2015-00764, Paper 13 at 13 (P.T.A.B. Sept. 2, 2015) ("[W]e fail to see, and Petitioner does not adequately explain, why it would be obvious to add a translator to redundantly perform the function that Petitioner maintains is performed by the interconnect devices and network computer located within the surgical network.").

Despite this acknowledgement, the Petition suggests Saylor "does not explain *how* to convey notifications to recipients in different networks." Petition, 28 (emphasis in original). This assertion is plainly contradicted by Saylor, which Petitioner's declarant readily admitted. In response to the question "Saylor discloses how to convey notifications to recipients in different networks in a myriad of ways, right?" Dr. Polish admitted, "Saylor discloses that you can do it in lots of different ways and that it lists a bunch of examples." Ex. 2008, 54:6-11, 53:2-8. The "myriad of ways" disclosed in Saylor includes notifications over the Internet, phone calls (POTS), emails, text messages, pager notifications, PDA messages, instant messages, and more. *See* Ex. 1011, 6:22-32 ("Alert notifications may be communicated via the Internet 150, POTS 152, wireless communication portals,

24

voice portals, and/or other methods."), 7:40-48 ("Central security server 130 may then alert users and other identified entities…via a voice alarm, text message, and other notifications [such as] email or other form of electronic communication"), 11:24-28 ("Methods of notification may include cell phone, regular phone, pager, PDA, email, instant messenger, or other form of communication."); Ex. 2008, 52:9-54:5. As shown, Saylor provides plenty of disclosure regarding "*how* to convey notifications to recipients in different networks." Ex. 2006, ¶¶ 60-63; Ex. 2008, 54:6-11.

Even the Petition acknowledges Saylor provides the mechanisms needed for conveying notifications across networks. *See* Petition, 40 (citing Saylor for the proposition "'user-defined conditions' determine which entity to notify *and how to send the notification*"), 28 (noting Saylor "sends communications to another network…in the manner *already envisioned by both references*" (emphasis added)), 19 (citing Ex. 1011, 6:22-32, 7:40-48, 11:24-28). Therefore, there would be no need to combine the teachings of Shaffer with Saylor because Saylor already includes everything it needs to send notifications to recipients in different networks. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012); *TRW Automotive U.S. LLC v. Magna Electronics, Inc.*, IPR2015-00972, Paper 9 at 11 (P.T.A.B. September 16, 2015); *Stryker Corp.*, IPR2015-00764, Paper 13 at 13 ("[W]e fail to see, and Petitioner does not adequately explain, why it would

be obvious to add a translator to redundantly perform the function that Petitioner maintains is performed by the interconnect devices and network computer located within the surgical network."); Ex. 2006, ¶ 60.

Because Saylor is replete with instructions regarding how to convey notifications to recipients across a wide range of communication mediums, there would be no need to incorporate this with Shaffer's IS, and therefore no need to combine these references. Ex. 2006, ¶ 64; *Kinetic Concepts*, 688 F.3d at 1369.

### iii.    Lack of Evidence

Finally, the Petition presents hindsight-ridden "motivations" that fail to consider the context of the art. For example, the Petition states "as Shaffer describes, IS 120 is designed to connect various types of networks." Petition, 27. This is not a motivation to combine Shaffer and Saylor, but is merely a statement noting, at best, Shaffer's IS *could* connect Saylor's network to other types of networks. "[B]ecause obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention," this fails to provide a motivation to combine Shaffer and Saylor. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (emphasis in original). Indeed, Petitioner's declarant confirmed "Shaffer talks about very broadly interconnecting different kinds of networks, including TCP/IP

networks." Ex. 2008, 62:10-63:5 ("Shaffer's IS is meant to be very broadly interoperable.").

The Petition next asserts "Shaffer describes that the networks can be associated with locations such as business and campuses" and that "Shaffer's IS is well-suited to connect a network, such as a video security system designed to monitor particular buildings, with a different network that responds to incidents in those buildings, such as a security or emergency network." Petition, 27. This, again, fails to present any reason why a POSITA would have been motivated to make the combination because Shaffer *can be* associated with buildings and campuses. *Belden*, 805 F.3d at 1073. This again suggests *any* network could be provided as an input to Shaffer's network and fails to consider why a POSITA would have been specifically motivated to make Saylor an input. Ex. 2006, ¶¶ 65-66. "An assertion that something could be done, even when coupled with an advantage of doing so, without articulating a reason why something would be done by a POSITA at the time of the invention, raises a specter of impermissible hindsight bias in an obviousness analysis." *Nautilus Hyosung Inc. v. Diebold, Inc.*, IPR2016-00633, Paper 9 at 21-22 (P.T.A.B. Aug. 22, 2016).

The Petition also suggests Shaffer's IS would assign a multicast IP address that would be stored in Saylor's databases. Petition, 26. Shaffer explains, however, that multicast IP addresses are stored in the memory of endpoints. Ex. 1004, ¶¶

[0040], [0047]. As the endpoints travel between networks, they can join the geographically relevant channel. *Id.* While Shaffer describes a variety of communication networks (*e.g.*, communication networks 110-114), Shaffer says nothing about storing the multicast IP addresses within those networks. Ex. 2006, ¶ 67. The Petition fails to provide any reason to deviate from Shaffer's disclosure regarding storing IP addresses in the endpoints to enable them to communicate locally while travelling between geographic areas. Ex. 1004, ¶¶ [0040], [0008]; Ex. 2006, ¶ 68. There would be no reason to store these addresses in Saylor's stationary network. Ex. 2006, ¶ 68.

Because the Petition relies on both Shaffer and Saylor in its first Ground, the lack of a motivation to combine these references confirms the challenged claims are not obvious in light of these references. "An obviousness determination generally requires [1] a finding that all claimed limitations are disclosed in the prior art, and [2] that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (citations omitted).

Moreover, even if the Board finds a POSITA would have been motivated to combine Shaffer and Saylor, the combination still fails to render obvious each limitation of the challenged claims for the reasons discussed in sections V.A.1.a and

V.A.1.c. Ex. 2006, ¶ 69. Thus, the Board should find the challenged claims patentable. *Id.*

### c.     The Remainder of Ground 1 Is Replete with Holes That Sink the Analysis

The remainder of the Petition's Ground 1 analysis contains numerous flaws that provide further reasons for the Board to find the Petition fails to render any Challenged Claim unpatentable.

#### i.     Shaffer in view of Saylor fails to teach "providing a plurality of radio frequencies on a display of the mobile communication device," as recited in claims 1 and 15

The Petition acknowledges that the inclusion of this limitation, along with the frequency selection limitation, resulted in allowance of the '830 Patent. Petition, 13. Despite this limitation being a key limitation for allowability, the Petition relies on Shaffer's user interface along with the separately stored network communication parameter listings to claim Shaffer "discloses" this limitation. Petition, 32 (citing Ex. 1004, ¶¶ [0043]-[0048], Fig. 4). Shaffer notably lacks disclosure of any radio frequency being presented on the user interface (or any display), much less a plurality of radio frequencies presented on a display of the mobile communication device as claimed.

The Petition explains Shaffer's "FIG. 4 shows an exemplary mobile communication device with memory module 208 that stores several different

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

MOTOROLA SOLUTIONS, INC.,

Petitioner,

v.

STA GROUP LLC,

Patent Owner.

———————————

IPR2023-01295
U.S. Patent No.: 8,994,830 B2

———————————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

1[e][1]/15[g] fails for many of the same reasons. POR, 15-16. PO argues that a feed must be selected from the plurality "*before*" recorded images from the feed are sent to the central server. POR, 15. The claim, however, recites neither this purported order of steps, nor a "server" of any kind. Saylor meets the claim by selecting among a plurality of feeds when it relies on its user policies to select which video feed clips should be sent to particular entities. Petition, 37-41; Ex[1036], 75:1-76:22. Additionally, even under PO's narrow interpretation of "selecting," Saylor's security network selects one of the plurality of feeds in the geographic area (*e.g.*, building) *before* recorded images are sent to the central server via the motion detection trigger that selects a feed to send to the central server. *Id*. PO tries to distinguish this aspect of Saylor by arguing that, in this scenario, the "video cameras themselves, and not the central security network, monitor the feeds." POR, 16. But the claim does not require that any particular part of the system perform the monitoring. Ex[1001], cl.1; Ex[1036], 43:9-21. As discussed, Saylor's central security network performs the claimed monitoring and selecting in multiple ways that satisfy limitations 1[e][1]/15[g]. Petition, 37-41.

### B. A POSITA would have been motivated to combine Shaffer with Saylor

PO incorrectly argues that a POSITA would not have been motivated to combine Shaffer and Saylor because they allegedly (1) are "incompatible" and (2) have redundant disclosures. These arguments ignore the Petition's specific combination—Shaffer's interoperability system with Saylor's central security

network—and are irrelevant.

### 1. The Alleged Distinctions Between Shaffer and Saylor Are Irrelevant to the Combination and In Fact Establish a Motivation to Combine

PO argues that Shaffer and Saylor are "incompatible" based on two alleged differences: endpoint connectivity and network structure. POR, 17. Neither argument has merit.

Regarding endpoint connectivity, PO's arguments rely on Dr. Akl's opinions that Saylor's security system is "location-agnostic[.]" POR, 19-20. However, Dr. Akl's opinion is contradicted by Saylor's actual disclosure that "[n]etwork alerts may be based on alert notifications associated with property, personal property and/or individuals within a ***defined area or locality***." Ex[1011], 10:62-11:3. Indeed, on cross-examination Dr. Akl admitted that this example in Saylor is ***not*** agnostic to location. Ex[1036], 68:3-69:8.

Shaffer's endpoints are also not all "transient" as PO suggests. POR, 19, 23. Shaffer's endpoints include a "personal [desktop] computer" and "command center" that are not mobile. Ex[1004], ¶0025; Ex[1002], ¶71; Ex[1036], 65:3-66:10 (failing to consider whether a "command center" or "desktop computer" are mobile devices). Shaffer discloses other stationary, non-transient, endpoints such as those in "buildings, campuses, municipalities, counties, states, countries or any other particular geographical area." Ex[1004], ¶¶0025-27.

Regardless, PO's arguments are also irrelevant as they attack the reference

individually, rather than considering the combination. The fact that Saylor sends alerts to a "defined area or locality" where a transient Shaffer endpoint may be positioned is precisely one of the reasons a POSITA would want to use Saylor's central security network with Shaffer. Petition, 26 (describing how Saylor's central security network retrieves relevant IP addresses to notify entities, provided by Shaffer's IS); Ex[1002], ¶¶84-85. PO assumes, incorrectly, that a POSITA would not desire to expand Saylor's alerts and video feeds beyond its localized "owners/users," when in fact Saylor expressly describes providing alarms to transient "emergency entities" such as "the police, fire department…and others." Ex[1011], 1:17-22, 9:22-28.

PO is simply wrong that Saylor already "provides the mechanisms to establish [] communications" between users and "authorized entities." POR, 19. PO's support for this assertion is its expert, who quotes Saylor's disclosure that "notifications" are executed "in the manner specified by the user." Ex[2006], ¶85 (quoting Ex[1011], 5:27-36, 6:25-27, 8:28-30). But neither PO nor its expert ever point to anywhere in Saylor that specifically identifies the user-specified "manner." Instead, Saylor leaves the specified manner up to the POSITA—precisely why a POSITA would have looked to Shaffer for these details. Ex[1002], ¶¶88-89.

Regarding network structure, Saylor's express disclosures contradict PO's argument. POR, 21-23. Saylor is not a "closed" network; it describes a packet-based

IPR2023-01295
U.S. Patent No. 8,994,830

central security network (using "TCP/IP") that receives alarms from security devices (*e.g.*, cameras) in buildings/facilities and transmits notifications to relevant recipients in ***other*** networks, including specifically "via the internet." Ex[1011] FIG. 1, element 150, 6:24; Petition, 28; Ex[1002], ¶¶87-89. Moreover, the premise of PO's argument is wrong. The combination does not rely on "modifying" Shaffer's network into a closed network. POR, 23. The entire point of Shaffer's "interoperability system IS" is to "provide network interoperability." Ex[1004] ¶¶[0016], [0037], [0039-40], [0053]. Thus, the combination relies on Shaffer's IS to allow Saylor's system to communicate with responders on a different network. Petition, 25-28; Ex[1002], ¶¶87-89.

Tellingly, PO does not argue that a POSITA would not expect success in making the Shaffer-Saylor combination. POR, 16-26. The Petition details numerous reasons why the two systems were compatible, which PO does not dispute. Petition, 28-29. These undisputed reasons undermine any argument that any purported "structural differences" would preclude the combination.

### 2.    Shaffer and Saylor Are Not "Redundant"

Contradicting its position that Shaffer and Saylor are "distinct," PO also argues that because Saylor teaches various methods of notification (*e.g.*, emails, text messages), it is redundant to Shaffer's IS. POR, 24-25 (citations omitted). In making this argument, PO conflates whether the combined references are redundant with the question of whether they are analogous. That Saylor discloses different possible

"[m]ethods of notification" is not redundant of using Shaffer's IS approach to implement communications among devices on different networks. Ex[1002], ¶¶87-88.

The Petition explains that, in Shaffer-Saylor, Shaffer's IS specifically provides the mechanism by which the different "[m]ethods of notification" in Saylor can be used to communicate alarms from sensors in buildings/facilities to emergency services *across different networks* in different regions, including different buildings. Ex[1004], ¶¶0039-40, 0046; Ex[1002], ¶¶84-85; Petition, 25-26, 28. PO does not (and cannot) argue that the data generated by Saylor—the alarms, video feeds, etc.—are redundant of Shaffer. That Shaffer may disclose more details regarding how Saylor's network security system could use the "internet" to connect to other networks does not make it redundant. Rather, they are highly analogous and confirm that a POSITA would look to Saylor for just such additional implementation details. Ex[1002], ¶¶86-87.

PO also mischaracterizes Dr. Polish's testimony. POR, 24-25 (citing Ex[2008], 54:6-11, 53:2-8). Dr. Polish explained that Saylor discloses that there are different types of notifications that can be sent such as audio, video, or other data. Ex[1002], ¶87. But Saylor does not explain in detail how to transmit that information to *other* networks, which is precisely what Shaffer's IS is designed to do. *Id.*, ¶88. Dr. Polish's testimony in context makes this clear when Patent Owner's counsel

IPR2023-01295
U.S. Patent No. 8,994,830

asked if "Saylor discloses **how**" but Dr. Polish responded that "Saylor discloses that you **can** do it in lots of different ways." Ex[2008], 54:6-11. Dr. Polish did not testify that Saylor teaches "how." *Id.*

PO's reliance on *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) is misplaced. POR, 25-26. There, the party challenging validity "never offered evidence articulating" a motivation to combine. *Kinetic*, 688 F.3d at 1368-69. Further, PO takes the Court's note that "both … references independently accomplish **similar** functions" (draining fluids) too far. *Id.* Shaffer and Saylor do not both independently teach interoperable communication functions for connecting endpoints used by first responders to each other. Only Shaffer does that, which is why a POSITA would have looked to it to achieve Saylor's goals. Ex[1002], ¶¶82-83.

### 3.   PO Ignores the Motivation Described in the Petition

PO's fallback position is that Shaffer and Saylor "could" be combined, not that they would have been. POR, 26-29. However, disclosures in the prior art showing that two systems were compatible are highly relevant to obviousness. *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011).[3] Moreover, PO does not dispute that Shaffer's IS is "designed to connect various types of networks" and "well-suited to

---

[3] PO and its expert do not dispute that Shaffer and Saylor are analogous art.

connect a network, such as a video security system designed to monitor particular buildings, with a different network that responds to incidents in those buildings, such as a security emergency network." POR, 26-27 (quoting Petition, 27). PO's arguments just ignore the Petition's detailed explanation regarding why these disclosures establish a motivation to combine Shaffer with Saylor's network security system. Petition, 25-28.

PO also argues that "[t]here would be no reason to store these [IP] addresses in Saylor's stationary network" because Shaffer only discloses storing them in transient endpoints. POR, 28. This is incorrect. First, the endpoints in Shaffer are not all transient and include computers, just like Saylor's servers. Ex[1004], ¶0025. Second, Shaffer itself discloses storing IP addresses in a computer—specifically, the IS itself, which is what provides IP addresses "to a group of endpoints[.]" Ex[1004], ¶¶0039-0040. Third, Saylor expressly discloses that its central server can store "address information, and other profile information" in an address book to use for communication. Ex[1011], 8:36-41. In the combination, Shaffer's IS sends the relevant IP addresses to Saylor's server for storage and use for needed communication, exactly consistent with the disclosures of both Saylor and Shaffer. Petition, 28. PO just ignores the express disclosures in the art and the Petition's combination.

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# PATENT TRIAL AND APPEAL BOARD

---

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

---

Case IPR2023-01295
U.S. Patent No. 8,994,830

---

# PATENT OWNER'S SUR-REPLY

IPR2023-01295
U.S. Patent No. 8,994,830

wireless communication system to automatically inform an owner and other authorized entities *in a manner predetermined by the user* when alarm situations and/or alarm worthy situations occur."); Ex. 2006, ¶¶ 51-52; Ex. 2008, 60:19-61:1, 71:20-72:3. Shaffer's disclosure is squarely directed towards forming communication groups based on the position information of the endpoint. Ex. 1004, Abstract ("A method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location [and] adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters."), ¶¶ [0001]. [0005]-[0006]. These two communication regimes—alerts sent to a predetermined list of recipients (*i.e.*, a closed group of recipients) versus creating communication groups based on endpoint position information (*i.e.*, an open group of participants)— are fundamentally at odds with one another such that a POSITA would not have been motivated to combine these references. Ex. 2006, ¶¶ 47-54.

Further evidencing why a POSITA would not have been motivated to make the combination, Saylor provides clear, detailed mechanisms for notifying users of

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MOTOROLA SOLUTIONS INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner

---

CASE: IPR2023-01295
U.S. PATENT NO. 8,994,830 B2

---

**PATENT OWNER'S NOTICE OF APPEAL**

Case IPR2023-01295
U.S. Patent 8,994,830 B2

Pursuant to 35 U.S.C. §§ 141 and 142, and 37 C.F.R. §§ 90.2 and 90.3, STA Group LLC, ("Patent Owner") hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's ("Board") Final Written Decision Determining All Challenged Claims Unpatentable entered on March 17, 2025, (Paper 39, "Final Written Decision") in the above-captioned mater regarding U.S. Patent No. 8,994,830 ("the '830 Patent"). A copy of the Final Written Decision is attached hereto as Exhibit A. This notice of appeal is timely filed within 63 days of the Final Written Decision. 37 C.F.R. § 90.3(a)(1).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner states that the issues on appeal may include all findings of unpatentability by the Board in the Final Written Decision, including but not limited to, the Board's determination that the challenged claims of the '830 Patent are unpatentable, and any related issues, findings, or determinations, leading thereto or underlying that decision.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2(a), this Notice is being filed with the Patent Trial and Appeal Board. In addition, a copy of this Notice and the required docketing fees are being filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit via CM/ECF.

2

Case IPR2023-01295
U.S. Patent 8,994,830 B2

Respectfully submitted,

Dated: May 14, 2025

/Jason A. Engel/
Jason A. Engel (Reg. No. 51,654)
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602

Jason.Engel.PTAB@klgates.com
T: (312) 807-4236
F: (312) 827-8145

*Counsel for Patent Owner*

3

Case IPR2023-01295
U.S. Patent 8,994,830 B2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, in addition to being electronically filed through P-TACTS, a true and correct copy of the above-captioned **PATENT OWNER'S NOTICE OF APPEAL** is also being filed pursuant to 37 C.F.R § 90.2(a) with the Director of the United States Patent and Trademark Office, on May 14, 2025, by electronic mail to efileSO@uspto.gov, which is the e-mail address indicated on the United States Patent and Trademark Office's web page for the Office of the General Counsel, <https://www.uspto.gov/about-us/organizational-offices/office-general-counsel>.

I also hereby certify that, on May 14, 2025, a true and correct copy of the foregoing Patent Owner's Notice of Appeal, and the filing fee, were filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit, via CM/ECF.

Respectfully submitted,

/Jason A. Engel/
Jason A. Engel
Reg. No. 51,654
K&L Gates LLP

4

Case IPR2023-01295
U.S. Patent 8,994,830 B2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing documents were served by electronic service, via e-mail on May 14, 2025 in its entirety on the following:

Eliot D. Williams
Baker Botts L.L.P.
eliot.williams@bakerbotts.com

Katharine Burke
Baker Botts L.L.P.
katharine.burke@bakerbotts.com

Michael Knierim
Baker Botts L.L.P.
michael.knierim@bakerbotts.com

Clarke W. Stavinoha
Baker Botts L.L.P.
clarke.stavinoha@bakerbotts.com

Joseph B. Cahill
Baker Botts L.L.P
Joe.cahill@bakerbotts.com

Stephen O'Donohue
Baker Bott L.L.P.
Stephen.odonohue@bakerbotts.com

dlbbstamsiiprs@bakerbotts.com

5

Case IPR2023-01295<br>
U.S. Patent 8,994,830 B2

Dated May 14, 2025

           Respectfully submitted,

           /Jason A. Engel/
           Jason A. Engel
           Reg. No. 51,654
           K&L Gates LLP

6

# EXHIBIT A

Trials@uspto.gov
571-272-7822

Paper: 39
Date: March 17, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

IPR2023-01295
Patent 8,994,830 B2

Before MICHAEL J. FITZPATRICK, DAVID C. McKONE, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2023-01295
Patent 8,994,830 B2

## I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) (2018) and 37 C.F.R. § 42.73 (2019). For the reasons discussed herein, we determine that Petitioner, Motorola Solutions, Inc. ("Petitioner") has shown by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 (the "challenged claims") of U.S. Patent No. 8,994,830 B2 (Ex. 1001, "the '830 patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## II. BACKGROUND

### A. *Procedural History*

Petitioner filed a Petition, Paper 1 ("Pet." or "Petition"), requesting *inter partes* review of the challenged claims. STA Group LLC ("Patent Owner") timely filed a Preliminary Response, Paper 7 ("Prelim. Resp."). With our approval, Petitioner filed a Preliminary Reply (Paper 9, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-reply (Paper 10, "Prelim. Sur-reply"). Based on the record at that time, we issued a Decision granting *inter partes* review. Paper 11 ("Dec." or "Institution Decision").

After institution, Patent Owner filed a Response (Paper 18, "PO Resp." or "Resp."), Petitioner filed a Reply (Paper 26, "Pet. Reply" or "Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply" or "Sur-reply").

On January 21, 2025, an oral hearing was held. A transcript of the hearing is made part of the record. Paper 38.

2

IPR2023-01295
Patent 8,994,830 B2

## B. *Related Proceedings*

According to the parties, the '830 patent is the subject of the following actions: *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 2:22-cv-00381 (E.D. Tex.) filed Sept. 30, 2022 (the "Related Litigation"); and *STA Group LLC v. Motorola Solutions, Inc.*, Case No. 4-22-cv-00840 (E.D. Tex.) filed Sept. 30, 2022, and administratively closed Oct. 6, 2022. Pet. 1; Paper 4, 1; Paper 6, 4–5; Paper 8, 4–5.

## C. *Real Party in Interest*

Petitioner identifies itself as the real party in interest. Pet. 1. Patent Owner identifies itself as the real party in interest. Paper 4, 1.

## D. *The '830 Patent (Ex. 1001)*

The '830 patent issued on March 31, 2015, and "relates to providing access to video streams associated with communication channels in a communication network." Ex. 1001, 1:7–9. Figure 1B of the '830 patent is reproduced below.



*FIG. 1B*

3

IPR2023-01295
Patent 8,994,830 B2

Figure 1B, above, is a diagram of communication system 150, including "a public switched telephone network (PSTN) 102, cellular network 104, and various networked computing devices," which is configured to communicate with, for example, "telephones 106, computers 112, Voice over Internet Protocol (VoIP) phones 110, mobile phones 108, gateways 116, routers 118, switches, transmission systems, relay systems, and other communication devices." *Id*. at 2:34–40; *see also id*. at 3:30–36. "The communication system 150 further includes a radio network 152 configured to communicate with one or more mobile communication devices (e.g., one or more push-to-talk (PTT) radios)." *Id*. at 3:37–40. According to the '830 patent, "[a] plurality of cameras 122 provide video feeds that . . . are associated with communication channels (e.g., communication channels providing Virtual Talk Groups (VTGs))." *Id*. at 2:40–43.

Figure 4 of the '830 patent is reproduced below.



*FIG. 4*

4

IPR2023-01295
Patent 8,994,830 B2

Figure 4, above, is a flow diagram of method 400 "for associating video feeds with a communication channel associated [with] a plurality of mobile communication devices." *Id*. at 6:18–21.  Referring to Figure 3, the '830 patent discloses that "a user interface may optionally be presented to a user (e.g., the user 305.1–305.q or 307.1–307.r) to allow the user to select a communication channel 302.1–302.n to which his/her mobile communication device 304.1–304.q or 306.1–306.r is to be set or tuned to." *Id*. at 6:24–28.  At block 402, the method 400 "may then monitor selection of a communication channel by the user 305.1–305.q, 307.1–307.r of an associated mobile communication device 304.1–304.n, 306.1–306.r." *Id*. at 6:28–32.  At block 404, "[a]t least one video feed associated with the selected channel . . . may be identified." *Id*. at 6:35–36.  "Once the particular channel has been selected and the at least one video feed associated with the channel has been identified, the method 400 may then provide any mobile communication device 305.1–305.q or 307.1–307.r that is set to the particular channel with access to the at least one video feed." *Id*. at 6:57–62.  At block 408, "the video feed may be then communicated to the mobile communication device." *Id*. at 7:1–3.

5

IPR2023-01295
Patent 8,994,830 B2

Figure 9 of the '830 patent is reproduced below.



*FIG. 9*

Figure 9, above, depicts a graphic user interface (GUI) 900 "to allow a user to select a communication frequency associated with a communication channel." *Id.* at 9:60–62. For example, "a user may select a specific VTG by selecting one of the channels 902.1–902.s," and then "a frequency associated with a region in which the user is located may be selected using the drop-down menus." *Id.* at 10:13–16. "Thus, in an example embodiment, a radio frequency of a given base station in a specific geographical region may be selected, thereby automatically providing access to video feeds associated with the selected frequency." *Id.* at 10:20–24.

## E. Illustrative Claim

Petitioner challenges claims 1–5, 7–19, and 21–24 of the '830 patent. Pet. 9–10. Claims 1 and 15 are independent. Claim 1 is generally illustrative and is reproduced below.

6

IPR2023-01295
Patent 8,994,830 B2

    1. [pre][1] A method comprising:

    [a] monitoring a selection of a communication channel by a user of a mobile communication device;

    [b] providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone

    [c] from which a plurality of video feeds associated with the geographic zone are sourced;

    [d] monitoring a selection of a radio frequency of the plurality of radio frequencies by the user[;][2]

    [e] identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,

    [f] the one or more video feeds being independent of the selected communication channel; and

    [g] providing access to the identified at least one video feed to the mobile communication device based on the user policy.

Ex. 1001, 12:18–39.

*F. Evidence*

    Petitioner relies upon the following evidence:

    (1) U.S. Patent Application Publication No. US 2006/0281471 A1, published December 14, 2006 ("Shaffer") (Ex. 1004);

    (2) U.S. Patent No. 7,113,090 B1, issued September 26, 2006 ("Saylor") (Ex. 1011);

---

[1] Bracketed letter designations added.

[2] Here, the '830 patent appears to have a typographical error. Instead of a semicolon, it has a period. *See* Ex. 1001, 12:27.

IPR2023-01295
Patent 8,994,830 B2

(3) U.S. Patent Application Publication No. US 2007/0173273 A1, published July 26, 2007 ("Gogic") (Ex. 1006); and

(4) U.S. Patent No. 8,090,388 B1, filed March 20, 2007, and issued January 3, 2012 ("Opitz") (Ex. 1007).

Petitioner also relies on the declaration of Nathaniel Polish, Ph.D. (Ex. 1002).

Patent Owner relies on the declaration of Robert Akl, Ph.D. (Ex. 2006).

*G. Asserted Grounds of Unpatentability*

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–5, 7–19, 21–24 | 103(a)[3] | Shaffer, Saylor |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz |

Pet. 10.

## III. ANALYSIS

*A. Applicable Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

---

[3] Because the application from which the '830 patent issued has an effective filing date before March 16, 2013 (Ex. 1001, code (22)), citations to 35 U.S.C. § 103 are to the pre-AIA version. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29 § 3(n).

8

IPR2023-01295
Patent 8,994,830 B2

factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Neither party has presented evidence on the fourth *Graham* factor.

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. Reaching this conclusion, however, "requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

## B. Level of Ordinary Skill

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of

9

IPR2023-01295
Patent 8,994,830 B2

maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner describes a person of ordinary skill in the art as a person having "at least (a) a bachelor's degree in computer science, electrical engineering, or a similar field, and (b) approximately 2 years industry experience in networking or communication systems, including interoperating different types of networks that include video feeds." Pet. 13 (citing Ex. 1002 ¶¶ 45–47). Patent Owner does not dispute Petitioner's description of a person of ordinary skill in the art. PO Resp. 13.

Petitioner's description of a person of ordinary skill is consistent with the subject matter of the '830 patent. This is supported by the testimony of Petitioner's declarant, Dr. Polish. Ex. 1002 ¶ 46. Patent Owner's declarant, Dr. Akl, does not dispute Petitioner's description. Ex. 2006 ¶ 30. We, therefore, continue to use the same description that we adopted in our Institution Decision, as it is consistent with the challenged patent and the asserted art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art itself may reflect an appropriate level of skill).

## C. Claim Construction

A claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R.

10

IPR2023-01295
Patent 8,994,830 B2

§ 42.100.  Thus, we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art.  *Id.* at 1312–17.  "In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, *if needed* to assist in determining the meaning or scope of technical terms in the claims."  *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995).  Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term.  *Phillips* at 1315.  Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Id.* at 1317.

Petitioner contends that the term "video stream association module" recited in claim 15 may invoke pre-AIA 35 U.S.C. § 112 ¶ 6[4] and proposes the following construction:

---

[4] Because the application from which the '830 patent issued has an effective filing date before September 16, 2012 (Ex. 1001, code (22)), citations to 35 U.S.C. § 112 are to the pre-AIA version.  AIA § 4(e).

11

IPR2023-01295
Patent 8,994,830 B2

| Elements | Function and Structure |
|---|---|
| 15[b] "video stream association module" | Function: monitoring a selection of a communication channel. . ., providing a plurality of radio frequencies on a display. . ., monitoring a selection of a radio frequency. . ., identifying at least one video feed. . ., providing access to the identified at least one video feed. . .<br><br>Structure: "a variety of software applications and/or hardware that can monitor and process communications between the communication devices," as described at Ex[1001], 3:46–49 and FIGs. 2–4, 89, 11 and associated text. |

Pet. 14–15.

In its Response, Patent Owner argues that "[t]he E.D. Tex. rejected this construction, undermining Petitioner's challenge to claim 15." PO Resp. 11.

According to Patent Owner, the parties agreed on the following constructions in the Related Litigation:

| Term | Agreed Construction |
|---|---|
| Order of Steps (Claim 1) | The "monitoring a selection of a communication channel" step must be performed before the "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds" step. |
| "Push-to-Talk (PTT) channel in a PTT communication network" (Claim 5) | "A channel for transmitting half-duplex communications in a Push-to-Talk communication network" |

PO Resp. 9–10 (citing Ex. 2001, 7, 9–10).

Patent Owner states that "[t]he Eastern District of Texas further construed certain claims as follows:

12

IPR2023-01295
Patent 8,994,830 B2

| Term | E.D. Tex. Construction |
|---|---|
| "wherein the at least one video feed is associated with the selected communication channel . . . the one or more video feeds being independent of the selected communication channel" (Claim 1) | "the one or more video feeds being capable of being associated with more than the selected communication channel" |
| "video stream association module" (Claim 15) | Plain and ordinary meaning; not subject to 35 U.S.C. § 112 ¶ 6 |

PO Resp. 10–11 (citing Ex. 2005, 17–31).

In its Reply, Petitioner argues that "[t]he obviousness grounds in the Petition apply under the district court's constructions," and that Patent Owner's "assertion that the court's plain and ordinary meaning construction of video stream association module' 'undermin[es]' Petitioner's challenge to claim 15 has no support or explanation." Pet. Reply 1 (quoting PO Resp. 11) (alteration in original). Petitioner argues that "Shaffer-Saylor and Gogic teach these limitations under that court's construction." Pet. Reply 2.

For purposes of this Decision, we adopt the claim construction agreed to by the parties as well as the claim construction provided by the district court. We otherwise use the ordinary and customary meaning of the claim terms as they would be understood by a person of ordinary skill in the art at the time of the claimed invention.

## D. Relevant Prior Art

### 1. Shaffer (Ex. 1004)

Shaffer is a U.S. Patent Application Publication published on December 14, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1004, code (43).

13

IPR2023-01295
Patent 8,994,830 B2

Shaffer relates to "a method and system for communicating using position information." Ex. 1004 ¶ 1. According to Shaffer, a method for communicating using position information includes:

> communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location.

> adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.

*Id*. ¶ 5; *see also id*. at Fig. 5, ¶¶ 49–50. "The first and second communication parameters may comprise a frequency, a modulation method and/or an encryption key." *Id*. ¶ 6. According to Shaffer, "[t]echnical advantages of particular embodiments include providing a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys." *Id*. ¶ 8.

Shaffer's Figure 3 is shown below:

14

IPR2023-01295
Patent 8,994,830 B2



FIG. 3

Shaffer's Figure 3 illustrates "[c]ommunication system 100, [that] includes communication networks 110–114, interoperability system (IS) 120 and endpoints 122." Ex. 1004 ¶ 37. "[C]ommunication network 110 comprises a radio or wireless network, communication network 111 comprises a LAN, communication network 112 comprises a [Public Switched Telephone Network] (PSTN), communication network 113 comprises a radio network and communication network 114 comprises an [Internet Protocol] (IP) network." *Id.* According to Shaffer, "communication system 100 may comprise any number of IP or non-IP communication networks of any wireless or wireline form capable of communicating audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages." *Id.*

15

IPR2023-01295
Patent 8,994,830 B2

Shaffer explains that "[c]ommunication networks 110–113 may comprise networks of particular groups or agencies (e.g., a municipality's police department network), whether operational with respect to a particular area or otherwise." *Id.* For example, "endpoints 122 comprise a PC (endpoint 122a), a [personal digital assistant] (PDA endpoint 122b) and an IP phone 122c)." *Id.* Interoperability system "120 may be configured to communicate with any type of communication endpoint." *Id.*

Shaffer's Figure 2 is shown below:



*FIG. 2*

Shaffer's Figure 2 depicts "communication system 50 for communicating using position information," which "includes a plurality of geographic regions 52–55, communication networks 60–64, endpoints 70 and 74 and CCP [communication control post] 80." *Id.* ¶ 26. "Communication networks 60–64 each may communicate information (e.g., signals, data or messages) over assigned radio frequencies, modulation methods and/or various encryption keys to support communication among

16

IPR2023-01295
Patent 8,994,830 B2

network communication devices." *Id.* ¶ 27. According to Shaffer, "frequencies, modulation methods and/or encryption keys utilized by the various communication networks 60–64 may be embedded in memory of mobile endpoints" such that "as mobile endpoint 70 (e.g., a LMR in a safety vehicle) moves between geographic areas, the endpoint may use GPS information to pin-point its location and automatically adjust its current communication radio frequency, modulation method and/or encryption key settings to allow the user of the endpoint to communicate with local safety and security forces in the area in which the endpoint is currently located." *Id.* ¶ 31.

Shaffer's Figure 4 is shown below:



| LOCATION | NETWORK | FREQUENCY (Hz) | ENCRYPTION KEY |
|---|---|---|---|
| CITY A | POLICE | X | J |
| CITY A | FIRE | Y | K |
| CITY B | POLICE | Z | L |
| STATE C | POLICE | P | M |
| COUNTRY D | POLICE | Q | N |

*FIG. 4*

17

IPR2023-01295
Patent 8,994,830 B2

Shaffer's Figure 4 illustrates mobile endpoint 200 including "a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.* ¶¶ 43, 44. According to Shaffer, "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200 and receives and transmits voice and other data between endpoint 200 and other network devices and components." *Id.* ¶ 44. Shaffer discloses that "[u]ser interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices," and "may comprise a keypad, display, touch screen, audio input or any other suitable interface." *Id.* "For example, through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (e.g., radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*

### 2. Saylor (Ex. 1011)

Saylor is a U.S. Patent that issued on September 26, 2006, more than one year before the earliest priority date of the '830 patent. Ex. 1001, code (22); Ex. 1011, code (45).

Saylor describes "a security network where a user may set up personalized alarms and alert services; identify various methods of contact; order at which to be contacted; individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information." Ex. 1011, Abstr. Saylor's "security system [may be] connected to a wireless communication system which enables communication with a subscribed user when an alarm (or other defined) situation occurs." *Id.* at 2:10–13. Saylor describes "a personal security network where one or more security devices related to a subscriber may be

18

IPR2023-01295
Patent 8,994,830 B2

connected to a central security network over wireless communication,"
where the central security network "may monitor those security devices and
alert a user when an alert situation occurs." *Id*. at 2:20–26.

Figure 1 of Saylor is shown below.



FIG. 1

Saylor's Figure 1 depicts "a graphical representation of a central
security network system 100." *Id*. at 5:63–64. According to Saylor,
"[a]larm situations may be detected by a control panel 120, 122, 124
associated with and preferably local to each security device and/or system
(e.g., property, personal property, individual, or combination)," wherein
"[c]ontrol panels 120, 122, 124 may transmit alarm information to central
security network 130." *Id*. at 6:1–6; *see also id*. at 7:29–40. "Central
security server 130 may then alert users and other identified entities via
wireless and/or other devices, such as mobile device 240, via a voice alarm,
text message and other notifications." *Id*. at 7:40–43; *see also id*. at 6:19–
25. According to Saylor, "[c]ontact individuals and/or entities $161_1$–$162_N$

19

IPR2023-01295
Patent 8,994,830 B2

identified by the user may also receive alert notification in an order determined by the user," and "the user may select contact order and/or other actions through menu options at the time of alarm situation notification." *Id*. at 6:25–30. Saylor also discloses that "[d]atabases 140, 142, 144 and 146 may store relevant information for personalized alarm services." *Id*. at 6:9–10.

> Saylor explains that

> [c]entral security network 130 may process the alarm situation. User profile information may be retrieved from user database 140. User database 140 may contain user information, such as profile information, user preferences, contact information, special instructions and/or other information. User profile information may include one or more of name, identification information, address information, and other profile information. User preferences may include mode of communication, order of communication, contact information and other preferences. User preference information may be associated with each security device, group of devices, systems or other combinations. For example, different alarm situations that may be detected in various locations or systems may warrant different levels of response. In addition, a user may maintain a personal address book where contact information (e.g., phone, pager, mobile device, etc.) associated with various individuals may be stored and accessed based on various identified alarm situations and/or potential alarm situations. Special instructions may include information to be conveyed to entities reacting to the alarm for a particular location or object. For example, when a fire detector is activated, the user may want to inform the fire department that the user has two pets living at the user's primary residence. Other instructions for different registered locations, objects and/or individuals may be stored and conveyed to entities reacting to the alarm situation per the user's instructions or preferences.

*Id.* at 8:34–60.

IPR2023-01295
Patent 8,994,830 B2

Saylor also explains that "[b]ased on user information retrieved from one or more databases 140, 142, 144 and 146, central security network 130 may contact one or more users 160 or other identified contacts $162_1$–$162_N$ as specified by the user. Other identified contacts may include neighbors, family members, personal doctors, emergency entities 164, such as the police, fire department, hospital and others." *Id.* at 9:22–28.

For example, Saylor explains that

> when a smoke alarm goes off, a user may instruct a central security network to first contact the user's home to verify the alarm. If no one is home or the emergency situation was confirmed by someone at home, the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency.

*Id.* at 12:15–21.

Saylor further describes "a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected by comparing images" such that "[w]hen a change in images (indicating motion) is detected, an alarm may be signaled." *Id*. at 2:45–50.

Figure 10 of Saylor is set out below.

21

IPR2023-01295
Patent 8,994,830 B2



Figure 10 is a flowchart illustrating a process for accessing video images provided by a central system network. According to Saylor, "[u]sers may monitor an identified location by using video or other similar recording device. The video feature of the central security network . . . may compare images. For example, if a change between images is detected, a recording may be triggered. The video clips of movement may be stored or sent to a server of a central security network. The user may then be notified according to predefined notification methods." *Id.* at 16:41–51.

IPR2023-01295
Patent 8,994,830 B2

E.    *Obviousness Over Shaffer and Saylor (Ground 1)*

Petitioner contends that claims 1–5, 7–19, and 21–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor.  Pet. 23–54. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 82–152.  Patent Owner disputes aspects of Petitioner's evidence and arguments.  PO Resp. 14–38.  Patent Owner submits the testimony of Dr. Akl in support of its contentions.  Ex. 2006 ¶¶ 46–103.  We first consider whether Petitioner establishes a rationale to combine the asserted prior art.

1.  *Rationale to Combine Shaffer and Saylor*

Petitioner contends that a person of ordinary skill in the art "would have been motivated to combine Shaffer and Saylor . . . to connect Saylor's central security network as an input to Shaffer's IS [Interoperability System]."  Pet. 25–26.  Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the proposed combination.



23

IPR2023-01295
Patent 8,994,830 B2

Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27. According to Petitioner, "[i]n the combined system ('Shaffer-Saylor'), the IS in Shaffer ([120 boxed in] red) facilitates communications from Saylor's central security network to the relevant personnel and authorities in a different network (*e.g.*, a building's security personnel or local police)." *Id.* at 26 (citing Ex. 1002 ¶ 84).

"For example," Petitioner explains,

the IS assigns a multicast IP address (communication channel) to a particular endpoint or a group of endpoints in advance (*e.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses)) and provides that multicast IP address to store in Saylor's databases. Ex[1002], ¶85. When Saylor's central security network detects an alarm situation, it queries its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor ([shown in] blue) to the relevant recipients ([shown in] purple). Ex[1011], 9:22–28, 11:67–12:6, 13:51–54; Ex[1002], ¶85.

*Id.*

Petitioner contends that the motivation for a person of ordinary skill in the art to make this combination

is found in both references. For example, as Shaffer describes, IS 120 is designed to connect various types of networks, including a PTT radio network (typically used by security or emergency personnel) and a local area network (LAN) or public switched telephone network (PSTN) (typically used by sensors in homes and businesses). Ex[1004], ¶0037; Ex[1002], ¶86. In addition, Shaffer describes that the networks can be associated with locations such as business and campuses. Ex[1004], ¶0027. In view of these disclosures, a POSITA would have recognized that Shaffer's IS is well-suited to connect a network,

24

IPR2023-01295
Patent 8,994,830 B2

> such as a video security system designed to monitor particular buildings, with a different network that responds to incidents in those buildings, such as a security or emergency network. Ex[1002], ¶86.

*Id.* at 27.

> Petitioner goes on to explain that

> Saylor discloses the type of network well-suited to work with Shaffer's IS. Ex[1002], ¶87. For example, Saylor describes a packet-based central security network (using "TCP/IP") that receives alarms from sensors in buildings and other facilities. Ex[1011], 17:10–21, FIG. 11, 6:33–43. That central security network processes the alarms and, according to rules and preferences, transmits notifications and information to relevant recipients in *other* networks, including security or emergency personnel in other types of networks with other communication protocols. *Id.*, 6:33–43, 8:18–33, 9:25–28; Ex[1002], ¶87. The notifications and information can include audio, video, or other data. Ex[1011], 16:41–51, 8:52–60. To implement these communications, Saylor describes that the central security network can identify relevant recipients in an "address book," (*id.*, 7:48–52), but does not explain *how* to convey notifications to recipients in different networks. Ex[1002], ¶88. Shaffer's IS system provides the needed mechanism for interoperable communications to achieve Saylor's goals; using Shaffer's IS, security personnel or other responders could directly and seamlessly receive communications and information from surveillance cameras in an alarming building. *Id.*

Pet. 28. Petitioner's arguments are supported by Dr. Polish's testimony. *See* Ex. 1002 ¶¶ 82–88.

Petitioner also argues that a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the references in the manner described." Pet. 28 (citing Ex. 1002 ¶ 89). Petitioner asserts that, "[i]n the combination, Saylor's central security network sends communications to another network via Shaffer's IS in the manner already envisioned by both references—namely, by a first network sending a packet-

25

IPR2023-01295
Patent 8,994,830 B2

based communication through an intermediary network to a second network also connected to the same intermediary network." Pet. 28–29 (citing Ex. 1011, 6:22–25, Fig. 1; Ex. 1004 ¶ 20; Ex. 1002 ¶ 89). According to Petitioner, a person of ordinary skill in the art "would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor." Pet. 29 (citing Ex. 1002 ¶ 90; Ex. 1004 ¶¶ 39–40).

Patent Owner contests Petitioner's evidence and arguments directed to a rationale to combine the teachings of Shaffer and Saylor. *See* PO Resp. 16–29. Patent Owner argues that "Shaffer and Saylor are directed to vastly distinct systems that a POSITA would not have considered combining." PO Resp. 16 (citing Ex. 2006 ¶ 46). Patent Owner claims that "[t]he structural differences between the references, the existing disclosure of each reference, and the lack of any detail regarding the combination evidences the lack of a motivation to combine Shaffer with Saylor." PO Resp. 16.

Patent Owner first argues that "Shaffer and Saylor are structurally distinct," and that they "present two ways of structuring networks that are incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references." *Id.* at 17 (citing Ex. 2006 ¶ 47). Patent Owner argues that Shaffer, "where endpoints move between locations and adjust communication parameters as they enter different locations, is markedly distinct from the teachings of Saylor." *Id.* at 18. "In contrast," Patent Owner argues, "Saylor handles all communications for a variety of systems of security devices at a specific premises regardless of a

26

IPR2023-01295
Patent 8,994,830 B2

location of a user relative to the premises." *Id.* (citing Ex. 2006 ¶ 49). Patent Owner argues that "[b]ecause Saylor's system establishes communication with owners/users and authorized entities in a location agnostic manner, and provides the mechanisms to establish those communications, there would be no need to combine Saylor with Shaffer's transient endpoints." PO Resp. 19 (citing Ex. 2006 ¶¶ 50, 82–89; Ex. 2008, 60:19–61:1, 71:20–72:3). According to Patent Owner, "Saylor's location-agnostic security system would not be a relevant input to Shaffer's location-specific endpoint communication network," and "[t]he structural differences between Shaffer and Saylor discourage the combination." PO Resp. 20–21 (citing Ex. 2006 ¶¶ 51, 54).

Petitioner counters that Patent Owner's position "is contradicted by Saylor's actual disclosure that '[n]etwork alerts may be based on alert notifications associated with property, personal property and/or individuals within a ***defined area or locality***.'" Pet. Reply 6 (quoting Ex. 1011, 10:62–11:3) (emphasis by Petitioner). "Indeed," Petitioner argues, "on cross-examination Dr. Akl admitted that this example in Saylor is not agnostic to location." Pet. Reply 6 (citing Ex. 1036, 68:3–69:8) (emphasis omitted). Petitioner points out that "Shaffer's endpoints are also not all 'transient' as [Patent Owner] suggests. Shaffer's endpoints include a 'personal [desktop] computer' and 'command center' that are not mobile." Pet. Reply 6 (citing Ex. 1004 ¶ 25; Ex. 1002 ¶ 71; Ex. 1036, 65:3–66:10). Petitioner notes that "Shaffer discloses other stationary, non-transient, endpoints such as those in 'buildings, campuses, municipalities, counties, states, countries or any other particular geographical area.'" Pet. Reply 6 (citing Ex. 1004 ¶¶ 25–27). Petitioner also points out that "Saylor expressly describes providing alarms to transient 'emergency entities' such as 'the police, fire department . . . and

27

IPR2023-01295
Patent 8,994,830 B2

others.'"  Pet. Reply 7 (citing Ex. 1011, 1:17–22, 9:22–28) (alteration in original).

In its Sur-reply, Patent Owner argues that the "two communication regimes" of Saylor and Shaffer, "alerts sent to a predetermined list of recipients (*i.e.*, a closed group of recipients) versus creating communication groups based on endpoint position information (*i.e.*, an open group of participants)—are fundamentally at odds with one another such that a POSITA would not have been motivated to combine these references."  PO Sur-reply 10 (citing Ex. 2006 ¶¶ 47–54).

We agree with Petitioner and disagree with Patent Owner.  Despite differences between Saylor and Shaffer, it does not follow necessarily that they are "fundamentally at odds with one another" such that a person of ordinary skill in the art would consider them "incompatible with one another, or at least so distinct that a POSITA would not be motivated to combine the references" as Patent Owner argues.  PO Resp. 17; PO Sur-reply 10.  Indeed, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *KSR*, 550 U.S. at 420.

Here, Dr. Polish testifies, and we agree, that a person of ordinary skill in the art would "have recognized that Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network."  Ex. 1002 ¶ 86.  We credit Dr. Polish's testimony that a person of ordinary skill in the art "would have understood that Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and

28

IPR2023-01295
Patent 8,994,830 B2

information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Indeed, the Federal Circuit has "repeatedly held that an implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, *or more efficient*." *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (emphasis added). Dr. Polish's testimony that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network," specifically describes the desirable benefit of efficiency a person of ordinary skill in the art would have reasonably expected to obtain from Petitioner's proposed combination. Ex. 1002 ¶ 88.

Patent Owner next argues that Shaffer and Saylor provide "redundant disclosures," i.e., "redundant mechanisms for sending communications between networks." *See* PO Resp. 23–26. Patent Owner argues that "there would be no need to combine the teachings of Shaffer with Saylor because Saylor already includes everything it needs to send notifications to recipients in different networks." PO Resp. 25. Patent Owner argues that "[b]ecause Saylor is replete with instructions regarding how to convey notifications to recipients across a wide range of communication mediums, there would be no need to incorporate this with Shaffer's IS, and therefore no need to combine these references." *Id.* at 26 (citing Ex. 2006 ¶ 64).

IPR2023-01295
Patent 8,994,830 B2

In its Reply, Petitioner argues that Patent Owner "conflates whether the combined references are redundant with the question of whether they are analogous." Pet. Reply 8. According to Petitioner, Saylor's disclosure of "different possible '[m]ethods of notification' is not redundant of using Shaffer's IS approach to implement communications among devices on different networks." *Id.* at 8–9 (citing Ex. 1002 ¶¶ 87–88). Petitioner explains that "Shaffer's IS specifically provides the mechanism by which the different '[m]ethods of notification' in Saylor can be used to communicate alarms from sensors in buildings/facilities to emergency services across different networks in different regions, including different buildings." Pet. Reply 9 (citing Ex. 1004 ¶¶ 39–40, 46; Ex. 1002 ¶¶ 84–85; Pet. 25–26, 28).

We agree with Petitioner. Dr. Polish specifically testifies that "the IS [Interoperability System] in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. Dr. Polish explains that in the combined system,

> the IS of Shaffer would assign a multicast IP address (communication channel) to a particular endpoint or a group of endpoints requiring notification of a particular type of event. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses). That IP address would have then been stored in Saylor's databases for retrieval and use to contact entities outside of the security system upon occurrence of an event. For example, in the combined system, when an alarm is triggered in Saylor's central security network, the security network could query its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor (blue) to the relevant recipients (purple).

IPR2023-01295
Patent 8,994,830 B2

Ex. 1002 ¶ 85 (citing Ex. 1011, 9:22–28, 11:67–12:6, 13:51–54).

Petitioner's combined Shaffer-Saylor system is shown below.

Petitioner's annotated Shaffer-Saylor system depicts Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. The clear complementation, interoperability, and benefits of Petitioner's combined Shaffer-Saylor system directly contradicts Patent Owner's argument that Shaffer and Saylor provide "redundant disclosures," and that "there would be no need to combine the teachings of Shaffer with Saylor." PO Resp. 25.

Finally, Patent Owner argues that "the Petition presents hindsight-ridden 'motivations' that fail to consider the context of the art." PO Resp. 26. In particular, Patent Owner argues that "[t]he Petition fails to provide any reason to deviate from Shaffer's disclosure regarding storing IP addresses in the endpoints to enable them to communicate locally while travelling between geographic areas," and "[t]here would be no reason to

31

IPR2023-01295
Patent 8,994,830 B2

store these addresses in Saylor's stationary network." PO Resp. 28 (citing Ex. 1004 ¶¶ 40, 8; Ex. 2006 ¶ 68).

We disagree with Patent Owner. As noted above, Dr. Polish testifies that "the IS in Shaffer . . . provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located)." Ex. 1002 ¶ 84. According to Dr. Polish, "Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network." *Id.* ¶ 86. Dr. Polish further testifies, and we agree, that "Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network." *Id.* ¶ 88.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art at the time of the claimed invention would have had a reasoned basis to combine the teachings of Shaffer and Saylor in the manner described in the Petition and would have had a reasonable expectation of success in that endeavor.

### 2. Independent Claim 1

Petitioner contends that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over Shaffer and Saylor. Pet. 29–42. Petitioner submits the testimony of Dr. Polish in support of its contentions. Ex. 1002 ¶¶ 91–110. Patent Owner disputes certain aspects of Petitioner's evidence and arguments with respect to claim 1, in particular limitations 1[b], 1[d],

32

IPR2023-01295
Patent 8,994,830 B2

and 1[e].  *See* PO Resp. 14–16, 29–35.  Patent Owner does not contest Petitioner's evidence and arguments with respect to claim 1's preamble and limitations [1a], [1c], [1f], and [1g].  *See id.*  We consider all of Petitioner's evidence and arguments directed to claim 1, and we address in detail Patent Owner's arguments directed to the contested limitations.

### a.  *Preamble: A method comprising:*

Petitioner asserts that "Shaffer-Saylor discloses "*[a] method, comprising.*"  Pet. 29 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 91).  Indeed, the abstract of Shaffer describes "[a] method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network."  Ex. 1004, Abstr.  Patent Owner does not contest this evidence.  *See* PO Resp. 14–35.  Based on the complete record, we determine that Shaffer's disclosure meets the preamble of independent claim 1.

### b.  *Limitation 1[a]*

Limitation 1[a] recites: "*monitoring a selection of a communication channel by a user of a mobile communication device.*"  Ex. 1001, 12:19–20.  Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[a].  Pet. 29–31.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation.  *See* PO Resp. 14–35.

Petitioner asserts that, "in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located."  Pet. 29.  Petitioner asserts that "Shaffer discloses a communication channel as described in the '830 patent—namely, a 'particular IP address' for hosting a 'virtual talk

33

IPR2023-01295
Patent 8,994,830 B2

group.'"  *Id.* at 28–29 (citing Ex. 1001, 2:59–62, 4:22–28; Ex. 1004 ¶ 39;

Ex. 1002 ¶ 93).

To illustrate this, Petitioner refers to Figure 3 of Shaffer, shown

below.  Pet. 30.



*FIG. 3*

With respect to Shaffer's Figure 3, Petitioner explains that it

"illustrates various types of endpoints (including radios in radio network

(110), an IP phone (122c), and a PDA (122b)) that can form communication

sessions" comprising "audio and/or video telecommunication signals."  *Id.*

(citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37).  "In particular,"

Petitioner explains that "Interoperability System (IS) 120 uses 'multicast IP

addresses' so that the devices can 'communicate with each other through IS

120 to provide network interoperability.'"  Pet. 30 (citing Ex. 1004 ¶¶ 38–

39).  "For example," Petitioner explains, "communication channels

34

IPR2023-01295
Patent 8,994,830 B2

(multicast IP addresses) may exist for 'local safety and security agencies.'" Pet. 30 (citing Ex. 1004 ¶ 40).

"Second," Petitioner asserts, "Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel." Pet. 31 (citing Ex. 1002 ¶ 94). "For example," Petitioner explains, "Shaffer discloses that a police officer 'such as a state highway patrol officer, may be provided with a PC with a touch screen' where the 'PC comprises a mobile endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 40). According to Petitioner, "[t]he officer can use the touchscreen to select 'local safety and security forces' by selecting '[i]cons on the touch screen' to 'join communication sessions.'" Pet. 31 (citing Ex. 1004 ¶ 34). Petitioner explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" *Id.*; *see also id.* ¶ 41 (describing that IS stores multicast addresses "utilized by various agencies"). Petitioner asserts that "[t]he communication parameters identified by IS 120 include a 'multicast address' identifying the communication channel for the VTG for 'local safety and security forces.'" Pet. 31 (citing Ex. 1004 ¶¶ 40–41). According to Petitioner, "[t]his allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke." Pet. 31 (citing Ex. 1004 ¶ 40).

"Finally," Petitioner asserts, "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

35

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on Shaffer's teaching of a communication channel similar to one described in the '830 patent—namely, a particular IP address for hosting a virtual talk group. *See* Pet. 29–30 (citing Ex. 1001, 2:59–62 ("The gateway 116 may provide voice interoperability between computer and non-computer networks, such as the PSTN 102, by bridging telephone transmissions to Internet Protocol (IP) multicast streams."), 4:22–28 ("The radio network 152 may communicate with the computer network 114 by way of a gateway 160, which provides voice and control interoperability between the radio network 152 and the computer network 114 by bridging media and control transmissions to Internet Protocol (IP) multicast and/or Unicast (e.g., Session Initiation Protocol (SIP)) streams."); Ex. 1004 ¶ 39; Ex. 1002 ¶ 93).

Petitioner refers to Shaffer's Figure 3 and explains that Shaffer "illustrates various types of endpoints (including radios in radio network (110), an IP phone (122c), and a PDA (122b)) that can form communication sessions" comprising "audio and/or video telecommunication signals." Pet. 28 (citing Ex. 1004 ¶¶ 20, 37–42, Fig. 3; *see also id.* ¶¶ 16, 37). In particular, Petitioner points out that Shaffer's "Interoperability System (IS) 120 uses 'multicast IP addresses' so that the devices can 'communicate with each other through IS 120 to provide network interoperability.'" Pet. 30 (citing Ex. 1004 ¶¶ 38–39).

Petitioner also explains that "[t]he IS monitors the officer's selection, and '[u]pon receiving instructions from the officer,' adjusts 'communications parameters used by the endpoint.'" Pet. 31 (citing Ex. 1004 ¶¶ 34, 41. In addition, Petitioner explains that "the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other

36

IPR2023-01295
Patent 8,994,830 B2

data' with other devices." Pet. 31 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47; Ex. 1002 ¶ 95).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a communication channel by a user of a mobile communication device*" as recited in limitation 1[a].

### c. Limitation 1[b]

Limitation 1[b] recites: "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone.*" Ex. 1001, 12:21–23.

Petitioner contends that Shaffer discloses the subject matter recited in limitation 1[b]. Pet. 32–35. Patent Owner disagrees. PO Resp. 29–31.

Petitioner asserts that "in Shaffer, mobile security personnel can select a frequency associated with a nearby building" and "Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones." Pet. 32 (citing Ex. 1004, Fig. 4). To illustrate this capability, Petitioner provides an annotated version of Shaffer's Figure 4, shown below.

37

IPR2023-01295
Patent 8,994,830 B2



FIG. 4

Petitioner's annotated version of Shaffer's Figure 4 depicts an example of mobile endpoint 200 comprising transmitter/receiver 202, user interface 204, processor 206, memory module 208, and network communication parameter listing 210, "which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location."  Pet. 33; Ex. 1004 ¶¶ 44, 46.

Petitioner explains that Shaffer's Figure 4 "shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210."  Pet. 32 (citing Ex. 1004 ¶¶ 43, 46–47).  According to Petitioner, "these parameter listings include *radio frequencies,* identified in Hertz (listed as X, Y, Z, P, Q)."  Pet. 32 (citing Ex. 1004 ¶¶ 43–48, Fig. 4) (emphasis by Petitioner).

38

IPR2023-01295
Patent 8,994,830 B2

Petitioner asserts that, in Shaffer, "the mobile device stores 'radio frequencies' of 'communication networks by location.'" Pet. 33 (citing Ex. 1004 ¶ 46). Petitioner explains that in Figure 4, "each radio frequency is also specifically associated with a 'location' such as City A, City B, State C, or Country D." Pet. 33 (citing Ex. 1004, Fig. 4). Petitioner also points out that "Shaffer explains the locations can also be 'buildings' and 'campuses,' in addition to municipalities." Pet. 33 (citing Ex. 1004 ¶ 27). "For example," Petitioner explains, Figure 2 of Shaffer shows "different geographic regions (52, 53, 54, 55) 'may correspond to buildings, campuses, municipalities . . . or any other particular geographical area,'" and "[e]ach geographic region may also contain one or more communication networks (60–64), each of which may have a different 'assigned radio frequenc[ies].'" Pet. 33–34 (citing Ex. 1004 ¶ 27; *see also id.* ¶¶ 20–22, 26, 34–35; Ex. 1002 ¶¶ 97–98). Shaffer's Figure 2 is shown below.



*FIG. 2*

Shaffer's Figure 2 depicts system 50 for communicating using position information that includes a plurality of geographic regions 52–55,

39

IPR2023-01295
Patent 8,994,830 B2

communication networks 60–64, endpoints 70, 74, and communication control post (CCP) 80.  Ex. 1004 ¶ 26, Fig. 2.

Petitioner asserts that "Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device."  Pet. 34 (citing Ex. 1002 ¶ 99).  "For example," Petitioner explains, "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface."  Pet. 34 (citing Ex. 1004 ¶ 44 (emphasis by Petitioner).

According to Petitioner, "[t]he display presents frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network."  Pet. 34–35 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶ 3, 8 (describing, as background, known functionality for using a handbook to look up local frequencies by location)).  "For example," Petitioner explains with reference to Shaffer's Figure 4, "if a user enters city A, there are two possible frequencies, X and Y.  Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the 'pressing' of a touch screen 'key stroke.'"  Pet. 35 (citing Ex. 1004 ¶¶ 35–36, 44).

Petitioner argues that a person of ordinary skill in the art "would at least have recognized that displaying the multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' would have been obvious and one of a finite number of predictable options for selecting on the touch screen all available frequencies in an area."  Pet. 35 (citing Ex.

40

IPR2023-01295
Patent 8,994,830 B2

1002 ¶ 100). "Such an implementation," Petitioner asserts, "uses a known technique (touchscreen display and selection) with known benefits (selection using a single 'stroke') according to its established function, and is therefore obvious." *Id.*

Patent Owner argues that "Shaffer notably lacks disclosure of any radio frequency being presented on the user interface (or any display), much less a plurality of radio frequencies presented on a display of the mobile communication device as claimed." PO Resp. 29. Patent Owner also argues that "[t]here is nothing in Shaffer that suggests interface 204 provides, on a display, any of the "several different communication parameter listings 210" that are stored in memory module 208, much less a plurality of these listings." *Id.* at 30 (citing Pet. 32; Ex. 1004 ¶ 46). According to Patent Owner, "[t]he assumption that Shaffer discloses providing a plurality of the stored communication parameter listings on a display highlights that the Petition uses hindsight biased reasoning to arrive at the claimed invention." PO Resp. 30. Patent Owner also asserts that "it is unclear why Shaffer's 'instructions regarding adjustment of the end point's communication settings' would provide a plurality of radio frequencies on a display." PO Resp. 30 (citing Ex. 1004 ¶ 44).

We agree with Petitioner and disagree with Patent Owner. Shaffer explains that

> [i]n some cases the endpoint may be set to automatically switch communication settings upon such a move once the endpoint enters an area of a different or particular communication network. *In some cases such a switch may occur through a user interface, such as a user pressing a button to enable the switch. For example, specific buttons may be used to switch communication settings.*

41

IPR2023-01295
Patent 8,994,830 B2

Ex. 1004 ¶ 32 (emphasis added).  Shaffer explains that these
"communication settings" include "radio frequency and encryption key."  *Id.*
¶ 31.

Shaffer's Figure 4 illustrates mobile endpoint 200 comprising
transmitter/receiver 202, user interface 204, processor 206, memory module
208, and network communication parameter listing 210.  Ex. 1004 ¶ 44,
Fig. 4.  Parameter listing 200 provides a call-out table populated with a list
of geographic locations of different networks along with their related
frequencies (in Hz) and encryption keys.  Parameter listing 200 shows
different geographic zones (City A, City B, State C, Country D) and
associated radio frequencies (frequencies X, Y, Z, P, Q).  Shaffer explains
that user interface 204 "may comprise a keypad, *display, touch screen*, audio
input *or any other suitable interface*."  *Id.* ¶ 44 (emphasis added).

Although Figure 4 represents the frequencies of the different
geographic zones by letters (X, Y, Z, P, Q), the column heading of the
display clearly indicates that they represent a "FREQUENCY" in Hertz
(HZ).  We credit Dr. Polish's testimony on this point.  *See* Ex. 1002 ¶ 97
("These parameter listings include *radio frequencies*, identified in Hertz
(listed as X, Y, Z, P, Q") (citing Ex. 1004 ¶¶ 43–48, Fig. 4)).

We also credit Dr. Polish's testimony with respect to Figure 2 that
Shaffer's geographic regions "may correspond to buildings, campuses,
municipalities . . . or any other particular geographical area."  Ex. 1002 ¶ 98
(citing Ex. 1004 ¶ 27).  Dr. Polish testifies, and we agree, that each
"geographic region may also contain one or more communication networks
(60–64), each of which may have different "assigned radio frequenc[ies]."
*Id.*; *see also id.* ¶¶ 20–22, 26, 34–35.

IPR2023-01295
Patent 8,994,830 B2

We credit Dr. Polish's testimony that "Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen . . . or any other suitable interface," such that the "display presents multiple frequencies to the user so that 'through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network.'" Ex. 1002 ¶ 99 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change endpoint communication setting)).

We further credit Dr. Polish's testimony that

> [d]isplaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA. When there are multiple frequencies available for communication in a particular area, as in Shaffer, and when a user's device can include a touch screen, as in Shaffer, presenting for selection on the touch screen all available frequencies in an area a user enters would have been one of a finite number of predictable options for selecting a frequency.

Ex. 1002 ¶ 100.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing a plurality of radio frequencies on a display of the mobile communication device, each radio frequency being associated with a geographical zone*," as recited in limitation 1[b].

### d.  Limitation 1[c]

Limitation 1[c] recites: "*from which a plurality of video feeds associated with the geographic zone are sourced*." Ex. 1001,12:23–25. Petitioner contends that the combination of Shaffer and Saylor teaches the

43

IPR2023-01295
Patent 8,994,830 B2

subject matter recited in limitation 1[c].  Pet. 35–36.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "Shaffer-Saylor discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds."  Pet. 35 (citing Ex. 1002 ¶ 101). "For example," Petitioner explains, "Saylor discloses 'video cameras' located in a geographic zone (*e.g.*, a building of a 'business')."  Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10).  "In particular," Petitioner points out, "'an identified location may be monitored by a video or other recording device,' and, if motion is detected, 'video clips' maybe sent to a 'central security network.'"  Pet. 35–36 (citing Ex. 1011, 16:52–17:9; *see also id.* at 11:64–12:6).

With respect to video feeds associated with geographic zones, the '830 patent explains that "[i]n an example embodiment, one or more of the cameras . . . are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations)."  Ex. 1001, 3:17–21.  The '830 patent also explains that

> [a]s one or more users . . . approach a location from which specific video feed is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading, the policy module 312 may automatically associate the video feed from the relevant camera 122 with the communication channels of the fire truck and render access to this video feed to all other members of a fire-truck VTG [virtual talk group].

*Id.* at 6:4–11.

44

IPR2023-01295
Patent 8,994,830 B2

Dr. Polish testifies that by 2008 "video surveillance systems were ubiquitous. They addressed the well-known need to monitor areas of interest, providing eyes on scene, without the need for the physical presence of personnel." Ex. 1002 ¶ 66 (citing Ex. 1029 ¶ 17) ("The subject invention is directed to an IP-network-based surveillance and monitoring system wherein video captured from a number of remotely located security cameras may be digitized, compressed, and networked for access, review and control at a remote monitoring station.").

Saylor also teaches that "[t]he security system may be applied to a user's home, office, vacation house or other location." Ex. 1011 2:13–15. Saylor explains that such a system may "provide a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected," and that "[t]he user may also view the images (e.g., video clips) remotely via the web or other remote access methods." *Id.* at 2:53–55.

The term "geographic zone" is not defined in the '830 patent and neither party has proffered any special meaning for it. *See* Pet. 14–15; PO Resp. 9–12. These examples from the '830 patent and the prior art indicate that a person of ordinary skill in the art would understand that a "geographic zone" may be a particular location or area where a camera producing a video feed is located, such as a traffic intersection, along a freeway, or at some other public or non-public location, such as a building, business location, or home.

Thus, Petitioner's assertion that "a building or a campus" may be considered a "geographic zone," is consistent with the examples provided in '830 patent and the prior art. Pet. 35 (citing Ex. 1011, 10:32–34, Fig. 10; *see*

45

IPR2023-01295
Patent 8,994,830 B2

*also* Ex. 1002 ¶ 101).  Patent Owner does not challenge Petitioner's
understanding of this term.  *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has
established that the combination of Shaffer and Saylor teaches "*from which
a plurality of video feeds associated with the geographic zone are sourced*"
as recited in limitation 1[c].

### e.  Limitation 1[d]

Limitation 1[d] recites: "*monitoring a selection of a radio frequency
of the plurality of radio frequencies by the user.*"  Ex. 1001, 12:26–27.

Petitioner contends that Shaffer teaches the subject matter recited in
limitation 1[d].  Pet. 36 (citing Ex. 1002 ¶ 102).  Patent Owner disagrees.
PO Resp. 31–32.

Petitioner asserts that "[a]s discussed with respect to limitation 1[b],
Shaffer discloses and renders obvious that the [radio] frequencies are
provided on the display of a mobile communication device for *selection* by
the user."  Pet. 36.  "For example," Petitioner points out, "Shaffer explains
that the display presents frequencies to the user so that 'through interface
204 a user may input instructions regarding adjustment of the end point's
communication settings (*e.g.*, radio frequency. . .)."  *Id.* (citing Ex. 1004
¶ 44; *see also id.* ¶¶ 35–36 (describing a "pressing of a key stroke" to change
endpoint communication setting)).  According to Petitioner, "[t]he user's
selection of frequency is monitored by the processor of the mobile endpoint
so that the endpoint can 'receive[] and transmit[] voice and other data' with
other devices."  Pet. 36 (citing Ex. 1004 ¶ 44; *see also id.* ¶¶ 45–47).
Petitioner argues that "[d]isplaying the multiple available frequencies on
Shaffer's touch screen for selection by a 'key stroke' on a touch screen

46

IPR2023-01295
Patent 8,994,830 B2

would at least have been obvious, as described for limitation 1[b]."  Pet. 36 (citing Ex. 1002 ¶ 102).

Patent Owner argues that "[b]ecause Shaffer fails to provide a plurality of radio frequencies on a display, a user cannot select a radio frequency from a plurality of radio frequencies."  PO Resp. 31 (citing Ex. 2006 ¶ 79).  Patent Owner also argues that although "Shaffer teaches a user inputting 'instructions regarding adjustment of the endpoint's communication settings . . . *upon entering a new communication network*,'" when "[r]ead in context, Shaffer's 'instructions' do not monitor for the selection of a radio frequency from a plurality of radio frequencies provided to a user, but instead prescribe how to change networks as the endpoint moves between locations."  PO Resp. 31–32 (citing Ex. 2006 ¶ 80).

We agree with Petitioner and disagree with Patent Owner.  Patent Owner's argument is based on the false premise that "Shaffer fails to provide a plurality of radio frequencies on a display."  This is demonstrably incorrect, as discussed above in connection with Shaffer's disclosure of parameter listings, include ***radio frequencies***, identified in Hertz (listed as X, Y, Z, P, Q) in Shaffer's Figure 4.  *See supra,* Sec. IV.E.2.b.

Patent Owner's argument appears to be that because Shaffer's Figure 4 presents a list of frequencies as letters (X, Y, Z, P, Q) instead of numbers that a person of ordinary skill in the art would not understand that Shaffer's letters represent different radio frequencies.  This argument is unpersuasive, especially given that the table heading in Shaffer's Figure 4 clearly reads "FREQUENCY (Hz)."

Moreover, the level of information provided in Shaffer's Figure 4 is similar to the level of information provided in Figure 9 of the '830 patent, shown below.

47

IPR2023-01295
Patent 8,994,830 B2



FIG. 9

Figure 9 of the '830 patent illustrates a graphic user interface (GUI) of a mobile communication device "to allow a user to select a communication frequency associated with a communication channel."  Ex. 1001, 9:61–62. Notably, GUI 900 does not list any of its frequencies in Hertz, but merely labels them as Frequency 1 thru Frequency k, apparently assuming that a person of ordinary skill in the art would understand that these labels represent actual radio frequencies.

Equally unpersuasive is Patent Owner's other argument that Shaffer's instructions do not monitor for the selection of a radio frequency, but instead "prescribe how to change networks as the endpoint moves between locations."  PO Resp. 31–32.  We find more persuasive Dr. Polish's testimony that "[t]he user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can 'receive[] and transmit[] voice and other data' with other devices," and "[d]isplaying the

48

IPR2023-01295
Patent 8,994,830 B2

multiple available frequencies on Shaffer's touch screen for selection by a 'key stroke' on a touch screen would at least have been obvious to a POSITA, for the reasons described for limitation 1[b]." Ex. 1002 ¶ 102 (citing Ex. 1004 ¶¶ 44–47).

Based upon the complete record, we find that Petitioner has established that Shaffer teaches "*monitoring a selection of a radio frequency of the plurality of radio frequencies by the user,*" as recited in limitation 1[d].

### f.  Limitation 1[e]

Limitation 1[e] recites: "[1] *identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, [2] wherein the at least one video feed is associated with the selected communication channel [3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" Ex. 1001, 12:28–32.[5]

Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[e]. Pet. 36–41. According to Petitioner "the Shaffer-Saylor system identifies a video feed associated with the *geographic zone*, and that feed is also associated with a multicast IP address (*selected communication channel*) based on a user preferences database entry (*user policy*) that identifies video feeds relevant to security personnel (*users*) when they access the communication channel." Pet. 36–37 (citing Ex. 1002 ¶ 103). Patent Owner disagrees. PO Resp. 14–16, 32–35.

---

[5] Bracketed numbers suggested by Petitioner.  *See* Pet. 36–37.

49

IPR2023-01295
Patent 8,994,830 B2

> i.  *[1]identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone*

Petitioner asserts that "Saylor's central security network [1] *identifies and selects a video feed associated with the geographic zone*." Pet. 37 (citing Ex. 1002 ¶ 104).

Petitioner relies on Saylor's Figure 10, which is shown below.



Saylor's Figure 10 is a flowchart illustrating a process for accessing video images provided by a security system. Ex. 1011, 4:58–59. According to Petitioner, "in step 1010, Saylor's central security network monitors a specific video feed in an 'identified location' of a building (*the geographic zone*) and, in steps 1012, 1014, 1016, and 1020, selects and identifies that

50

IPR2023-01295
Patent 8,994,830 B2

feed when a 'trigger[]' event occurs, such as 'motion.'" Pet. 37 (citing Ex. 1011, 16:52–60, 34:6–10). In steps 1022 and 1024, Petitioner asserts that "a 'video clip[]' from that feed is processed to determine whether certain 'conditions are met for alarm triggers' or '[n]otifications.'" Pet. 37 (citing Ex. 1011, 17:1–5). Petitioner points out that "in steps 1026 and 1028, an 'image may be automatically transmitted' to recipients." Pet. 37 (citing Ex. 1011, 17:8–9; *see also id.* at 34:1–9 (describing that a subscriber can be sent a "video clip" from a camera near the front door if the "front door opens" or "when an unrecognized person enters").

Patent Owner contends that "[t]he Petition fails to address the portion of limitation 1[e] in which the video feed is selected 'from the plurality of video feeds.'" PO Resp. 14. Patent Owner argues that "[t]he video monitored at the identified location that sends video clips to a central security network after motion is detected does not teach 'identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds' because the identified location is not reviewing a plurality of video feeds." *Id.* at 15 (citing Ex. 2006 ¶¶ 72–73). Patent Owner argues that "[w]ith each video device monitoring its own feed, Saylor fails to disclose any element that *selects* a video feed from the plurality of video feeds." PO Resp. 16 (citing Ex. 2006 ¶ 72).

In its Reply, Petitioner argues that "[t]he Petition describes the plurality of feeds in Shaffer-Saylor for limitation 1[c]—namely, a 'plurality of video feeds' from 'video cameras' (plural) located in 'each geographic region' (e.g., a 'building or campus') that the system monitors." Pet. Reply 2–3 (citing Pet. 35–37; Ex. 1011, 10:32–41, Fig. 10). Petitioner points out that Patent Owner "does not dispute that Shaffer-Saylor discloses the plurality of video feeds in limitation 1[c] . . . [n]or does PO explain why

51

IPR2023-01295
Patent 8,994,830 B2

those video feeds do not meet limitation 1[e]." Pet. Reply 3 (citing PO Resp. 14–20). Petitioner contends that Patent Owner's "argument depends on [Patent Owner's] narrow interpretation of 'selecting' as limited to a specific, unclaimed process in which video feeds are received at a central server that then selects one feed." Pet. Reply 3.

In its Sur-reply, Patent Owner argues that "all Shaffer-Saylor accomplishes is individual video monitoring devices that are capable of identifying and selecting its own, non-plural video feed." PO Sur-reply 4 (citing Ex. 2006 ¶¶ 70–71). According to Patent Owner, "Shaffer in combination with Saylor fails to teach identifying and selecting a video feed from a plurality of video feeds because each video monitoring device merely identifies and selects its single, *i.e.*, non-plural, video feed." PO Sur-reply 4 (citing Ex. 2006 ¶ 73; Ex. 1011, 16:52–60). According to Patent Owner, "Siloed cameras do not select a video feed from a plurality of video feeds, and thus cannot render obvious a claim that expressly requires the identification and selection of at least one video feed from a plurality of video feeds." PO Sur-reply 6.

We agree with Petitioner and disagree with Patent Owner. The limitation at issue recites "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone.*" The claim does not limit how the identifying and selecting takes place. Patent Owner concedes this point in its Sur-reply. *See* PO Sur-reply 6 ("the means of identification and selection are not limited by the claim").

According to the '830 patent, a "geographic zone" may, for example, be a section of freeway, a traffic intersection, or some other public or non-public location such as a building with surveillance cameras. *See, e.g.,* Ex.

52

IPR2023-01295
Patent 8,994,830 B2

1001, 3:17–21 ("In an example embodiment, one or more of the cameras 122 are independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and public and non-public locations).").

The identifying and selecting of a video feed may also occur because of some event, trigger, or condition being satisfied. The '830 patent explains, for example, that

> the method 600 monitors an audio signal generated in proximity to a video camera providing a video feed. For example, the audio signal may be a gunshot requiring a response by an ERT. As shown at block 604, the method 600 may process the audio signal to identify an audio event (e.g., the gunshot). Once the audio event had been identified, the identified video feed from the surveillance camera may be associated with a communication channel associated with the ERT.

Ex. 1001, 8:39–47.

Similarly, Saylor explains how its security system "may be applied to a user's home, office, vacation house or other location." Ex. 1011, 2:13–15. Saylor explains that "within a house, a user may have window and door contacts, smoke detectors and motion sensors, *video cameras*, key chain control, temperature monitors, CO and other gas detectors, vibration sensors, and other" sensors or detectors. *Id.* at 10:31–34 (emphasis added). Saylor explains that its invention "provides a personal security network *where one or more security devices* related to a subscriber *may be connected to a central security network over wireless communication.* The central security network . . . *may monitor those security devices* and alert a user when an alert situation occurs." *Id.* at 2:20–26 (emphasis added). Saylor further explains that its invention may provide "*a monitoring system for providing images* (e.g., photos, pictures, *video*, diagrams, illustrations, etc.) where an

53

IPR2023-01295
Patent 8,994,830 B2

alarm situation may be detected by comparing images. When a change in images (indicating motion) is detected, an alarm may be signaled." *Id.* at 2:45–50 (emphasis added).

Thus, Saylor expressly teaches how multiple "video cameras" may be used at a particular location, such as "home, office, vacation house or other location" to provide a local security network that may be connected to a central network over wireless communication. *Id.* at 2:13–15, 10:31–34. In particular, Saylor explains how "an identified location may be monitored by a video or other recording device," and, if, for example, motion is detected, "video clips" maybe sent to a "central security network" for further processing and action. *Id.* at 11:64–12:6, 16:52–17:9. Saylor also explains how "the user may select the appropriate one or more actions. For example, the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action." *Id.* at 16:23–28.

As Petitioner points out, Saylor teaches "personalized alarm services" and stores user policies at a central server for determining which triggered video feeds received by the central server should be selected and conveyed to particular entities. *See, e.g.*, Pet. 38–39, 25 (describing Saylor's "user preferences" set to inform entities of certain alarms), 26 (describing Saylor's database to determine whether to notify users regarding an alarm), 28 (describing how Saylor's "central security network processes the alarms and, according to rules and preferences, transmits notifications and information"). Thus, the Petition adequately explains how Saylor's central server receives multiple video feeds (e.g., where motion is detected) and selects one or more of those feeds to send to a user/entity based on stored rules/preferences.

54

IPR2023-01295
Patent 8,994,830 B2

The Petition is supported by Dr. Polish's testimony.  Dr. Polish testifies that

> Saylor discloses a security system including "monitoring system" that provide "photos, pictures, [and] video" to an end user.  Ex[1011], 2:45–55.  The security system notifies a recipient, including emergency personnel, when it detects an "alert situation."  *Id.*, 5:37–42.  For example, the notification can include "video clips" from video surveillance cameras.  *Id.*, 2:49–55, 11:67–12:6, 13:51–54.  A central security network (FIG. 1 below) may alert "identified entities via wireless and/or other devices, such as mobile devices."  *Id.*, 7:40-–42.  For example, when an alarm is detected, the central security network can send relevant information "via the Internet 150" or other methods to "[a]n emergency entity 164" or other entities 161–162.  *Id.*, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.*, 11:24–28 (identifying mobile devices receiving notifications).

Ex. 1002 ¶ 74.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone*," as recited in limitation 1[e][1].

> ii.    *[2] wherein the at least one video feed is associated with the selected communication channel*

For this portion of the limitation, Petitioner asserts that "Shaffer-Saylor accesses a user preferences database that [2] *associates the video feed with the selected communication channel*."  Pet. 38 (citing Ex. 1002 ¶ 105).  Petitioner points out that "Saylor's databases already store 'relevant information for personalized alarm services.'"  Pet. 38 (citing Ex. 1011, 6:9–10).  "For example," Petitioner explains, "[u]ser database 140 may contain 'user preferences' that may indicate how 'different alarm situations that may

55

IPR2023-01295
Patent 8,994,830 B2

be detected in various locations or systems may warrant different levels of response' and '[s]pecial instructions' that may 'include information to be conveyed to entities reacting to the alarm for a particular location or object.'" Pet. 38–39 (citing Ex. 1011, 8:34–60).

Petitioner provides an annotated composite of Saylor's Figure 1 and Shaffer's Figure 3, shown below, to illustrate the combination.



Petitioner's annotated Shaffer-Saylor system is shown above with Figure 1 of Saylor's Central Security Network on the left next to Figure 3 of Shaffer's Interoperability System on the right. Pet. 27.

Petitioner explains that "when an event occurs (such as motion), the central security network can send relevant information (such as video clips) 'via the Internet 150' to '[a]n emergency entity 164.'" Pet. 39 (citing Ex. 1011, 6:22–32, 7:40–48, 9:23–29, 11:46–55; *see also id.* at 11:24–28 (identifying mobile devices receiving notifications), 12:34–35 ("the user

56

IPR2023-01295
Patent 8,994,830 B2

may specify when emergency dispatch is to occur."). "For example," Petitioner explains, "the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency." Pet. 39 (citing Ex. 1011, 12:17–21).

Petitioner also explains that "to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage." Pet. 39 (citing Ex. 1004 ¶¶ 39–40 (describing assigning and storing multicast IP addresses at an endpoint); Ex. 1002 ¶ 106). Petitioner further explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to this portion of the limitation. *See* PO Resp. 14–35.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*wherein the at least one video feed is associated with the selected communication channel*," as recited in limitation 1[e][2].

> iii.    *[3] based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel*

For this portion of the limitation, Petitioner asserts that "the association between video feed and communication channel is [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" Pet. 40

57

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1002 ¶ 103). According to Petitioner, "[t]he user policy is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." Pet. 40 (citing Ex. 1011, 8:34–60, Abstr. (identifying "individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information"), 11:48–63 ("user-defined conditions" determine which entity to notify and how to send the notification), 12:26–29). Petitioner asserts that "[t]he preferences identify which alarms are relevant to the users (and are designed, e.g., to filter out 'false alarms')." Pet. 40–41 (citing Ex. 1011, 12:34–41).

Petitioner explains that

Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address. Ex[1002], ¶107. Accordingly, when the security personnel selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer.

Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

Patent Owner argues that Petitioner's combination "fails to teach identification of 'video feeds that are relevant to the user *when the user accesses* the selected communication channel.'" PO Resp. 32 (emphasis by Patent Owner). Patent Owner argues that "[i]dentifying when to notify users and what to send them does not disclose identifying video feeds that are relevant to a user when the user accesses a selected communication channel." PO Resp. 32 (citing Ex. 2006 ¶¶ 90–91). According to Patent Owner, Petitioner does not provide "identification of the one or more video feeds that are relevant to the user at all, much less relevant specifically *when the user accesses the communication channel* as claimed." PO Resp. 33

58

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 2006 ¶ 92) (emphasis by Patent Owner).  Patent Owner contends that "[p]redetermined notifications based on alarm conditions differ substantially from the claimed 'user policy that identifies one or more video feeds that are relevant to the user *when the user accesses* the selected communication channel.'"  PO Resp. 34 (citing Ex. 2006 ¶ 94) (emphasis by Patent Owner).  Patent Owner contends that the claims "require user access to a communication channel before video feeds relevant to a user at the time of access are identified."  PO Resp. 34 (citing Ex. 2006 ¶¶ 93–94).

> In its Reply, Petitioner argues that

> the Shaffer-Saylor combination works in the same way as disclosed by the '830 Patent.  Saylor's databases implement a user policy that identifies relevant video feeds in Saylor's security system (*e.g.*, a video feed associated with a triggered alarm) for users associated with a specific communication channel (IP address) provided by Shaffer's IS.  Ex[1002], ¶¶84-85, 104–106.  The IS makes the video feeds accessible to a user when that user selects the relevant communication channel associated with the IP address.

Pet. Reply 15 (citing Ex. 1002 ¶¶ 86, 103 & n.3, 107).

> Petitioner also argues that

> dependent claim 6 of the '830 Patent confirms that identification of video feeds associated with a user in claim 1 can be accomplished via a database before the user selects the channel.  Ex[1001], cl. 6.  The embodiment in FIG. 3 also discloses a user policy that associates video feeds (308.1–308.m) with a communication channel (first channel 302.1) and makes those video feeds accessible "when any user 305.1–305.q" in a group associated with that channel sets his device "to the first channel."

59

IPR2023-01295
Patent 8,994,830 B2

Pet. Reply 15 (citing Ex. 1001, 5:23–53, Fig. 3).[6]

Patent Owner does not address Petitioner's arguments and evidence on this issue in its Sur-reply. *See* PO Sur-reply 3–14.

We agree with Petitioner and disagree with Patent Owner. In our view, Petitioner provides sufficient explanation as to how the proposed Shaffer-Saylor combination would operate. Petitioner explains that Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. Pet. 39 (citing Ex. 1004 ¶¶ 39–40; Ex. 1002 ¶ 106). Petitioner also explains that, "when an event occurs that requires sending a video clip to security forces, Saylor's central security network can lookup the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel." Pet. 39.

Petitioner further explains that the association between a video feed and a communication channel is based on a "user policy," which "is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them." *Id.* at 40 (citing Ex. 1002 ¶ 103; Ex. 1011, 8:34–60, Abstr., 11:48–63, 12:26–29). Petitioner points out that "Saylor's central security network sends the notification to users (such as security personnel) using the assigned multicast IP address." Pet. 41 (citing Ex. 1002 ¶ 107). "Accordingly," Petitioner explains, "when the security personnel selects a communication channel associated with the

---

[6] Claim 6 recites: The method of claim 1, further comprising: accessing a database to identify a group of video feeds associated with the user; and when the user selects the communication channel, providing access to the group of video feeds associated with the user to one or more other users of the communication channel. Ex. 1001, 12:61–67.

60

IPR2023-01295
Patent 8,994,830 B2

multicast IP address . . . the officer can access the transmitted communications, as described in Shaffer." Pet. 41 (citing Ex. 1002 ¶ 107; Ex. 1004 ¶¶ 40–42).

The Petition is supported by Dr. Polish's testimony. For example, Dr. Polish testifies that

> Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. *E.g.*, Ex[1004], ¶¶0039–0040 (describing assigning and storing multicast IP addresses at an endpoint). Accordingly, when an event occurs that requires sending a video clip to security forces, Saylor's central security network can look up the appropriate multicast address and use the address to send the information to the security personnel that have selected this communication channel.

Ex. 1002 ¶ 106.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel,*" as recited in limitation 1[e][3].

### g.  Limitation 1[f]

Limitation 1[f] recites: "*the one or more video feeds being independent of the selected communication channel.*" Ex. 1001, 12:34–36. Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[f]. Pet. 41–42. Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation. *See* PO Resp. 14–35.

Petitioner asserts that "the '830 patent specification describes 'independent video surveillance cameras' as those installed at 'public and

61

IPR2023-01295
Patent 8,994,830 B2

non-public locations,' and that Shaffer-Saylor describes the same type of video feeds." Pet. 41 (citing Ex. 1001, 3:17–21; Ex. 1002 ¶ 108). "For example," Petitioner points out, "the video feed selected by Saylor's central security network are video surveillance cameras at a building or home." Pet. 41 (citing Ex. 1011, 10:31–34, 10:43–44). "In the combined system," Petitioner asserts, "Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel." Pet. 41–42 (citing Ex. 1002 ¶ 109).

> Dr. Polish testifies that
>
> the video feed selected by Saylor's central security network are video surveillance cameras independently installed at a building or home and independent of the security forces communication channel. Ex[1011], 10:31–34, 10:43–44 ("[T]he central security network of the present invention may also support users who already have an alarm system in their home, or want to buy a system from an alarm dealer and have it professionally installed."). It would have been obvious to a POSITA that in the combined system, Saylor's configurable central security network can associate the video feeds with the communication channel based on a user's preferences and the occurrence of relevant events triggering the forwarding of the video feeds to the multicast channel.

Ex. 1002 ¶ 109.

Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*the one or more video feeds being independent of the selected communication channel*" as recited in limitation 1[f].

62

IPR2023-01295
Patent 8,994,830 B2

### h. Limitation 1[g]

Limitation 1[g] recites: "*providing access to the identified at least one video feed to the mobile communication device based on the user policy.*" Ex. 1001, 12:37–39.  Petitioner contends that the combination of Shaffer and Saylor teaches the subject matter recited in limitation 1[g].  Pet. 42.  Patent Owner does not contest Petitioner's evidence and arguments with respect to this limitation.  *See* PO Resp. 14–35.

Petitioner explains that "Saylor's central security network sends video clips to mobile devices of security forces (users) based on the user policy stored in databases."  Pet. 42 (citing Ex. 1011, 11:24–28 (notifications to cell phones, etc.), 11:56–63, 35:15–33; Ex. 1002 ¶ 110).  "For example," Petitioner explains, "when a particular event in a particular building occurs, the user policy describes what notifications are sent and to whom."  Pet. 42 (citing Ex. 1011, 6:9–32, 8:34–60, 9:22–28; Ex. 1002 ¶ 110).  According to Petitioner, "[i]f a notification is sent to the selected communication channel (multicast address), the group members can access it."  Pet. 42 (citing Ex. 1004 ¶ 39 (interoperability system (IS 120) may communicate "with endpoints using multicast IP addresses"); Ex. 1002 ¶ 110).

We agree with Petitioner that Saylor's central security network sending video to the mobile devices of users based on user policies stored in databases meets the recited limitation.  Based upon the complete record, we find that Petitioner has established that the combination of Shaffer and Saylor teaches "*providing access to the identified at least one video feed to the mobile communication device based on the user policy*" as recited in limitation 1[g].

63

IPR2023-01295
Patent 8,994,830 B2

### i. Conclusion as to Independent Claim 1

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 1.  Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 1 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### 3.  Independent Claim 15

Independent claim 15 is substantially similar to independent clam 1. Claim 15, however, is directed to an apparatus while claim 1 is directed to a method.  Moreover, claim 15 contains two limitations, 15[a] and 15[b], that are not recited in claim 1.  We now consider the evidence and arguments directed to claim 15.

### a.  15[pre] An apparatus, comprising:

For the preamble, Petitioner contends that "Shaffer-Saylor discloses "*[a]n apparatus.*"  Pet. 50 (citing Ex. 1004, Abstr., ¶ 1; Ex. 1002 ¶ 136). Paragraph 1 of Shaffer explains that "[t]his invention relates in general to communication systems and, more particularly, to a method and system for communicating using position information."  Ex. 1004 ¶ 1.  Patent Owner does not contest Petitioner's showing with respect to claim 15's preamble. *See* PO Resp. 14–35.

### b.  15[a] at least one processor

For this limitation, Petitioner asserts that "Shaffer-Saylor discloses '*at least one processor.*'"  Pet. 51.  "For example," Petitioner explains, "Shaffer describes a processor in the mobile communication device, and in the IS.  *Id.*

64

IPR2023-01295
Patent 8,994,830 B2

(citing Ex. 1004 ¶¶ 38, 44–45, 48). According to Petitioner, "Saylor also discloses a server for 'processing' alarm information in the central security network." Pet. 51 (citing Ex. 1011, 35:45–48; Ex. 1002 ¶ 137).

Petitioner's position is supported by the testimony of Dr. Polish. *See* Ex. 1002 ¶ 137. Patent Owner does not contest Petitioner's showing with respect to this limitation. *See* PO Resp. 14–35.

> c. *15[b] a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor; the video stream association module being executed by the at least one processor to cause operations to be performed, the operations comprising:*

For this limitation, Petitioner contends that Shaffer-Saylor discloses "*a memory in communication with the at least one processor, the memory being configured to store a video stream association module executable by the at least one processor, the video stream association module being executed by the at least one processor to cause operations to be performed.*" Pet. 51 (citing Ex. 1002 ¶ 138).

According to Petitioner, "Shaffer discloses a memory at the mobile communication device and the IS for communicating with the processor," and "Saylor discloses a memory, including databases, communicating with a processor." Pet. 51 (citing Ex. 1004, ¶¶ 31, 36, 38, 40, 44–46, 48; Ex. 1011, Fig. 1, 6:9–32, 8:34–9:21; Ex. 1002 ¶¶ 138–139).

Petitioner asserts that "Shaffer-Saylor also disclose[s] the claimed 'video stream association module.' If not construed as a means-plus-function limitation, it is simply stored in the memory in Shaffer's mobile device and IS and Saylor's central security network and databases and perform the recited operations, as described for claim 1." Pet. 51 (citing Ex.

65

IPR2023-01295
Patent 8,994,830 B2

1001, 4:34–39 (video feed association module may be at a "central node and/or distributed nodes"), 3:21–27; Ex. 1002 ¶¶ 140–142). "If construed as a means-plus-function term," Petitioner argues that "the video stream association module includes (1) Shaffer's mobile communication device, (2) Shaffer's IS, and (3) Saylor's central security server and databases." Pet. 52.

Petitioner asserts that "[t]he functions of these elements disclose the functions of the video stream association module, as above with respect to limitations 1[a]-1[g]. In addition, Shaffer-Saylor discloses each element of the 'video feed association module' described in the '830 patent." Pet. 52.

Petitioner's position is supported by the testimony of Dr. Polish. *See* Ex. 1002 ¶¶ 138–143. Patent Owner does not contest Petitioner's showing with respect to this limitation. *See* PO Resp. 14–35.

### d. Limitations 15[d]–15[i]

For these limitations, Petitioner relies on the same evidence and arguments it relied upon for limitations 1[a]–1[g]. *See* Pet. 54 (citing Ex. 1002 ¶ 144).

### e. Conclusion as to Independent Claim 15

We have considered all of the evidence and arguments presented by the parties with respect to independent claim 15. Based on the complete record, including the reasons discussed above with respect to independent claim 1, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of independent claim 15 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

66

IPR2023-01295
Patent 8,994,830 B2

### 4. Dependent Claims 2–5, 7–14, 16–19, and 21–24

Petitioner argues that the combination of Shaffer and Saylor teaches or suggests the limitations of dependent claims 2–5, 7–14, 16–19, and 21–24. *See* Pet. 42–50, 54. Petitioner provides explanations as to how the combination of Shaffer and Saylor teaches or suggests each claim limitation as well as a rationale for combining the art in the manner proffered. *See* Pet. 42–43 (claim 2), 43–44 (claim 3), 44 (claim 4), 44–45 (claim 5), 45–46 (claim 7), 46–47 (claim 8), 47 (claims 9 and 10), 48–49 (claim 11), 49 (claim 12), 49–50 (claim 13), 50 (claim 14), and 54 (claims 16–19 and 22–24). Dr. Polish provides supporting testimony for Petitioner's contentions. *See* Ex. 1002 ¶¶ 111–135, 145–152.

Patent Owner specifically contests Petitioner's evidence and arguments directed to dependent claims 3, 7, 17, and 21. *See* PO Resp. 35–38. Patent Owner, however, does not separately contest Petitioner's evidence and arguments directed to challenged dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24. *See id.* Instead, Patent Owner relies on its previous evidence and arguments made with respect to independent claims 1 and 15 to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable." PO Resp. 35. We address contested dependent claims 3, 7, 17, and 21 first.

### f. Contested Dependent Claims 3, 17[7]

Dependent claim 3 recites: 3[a][8] *The method of claim 1, further comprising: accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile*

---

[7] Claim 17 depends from independent claim 15 and recites limitations similar to dependent claim 3.
[8] Bracketed designations proposed by Petitioner. *See* Pet. 4, 43–44.

IPR2023-01295
Patent 8,994,830 B2

*communication device; and* 3[b] *presenting a plurality of available video feeds on the display of the mobile communication device, the plurality of available video feeds including video streams associated with the plurality of members of the emergency response team.*

With respect to limitation 3[a], Petitioner contends that Shaffer-Saylor discloses this limitation.  Pet. 43.  Petitioner asserts that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel."  *Id.* (citing Ex. 1002 ¶ 114).

With respect to limitation 3[b], Petitioner asserts that "video streams may be associated with a communication channel, and team," and that "[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds, via thumbnails or a drop-down menu for selection." Pet. 44 (citing Ex. 1002 ¶ 115; Ex. 1004 ¶ 25).

In its Response, Patent Owner asserts with respect to limitation 3[a] that "[n]one of [Petitioner's] analysis explains how Saylor's database is accessed 'to identify a plurality of members of an emergency response team.'"  PO Resp. 35–36 (citing Ex. 2006 ¶¶ 96–98).

Patent Owner also asserts with respect to limitation 3[b] that Petitioner's analysis "regarding the claimed step of 'presenting a plurality of available video feeds on the display of the mobile communication device' starts and stops with Dr. Polish's unsupported assertion that '[b]y 2008, it would have been obvious that a mobile device could have displayed multiple video feeds.'"  PO Resp. 36 (citing Pet. 44).

In its Reply, Petitioner points out with respect to limitation 3[a] that the Petition "explains that 'Saylor's database' that 'associates video feeds with the user's selected multicast IP address' meets this limitation because

68

IPR2023-01295
Patent 8,994,830 B2

Saylor's database contains information to identify members of an emergency response team associated with a communication channel." Pet. Reply 16 (citing Pet. 42–43).

With respect to limitation 3[b], Petitioner points to testimony and other evidence in Dr. Polish's declaration that supports Dr. Polish's opinion that "by 2008, it would have been obvious for a mobile device to display multiple video feeds from a security network." Pet. Reply 16–17 (citing Ex. 1002 ¶¶ 66–68).

In its Sur-reply, Patent Owner argues with respect to limitation 3[a] that "[n]othing in [Petitioner's] analysis explains how Saylor's database, or Shaffer's IS, renders obvious 'accessing a database to identify a plurality of members of an emergency response team.'" PO Sur-reply 15.

With respect to limitation 3[b], Patent Owner reiterates its argument that "[t]he only evidence in support of the element 'presenting a plurality of video feeds on the display of the mobile communication device' is the unsupported testimony of Dr. Polish." *Id.*

We agree with Petitioner and disagree with Patent Owner. With respect to limitation 3[a], "*accessing a database to identify a plurality of members of an emergency response team that includes the user of the mobile communication device*," Petitioner explains that "[a]s described for claim 2, Saylor's database may contain location information to identify members of an emergency response team associated with a communication channel." Pet. 43 (citing Ex. 1002 ¶ 114). There, Petitioner explains that

> Shaffer discloses that the IS can act as a centralized communication control post (CCP) to track GPS information of users. Ex[1004], ¶¶0016, 0041. It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the

69

IPR2023-01295
Patent 8,994,830 B2

> central security network can notify users on the audio
> communication channel of an event, *e.g.*, by sending a video
> clip, when any user associated with the channel is within the
> designated location.

Pet. 43 (citing Ex. 1002 ¶ 113).

With respect to limitation 3[b], Petitioner and Dr. Polish did not specifically cite to Paragraphs 66–68 of Dr. Polish's declaration and the particular references discussed therein when discussing dependent claims 3 and 17. These paragraphs, however, are found in Section VIII of Dr. Polish's declaration, titled "KNOWLEDGE OF A POSITA," and in particular, Section D describing "Video Surveillance Systems Transmitting Video Feeds." There Dr. Polish opines that "[b]y 2008, video surveillance systems were ubiquitous" and references as support, for example, a September 2005 U.S. Patent Application Publication describing in its abstract "[a] system for capturing, encoding and transmitting continuous video from a camera to a display monitor via a network" that "supports a plurality of cameras." Ex. 1002 ¶ 66 (citing Ex. 1029). In this section of his declaration, Dr. Polish testifies that "surveillance video feeds could be provided to mobile devices and could be accompanied with other information such as the location from which the video feed is sourced." Ex. 1002 ¶ 67 (citing Ex. 1029 ¶¶ 17, 20; Ex. 1028 ¶¶ 7–15, 20–22, 27; Ex. 1030 ¶¶ 27–28, 31, 36, 44). One of these references, for example, describes "a system for providing secure streaming multimedia data via a wireless network from a first response unit such as a patrol car, to one or more remote playing devices in response to a trigger." Ex. 1028 ¶ 10.

It is clear when considering Dr. Polish's declaration testimony as a whole that that these paragraphs and the references discussed therein provide Dr. Polish's understanding of the background skill of the art at the time of

70

IPR2023-01295
Patent 8,994,830 B2

the claimed invention and what a person of ordinary skill would have understood about video surveillance systems transmitting video feeds at that time. We are not inclined to disregard this testimony. This testimony was specifically identified in Petitioner's Reply as part of the support for Dr. Polish's opinion (*see* Pet. Reply 16–17), but it was not addressed by Patent Owner in its Sur-reply (*see* PO Sur-reply 14–16).

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 3 and 17 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

### g. Contested Dependent Claims 7, 21[9]

7[a] *The method of claim 1, further comprising: monitoring an audio signal generated in proximity to a video camera providing a first video feed included in the identified at least one video feed*;

7[b] *processing the audio signal to identify an audio event; and*

7[c] *based on the identified audio event, providing access to the first video feed to a plurality of mobile communication devices in a group of mobile communication devices, the group of mobile communication devices including the mobile communication device of the user corresponding to the selection of the communication channel.*

---

[9] Claim 21 depends from independent claim 15 and recites limitations similar to dependent claim 7.

71

Appx00873

IPR2023-01295
Patent 8,994,830 B2

Petitioner contends that Shaffer-Saylor renders dependent claim 7 obvious. With respect to limitation 7[a], Petitioner asserts that

> Saylor discloses that the central security network may include various types of sensors, including "sound" sensors, Ex[1011], 14:17–20, Which could have been located in "proximity" to the camera providing video notifications. Ex[1002], ¶119; §VIII.A.2.f. As Saylor already describes, the video camera may monitor a specific area, such as the front door of a building, Ex[1011], 16:41–51, and a camera near that door can identify motion. *Id.*; Ex[1002], ¶119. It would have been obvious that a "sound" sensor could also be installed by the door to detect breaking glass, or another sign of a break-in, in addition to movement.

Pet. 45 (citing Ex. 1002 ¶¶ 119–120).

With respect to limitation 7[b], Petitioner asserts that "[a]s described for limitation 7[a], it would have been obvious for Saylor's central security network to process the output of the sound sensor, to determine if there was an audio event, such as breaking glass." Pet. 46 (citing Ex. 1002 ¶ 121).

With respect to limitation 7[c], Petitioner asserts that

> Saylor's central security network sends a notification, including with a video clip, to a group of users upon the occurrence of events. Ex[1011], 17:1-–9, 5:58–62, 8:54–60. It would have been obvious that Saylor's central security network could send a video clip from a camera near the front door when a sound of breaking glass is detected near the front door. Ex[1002], ¶122. In this scenario, the group (security personnel) would include any mobile users selecting the relevant communication channel.

Pet. 46 (citing Ex. 1002 ¶ 122).

In its Response, Patent Owner asserts that "Petitioner relies on its declarant to create a notification logic structure that is not actually taught in the prior art references." PO Resp. 37. Patent Owner asserts that "Dr. Polish admitted in his deposition that some teachings did not come

72

IPR2023-01295
Patent 8,994,830 B2

from the prior art references and were simply 'a statement about general knowledge in the art.'" *Id.* (citing Ex. 2006 ¶ 101; Ex. 2008, 79:9–15).

In its Reply, Petitioner asserts that Patent Owner "ignores Dr. Polish's declaration, which cites [Ex.] 1008 for this exact point." Pet. Reply 17 (citing Ex. 1002 ¶ 120 ("[s]ound sensors (or audio sensors) were well known at the time and it would have been obvious to place the sensor nearby a camera that is in an area of interest.").

In its Sur-reply, Patent Owner asserts that "[l]ike Shaffer and Saylor, Exhibit 1008 is devoid of any logical structure where access to a video feed is provided in response to an audio event being identified, as recited in claims 7 and 21." PO Sur-reply 17.

We agree with Petitioner and disagree with Patent Owner. Saylor explains that "[t]he present invention may provide a security system where a user may personalize alert notifications for various security devices and/or systems." Ex. 1011, 5:19–21. Saylor explains that

> [t]he central security network may access the user's personal preferences, profile information and/or other information which may be used to execute notifications in the manner specified by the user. For example, the user may identify various personal preferences, which may include contact information, contact individuals, *methods of communication*, order of contact, special instructions and other information.

*Id.* at 5:29–36 (emphasis added). Saylor goes on to explain that

> [b]ased on user preferences and other information, *the user may be notified via various methods of communication*, as specified in the user's profile and preferences information. Alert notification may be communicated via the Internet 150, POTS 152, wireless communication portals, voice portals, and/or other methods.

*Id.* at 6:19–25 (emphasis added). Saylor further explains that the security system may be applied to the user's property, which "may include user's

73

IPR2023-01295
Patent 8,994,830 B2

home, office, vacation house, or other locations." *Id.* at 6:37–38. Saylor explains that "[f]or property . . . security devices may include sensors, detectors and/or other devices for detecting alarm situations." *Id.* at 6:46–48.

Saylor also explains that "a user may integrate still or motion video into an alarm system through the use of a broadband landline (e.g., cable or DSL) for image transmission with a wireless connection to send alarm data." *Id.* at 8:8–12. Saylor explains that "[t]he user may also have the option to view photographs and/or video clips at the time of the alarm incident." *Id.* at 13:51–53. Saylor further explains that "[b]ased on user defined preferences, a user may be notified before the sounding of an alarm and before contacting an emergency entity (e.g., police, ambulance, etc.) to reduce false alarm penalties and fees." *Id.* at 8:18–21.

Saylor provides an example to explain how the system may work. Saylor explains that

> the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action. For example, if the user views an image of a pet knocking over a lamp which falls and breaks a window, the user may cancel the alarm and emergency notification. Thus, police resources may be conserved and the user may avoid a penalty fine for a false alarm.

*Id.* at 16:24–32.

Saylor provides another example linking the sending of a video clip in response to some other alarm trigger, in this case the opening of a front door (contact sensor). Saylor explains that

> a subscriber may request notification when a front door opens, and request that the notification include a video clip of the front

74

IPR2023-01295
Patent 8,994,830 B2

> door at the time it was opened.  The subscriber may also request
> a video link or other image data when an unrecognized person
> enters.  According to another example, if an internal motion is
> triggered but no door has opened and video analysis suggests
> that a human is inside, the subscriber may request an alert
> notification with a single frame clip.

*Id.* at 34:1–9.

Based on our review of Saylor, we credit Dr. Polish's testimony where he explains that "Saylor discloses that the central security network may include various types of sensors, including 'sound' sensors" and "[i]t would have been obvious to locate the 'sound' sensor in 'proximity' to the video camera providing video clip notifications."  Ex. 1002 ¶ 119 (citing Ex. 1011, 14:17–20) ("Type of device may include smoke, heat, CO, radon, temperature, contact, motion, camera, breakage, sound, panic button, control, light, and others.").  This is consistent with Saylor's description of sending a video clip (video confirmation) whenever a front door opens (contact sensor triggered).

Dr. Polish's understanding of Saylor is consistent with ours, where he explains that

> Saylor describes that the video camera may monitor a specific
> area, such as the front door of a building.  Ex[1011], 16:41–51.
> A camera near the front door can identify motion indicating
> possible unknown entrants or break-ins.  *Id.*  It would have been
> obvious to a POSITA that a "sound" sensor could also be
> installed by the front door to detect breaking glass, or another
> sign of a break-in, in addition to movement.

Ex. 1002 ¶ 120.  We therefore agree with Dr. Polish that "[i]t would have been obvious to a POSITA that Saylor's central security network could implement a rule to send to a video clip from a camera near the front door to security personnel when a sound of breaking glass is detected near the front door" and that "this is an obvious design choice that would have enabled

75

IPR2023-01295
Patent 8,994,830 B2

timely delivery of relevant information." *Id.* ¶ 122.

Accordingly, based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of dependent claims 7 and 21 and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

> h.  *Uncontested Dependent Claims 2, 4, 5, 8, 9–14, 16, 18, 19, 22–24*

Petitioner contends that each of dependent claims 2, 4, 5, 8, 9–14, 16, 18, 19, and 22–24 are obvious over the combined teachings of Shaffer and Saylor.  *See* Pet. 42–54.  Patent Owner does not separately contest Petitioner's evidence or arguments with respect to these dependent claims other than to argue that "[b]ecause independent claims 1 and 15 are patentable, each claim depending therefrom is patentable."  PO Resp. 35. We consider Petitioner's evidence and arguments with respect to these dependent claims.

> i.  *Dependent Claims 2, 16*

Dependent claim 2 recites: "*The method of claim 1, wherein providing access comprises associating the identified at least one video feed with the mobile communication device in a database that is used to manage access to independent video feeds in a network based on audio communication channels that are selected by communication devices in the network.*"  Ex. 1001, 12:40–45.  Dependent claim 16 recites similar claim language with respect to independent claim 15.  *See id.* at 14:10–15.

76

IPR2023-01295
Patent 8,994,830 B2

With respect to claim 2, Petitioner asserts that

Saylor's database associates video feeds with the user's selected multicast IP address (an audio communication channel). Ex[1004], ¶0039 (describing audio communications); Ex[1003], p. 240; *see* Ground 1, limitation 1[e]; Ex[1002], ¶112. It would have been obvious to also associate video feeds with the particular user selecting the channel based on the user's location. For example, Saylor discloses that the system can be configured to send notifications to users based on a defined area. Ex[1011], 5:49. Shaffer discloses that the IS can act as a centralized communication control post (CCP) to track GPS information of users. Ex[1004], ¶¶0016, 0041. It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the central security network can notify users on the audio communication channel of an event, *e.g.*, by sending a video clip, when any user associated with the channel is within the designated location. Ex[1002], ¶113. This would have been a simple and predictable modification to Shaffer-Saylor motivated by how both Shaffer and Saylor are designed and would have been reasonably expected to succeed.

Pet. 42–43 (citing Ex. 1002 ¶ 113). Petitioner relies upon this evidence and argument with respect to claim 16 as well. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 111–113, 145. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 2 and 16. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 2 and 16.

### ii.    Dependent Claims 4, 18

Dependent claim 4 recites: "*The method of claim 3, wherein the available video feeds are sourced from a group of surveillance cameras.*"

77

IPR2023-01295
Patent 8,994,830 B2

Ex. 1001, 12:55–56.  Dependent claim 18 recites similar claim language. *See id.* at 14:26–27.

With respect to claim 4, Petitioner relies on the evidence and arguments it made with respect to limitation 1[f].  *See* Pet. 44 (citing Ex. 1002 ¶ 116; Pet. Sec. VIII.A.2.g.  Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 116, 147.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 4 and 18.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 4 and 18.

### iii.    Dependent Claims 5, 19

Dependent claim 5 recites: "*The method of claim 1, wherein: the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio.*"  Ex. 1001, 12:57–60.  Dependent claim 19 recites similar claim language.  *See id.* at 14:28–31.

With respect to claim 5, Petitioner asserts that

> Shaffer renders obvious "wherein the communication channel is a Push-To-Talk (PTT) channel in a PTT communication network and the mobile communication device is a PTT radio," under any party's proposed construction.  Shaffer expressly discloses a PTT communication channel in a PTT communication network, where the device is a PTT radio. Ex[1004], ¶0037.  Shaffer also describes that the user of a mobile endpoint can access a communication channel "manually with, for example, a single key stroke. . . ." Ex[1004], ¶0040.  A POSITA would have understood that this single keystroke can be a PTT key, and the channel can transmit

78

IPR2023-01295
Patent 8,994,830 B2

> half-duplex communications. Ex[1002], ¶¶117–18. Before the '830 patent, numerous systems had disclosed a PTT key to access IP messages on "half-duplex" PTT channels. Ex[1011], ¶¶0026–0027; Ex[1013], ¶¶0022–0024, 0041, 0048; *see also* Ex[1003], pp. 135, 189, 243, 290 (examiner noting that a POSITA would have "recognize[d] PTT as a widely used type of communication device").

Pet. 44–45. Petitioner relies on this same evidence and argument for claim 19. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 117–118, 148. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 5 and 19. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 5 and 19.

### iv.    *Dependent Claims 8, 22*

Dependent claim 8 recites: "*The method of claim 1, wherein the communication channel is associated with a Virtual Talk Group (VTG).*" Ex. 1001, 13:12–13. Dependent claim 22 recites similar claim language. *See id.* at 14:52–53.

> With respect to claim 8, Petitioner asserts that

> Shaffer discloses "*wherein the communication channel is associated with a Virtual Talk Group (VTG),*" under any party's proposed construction. As described for limitation 1[a], the selected communication channel (*e.g.*, multicast address) in Shaffer is for a virtual talk group, which communicates using the IP multicast address.

Pet. 46–47 (citing Ex. 1004 ¶¶ 27, 34, 37–39; Pet. Sec. VIII.A.2.b; Ex. 1002 ¶ 123).

IPR2023-01295
Patent 8,994,830 B2

Petitioner relies on this same evidence and argument for claim 22. *See* Pet. 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 123, 151. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 8 and 22. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 8 and 22.

> *v.    Dependent Claims 9, 10, 23*

Dependent claim 9 recites: "*The method of claim 1, wherein providing access to the video feeds depends on a video association policy.*" Ex. 1001, 13:14–15. Dependent claim 10 recites: "*The method of claim 9, wherein the video association policy includes a role of the user defined in a policy database.*" *Id.* at 13:16–17. Dependent claim 23 recites similar claim language. *See id.* at 14:54–57.

With respect to claims 9 and 10, Petitioner asserts that

> Shaffer-Saylor discloses "*wherein providing access to the video feeds depends on a video association policy.*" The '830 patent does not use the term "video association policy" but does describe a "video feed association module" that "associate[s] one or more video feeds with one or more communication channels." Ex[1001], 4:29–33. The specification also describes policies that "governs the association of video streams with communication channels and VTGs," as well as policies that identify "available feeds" based on a "particular role" associated with the user. *Id.*, 9:45–48, 10:61–65; *see also id.*, 6:3–17, 8:16–33.
>
> In Shaffer-Saylor, the preferences and rules stored in the central security system databases associate video feeds with communication channels (as described for limitation 1[e]) using

80

IPR2023-01295
Patent 8,994,830 B2

the same types of policies. Ex[1002], ¶¶124–25. For example, in the combined system, the databases store rules and preferences that associate video streams with communication channels (*e.g.*, multicast IP addresses) for users with particular roles (*e.g.*, security or police). *See* §§VIII.A.1, VIII.A.2.f.

For the same reasons described for claim 9, Shaffer-Saylor discloses "wherein the video association policy includes a role of the user defined in a policy database." Ex[1002], ¶126.

Pet. 47

Petitioner relies on this same evidence and argument for claim 23. *See id.* at 54. Dr. Polish's testimony supports Petitioner's position. *See* Ex. 1002 ¶¶ 124–126, 213. Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 9, 10, and 23. *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 9, 10 and 23.

*vi. Dependent Claims 11, 24*

Dependent claim 11 recites:

*The method of claim 1, further comprising: identifying a geographical location of the user's mobile communication device using a Global Positioning System; identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*

Ex. 1001, 13:18–28. Dependent claim 24 recites similar claim language. *See id.* at 14:58–15:2.

81

IPR2023-01295
Patent 8,994,830 B2

With respect to claim 11, Petitioner asserts that

> Shaffer-Saylor discloses "*identifying a geographical location of the user's mobile communication device using a Global Positioning System.*"  For example, Shaffer expressly describes using GPS for identifying a geographical location of a user's mobile communication device.  *E.g.*, Ex[1004], ¶¶0040–0041, 0044, 0046–0047; Ex[1002], ¶127.

> Shaffer-Saylor [also] discloses "*identifying that the at least one video feed is associated with the geographical location; associating the at least one video feed with other mobile communication devices set to the same channel as the user's mobile communication device; and automatically rendering access to the at least one video feed to the other mobile communication devices.*"  Ex[1002], ¶¶128–29.

> Shaffer-Saylor [further] discloses that each geographic location in Shaffer (*e.g.*, a building or a campus) can also be the source of a plurality of video feeds.  *Id.*  For example, Saylor discloses "video cameras" located in a geographic area (*e.g.*, a building of a "business").  Ex[1011], 10:32–34, FIG. 10. Further, the video feeds in that geographical location are associated with a communication channel, such as a multicast IP address associated with security forces as described in limitation 1[e]. §VIII.A.2.f.  Any device accessing that multicast IP address (including other mobile devices) will automatically have access to the video feeds associated with that channel.  *Id.*; Ex[1002], ¶129.

Pet. 48–49.

Petitioner relies on this same evidence and argument for claim 24. *See id.* at 54.  Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 127–129, 152.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 11 and 24.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has

82

IPR2023-01295
Patent 8,994,830 B2

established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 11 and 24.

> ### vii.    Dependent Claims 12, 13, 14

Dependent claim 12 recites:

> *The method of claim 1, wherein the selected communication channel is a selected audio communication channel that is selected from a plurality of audio communication channels, the at least one video feed being associated with the selected audio communication channel, and the user policy identifying the one or more video feeds that are relevant to the user when the user accesses the selected audio communication channel.*

Ex. 1001, 13:29–36.  With respect to claim 12, Petitioner asserts that

> As discussed for limitation 1[a] and claim 2, Shaffer discloses that the selected communication channel can be an "audio communication channel," which the user selected from a plurality as the user moves from one location to another. §§VIII.A.2.b, VIII.A.3; Ex[1004], ¶0040; Ex[1002], ¶131.  As also discussed for limitations 1[e] and 1[g], Shaffer-Saylor discloses a user policy stored in a database that identifies the relevant video feeds to a user of a particular group, associates the relevant video feeds with the audio communication channel for that group, and provides those feeds to the user when the user accesses that channel.

Pet. 49 (citing Pet. Secs. VIII.A.1, VIII.A.2.f, VIII.A.2.h; Ex. 1002 ¶ 131).

Dependent claim 13 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel based on the geographic zone from which the at least one video feed is sourced and a device group that includes the user's communication device.*"  Ex. 1001, 13:37–41.  With respect to claim 13, Petitioner asserts that

> [a]s described for claims 1 and 12, Shaffer-Saylor discloses a user policy that associates at least one video feed with the selected communication channel.  §§VIII.A.1,

83

IPR2023-01295
Patent 8,994,830 B2

> VIII.A.2.f.  Moreover, as described for claims 2 and 9, Shaffer-Saylor discloses or renders obvious that the user policy can be based on the geographic zone from which the at least one video feed is sourced and the device group that includes the user's device.

Pet. 50 (citing Ex. 1011, 10:62–67; Pet. Secs. VIII.A.1, VIII.A.2.f; Ex. 1002 ¶¶ 133–134).

Dependent claim 14 recites: "*The method of claim 1, wherein the user policy associates the at least one video feed with the selected communication channel by comparing a first geographic zone from which the at least one video feed is sourced with a second geographic zone corresponding to a location of the user's communication device.*"  Ex. 1001, 13:42–47.  With respect to claim 14, Petitioner asserts that "[a]s described for claim 2, it would have been obvious for Saylor's database to track the location of users and compare user location with the location of a device providing a video feed before associating the video feed with the communication channel including that user."  Pet. 50 (citing Pet. Sec. VIII.A.3; Ex. 1002 ¶ 135).

Dr. Polish's testimony supports Petitioner's position.  *See* Ex. 1002 ¶¶ 130–135.  Patent Owner does not specifically contest Petitioner's evidence and arguments with respect to dependent claims 12–14.  *See* PO Resp. 16–17.

Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we find that Petitioner has established that the combined teachings of Shaffer and Saylor meet the subject matter recited in dependent claims 12, 13, and 14.

> *viii.    Conclusion as to Dependent Claims 2–5, 7–14, 16–19, and 21–24*

We have considered all of the evidence and the arguments provided by the parties with respect to dependent claims 2–5, 7–14, 16–19, and 21–

IPR2023-01295
Patent 8,994,830 B2

24, as well as the testimony of Dr. Polish and Dr. Akl. Based on the complete record, including the reasons discussed above with respect to independent claims 1 and 15, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Shaffer and Saylor meet all the limitations of these dependent claims and that a person of ordinary skill in the art at the time of the claimed invention would have had reason to combine their teachings in the manner described, and would have had a reasonable expectation of success in so doing.

## F. Obviousness Over Gogic and Opitz (Ground 2)

Petitioner contends that claims 1–5, 8–19, and 22–24 are unpatentable under 35 U.S.C. § 103(a) as obvious over Gogic and Opitz. Pet. 55–81.

We have, however, determined that these claims are unpatentable over the combined teachings of Shaffer and Saylor (Ground 1). *See* Section III.E. Accordingly, we need not address Petitioner's alternative Ground 2 based on Gogic and Opitz. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (non-precedential) (recognizing that "the Board need not address issues that are not necessary to the resolution of the proceeding" and that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

85

IPR2023-01295
Patent 8,994,830 B2

## IV. CONCLUSION[10]

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable on the bases set forth in the following table.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 7–19, 21–24 | 103(a) | Shaffer, Saylor | 1–5, 7–19, 21–24 | |
| 1–5, 8–19, 22–24 | 103(a) | Gogic, Opitz | | |
| **Overall Outcome** | | | 1–5, 7–19, 21–24 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

86

IPR2023-01295
Patent 8,994,830 B2

## V. ORDER

Upon consideration of the record before us, it is

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–5, 7–19, and 21–24 of U.S. Patent 8,994,830 B2 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

87

IPR2023-01295
Patent 8,994,830 B2

*PETITIONER:*

Eliot Williams
Michael Knierim
Clarke Stavinoha
Joseph Cahill
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
michael.knierim@bakerbotts.com
clarke.stavinoha@bakerbotts.com
joe.cahill@bakerbotts.com

PATENT OWNER:

Jason Engel
Katherine Allor
Nolan Hubbard
Samuel Richey
Kyle Kantarek
K&L GATES LLP
jason.engel.ptab@klgates.com
katy.allor@klgates.com
nolan.hubbard@klgates.com
samuel.richey@klgates.com
kyle.kantarek@kirkland.com

88

<u>Petition for *Inter Partes* Review of U.S. Patent No. 8,994,830</u>

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

MOTOROLA SOLUTIONS, INC.,

Petitioner,

v.

STA GROUP LLC,

Patent Owner.

———————

IPR2023-01295
U.S. Patent No.: 8,994,830 B2

———————

**DECLARATION OF NATHANIEL POLISH, PH.D. IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW OF CLAIMS 1-5, 7-19, and 21-24 OF U.S. PATENT NO. 8,994,830 B2**

## A. Interoperability Systems

53. The '830 patent describes a communication system that facilitates "communication of media streams on a plurality of communication channels" that may use "different communication paradigms." Ex[1001], 3:46-57. Such Communication systems allowing different audio and video networks to interoperate (and users in different networks to communicate) were well known by August 8, 2008. As acknowledged in the overview of the '830 patent, for example, such communication systems included "a collection of communications networks, transmission systems, relay stations, tributary stations, and data terminal equipment usually capable of interconnection and interoperation to form an integrated whole." Ex[1001], 1:13-17. Communications using these prior art interoperability systems included "audio signals on different communication channels" and "[v]ideo feeds." *Id.*, 1:13-20.

54. Several prior art references taught interoperable communication systems between "any suitable IP or non-IP [*e.g.*, radio] communication network of any wireless or wireline form." Ex[1013], ¶0024. For example, Shaffer '339 describes interoperability between "wireless or wire-line network[s] that may send analog and/or internet protocol (IP) information." Ex[1014], ¶¶0008, 0012. As another example, FIG. 1 from Kalley, below, depicts a communication system with communication networks 24a-24e "distributed locally or across multiple cities or other geographic regions" interoperably connected by Interoperability System (IS)

31

20 utilizing an IP network. Ex[1013], ¶¶0024, 0041-0042. The illustrated communication networks and devices may include "a land mobile radios (LMR) network," a local area network ("LAN"), or an IP-based device such as a "personal computer (PC) or "IP phone." *Id.*, ¶¶0025, 0039-0040.



Ex[1013], FIG. 1.

55. By the time of the '830 patent, several companies, including Cisco and Motorola, had also developed and commercialized such interoperable systems that could bridge IP-based communications and land mobile radio (LMR) communications on radio networks to facilitate connections across various networks and geographical areas. For example, Kalley lists "[o]rganizations working towards

32

interoperability solutions" including "JPS COMMUNICATIONS of RAYTHEON CORPORATION, IP BLUE SOFTWARE SOLUTIONS, TWISTED PAIR SOLUTIONS, INC., M/A-COM, INC., MOTOROLA, INC., and CISCO SYSTEMS, INC." Ex[1013], ¶0003.

56.     These known interoperability systems also allowed devices with video feeds in one network to communicate with the PCs, radios, or IP phones in another network.  For example, the system in Kalley, depicted above, connected devices in disparate networks, including devices with a "camera," Ex[1013], ¶¶0021, 0039.  As another example, Shaffer '339 describes various "cameras" communicating with and connected to an interoperability system also communicating with various other communication devices, such as cellular phones and computers.  Ex[1014], ¶¶0008-0009, 0014, FIG. 1.  The benefits of such interoperability systems would have been readily apparent to a POSITA—one network could facilitate voice, data, and video communication among various communication devices. *E.g.*, Ex[1015], p. 10 ("The cost of VoIP systems can be significantly less than circuit switched systems."). The cost savings and simplicity made this form of communication an obvious decision.

## B.     Interoperability Systems Using Policies to Ensure That Users Receive Only Relevant Communications

57.     With interoperability systems involving various types of devices, the volume of communications a user could receive increases significantly. To avoid requiring a user to manually filter through all available communications, numerous

33

companies had developed technology that automatically mapped relevant communications to relevant users.

58. For example, in one prior art approach, systems organized users into logical groupings so that only relevant communications reached a user without inundating the user with all available communication streams. *See e.g.*, Ex[1016], Title, 2:50-4:9; Ex[1014], ¶0007; Ex[1013], ¶¶0005-0007. Such groups were known to be organized by various logical factors, such as the location of the user endpoints. Ex[1013], ¶0059; Ex[1014], ¶0018. For example, in the case of first responders in a particular location coordinating operations in response to an incident, an interoperability system could form a group to facilitate relevant communications amongst personnel who could not otherwise communicate with each other (because, for example, the fire department responders used a different radio network than the police department responders). Ex[1017], pp. 106, 108. Formation of such ad-hoc groups was done automatically through various user policies and/or user input, depending on the system's design. *See id.*, pp. 140-42; Ex[1018], pp. 2-3; Ex[1019], pp. 95, 97.

Policies related to geographic selection were well known. For example, in U.S. Patent App. No. 2007/0036100 ("Shaffer '100"), a user selects an area on a map to implement a "filter functionality" that identifies only the communications in the selected area. Ex[1005], ¶0082; *see also id.*, ¶¶0076-80, 0097-0100, Figs. 5, 8. "The endpoint may receive communications from additional endpoints but may filter

34

out for presentation to its users only those communications from endpoints within the selected area." *Id.*, ¶0023. For example, FIG. 8 (below) illustrates a user selection of a particular geographic area (step 602) to define the policy, and for each media message (such as video) a user receives from endpoints on the map, the user uses the policy to filter the messages by comparing location information for the message to the selected geographic area (step 606); only if the location information is within the selected area is the message presented to the user. *Id.*, ¶¶0097-0100.



FIG. 8

Ex[1005], Fig. 8.

35

59.    In addition to selecting a geographic area on a map, it was also well known to set policies based on geographic proximity to a communication source so a user could receive new communications as they moved into new areas. For example, U.S. Patent App. No. 2007/0076094 ("Dickerson") describes a policy where a user has the capability to restrict or limit the selection of video feeds based on the geographic location relative to their own. Ex[1020], ¶0054. "The receiver of the video feed controls the selection of the viewable distance... [to] limit[] the scope of the video sources" to display (Ex[1020], ¶0054), and "a determination can be made to show video sources that are within one-quarter mile or one-half mile, or whatever value is deemed suitable by the viewer" (*id.*, ¶0056).

60.    As another example, user policies were also known in the art to provide communications to geographically distinct agencies upon the occurrence of an event. For example, U.S. Patent App. No 2007/0060144 ("Mills") teaches that upon the occurrence of an "incident" an "incident controller 45 assigns an IP address that will be used for voice communications for the incident," where users from differing agencies can connect and communicate via an "Interoperability IP Network." Ex[1021], ¶¶0007, 0019, 0037, 0039, 0041. These communications among users in different agencies could be organized into a "peer-to-peer talk group." *Id.,* ¶0037. FIG. 1 of Mills, below, shows distinct agencies being connected through an Interoperability IP Network upon the occurrence of an incident. *Id.,* ¶¶0007, 0019.

36



FIG. 1

### C.    Radio Systems that Mapped Radio Frequencies to Geographic Zones and Displayed and Allowed User Selection of Radio Frequencies

61.    As I described above, the disparate networks that interoperability systems connected often included land mobile radio (LMR) networks, which have been used by first responders and other personnel for decades to communicate with other radios on specific frequencies.

62.    In such networks, for example, radio frequencies used for communications are commonly associated with specific geographic areas. *See* Ex[1022], pp. 57, 210-11; Ex[1023], p. 210. For example, a POSITA would have understood that two geographically adjacent radio base stations would typically operate on different frequencies to prevent signal interference. Accordingly, when a

37

    Motorola Solutions, Inc., Ex1002, p. 48

## X. THE ASSERTED GROUNDS OF INVALIDITY

### A.    Ground 1: Claims 1-5, 7-19, 21-24 would have been obvious over Shaffer in view of Saylor

#### 1.    A POSITA would have and could have combined Shaffer with Saylor

82.    Shaffer discloses an "Interoperability System" (IS 120 in FIG. 3, red below) that allows different networks using different communication protocols (*e.g.*, LAN 111 and radio network 113) to communicate "audio, video, or other data" to each other via an Internet Protocol (IP) network. Ex[1004], ¶¶0021-0022, 0038. The IS can, for example, connect devices in different networks and different regions, including different "buildings, campuses, cities, counties, states, countries or any other particular geographical area." Ex[1004], ¶0046. The IS uses IP to provide interoperability. Ex[1004], ¶¶0039-0040. For example, a "multicast IP address[]" can be assigned to a group of endpoints (such as "local safety and security forces") so that, even if devices are in different networks, they can "communicate with each other through IS 120." *Id.*; *see also id.*, ¶¶0022 (IP networks transmit voice and video data by "placing the data in packets"), 0025.

Appx00954    Motorola Solutions, Inc., Ex1002, p. 64



FIG. 3

Ex[1004], FIG. 3 (annotated).

83.    Saylor discloses a specific type of communications network—namely, a central security network (FIG. 1 below) for a building or facility—that communicates with other networks. Ex[1011], 5:62-65, FIG. 1.  In particular, Saylor's network is configured using rules and preferences to "automatically inform" recipients, including security or emergency contacts (blue below), of alarms or emergencies in a monitored building. *Id.*, 1:17-22, 9:22-28. Saylor specifically discloses that the central security network can convey video or other types of data, including video clips of or instructions relating to a monitored location, to entities in other networks over an IP communications network such as the Internet. *Id.*, 2:45-55, 5:27-36, 6:22-32, 17:1-9.

54



FIG. 1

Ex[1011], FIG. 1 (annotated).

84.　In view of these disclosures, it is my opinion a POSITA would have been motivated to combine Shaffer and Saylor and, specifically, to connect Saylor's central security network as an input to Shaffer's IS, as illustrated in the annotated figure below. In the combined system depicted below ("Shaffer-Saylor"), the IS in Shaffer (shown with a red box in the above figure after paragraph 85) provides the connection from Saylor's central security network to the relevant personnel and authorities in a different network who may respond to an incident (*e.g.*, a building's security personnel or local police in the city where the building is located).

85.　Specifically, it would have been obvious to a POSITA that, in the combined system, the IS of Shaffer would assign a multicast IP address (communication channel) to a particular endpoint or a group of endpoints requiring

Appx00956　Motorola Solutions, Inc., Ex1002, p. 66

notification of a particular type of event. *E.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses). That IP address would have then been stored in Saylor's databases for retrieval and use to contact entities outside of the security system upon occurrence of an event. For example, in the combined system, when an alarm is triggered in Saylor's central security network, the security network could query its databases to retrieve the relevant IP address of the relevant entities to notify (as provided by Shaffer's IS) and use the address to send the alerts and notifications disclosed in Saylor (blue) to the relevant recipients (purple). Ex[1011], 9:22-28, 11:67-12:6, 13:51-54.



Ex[1011], FIG. 1 (annotated); Ex[1004], FIG. 3 (annotated).

Appx00957   Motorola Solutions, Inc., Ex1002, p. 67

86.    The teachings of both Shaffer and Saylor would have motivated a POSITA to make this combination.  Shaffer describes that IS 120 is designed to connect various types of networks, including a PTT radio network (typically used by security or emergency personnel) and a local area network (LAN) or public switched telephone network (PSTN) (typically used by sensors in homes and businesses). Ex[1004], ¶0037.  Shaffer further describes that the networks may be associated with businesses, campuses, or other geographic areas or locations. Ex[1004], ¶0027. A POSITA would therefore have recognized that Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network.  Indeed, interconnecting communication networks was and is a common practice, as I described above. Section VIII.A (Knowledge of a POSITA).  Gateways, routers, and bridges are commonly used for this purpose.  I have employed such hardware in this way for decades for all manner of projects.

87.    A POSITA would also have recognized that Saylor discloses the type of network that would be operable with Shaffer's IS. Specifically, Saylor describes a packet-based central security network (using "TCP/IP") that receives alarms from sensors in buildings and other facilities.  Ex[1011], 17:10-21, FIG. 11, 6:33-43.  The Saylor central security network processes the alarms and, according to rules and preferences, transmits notifications and information to relevant recipients in *other*

57

networks, including security or emergency personnel in other types of networks with other communication protocols. *Id.*, 6:33-43, 8:18-33, 9:25-28. The notifications and information can include audio, video, or other data. *Id.*, 16:41-51, 8:52-60.

88.    To implement these communications, Saylor describes that the central security network can identify relevant recipients in an "address book," (*id.*, 7:48-52), but does not explain *how* to convey notifications to recipients in different networks. A POSITA would have recognized that Shaffer's IS system provides the needed mechanism for interoperable communications to achieve Saylor's security goals. A POSITA would have understood that Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network.

89.    A POSITA would have had a reasonable expectation of success in combining the references in the manner described. In the combination, Saylor's central security network sends communications to another network via Shaffer's IS in the manner already envisioned by both references—namely, by a first network sending a packet-based communication through an intermediary network, such as the "Internet," to a second network also connected to the same intermediary network. Ex[1011], 6:22-25, FIG. 1; Ex[1004], ¶0020 (describing the IP network could be a wide area network, cellular network, or global distributed network such as the Internet, among other things).

Appx00959    Motorola Solutions, Inc., Ex1002, p. 69

90. A POSITA would have recognized that Shaffer's IS could readily assign and provide a multicast address for a particular group required to communicate (*e.g.*, security personnel for a company receiving notifications from one of the company's buildings), and that Saylor could store and use the address to direct the video clips and alarm information to that group, according to the user preferences already set up in Saylor. *E.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses).

### 2. Claim 1

#### a. *1[pre]:*

91. If the preamble is limiting, Shaffer-Saylor discloses "*[a] method, comprising.*" *E.g.*, Ex[1004], Abstract, ¶0001.

#### b. *1[a]*

92. Shaffer discloses "*monitoring a selection of a communication channel by a user of a mobile communication device.*" For example, in Shaffer, mobile security personnel can select and set their device to an IP address associated with the security forces in the area in which the security personnel is located, so that the device can receive communications via that IP address.

93. First, Shaffer discloses a communication channel as described in the '830 patent (Ex[1001], 2:59-62, 4:22-28)—namely, a "particular IP address" for hosting a "virtual talk group." Ex[1004], ¶0039. FIG. 3 of Shaffer (below), for example, illustrates various types of endpoints (including radios in radio network

59

(110), an IP phone (122c), and a PDA (122b)) that can form "communication sessions" comprising "audio and/or video telecommunication signals." Ex[1004], ¶¶0020, 0037-0042, FIG. 3; *see also id.*, ¶0016 (describing FIG. 1), ¶0037 (noting that system 100 in FIG. 3 includes similar components and networks as FIG. 1). In particular, Interoperability System (IS) 120 uses "multicast IP addresses" so that the devices can "communicate with each other through IS 120 to provide network interoperability." *Id.*, ¶0039; *see also id.*, ¶0038. For example, communication channels (multicast IP addresses) may exist for "local safety and security agencies." *Id.*, ¶0040.



*FIG. 3*

Ex[1004], FIG. 3.

Appx00961    Motorola Solutions, Inc., Ex1002, p. 71

94.    Second, Shaffer discloses a selection of the communication channel by a user of a mobile communication device to set the device to the selected communication channel. For example, Shaffer discloses that a police officer "such as a state highway patrol officer, may be provided with a PC with a touch screen" where the "PC comprises a mobile endpoint." Ex[1004], ¶¶0034, 0040. The officer can use the touchscreen to select "local safety and security forces" by selecting "[i]cons on the touch screen" to "join communication sessions." Ex[1004], ¶0034. The IS monitors the officer's selection, and "[u]pon receiving instructions from the officer," adjusts "communications parameters used by the endpoint." *Id.*; *see also id.*, ¶0041 (describing that IS stores multicast addresses "utilized by various agencies"). The communication parameters identified by IS 120 include a "multicast address[]" identifying the communication channel for the VTG for "local safety and security forces." *Id.*, ¶¶0040-0041. "This allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke…" *Id.*, ¶0040.

95.    Finally, the selection of the communication channel is monitored by the processor of the mobile endpoint so that the endpoint can "receive[] and transmit[] voice and other data" with other devices. *Id.*, ¶0044; *see also id.*, ¶¶0045-0047.

      c.    *1[b]*

96.    Shaffer also discloses "*providing a plurality of radio frequencies on a display of a mobile communication device, each radio frequency being associated*

61

Motorola Solutions, Inc., Ex1002, p. 72

*with a geographical* zone." For example, in Shaffer, mobile security personnel can select a frequency associated with a nearby building.

97.    In particular, Shaffer describes that a user's device can store a plurality of radio frequencies associated with geographical zones. Ex[1004], FIG. 4. For example, FIG. 4 (below) shows an exemplary mobile communication device with memory module 208 that stores several different communication parameter listings 210. Ex[1004], ¶¶0043, 0046-0047. These parameter listings include *radio frequencies*, identified in Hertz (listed as X, Y, Z, P, Q). *Id.*, ¶¶0043-0048, FIG. 4.



FIG. 4

Appx00963   Motorola Solutions, Inc., Ex1002, p. 73

Ex[1004], FIG. 4.

98.    As Shaffer describes, the mobile device stores "radio frequencies" of "communication networks by location." *Id.*, ¶0046. As shown in FIG. 4 (above), each radio frequency is also specifically associated with a "location" such as City A, City B, State C, or Country D. *Id.*, FIG. 4. Notably, Shaffer explains the locations can also be "buildings" and "campuses," in addition to municipalities. *Id.*, ¶0027. In FIG. 2 (below), for example, different geographic regions (52, 53, 54, 55) "may correspond to buildings, campuses, municipalities…or any other particular geographical area." *Id.* Each geographic region may also contain one or more communication networks (60-64), each of which may have different "assigned radio frequenc[ies]." *Id.*, ¶0027; *see also id.*, ¶¶0020-0022, 0026, 0034-0035.



FIG. 2

Ex[1004], FIG. 2.

Appx00964    Motorola Solutions, Inc., Ex1002, p. 74

99.    Shaffer further discloses that the radio frequencies are provided by the memory of the mobile communication device to a *display* on the user interface of the mobile communication device. For example, Shaffer describes that mobile endpoint 200 has an interface 204 that may be a "*display*, touch screen… or any other suitable interface." Ex[1004], ¶0044 (emphasis added). The display presents multiple frequencies to the user so that "through interface 204 a user may input instructions regarding adjustment of the end point's communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*, ¶0044; *see also id.*, ¶¶0035-0036 (describing a "pressing of a key stroke" to change endpoint communication setting), ¶¶0003, 0008 (describing, as background, known functionality for using a handbook to look up local frequencies by location). In the example in FIG. 4 above, if a user enters city A, there are two possible frequencies, X and Y. Shaffer explains that those frequencies are presented to the user (*e.g.*, using a touch screen display) for selection by the "pressing" of a touch screen "key stroke." *Id.*, ¶¶0035-0036, 0044.

100.    Displaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA. When there are multiple frequencies available for communication in a particular area, as in Shaffer, and when a user's device can include a touch screen, as in Shaffer, presenting for selection on the touch screen all available frequencies in an area a user enters would have been one of a finite number of predictable options

for selecting a frequency. Such an implementation uses a known technique (touchscreen display and selection) with known benefits (selection using a single "stroke") according to its established function and is nothing more than a simple design choice that would have been obvious to a POSITA by August 2008.

d.    1[c]

101. Shaffer-Saylor discloses "*from which a plurality of video feeds associated with the geographic zone are sourced.*" Shaffer-Saylor discloses that each geographic region in Shaffer (*e.g.*, a building or a campus) can also be the source of and associated with a plurality of video feeds. For example, Saylor discloses "video cameras" located in a geographic zone (*e.g.*, a building of a "business"). Ex[1011], 10:32-34, FIG. 10. In particular "an identified location may be monitored by a video or other recording device," and, if motion is detected, "video clips" maybe sent to a "central security network." *Id.*, 16:52-17:9; *see also id.*, 11:64-12:6.

e.    1[d]

102. Shaffer discloses "*monitoring a selection of a radio frequency of a plurality of radio frequencies by a user.*" As discussed with respect to limitation 1[b], Shaffer discloses and renders obvious that the frequencies are provided on the display of a mobile communication device for *selection* by the user. For example, Shaffer explains that the display presents frequencies to the user so that "through interface 204 a user may input instructions regarding adjustment of the end point's

65

communication settings (*e.g.*, radio frequency, modulation method and encryption key) upon entering a new communication network." *Id.*, ¶0044; *see also id.*, ¶¶0035-0036 (describing a "pressing of a key stroke" to change endpoint communication setting). The user's selection of frequency is monitored by the processor of the mobile endpoint so that the endpoint can "receive[] and transmit[] voice and other data" with other devices. *Id.*, ¶0044; *see also id.*, ¶¶0045-0047. Displaying the multiple available frequencies on Shaffer's touch screen for selection by a "key stroke" on a touch screen would at least have been obvious to a POSITA, for the reasons described for limitation 1[b].

f.    *1[e]*

103.    Shaffer-Saylor discloses "[1] *identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, wherein* [2] *the at least one video feed is associated with the selected communication channel* [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.*" For example, the Shaffer-Saylor system identifies a video feed associated with the geographic zone, which is associated with the radio frequency selected by the user. In Shaffer-Saylor, that feed is also associated with the selected multicast IP address (communication channel) based on a user

66

preferences database entry (user policy) that identifies video feeds relevant to security personnel (user) when they access the communication channel.[3]

104. First, Saylor's central security network [1] *identifies and selects a video feed associated with the geographic zone*. For example:

- FIG. 10 (on next page) depicts step 1010 where Saylor's central security network monitors a specific video feed in an "identified location" of a building (the geographic zone). Ex[1011], 16:52-60, 34:6-10, FIG. 10.

- Steps 1012, 1014, 1016, and 1020, select and identify that feed when a "trigger[]" event occurs, such as "motion." *Id*.

- In steps 1022 and 1024, a "video clip[]" from that feed is processed to determine whether certain "conditions are met for alarm triggers" or "[n]otifications." *Id.*, 17:1-5.

- Then in, steps 1026 and 1028, an "image may be automatically transmitted" to recipients. *Id.*, 17:8-9; *see also, e.g.*, *id.*, 34:1-9 (describing that a subscriber can be sent a "video clip" from a camera

---

[3] A POSITA would have understood that the Shaffer-Saylor system would have performed the "monitoring a selection of a communication channel…," "providing a plurality of radio frequencies…," and "monitoring a selection of a radio frequency" steps before the "identifying …" step in various scenarios. For example, security personnel may be located in a scene of an emergency and select a radio frequency and a communication channel associated with that scene before the video feed is identified.

near the front door if the "front door opens" or "when an unrecognized

person enters").



FIG. 10

Ex[1011], FIG. 10.

105.    Second, Shaffer-Saylor also accesses a user preferences database that

[2] *associates the video feed with the selected communication channel.* Saylor's

68

databases already store "relevant information for personalized alarm services." Ex[1011], 6:9-10. For example, "[u]ser database 140 may contain "user preferences" that may indicate how "different alarm situations that may be detected in various locations or systems may warrant different levels of response" and "[s]pecial instructions" that may "include information to be conveyed to entities reacting to the alarm for a particular location or object." *Id.*, 8:34-60. Accordingly, when an event occurs (such as motion), the central security network can send relevant information (such as video clips) "via the Internet 150" to "[a]n emergency entity 164." *Id.*, 6:22-32, 7:40-48, 9:23-29, 11:46-55; *see also id.*, 11:24-28 (identifying mobile devices receiving notifications), 12:34-35 ("the user may specify when emergency dispatch is to occur."). For example, "the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency." Ex[1011], 12:17-21.

106. As described in Section IX.A (Shaffer overview), to facilitate these communications, Shaffer's IS system can assign a multicast IP address to the relevant security forces and provide the IP address to Saylor's databases for storage. *E.g.*, Ex[1004], ¶¶0039-0040 (describing assigning and storing multicast IP addresses at an endpoint). Accordingly, when an event occurs that requires sending a video clip to security forces, Saylor's central security network can look up the appropriate multicast address and use the address to send the information to the

security personnel that have selected this communication channel, as shown below.

*Id.*



Ex[1011], FIG. 1 (annotated); Ex[1004], FIG. 3 (annotated).

107.    Finally, Shaffer-Saylor discloses that the association between video feed and communication channel is [3] *based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel.* The user policy is the set of preferences stored in Saylor's databases identifying when to notify users (such as security personnel) and what to send them. *See* Ex[1011], 8:34-60, Abstract (describing that user can identify "individuals and entities to be contacted; type of situations to be alerted of and other

70

relevant security and other information"), 11:48-63 (describing processing alarms at the central security network according to "user-defined conditions" to determine which entity to notify and how to send the notification), 12:26-29. The preferences specifically identify which alarms are relevant to the users (and are designed, for example, to filter out "false alarms"). *Id.*, 12:34-41 ("[T]he user may specify when emergency dispatch is to occur," such as "at the detection of an alarm situation" or "after a predetermined period of time," thus "minimizing the penalties and fines associated with false alarms."). Moreover, a POSITA would have understood in the Shaffer-Saylor combination that users, such as security personnel, receive notifications from Saylor's central security network from the assigned multicast IP address (communication channel). Accordingly, when a user, such as security personnel, selects a communication channel associated with the multicast IP address, as described in limitation 1[a], the officer can access the transmitted communications, as described in Shaffer. Ex[1004], ¶¶0040-0042.

### g.    *1[f]*

108.    Shaffer-Saylor discloses that "*the one or more video feeds being independent of the selected communication channel*."[4] For example, the '830 patent

---

[4] It is my understanding that Petitioner has taken the position that this term is indefinite in the district court litigation.  I have not taken a position on that issue. Rather, I compare Shaffer-Saylor to the '830 patent specification without conceding that this term is definite and satisfies 35 U.S.C. §112.

AO 120 (Rev. 08/10)

| TO: Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
| --- | --- |

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court **Eastern District of Texas** on the following

☐ Trademarks or ☑ Patents. ( ☐ the patent action involves 35 U.S.C. § 292.):

| DOCKET NO.<br>4:22-cv-840 | DATE FILED<br>9/30/2022 | U.S. DISTRICT COURT<br>Eastern District of Texas |
| --- | --- | --- |
| PLAINTIFF<br><br>STA GROUP LLC | | DEFENDANT<br><br>MOTOROLA SOLUTIONS, INC. |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| --- | --- | --- | --- |
| 1 | 7,324,802 | 1/29/2008 | STA GROUP LLC |
| 2 | 8,489,134 | 7/16/2013 | STA GROUP LLC |
| 3 | 8,994,830 | 3/31/2015 | STA GROUP LLC |
| 4 | 8,831,664 | 9/9/2014 | STA GROUP LLC |
| 5 | | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY |
| --- | --- |
| | ☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| --- | --- | --- | --- |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
| --- |
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
| --- | --- | --- |
| | | |

Copy 1—Upon initiation of action, mail this copy to Director   Copy 3—Upon termination of action, mail this copy to Director
Copy 2—Upon filing document adding patent(s), mail this copy to Director   Copy 4—Case file copy

Appx01027     Motorola Solutions, Inc., Ex1003, p. 1

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 8,994,830 B2 | Page 1 of 1 |
| APPLICATION NO. | : 12/188982 | |
| DATED | : March 31, 2015 | |
| INVENTOR(S) | : Shmuel Shaffer et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below.

In the claims,

Column 12, Line 27, after the word "user" change "." to --;--

Signed and Sealed this
Eighth Day of March, 2016

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

Appx01029    Motorola Solutions, Inc., Ex1003, p. 3

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/188,982 | 08/08/2008 | Shmuel Shaffer | 1370.252US1 | 6073 |

21186      7590      01/20/2012
SCHWEGMAN, LUNDBERG & WOESSNER, P.A.
P.O. BOX 2938
MINNEAPOLIS, MN 55402

| EXAMINER |
|---|
| HSU, AMY R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2622 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/20/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

uspto@slwip.com
request@slwip.com

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 12/188,982 | SHAFFER ET AL. |
| | Examiner | Art Unit |
| | AMY HSU | 2622 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *17 March 2011*.

2a)☐ This action is **FINAL**.       2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) *1-24* is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1-24* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on *08 August 2008* is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

    1.☐ Certified copies of the priority documents have been received.

    2.☐ Certified copies of the priority documents have been received in Application No. _____.

    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.
4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 03-11)                    Office Action Summary                    Part of Paper No./Mail Date 20120111

 Motorola Solutions, Inc., Ex1003, p. 286

Application/Control Number: 12/188,982                                                Page 2

Art Unit: 2622

## DETAILED ACTION

### *Claim Rejections - 35 USC § 102*

1.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by
> another filed in the United States before the invention by the applicant for patent or (2) a patent
> granted on an application for patent by another filed in the United States before the invention by the
> applicant for patent, except that an international application filed under the treaty defined in section
> 351(a) shall have the effects for purposes of this subsection of an application filed in the United States
> only if the international application designated the United States and was published under Article 21(2)
> of such treaty in the English language.

2.      Claims 1-2, 13-14, 24 are rejected under 35 U.S.C. 102(e) as being anticipated

by Patel (US 2008/0036851).

Regarding Claim 1, Patel teaches a method comprising: monitoring selection of a

communication channel by a user of a mobile communication device (*paragraph 23*

*teaches receiving channel selection by wireless communication device)*; identifying at

least one video feed associated with the selected channel; and providing access to the

mobile communication device to the identified at least one video feed (*paragraphs 23-*

*24 describe providing the video data associated with the selected channel to wireless*

*communication device)*, wherein providing the access is based on a user policy

(*paragraph 15 teaches the access is via a service provider and is thus based on the*

*associated user policy of the service provider)*.

Regarding Claim 2, Patel teaches the method of claim 1, wherein providing

access comprises associating the identified video feed with the mobile communication

 Motorola Solutions, Inc., Ex1003, p. 287

Application/Control Number: 12/188,982                                              Page 3

Art Unit: 2622

device (*paragraphs 23-24 teaches associating the video feed with the mobile*

*communication device by delivering the video data to the mobile device.*

      Claims 13-14, 24 rejected similarly.

### *Claim Rejections - 35 USC § 103*

3.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

4.     Claims 3-4, 6, 8, 15-16, 18, 20 rejected under 35 U.S.C. 103(a) as being

unpatentable over Patel (US 2008/0036851) in view of Siemens (US 2005/0232352).

      Regarding Claim 3, Patel teaches the method of claim 1, but does not teach

applying the method of claim 1 in the specific area of emergency response including

accessing a database to identify a plurality of members of an emergency response

team; and presenting a plurality of available video feeds on a display of the mobile

communication device, the plurality of available video feeds including video streams

associated with the plurality of members of the emergency response team.  However, it

is well known to use a video communication system for the purpose of emergency

response such as to police patrol cars as taught in Siemens.   In Fig. 4, Siemens

teaches a database identifying patrol cars, 452,454, 456, and 458.  The monitor 170

also displays available video feeds and the feeds correspond to video streams from 4

police cars.  One of ordinary skill in the art would realize the invention taught by Patel

Application/Control Number: 12/188,982                                                    Page 4
Art Unit: 2622

which allows a mobile user to select channels with the capability of Siemens to have

video associated with different police cars and to combine such that mobile users may

select video associated with different police cars.  It is readily foreseen that a user

wishes to select video based on particulars of the video such as location of the video or

who shot the video.  Thus given the two teachings, it would be obvious to realize

allowing a user to select video based on the police car that the video came from.  It

would have been obvious to one of ordinary skill in the art at the time of the invention to

modify the teaching of Patel with that of Siemens to realize the use of video

communication via channels corresponding to different video feeds in the area of

emergency response such as among a police department.  This would be obvious

because police activity and other emergency response activity benefits from video

communication for various reasons like evidence gathering or spreading critical

information quickly.

Regarding Claim 4, Patel teaches the method of claim 3, wherein the available

video feeds are sourced from a group of surveillance cameras.  Siemens further

teaches the video feeds are from surveillance system in a patrol vehicle.  It would have

been obvious to one of ordinary skill in the art at the time of the invention to modify the

teaching of Patel with that of Siemens for the reason above.

Claim 6 is rejected similarly to claim 3 where Patel teaches allowing a user to

select a channel associated with a video and Siemens teaches in Fig. 4 a database to

identify a set of video with a certain user.  Similar to the rationale of claim 3, it would

have been obvious to one of ordinary skill in the art at the time of the invention to

 Motorola Solutions, Inc., Ex1003, p. 289

US 20060281471A1

## (19) United States
## (12) Patent Application Publication
Shaffer et al.

(10) Pub. No.: US 2006/0281471 A1
(43) Pub. Date: Dec. 14, 2006

(54) **METHOD AND SYSTEM FOR COMMUNICATING USING POSITION INFORMATION**

(75) Inventors: **Shmuel Shaffer**, Palo Alto, CA (US); **Shah Talukder**, Los Gatos, CA (US); **Dean M. Zanone**, Norco, CA (US); **Yogesh Kalley**, Sunnyvale, CA (US); **Kittur V. Nagesh**, Saratoga, CA (US)

Correspondence Address:
**BAKER BOTTS L.L.P.**
**2001 ROSS AVENUE**
**SUITE 600**
**DALLAS, TX 75201-2980 (US)**

(73) Assignee: **Cisco Technology, Inc.**

(21) Appl. No.: **11/149,041**

(22) Filed: **Jun. 8, 2005**

**Publication Classification**

(51) Int. Cl.
*H04Q 7/20* (2006.01)
(52) U.S. Cl. ..................................... **455/456.2**; 455/456.1

(57) **ABSTRACT**

A method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location. The method includes adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.



Appx01407    Motorola Solutions, Inc., Ex1004, p. 1

Patent Application Publication   Dec. 14, 2006   Sheet 1 of 3        US 2006/0281471 A1



*FIG. 1*

*FIG. 2*

Appx01408    Motorola Solutions, Inc., Ex1004, p. 2



*FIG. 3*



START

300 — COMMUNICATE ON FIRST COMMUNICATION NETWORK AT FIRST LOCATION USING COMMUNICATION PARAMETER(S)

302 — MOVE FROM FIRST LOCATION TO SECOND LOCATION

304 — RECEIVE POSITION INFORMATION IDENTIFYING SECOND LOCATION

306 — ADJUST FIRST COMMUNICATION PARAMETER(S) TO SECOND COMMUNICATION PARAMETERS BASED ON SECOND LOCATION

308 — COMMUNICATE ON SECOND COMMUNICATION NETWORK AT SECOND LOCATION USING SECOND COMMUNICATION PARAMETERS

*FIG. 5*   END

Case: 25-1787    Document: 30    Page: 459    Filed: 04/29/2026



FIG. 4

Appx01410    Motorola Solutions, Inc., Ex1004, p. 4

US 2006/0281471 A1                                    Dec. 14, 2006

1

# METHOD AND SYSTEM FOR COMMUNICATING USING POSITION INFORMATION

## TECHNICAL FIELD OF THE INVENTION

[0001] This invention relates in general to communication systems and, more particularly, to a method and system for communicating using position information.

## BACKGROUND OF THE INVENTION

[0002] Many security and safety personnel, such as police, fire fighters and ambulance drivers use radio systems for communication. Radio frequencies are allocated based on the agency to which the safety and security team belongs and on their geographical location. For example, the Palo Alto police department may use one set of radio frequencies while the San Jose police department may utilize a different set of frequencies. This method allows each team to use their radio to broadcast communications to their own team without overwhelming a neighboring team with information which may not be relevant for their operations. In addition, this method enables the reuse of the limited frequency bands for communication by other teams.

[0003] Statewide agencies like the California Highway Patrol (CHP) or nationwide agencies like the Federal Bureau of Investigation (FBI) may need to communicate with local safety and security agencies as part of their normal operations. For example, if the CHP needs to chase a car on highway a certain highway, they may need to coordinate the event with the local agencies along the chase path. Some systems rely on a centrally located dispatch to coordinate communication with local agencies. Some systems rely on a handbook of frequencies for different agencies at a variety of locations. In addition, some safety and security personnel utilize frequency scanners to locate the set of frequencies utilized in specific geographical locations. Many communications over such frequencies are increasingly becoming encrypted.

## SUMMARY OF THE INVENTION

[0004] The present invention provides a method and system for communicating using position information that substantially eliminates or reduces at least some of the disadvantages and problems associated with previous methods and systems.

[0005] In accordance with a particular embodiment, a method for communicating using position information includes communicating on a first communication network at a first location using one or more first communication parameters of the first communication network and, upon moving from the first location to a second location, receiving position information identifying the second location. The method includes adjusting the one or more first communication parameters to one or more second communication parameters based on the second location and communicating on a second communication network at the second location using the one or more second communication parameters.

[0006] The first and second communication parameters may comprise a frequency, a modulation method and/or an encryption key. The communication networks may comprise safety and security agency networks of the first and second locations. Adjusting the one or more first communication parameters to one or more second communication parameters based on the second location may comprise automatically adjusting the one or more first communication parameters to one or more second communication parameters based on the move to the second location, adjusting the one or more first communication parameters to one or more second communication parameters in response to a user command or adjusting the one or more first communication parameters to one or more second communication parameters based on predefined user instructions.

[0007] In accordance with another embodiment, a system for communicating using position information includes a processor operable to communicate on a first communication network at a first location using one or more first communication parameters of the first communication network. The system includes a receiver coupled to the processor and operable to, upon moving from the first location to a second location, receive position information identifying the second location. The processor is also operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location and communicate on a second communication network at the second location using the one or more second communication parameters.

[0008] Technical advantages of particular embodiments include providing a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys. As a user moves locations, GPS information may be used to recognize a new location. A user's endpoint may then, either automatically, through specific user command or predefined instructions, alter its communication parameters so that the user may communicate on one or more local or other networks that correspond to the user's location. Accordingly, effort and time associated with determining appropriate communication parameters when moving to a new location are reduced.

[0009] Other technical advantages will be readily apparent to one skilled in the art from the following figures, descriptions and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some or none of the enumerated advantages.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0010] For a more complete understanding of the present invention and its advantages, reference is now made to the following description, taken in conjunction with the accompanying drawings, in which:

[0011] FIG. 1 illustrates a communication system including a plurality of endpoints operable to communicate among each other, in accordance with a particular embodiment;

[0012] FIG. 2 illustrates a system for communicating using position information, in accordance with a particular embodiment;

[0013] FIG. 3 illustrates a communication system having an interoperability system, in accordance with a particular embodiment;

[0014] FIG. 4 illustrates an example mobile endpoint, in accordance with a particular embodiment; and

Appx01411    Motorola Solutions, Inc., Ex1004, p. 5

US 2006/0281471 A1

Dec. 14, 2006

2

[0015]   **FIG. 5** illustrates a method for communicating using position information, in accordance with a particular embodiment.

## DETAILED DESCRIPTION OF THE INVENTION

[0016]   **FIG. 1** illustrates a communication system **30** including a plurality of endpoints **32a-32h** having the ability to establish communication sessions between each other and/or communication control posts (CCPs) **34a-34c** and interoperability system (IS) **35** using one or more of communication networks **36a-36c**. In particular embodiments, at least some of endpoints **32** comprise mobile devices capable of communicating with other endpoints and devices through any of a variety of communication parameters, such as radio frequencies. modulation methods and encryption keys. As discussed in further detail below, CCPs **34** aid in providing communication parameters to mobile endpoints as system configurations require, and IS **35** facilitates interoperability between endpoints and devices of various communication networks.

[0017]   Particular embodiments provide a mobile endpoint user the ability to communicate, while changing locations, with different communication networks that utilize different communication parameters, such as different radio frequencies, modulation methods and/or encryption keys. As a user moves locations, GPS information may be used to recognize a new location. A user's endpoint may then, either automatically, through specific user command or predefined instructions, alter its communication parameters so that the user may communicate on one or more local or other networks that correspond to the user's location.

[0018]   In the illustrated embodiment, communication network **36a** enables communication between a plurality of endpoints **32a-32g**, CCPs **34a-34c** and IS **35** distributed across multiple cities and geographic regions. Communication network **36b** may comprise a public switched telephone network (PSTN) that couples endpoints **32g** and **32h** with communication network **36a** through gateway **38**. Communication network **36c** is a local area network (LAN), which couples endpoints **32c** and **32d** and CCP **34a** with communication network **36a**. Accordingly, users of endpoints **32a-32h**, CCPs **34a-34c** and IS **35** can establish communication sessions between and among each network component coupled for communication with one or more of networks **36a-36c**. Communication links **37a** and **37b** couple communication networks **36a** and **36b**, and communication networks **36a** and **36c**, respectively. In the illustrated embodiment, communication link **37b** is a wide area network (WAN), which couples communication networks **36a** and **36c**.

[0019]   Communication network **36a** includes a plurality of segments **40** and nodes **41** that couple endpoints **32a**, **32b**, **32e** and **32f** with CCP **34b** and IS **35**, gateway **38** and communication networks **36b-36c**. Therefore, a user of endpoint **32a** is provided with access to endpoints **32b-32h**, and CCPs **34a-34c**. Nodes **41** may include any combination of network components, gatekeepers, call managers, conference bridges, routers, hubs, switches, gateways, base stations, endpoints or other hardware, software or embedded logic implementing any number of communication protocols that allow for the exchange of data in communication system **30**.

[0020]   Although the illustrated embodiment includes three communication networks **36a-36c**, the term "communication network" should be interpreted as generally defining any network capable of transmitting audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages. Any one of networks **36a-36c** may be implemented as a local area network (LAN), wide area network (WAN), cellular network, global distributed network such as the Internet, Intranet, Extranet, or any other form of wireless or wireline communication network. Communication network **36a** may include any number and combination of segments **40**, nodes **41**, endpoints **32**, CCPs **34** and/or ISs **35**.

[0021]   Communications over communication networks **36a-36c** may use any suitable communication protocol. In a particular embodiment, communication network **36a** employs voice communication protocols that allow for the addressing or identification of endpoints, nodes, and/or other components coupled to communication network **36a**. For example, using Internet protocol (IP), each of the components coupled together by communication network **36a** in communication system **30** may be identified in information directed using IP addresses. In this manner, network **36a** may support any form and/or combination of point-to-point, multicast, unicast, or other techniques for exchanging media packets among components in communication system **30**. Any network components capable of exchanging audio, video, or other data are included within the scope of the present invention.

[0022]   Network **36a** may be directly coupled to other IP networks including, but not limited to, another LAN or the Internet. Since IP networks share a common method of transmitting data, telecommunication signals may be transmitted between telephony devices located on different, but interconnected, IP networks. In addition to being coupled to other IP networks, communication network **36a** may also be coupled to non-IP telecommunication networks, for example through the use of interfaces or components. In the illustrated embodiment, communication network **36a** is coupled with PSTN **36b** through gateway **38**. PSTN **36b** includes switching stations, central offices, mobile telephone switching offices, pager switching offices, remote terminals, and other related telecommunications equipment that are located throughout the world. IP networks transmit data (including voice and video data) by placing the data in packets and sending each packet individually to the selected destination, along one or more communication paths. Unlike a circuit-switched network (like PSTN **36b**), a dedicated circuit is not required for the duration of a call or fax transmission over IP networks.

[0023]   Technology that allows telecommunications to be transmitted over an IP network may comprise Voice over IP (VoIP), or simply Voice over Packet (VoP). In the illustrated embodiment, one or more of endpoints **32d**, CCPs **34** and gateway **38** may be IP telephony devices capable of participating in IM, video, and other multimedia communication sessions. IP telephony devices have the ability of encapsulating a user's voice (or other input) into IP packets so that the voice can be transmitted over network **36a**. IP telephony devices may include telephones, fax machines, computers running telephony software, nodes, gateways, wired or wireless devices, hand held PDA, or any other device capable of performing telephony functions over an IP network.

   Motorola Solutions, Inc., Ex1004, p. 6

US 2006/0281471 A1                                    Dec. 14, 2006

3

[0024] In particular embodiments, communication system 30 may receive and transmit data in a session initiation protocol (SIP) environment. SIP is an application-layer control protocol that includes primitives for establishing, modifying and terminating communication sessions. SIP works independently of underlying transport protocols and without dependency on the type of session that is being established. SIP also transparently supports name mapping and redirection services, which support personal mobility.

[0025] It will be recognized by those of ordinary skill in the art that endpoints 32a-32h, CCPs 34a-34s and/or gateway 38 may be any combination of hardware, software, and/or encoded logic that provides communication services to a user. For example, endpoints 32a-32h may include a telephone, a personal computer (PC) , a video monitor, a camera, an IP phone, a cell phone, a land mobile radio (LMR), a personal digital assistant (PDA), a command center or any other communication hardware, software and/or encoded logic that supports the communication of audio, video or other data, using packets of media (or frames) or otherwise, using communication network 36a. Endpoints 32a-32h may also include unattended or automated systems, gateways, other intermediate components or other devices that can establish media sessions. Although FIG. 1 illustrates a particular number and configuration of endpoints, CCPs, an IS, segments, nodes, and gateways, communication system 30 contemplates any number or arrangement of such components for communicating media.

[0026] FIG. 2 illustrates a communication system 50 for communicating using position information, in accordance with a particular embodiment. Communication system 50 includes a plurality of geographic regions 52-55, communication networks 60-64, endpoints 70 and 74 and CCP 80.

[0027] In particular embodiments, geographic regions 52-55 may correspond to buildings, campuses, municipalities, counties, states, countries or any other particular geographical area. As illustrated, geographic area 52 includes communication networks 60 and 61 that communicate information in area 52; geographic area 53 includes communication network 62 that communicates information in area 53; geographic area 54 includes communication network 63 that communicates information in area 54; and geographic area 55 includes communication network 64 that communicates information in area 55. Communication networks 60-64 each may communicate information (e.g., signals, data or messages) over assigned radio frequencies, modulation methods and/or various encryption keys to support communication among network communication devices. In particular embodiments, each communication network 60-64 may support communication among communication endpoints of one or more groups, such as safety and security agencies and other public or private organizations. For example, various groups may have their own communication networks that utilize particular communication parameters. Communication endpoints and devices of these networks may comprise any suitable communication components, such as land mobile radios. Communication networks 60-64 may comprise any number and combination of segments, nodes and endpoints to enable communication among network devices and components and may be similar to other communication networks described herein.

[0028] In some cases, some of communication networks 60-64 may support communication on the same or overlapping frequency bands, while in some cases some of communication networks 60-64 may support communication on different frequency bands. For example, geographic region 52 may comprise a particular municipality, and communication networks 60 and 61 may support communications for a police department and a fire department, respectively, of the municipality. In some cases, the police department network and the fire department network may communicate on different frequencies to ensure that devices on one such network do not receive irrelevant information from devices on the other network. In addition, communication networks 60 and 61 may use distinct encryption protocols or methods (e.g., distinct encryption keys) to provide secure communications within the respective networks.

[0029] As another example, geographic areas 52 and 54 may comprise separate municipalities proximate to each other, and communication networks 60 and 63 may support communications for respective police departments of the municipalities on different frequencies and using different modulation methods and encryption keys. In this example, geographic area 53 may comprise a particular county that overlaps with municipalities 52 and 54. Geographic area 55 may comprise a particular state or country that includes geographic areas 52-54 and communication network 64. For example, communication network 64 may support communications for a state police agency, such as a state highway patrol, or a national agency, such as the FBI, on different frequencies than those used for communication networks 60-63.

[0030] As indicated above, geographic areas may be defined using any suitable criteria. As an additional example, geographic areas 52 and 54 may comprise separate companies' facilities that each use respective communication networks (e.g., communication networks 60 and 63, respectively) to provide communications among their endpoints using separate frequencies, modulation methods or encryption keys.

[0031] In accordance with particular embodiments, frequencies, modulation methods and/or encryption keys utilized by the various communication networks 60-64 may be embedded in memory of mobile endpoints. For example, as mobile endpoint 70 (e.g., a LMR in a safety vehicle) moves between geographic areas, the endpoint may use GPS information to pin-point its location and automatically adjust its current communication radio frequency, modulation method and/or encryption key settings to allow the user of the endpoint to communicate with local safety and security forces in the area in which the endpoint is currently located. For example, mobile endpoint 70 may be currently located in geographic area 52 and may be communicating on communication network 60 (e.g., with other mobile endpoints, control centers or other communication devices) on a radio frequency X using encryption key J used by communication network 60. Safety and security personnel associated with a vehicle in which mobile endpoint 70 is used (e.g., a police officer) may need to drive to geographic area 54 and communicate on communication network 63 with users of that communication network (e.g., a police department network of a municipality 54). However, communication network 63 may support communications using a different frequency and encryption key, for example radio frequency Z and encryption key L. This information regarding particular radio frequencies and encryption protocols

US 2006/0281471 A1

Dec. 14, 2006

4

used by various communication networks may be stored in a memory of mobile endpoint 70. As mobile endpoint 70 enters geographic area 54, it recognizes is location through, for example, GPS technology, and adjusts its communication settings (e.g., radio frequency and encryption key) to allow for communication with other devices of communication network 63.

[0032]    In some cases the endpoint may be set to automatically switch communication settings upon such a move once the endpoint enters an area of a different or particular communication network. In some cases such a switch may occur through a user interface, such as a user pressing a button to enable the switch. For example, specific buttons may be used to switch communication settings. In some embodiments, each network for which communication settings are stored may have its own switch command or button (e.g., "City A Police," "City A Fire," "City B Police," etc.) that may be operable when in the network's geographic area. In some cases, buttons used to switch may be generically mapped to a local area in which the endpoint is present (e.g., "local fire," "local police," "state police," etc.). The present invention contemplates great flexibility in using various interfaces to switch communication settings of an endpoint.

[0033]    As another example, a user of mobile endpoint 70 may be communicating on communication network 64 of geographic area 55 using that communication network's respective frequency, modulation method and encryption key. As mobile endpoint 70 moves into local geographic area 54 (located within geographic area 55), the user may still desire to communicate on communication network 64. However, through GPS information, mobile endpoint 70 will still recognize the move into geographic area 54. If the user of mobile endpoint 70 desires to communicate on locally-specific communication network 63, the user may press a button, such as a local network button. Mobile endpoint 70 will recognize its location and switch its communication settings (e.g., frequency, modulation method and/or encryption key) to those of the communication network 63. The switching of communication settings using positioning information (e.g., GPS technology) to allow communication on the new settings may be implemented in any suitable manner, such as pressing a button, voice activation or predefined rules or instructions. For example, in some cases a mobile endpoint user may set the endpoint to switch endpoint communication settings upon entering certain networks but not to switch communication settings upon entering other networks.

[0034]    In another example, an officer, such as a state highway patrol officer, may be provided with a PC with a touch screen. The PC comprises a mobile endpoint. Icons on the touch screen may provide the officer the ability to join communication sessions with local safety and security forces (e.g., firefighters, police, etc.) as the officer's vehicle moves between communication domains. The officer may be provided with a plurality of options for communication (e.g., various communication networks and/or groups of endpoints) based on his location. Upon receiving instructions from the officer, communication parameters used by the endpoint may be automatically adjusted based on the officer's current location.

[0035]    In some embodiments, frequencies, modulation methods and encryption keys utilized by various communication networks (e.g., communication networks of various groups or agencies) may be kept in a centralized communication and control post. For example, CCP 80 may include mappings of various communication settings and communication networks via location and may be located at any suitable location. As a mobile endpoint (e.g., mobile endpoint 74 in a safety vehicle) moves between geographic areas (e.g., from geographic area 54 to geographic area 52), the endpoint sends its GPS information to CCP 80. CCP 80 may authenticate the mobile station and/or its user using any suitable information transmitted with or separate from the GPS information. Upon successful authentication, CCP 80 determines that the vehicle has moved to a new communication region (e.g., geographical area 52) and instructs endpoint 74 to adjust its frequencies, modulation methods and encryption keys to match parameters of one or more communication networks of the geographical area (e.g., parameters of communication network 61). In particular embodiments, communication between CCP 80 and mobile endpoint 74 may be performed automatically without human intervention resulting in automatic adjustment of the frequencies, modulation methods and encryption keys. This allows a user of the endpoint, such as a mobile officer, to automatically connect with network devices of a communication network (e.g., local safety and security forces) once the user enters the network's area. In some cases one or more interface actions, such as the pressing of a key stroke, and/or predefined instructions may be used to adjust endpoint communication settings transmitted by CCP 80 based on location information to allow communication between mobile endpoint 74 and devices of a communication network as the endpoint moves into the network's area.

[0036]    In some embodiments, a user may be given the option of contacting local agency networks. In some embodiments, the endpoint may store in memory the communication parameters of the previous communication region. The user may be given the option to connect with either the local agencies or with the agencies from the previous communication region. In yet another embodiment, for the sake of continuity the user may mark a specific frequency and or multicast address with the associated encryption keys. This feature may be used to facilitate quick communication with specific people from a given agency who were involved in the early phase of the specific event. In some embodiments, the system notifies the user as he moves between communication regions. The notification of a move between communication regions may include automatically converting position information, such as GPS information, to location information of a particular region (e.g., county or city) to which the user has moved such that, in particular embodiments, the name of the new region and/or networks may be announced to the user (e.g., "You have moved from City A to City B").

[0037]    FIG. 3 illustrates a communication system 100, in accordance with a particular embodiment. Communication system 100 includes communication networks 110-114, interoperability system (IS) 120 and endpoints 122. In the illustrated embodiment, communication network 110 comprises a radio or wireless network, communication network 111 comprises a LAN, communication network 112 comprises a PSTN, communication network 113 comprises a radio network and communication network 114 comprises an IP network. It should be understood, however, that communication system 100 may comprise any number of IP

    Motorola Solutions, Inc., Ex1004, p. 8

US 2006/0281471 A1

5

Dec. 14, 2006

or non-IP communication networks of any wireless or wireline form capable of communicating audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages. Communication networks 110-114 may comprise any number and combination of segments, nodes and endpoints to enable communication among network devices and components. A radio network may support communication among portable mobile station endpoints, such as land mobile radios (LMRs), using any suitable communication methods or features, such as cellular and push-to-talk (PTT). Communication networks 110-113 may comprise networks of particular groups or agencies (e.g., a municipality's police department network), whether operational with respect to a particular area or otherwise. In the illustrated embodiment, endpoints 122 comprise a PC (endpoint 122*a*), a PDA (endpoint 122*b*) and an IP phone 122*c*). However, as indicated above, IS 120 may be configured to communicate with any type of communication endpoint. Segments 130, which may comprise any suitable wireless or wireline communication links, including one or more communication networks (e.g., WANS) as appropriate, coupled various networks with each other and with endpoints 122 and IS 120. In particular embodiments, segments may include gateways for facilitating communication between various networks, such as an LMR gateway between radio network 110 and IP network 114. In particular embodiments, communication system 100 may include similar components and networks as described with respect to communication systems 10 and 50 of FIGS. 1 and 2, respectively.

[0038] IS 120 enables, facilitates and/or provides for interoperable communication among communication endpoints and devices, such as LMRs, cellular phones, IP phones, PCs, PDAs, PSTN phones, video monitors, cameras, sensors and CCPs of one or more communication networks (e.g., communication networks 110-113) using Internet Protocol. In particular embodiments, IS 120 may control gateways (for example, of segments 130) in order to map radio frequencies of particular mobile radio endpoints to IP addresses for communication to other types of radio endpoints or IP devices. In some embodiments, IS 120 may host audio conferences that bridge communications received from endpoints. As indicated, communication system 100 (including IS 120) may include any suitable number or type of gateways (e.g., LMR and PSTN gateways), servers (e.g., multipoint conference servers), switches, routers, firewalls, access points, processors, memory or other hardware, software or encoded logic to provide functionality described herein. IS 120 is coupled to communication networks 110-113 and endpoints 122 through IP network 114, which may comprise any suitable IP network.

[0039] As indicated above, IS 120 uses IP to enable communication among endpoints of various networks. For example, IS 120 may communicate with endpoints using multicast IP addresses assigned to an endpoint of a communication network, a group of endpoints of a communication network or one or more endpoints of multiple communication networks or alternatively using a peer to peer dialed connection. For example, a group of endpoints may be combined into a virtual talk group for communication using a particular IP address. The use of multicast IP addresses allows communication devices and endpoints of various communication networks to communicate with each other through IS 120 to provide network interoperability.

[0040] The multicast IP addresses can be used to enable IS 120 to provide the functionality described above with respect to communication system 50 of FIG. 2. In accordance with some embodiments, multicast IP addresses, radio frequencies, modulation methods and encryption keys utilized by various networks (e.g., agencies) may be embedded in memory of the mobile endpoint. The multicast addresses in the IS 120 are mapped into a set of communication radio frequencies that are used by the networks (e.g., local safety and security agencies). As the mobile endpoint (e.g., in a safety vehicle) moves between communication regions, the endpoint uses GPS information to pinpoint its location and automatically adjusts communication parameters (e.g., IP addresses, radio frequencies, modulation methods and encryption keys) to achieve interoperability. This allows the mobile endpoint user to connect with local safety and security forces manually with, for example, a single key stroke or automatically based on pre-determined collaboration polices maintained in the mobile endpoint.

[0041] In some embodiments, IS 120 may act in a similar manners as CCPs of FIGS. 1, 2 and 4. For example, multicast addresses, radio frequencies, modulation methods and encryption keys utilized by various agencies may be kept with IS 120 as a centralized communication and control post. The multicast addresses may be mapped into a set of communication radio frequencies, modulation methods and/or encryption keys that are used by local safety and security agencies. As a mobile endpoint moves between communication regions, the endpoint may periodically send its GPS information to IS 120. Upon successful authentication of the endpoint, IS 120 may determine that the endpoint has moved to a new communication region and may instruct the endpoint to adjust its multicast addresses, radio frequencies, modulation methods and/or encryption keys to match the new communication region's parameters.

[0042] Therefore, as discussed above, the present invention contemplates embodiments that can apply to both IP and non-IP mobile endpoints and communication networks. Communication between a CCP and mobile endpoints may occur without any human intervention resulting in automatic adjustment of the frequencies, modulation methods, encryption keys and IP addresses. This allows a mobile officer to connect with local safety and security forces with a single key stroke.

[0043] FIG. 4 illustrates a mobile endpoint 200, in accordance with a particular embodiment. Mobile endpoint 200 may be similar to and provide similar functionality to other endpoints described herein, such as endpoints 70 and 74 of FIG. 2.

[0044] In the illustrated embodiment, endpoint 200 includes a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208. Transmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200 and receives and transmits voice and other data between endpoint 200 and other network devices and components. User interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices. For example, through interface 204 a user may input instructions regarding adjustment of the endpoint's communication settings (e.g., radio frequency,

Appx01415　　Motorola Solutions, Inc., Ex1004, p. 9

US 2006/0281471 A1

6

Dec. 14, 2006

modulation method and encryption key) upon entering a new communication network. Interface **204** may comprise a keypad, display, touch screen, audio input or any other suitable interface. Instructions may be submitted through speech recognition, collection of keystrokes, soft key or otherwise.

[0045] Processor **206** may be a microprocessor, controller, or any other suitable computing device, resource, or combination of hardware, software and/or encoded logic operable to perform endpoint functionality. Processor **206**, either alone or in conjunction with other endpoint components, provides endpoint functionality discussed herein. Memory module **208** may be any form of volatile or non-volatile memory including, without limitation, magnetic media, optical media, random access memory (RAM), read-only memory (ROM), removable media, or any other suitable local or remote memory component.

[0046] In the illustrated embodiment, memory module **208** includes network communication parameter listings **210** which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location. As indicated above, locations of communication networks may be defined in any suitable manner, such as by latitude/longitude coordinates, buildings, campuses, cities, counties, states, countries or any other particular geographical area. The illustrated embodiment includes city A, city B, state C and country D. The locations may be stored in memory module **208** with GPS coordinates so that upon receiving GPS coordinates via transmitter/receiver **202**, endpoint **200** will know within which location(s) the endpoint is currently positioned. Also stored in parameter listings **210** are various communication networks corresponding to the locations, such as police and fire. Any suitable communication networks may be identified stored as corresponding to a location. Stored with the communication networks are frequencies and encryption keys utilized by those networks. The stored frequencies may correspond to one or more frequency ranges utilized by a network, and the stored encryption key may correspond to any suitable encryption method utilized by the network. For example, the police network of city A communicates on frequency X and uses encryption key J.

[0047] Communication parameter listings **210** are accessed in various embodiments to provide communication system functionality as described above. For example, as an endpoint moves into a new location, it may recognize the new location through GPS technology and automatically adjust its communication settings (e.g., radio frequency and/or encryption key) to allow its user to communicate on a communication network of the location.

[0048] It will be recognized by those of ordinary skill in the art that mobile endpoints, CCPs and interoperability systems disclosed herein are merely example configurations in accordance with particular embodiments. These systems may include any number of interfaces, processors, memory modules, and other components to accomplish the functionality and features described herein. In addition, these components and other desired components for performing the above described functionality may be centrally located (local) with respect to one another, or distributed throughout communication systems 30, 50 and 100. In addition, one or more components of these systems and devices may work together in performing various functionalities described herein.

[0049] **FIG. 5** is a flowchart illustrating a method for communicating using position information, in accordance with a particular embodiment. At step **300**, one or more communication parameters are used to communicate on a first communication network at a first location. The communication parameters may comprise a radio frequency, modulation method and/or an encryption key of the first communication network. As an example, an officer may be communicating on a police network using a PC in the officer's vehicle. At step **302**, the officer moves from the first location to a second location. At step **304**, position information, such as GPS information, is received identifying the second location. The second location may comprise, for example, a city or area away from a city or area of the first location.

[0050] At step **306**, the first communication parameter(s) are adjusted to second communication parameter(s) based on the second location. This may include "replacing" the first communication parameter(s) with the second communication parameter(s) based on the second location. The second communication parameters may be stored at the communicating endpoint and may be based on one or more communication networks of the second location, such as a police network of the second location. Such adjustment may occur automatically as the user moves to the second location, in response to a user interface action, such as one or more key strokes or a voice command, or according to predefined rules or instructions. At step **308**, the second communication parameters (e.g., radio frequency, modulation method and/or encryption key of the second communication network) are used to communicate on the second communication network at the second location.

[0051] Some of the steps illustrated in **FIG. 5** may be combined, modified or deleted where appropriate, and additional steps may also be added to the flowchart. Additionally, steps may be performed in any suitable order without departing from the scope of the invention.

[0052] As indicated above, technical advantages of particular embodiments of the present invention include utilizing GPS information to adjust parameters of a mobile endpoint and automatically tune its parameters to match local network requirements. Particular embodiments automatically modify the frequencies of the mobile endpoint to match those of local agencies. Systems support multiple radio networks, with roaming, for seamless access. Particular embodiments automatically modify multicast addresses of a mobile communication system which may be mapped to frequencies of local agency networks. Embodiments also modify, modulation methods and encryption keys of a mobile communication system to match those of the local agencies.

[0053] In some embodiments, audible indication is provided to the mobile endpoint user regarding changing parameters, informing him that the specific local agency key will connect him to a different district. The system may automatically announce the name of the communication region as the user's mobile endpoint moves between communication regions. Some embodiments provide a means of marking a specific frequency and/or multicast address for

7

future communications. Various embodiments reduce the manual setup of communication parameters allowing security forces to focus on serving the public rather than on manually fine tuning their communication system. In addition, organizational polices for collaboration can be applied to determine and meet the levels of interoperability.

[0054] Although the present invention has been described in detail with reference to particular embodiments, it should be understood that various other changes, substitutions, and alterations may be made hereto without departing from the spirit and scope of the present invention. For example, although the present invention has been described with reference to a number of elements included within communication systems 30, 50 and 100 and endpoint 200, these elements may be combined, rearranged or positioned in order to accommodate particular routing architectures or needs. In addition, any of these elements may be provided as separate external components to communication systems 30, 50 and 100 and endpoint 200 or each other where appropriate. The present invention contemplates great flexibility in the arrangement of these elements as well as their internal components.

[0055] Numerous other changes, substitutions, variations, alterations and modifications may be ascertained by those skilled in the art and it is intended that the present invention encompass all such changes, substitutions, variations, alterations and modifications as falling within the spirit and scope of the appended claims.

What is claimed is:

1. A method for communicating using position information, comprising:

communicating on a first communication network at a first location using one or more first communication parameters of the first communication network;

upon moving from the first location to a second location, receiving position information identifying the second location;

adjusting the one or more first communication parameters to one or more second communication parameters based on the second location; and

communicating on a second communication network at the second location using the one or more second communication parameters.

2. The method of claim 1, wherein:

the one or more first communication parameters of the first communication network comprise a first frequency of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second frequency of the second communication network.

3. The method of claim 1, wherein:

the one or more first communication parameters of the first communication network comprise a first encryption key of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second encryption key of the second communication network.

4. The method of claim 1, wherein:

the one or more first communication parameters of the first communication network comprise a first modulation method of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second modulation method of the second communication network.

5. The method of claim 1, wherein:

the first communication network comprises a safety and security agency network of the first location; and

the second communication network comprises a safety and security agency network of the second location.

6. The method of claim 1, wherein adjusting the one or more first communication parameters to one or more second communication parameters based on the second location comprises automatically adjusting the one or more first communication parameters to one or more second communication parameters based on the move to the second location.

7. The method of claim 1, wherein adjusting the one or more first communication parameters to one or more second communication parameters based on the second location comprises adjusting the one or more first communication parameters to one or more second communication parameters based on predefined user instructions.

8. The method of claim 1, further comprising:

notifying a user of the move from the first location to the second location;

prompting the user with an option to adjust the one or more first communication parameters in response to the move; and

wherein adjusting the one or more first communication parameters to one or more second communication parameters based on the second location comprises adjusting the one or more first communication parameters to one or more second communication parameters in response to a user command.

9. The method of claim 8, wherein the user command comprises pressing a button specific to the second communication network.

10. The method of claim 8, wherein the user command comprises pressing a button associated with a local network of the second location.

11. A system for communicating using position information, comprising:

a processor operable to communicate on a first communication network at a first location using one or more first communication parameters of the first communication network;

a receiver coupled to the processor, the receiver operable to, upon moving from the first location to a second location, receive position information identifying the second location;

the processor operable to:

adjust the one or more first communication parameters to one or more second communication parameters based on the second location; and

US 2006/0281471 A1                                                              Dec. 14, 2006

8

communicate on a second communication network at the second location using the one or more second communication parameters.

12. The system of claim 11, wherein:

the one or more first communication parameters of the first communication network comprise a first frequency of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second frequency of the second communication network.

13. The system of claim 11, wherein:

the one or more first communication parameters of the first communication network comprise a first encryption key of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second encryption key of the second communication network.

14. The system of claim 11, wherein:

the one or more first communication parameters of the first communication network comprise a first modulation method of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second modulation method of the second communication network.

15. The system of claim 11, wherein:

the first communication network comprises a safety and security agency network of the first location; and

the second communication network comprises a safety and security agency network of the second location.

16. The system of claim 11, wherein a processor operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises a processor operable to automatically adjust the one or more first communication parameters to one or more second communication parameters based on the move to the second location.

17. The system of claim 11, wherein a processor operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises a processor operable to adjust the one or more first communication parameters to one or more second communication parameters based on predefined user instructions.

18. The system of claim 11, wherein the processor is further operable to:

notify a user of the move from the first location to the second location;

prompt the user with an option to adjust the one or more first communication parameters in response to the move; and

wherein a processor operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises a processor operable to adjust the one or more first communication parameters to one or more second communication parameters in response to a user command.

19. The system of claim 18, wherein the user command comprises pressing a button specific to the second communication network.

20. The system of claim 18, wherein the user command comprises pressing a button associated with a local network of the second location.

21. A system for communicating using position information, comprising:

means for communicating on a first communication network at a first location using one or more first communication parameters of the first communication network;

means for, upon moving from the first location to a second location, receiving position information identifying the second location;

means for adjusting the one or more first communication parameters to one or more second communication parameters based on the second location; and

means for communicating on a second communication network at the second location using the one or more second communication parameters.

22. Logic embodied in a computer readable medium, the computer readable medium comprising code operable to:

communicate on a first communication network at a first location using one or more first communication parameters of the first communication network;

upon moving from the first location to a second location, receive position information identifying the second location;

adjust the one or more first communication parameters to one or more second communication parameters based on the second location; and

communicate on a second communication network at the second location using the one or more second communication parameters.

23. The medium of claim 22, wherein:

the one or more first communication parameters of the first communication network comprise a first frequency of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second frequency of the second communication network.

24. The medium of claim 22, wherein:

the one or more first communication parameters of the first communication network comprise a first encryption key of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second encryption key of the second communication network.

25. The medium of claim 22, wherein

the one or more first communication parameters of the first communication network comprise a first modulation method of the first communication network; and

the one or more second communication parameters of the second communication network comprise a second modulation method of the second communication network.

Appx01418    Motorola Solutions, Inc., Ex1004, p. 12

26. The medium of claim 22, wherein:

the first communication network comprises a safety and security agency network of the first location; and

the second communication network comprises a safety and security agency network of the second location.

27. The medium of claim 22, wherein code operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises code operable to automatically adjust the one or more first communication parameters to one or more second communication parameters based on the move to the second location.

28. The medium of claim 22, wherein code operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises code operable to adjust the one or more first communication parameters to one or more second communication parameters based on predefined user instructions.

29. The medium of claim 22, further comprising code operable to:

notify a user of the move from the first location to the second location;

prompt the user with an option to adjust the one or more first communication parameters in response to the move; and

wherein code operable to adjust the one or more first communication parameters to one or more second communication parameters based on the second location comprises code operable to adjust the one or more first communication parameters to one or more second communication parameters in response to a user command.

30. The medium of claim 29, wherein the user command comprises pressing a button specific to the second communication network.

31. The medium of claim 29, wherein the user command comprises pressing a button associated with a local network of the second location.

\* \* \* \* \*

Appx01419    Motorola Solutions, Inc., Ex1004, p. 13



US 20070036100A1

(19) **United States**

(12) **Patent Application Publication**  (10) Pub. No.: **US 2007/0036100 A1**
Shaffer et al.  (43) Pub. Date:    **Feb. 15, 2007**

(54) **METHOD AND SYSTEM FOR COMMUNICATING MEDIA BASED ON LOCATION OF MEDIA SOURCE**

(75) Inventors: **Shmuel Shaffer**, Palo Alto, CA (US); **Shah Talukder**, Los Gatos, CA (US); **Kittur V. Nagesh**, Saratoga, CA (US); **Douglas J. Hall**, Westerville, OH (US); **Larry R. Metzger**, Wake Forest, NC (US); **Yogesh Kalley**, Sunnyvale, CA (US)

Correspondence Address:
**BAKER BOTTS L.L.P.**
**2001 ROSS AVENUE**
**SUITE 600**
**DALLAS, TX 75201-2980 (US)**

(73) Assignee: **Cisco Technology, Inc.**

(21) Appl. No.: **11/202,400**

(22) Filed: **Aug. 10, 2005**

**Publication Classification**

(51) Int. Cl.
*H04Q 7/00*  (2006.01)
(52) U.S. Cl. ....................................................... 370/328

(57) **ABSTRACT**

A method for communicating media based on location of media source includes receiving communications from a plurality of endpoints. Each communication comprises a media message and location information identifying a location of its transmitting endpoint. The method includes receiving a selection of a geographical area and comparing the location information of each communication with the selected geographical area. The method also includes presenting to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.



Patent Application Publication    Feb. 15, 2007    Sheet 1 of 6    US 2007/0036100 A1



FIG. 1

FIG. 2

    Motorola Solutions, Inc., Ex1005, p. 2

Patent Application Publication    Feb. 15, 2007   Sheet 2 of 6      US 2007/0036100 A1



*FIG. 3*



*FIG. 7*

START

500 — RECEIVE COMMUNICATIONS FROM PLURALITY OF VIRTUAL TALK GROUPS

502 — RECEIVE FROM FIRST MOBILE ENDPOINT OF FIRST VIRTUAL TALK GROUP A FIRST COMMUNICATION COMPRISING FIRST MEDIA MESSAGE AND LOCATION INFORMATION

504 — PRESENT FIRST MEDIA MESSAGE TO USER

506 — PRESENT IDENTIFICATION OF FIRST VIRTUAL TALK GROUP TO USER

508 — PRESENT LOCATION OF FIRST MOBILE ENDPOINT TO USER

END

Appx01422    Motorola Solutions, Inc., Ex1005, p. 3



FIG. 4

| VIRTUAL TALK GROUP | INCIDENT | MEMBERS |
|---|---|---|
| 1 | | 210a, 210b, 210c |
| 2 | 213 | 212a, 212b, 212c |
| 3 | 215 | 214a, 214b, 214c |

Appx01423    Motorola Solutions, Inc., Ex1005, p. 4

Patent Application Publication  Feb. 15, 2007  Sheet 4 of 6      US 2007/0036100 A1



*FIG. 5*

| VIRTUAL TALK GROUP | MEMBERS |
|---|---|
| 1 | 304a, 304b, 304c, 304d, 304e |
| 2 | 306a, 306b |
| 3 | 308a, 308b, 308c |
| 4 | 310a, 310b, 310c, 310d, 310e |
| 5 | 316a, 316b, 316c, 316d, 316e, 316f |

Appx01424    Motorola Solutions, Inc., Ex1005, p. 5



*FIG. 6*

| VIRTUAL TALK GROUP | SCENE | MEMBERS |
|---|---|---|
| 1 | 403 | 402a, 402b, 402c, 402d, 406 |
| 2 | 405 | 404a, 404b, 404c, 404d, 404e, 408 |
| 3 | 411 | 410a, 410b, 410c |
| 4 | 406 | 406 |

Appx01425     Motorola Solutions, Inc., Ex1005, p. 6



*FIG. 8*

START

600 — RECEIVE COMMUNICATIONS COMPRISING MEDIA MESSAGE AND LOCATION INFORMATION FROM PLURALITY OF ENDPOINTS

602 — RECEIVE SELECTION OF GEOGRAPHICAL AREA

604 — COMPARE LOCATION INFORMATION OF EACH COMMUNICATION WITH SELECTED GEOGRAPHICAL AREA

606 — LOCATION INFORMATION WITHIN SELECTED GEOGRAPHICAL AREA?

NO

YES

608 — PRESENT MEDIA MESSAGE(S) FROM ENDPOINT(S) TO USER

END

*FIG. 9*

START

700 — MONITOR COMMUNICATIONS FROM PLURALITY OF MOBILE ENDPOINTS

702 — RECEIVE VIRTUAL TALK GROUP CONFIGURATION INSTRUCTIONS

704 — SELECT FIRST GROUP OF MOBILE ENDPOINTS ACCORDING TO VIRTUAL TALK GROUP CONFIGURATION INSTRUCTIONS

706 — CONFIGURE FIRST VIRTUAL TALK GROUP COMPRISING FIRST GROUP OF MOBILE ENDPOINTS

END

US 2007/0036100 A1

Feb. 15, 2007

1

# METHOD AND SYSTEM FOR COMMUNICATING MEDIA BASED ON LOCATION OF MEDIA SOURCE

## RELATED APPLICATIONS

[0001] This application is related to U.S. patent application Ser. No. _____, entitled "METHOD AND SYSTEM FOR PROVIDING INTEROPERABLE COMMUNICATIONS WITH LOCATION INFORMATION," Attorney's Docket No. 062891.1648, filed concurrently with the present application, and to U.S. patent application Ser. No. _____, entitled "METHOD AND SYSTEM FOR AUTOMATIC CONFIGURATION OF VIRTUAL TALK GROUPS BASED ON LOCATION OF MEDIA SOURCE," Attorney's Docket No. 062891.1643, filed concurrently with the present application.

## TECHNICAL FIELD OF THE INVENTION

[0002] This invention relates in general to communication systems and, more particularly, to a method and system for communicating media based on location of media source.

## BACKGROUND OF THE INVENTION

[0003] Many public and private groups, such as security and safety personnel (e.g., police, fire fighters and ambulance drivers) use various communication networks of differing technologies and types for communication. Many networks utilize land mobile radios communicating through push-to-talk technologies. However, communications among different endpoints of different networks such as endpoints of different police, fire or other security networks may be difficult. Collaboration between the different agencies and networks tends to be ad hoc and inefficient. When achieved, it often involves laborious manual intervention. Organizations working towards interoperability solutions include Raytheon JPS Communications, IP Blue, Twisted Pair, M/A-COM and Cisco Systems.

## SUMMARY OF THE INVENTION

[0004] The present invention provides a method and system for communicating media based on location of media source that substantially eliminates or reduces at least some of the disadvantages and problems associated with previous methods and systems.

[0005] In accordance with a particular embodiment, a method for providing interoperable communications with location information includes receiving communications from a plurality of virtual talk groups. Each virtual talk group comprises a plurality of endpoints of different communication networks. The method includes receiving from a first mobile endpoint of a first virtual talk group of the plurality of virtual talk groups a first communication. The first communication comprises a first media message and location information identifying a location of the first mobile endpoint. The method includes presenting to a user the first media message from the first mobile endpoint and the location of the first mobile endpoint.

[0006] In accordance with another embodiment, a method for automatic configuration of virtual talk groups based on location of media source includes monitoring communications from a plurality of mobile endpoints. Each communication comprises a media message and location information

identifying a location of its transmitting endpoint. The method includes selecting a first group of mobile endpoints of the plurality of endpoints according to virtual talk group configuration instructions based on the locations of the mobile endpoints. The method also includes configuring a first virtual talk group comprising the first group of mobile endpoints to facilitate communications among the first group of mobile endpoints. The first group of mobile endpoints comprises mobile endpoints of different communication networks.

[0007] In accordance with an additional embodiment, a method for communicating media based on location of media source includes receiving communications from a plurality of endpoints. Each communication comprises a media message and location information identifying a location of its transmitting endpoint. The method includes receiving a selection of a geographical area and comparing the location information of each communication with the selected geographical area. The method also includes presenting to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.

[0008] Technical advantages of particular embodiments include systems and methods for providing interoperable communications among endpoints of various types that utilize differing technologies. Virtual talk groups may be created dynamically to enable communication among a subset of endpoints for particular circumstances, such as particular security events that arise. Particular embodiments present to a user location information of an endpoint communicating through an interoperable communication system so that the user may more easily monitor various endpoints and various virtual talk groups of a subset of endpoints. As a result, the user may be better able to make decisions based on current communications. Embodiments may also provide an identification of a particular virtual talk group of which the communicating endpoint is a member, particularly when a user is receiving communications from endpoints of a plurality of virtual talk groups.

[0009] In addition, in some embodiments a user may be able to select a geographical area and receive interoperable communications from all endpoints within the selected geographical area. For example, the user's endpoint may receive communications from a plurality of endpoints from multiple areas and may filter those communications to present to the user only communications from endpoints transmitting from the selected geographical area. This enables a user to monitor only communications of interest for critical security or other needs. Moreover, particular embodiments provide automated configuration of endpoints into virtual talk groups based on the locations of the endpoints. For example, according to configuration instructions from a user, a virtual talk group may be automatically configured as including endpoints of a particular neighborhood, such as endpoints within a configurable distance from an event or as all endpoints who are in proximity to the user.

[0010] Other technical advantages will be readily apparent to one skilled in the art from the following figures, descriptions and claims. Moreover, while specific advantages have been enumerated above, various embodiments may include all, some or none of the enumerated advantages.

US 2007/0036100 A1                                                                Feb. 15, 2007

2

## BRIEF DESCRIPTION OF THE DRAWINGS

[0011]    For a more complete understanding of the present invention and its advantages, reference is now made to the following description, taken in conjunction with the accompanying drawings, in which:

[0012]    FIG. 1 illustrates a communication system with various communication networks and an interoperability system, in accordance with a particular embodiment;

[0013]    FIG. 2 illustrates an example interoperability system, in accordance with a particular embodiment;

[0014]    FIG. 3 illustrates an example endpoint, in accordance with a particular embodiment;

[0015]    FIG. 4 illustrates an example display used in providing interoperable communications with location information, in accordance with a particular embodiment;

[0016]    FIG. 5 illustrates an example display used for communicating media based on location of media source, in accordance with a particular embodiment;

[0017]    FIG. 6 illustrates an example display used in providing interoperable communications according to scene-related virtual talk groups, in accordance with a particular embodiment;

[0018]    FIG. 7 illustrates a method for providing interoperable communications with location information, in accordance with a particular embodiment;

[0019]    FIG. 8 illustrates a method for communicating media based on location of media source, in accordance with a particular embodiment; and

[0020]    FIG. 9 illustrates a method for automatic configuration of virtual talk groups based on location of media source, in accordance with a particular embodiment.

## DETAILED DESCRIPTION

[0021]    FIG. 1 illustrates a communication system 10, in accordance with a particular embodiment. Communication system 10 includes communication networks 24a-24e, interoperability system (IS) 20 and endpoints 22a-22c. IS 20 is able to facilitate interoperable communication sessions between and among various communication devices, such as endpoints of communication networks 24 and endpoints 22. IS 20 uses a systems approach to offer a framework based on IP protocols and services to immediately achieve secure voice, video and other data interoperability among communication endpoints and networks utilizing different technologies.

[0022]    In particular embodiments when a user of a mobile endpoint communicates audio, video or other information to one or more other endpoints, GPS information identifying the mobile endpoint's location is included in the transmission such that the mobile endpoint's location can be presented to the one or more other endpoints in connection with the communicated audio, video or other information. In some embodiments, GPS information may be steganographically embedded within a communication stream, such as a voice stream. The communication of location information may be used to notify a user monitoring various endpoints and various virtual talk groups of a subset of endpoints of the location of a particular transmitting end-

point. Thus, the user may be better able to make decisions based on current communications.

[0023]    In some embodiments, a user may be able to select a geographical area and have presented by the user's endpoint communications from all endpoints within the selected geographical area. The endpoint may receive communications from additional endpoints but may filter out for presentation to its users only those communications from endpoints within the selected area. This enables a user to monitor only communications of interest for critical security or other needs.

[0024]    Moreover, particular embodiments provide automated configuration of endpoints into virtual talk groups based on the locations of the endpoints. For example, according to configuration instructions from a user, a virtual talk group may be automatically configured as including endpoints of a particular neighborhood, such as endpoints within a configurable distance from an event or as all endpoints who are in proximity to the user.

[0025]    In the illustrated embodiment, communication networks 24a and 24d comprise radio networks (RNs), communication network 24b comprises a local area network (LAN), communication network 24c comprises a PSTN and communication network 24e comprises an IP network. It should be understood, however, that communication system 10 may comprise any number of IP or non-IP communication networks of any wireless or wireline form capable of communicating audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages. Communication networks 24a-24e may include any number and combination of segments, nodes and endpoints to enable communication among network devices and components. Communication networks 24a-24e may be distributed locally or across multiple cities and geographic regions. Nodes may include any combination of network components, gatekeepers, call managers, conference bridges, routers, hubs, switches, gateways, base stations, endpoints or other hardware, software or embedded logic implementing any number of communication protocols that allow for the exchange of data in communication system 10. Segments 30, which may comprise any suitable wireless or wireline communication links, including one or more communication networks (e.g., WANs) as appropriate, couple various networks with each other and with endpoints 22 and IS 20. In particular embodiments, segments may include gateways for facilitating communication between various networks, such as an LMR gateway between radio network 24a and IP network 24e.

[0026]    In some cases, users of endpoints of one of communication networks 24a-24e may communicate with endpoints of another of communication networks 24a-24e through IS 20. A radio network, such as radio network 24a or 24d, may support communication among portable mobile station endpoints, such as land mobile radios (LMRs), using any suitable communication methods or features, such as cellular and push-to-talk (PTT). Communication networks 24a-24e may comprise networks of particular groups or agencies (e.g., a municipality's police department network), whether operational with respect to a particular area or otherwise.

[0027]    IS 20 enables, facilitates and/or provides for interoperable communication among communication end-

US 2007/0036100 A1

3

Feb. 15, 2007

points and devices, such as LMRs, cellular phones, IP phones, PCs, PDAs, PSTN phones, video monitors, cameras and sensors of one or more communication networks (e.g., communication networks 24a-24e) using Internet Protocol. Such endpoints may comprise IP or non-IP-enabled endpoints. In particular embodiments, IS 20 may control gateways (for example, of segments 30) in order to map radio frequencies of particular mobile radio endpoints to IP addresses for communication to other types of radio endpoints or IP devices. For example, a particular gateway may be able to receive communications from various types of endpoints (e.g., on various types of communication networks) and may convert such communications for transmission to other types of endpoints. IS 20's control of the gateway may control the various endpoints and/or networks that receive particular communications, depending on system functionality and configuration as further discussed below. As indicated, such control may include the mapping of communications and endpoints to IP addresses for interoperable communication. In some embodiments, IS 20 may host audio conferences that bridge communications received from endpoints. As indicated above, communication system 10 (including IS 20) may include any suitable number or type of gateways (e.g., LMR and PSTN gateways), servers (e.g., multipoint conference servers), switches, routers, firewalls, access points, processors, memory or other hardware, software or encoded logic to provide functionality described herein. IS 20 is coupled to communication networks 24a-24d and endpoints 22 through IP network 24e, which may comprise any suitable IP network.

[0028]  As indicated above, IS 20 uses IP to enable communication among endpoints of various networks. The manner in which IS 20 facilitates communications among endpoints may vary according to location and system or operational needs. For example, IS 20 may communicate with endpoints using multicast IP addresses assigned to an endpoint of a communication network, a group of endpoints of a communication network or one or more endpoints of multiple communication networks or alternatively using a peer to peer dialed connection or a nailed dialed connection. A group of endpoints may be combined into a virtual talk group for communication using a particular IP address. As an example, the virtual talk group may be assigned a multicast IP address through which users of various endpoints may communicate on the talk group. The use of multicast IP addresses allows Is 20 to facilitate communications among communication devices and endpoints of various communication networks to provide audio, data, video and control network interoperability. As an additional example, in some cases multicast streams (e.g., utilizing multicast IP addresses) may be used. In some cases nailed dialed connections, such as those using SIP protocol, may be used for communication among endpoints and with IS 20. Various embodiments may combine communication methods to facilitate communication among endpoints. For example, in some cases certain endpoints of a virtual talk group may participate in the talk group through a multicast IP address while other endpoints may utilize a nailed SIP connection. IS 20 may control this participation, such as by controlling gateways, multipoint conferences and the mapping of communications to IP addresses.

[0029]  IS 20 may be utilized and implemented in any number of market segments, such as enterprise safety and

security (e.g., loss prevention), transportation, retail, public safety and federal agencies in order to provide radio and non-radio network interoperability within and between such market segments. As indicated above, such network interoperability includes the interoperability of push-to-talk voice technology within various networks and the interoperability between push-to-talk and full duplex dialed connections.

[0030]  It will be recognized by those of ordinary skill in the art that endpoints 22 and IS 20 may be any combination of hardware, software, and/or encoded logic that provides communication services to a user. In the illustrated embodiment, endpoints 22 comprise a PC (endpoint 22a), a PDA (endpoint 22b) and an IP phone 22c). However, in other embodiments, endpoints 22 may include a telephone, a personal computer (PC), a video monitor, a camera, an IP phone, a cell phone, a land mobile radio (LMR), a personal digital assistant (PDA), a command center or any other communication hardware, software and/or encoded logic that supports the communication of audio, video or other data, using packets of media (or frames) or otherwise, through communication system 10. Endpoints 22 as well as endpoints and components of communication networks 24 may be capable of communicating using any particular type of technology, such as cellular, IP, PSTN, CDMA, GSM, TDMA and satellite. Endpoints 22 and IS 20 may also include unattended or automated systems, gateways, other intermediate components or other devices that can establish media sessions.

[0031]  Although the illustrated embodiment includes five communication networks 24a-24e, the term "communication network" should be interpreted as generally defining any network capable of transmitting audio and/or video telecommunication signals, data, and/or messages, including signals, data or messages. Any one of networks 24a-24e may be implemented as a local area network (LAN), wide area network (WAN), cellular network, global distributed network such as the Internet, Intranet, Extranet, PSTN, LMR network, CDMA network, GSM network, TDMA network, satellite network or any other form of wireless or wireline communication network.

[0032]  Communications over communication networks 24a-24e may use any suitable communication protocol. In a particular embodiment, some communication networks may employ voice communication protocols that allow for the addressing or identification of endpoints, nodes, and/or other components coupled to the communication network. For example, using Internet protocol (IP), each of the components coupled together by, for example, communication network 24b in communication system 10 may be identified in information directed using IP addresses. In this manner, network 24b may support any form and/or combination of point-to-point, multicast, unicast, or other techniques for exchanging media packets among components in communication system 10. Any network components capable of exchanging audio, video, or other data are included within the scope of the present invention.

[0033]  Since IP networks share a common method of transmitting data, telecommunication signals may be transmitted between telephony devices located on different, but interconnected, IP networks. In addition to being coupled to other IP networks, communication network 24b may also be coupled to non-IP telecommunication networks, for example

   Motorola Solutions, Inc., Ex1005, p. 10

through the use of interfaces or components, including gateways. In the illustrated embodiment, communication network 24b may be coupled with PSTN 24c through a gateway. In some embodiments the gateway may be a part of IS 20 or network 24e. PSTN 24c includes switching stations, central offices, mobile telephone switching offices, pager switching offices, remote terminals, and other related telecommunications equipment that are located throughout the world. IP networks transmit data (including voice and video data) by placing the data in packets and sending each packet individually to the selected destination, along one or more communication paths. Unlike a circuit-switched network (like PSTN 24c), a dedicated circuit is not required for the duration of a call or fax transmission over IP networks.

[0034] Technology that allows telecommunications to be transmitted over an IP network may comprise Voice over IP (VoIP), or simply Voice over Packet (VOP). In the illustrated embodiment, one or more of endpoints 22, and endpoints and components of communication networks 24 may be IP telephony devices capable of participating in IM, video, and other multimedia communication sessions. IP telephony devices have the ability of encapsulating a user's voice (or other input) into IP packets so that the voice can be transmitted over a communication network. IP telephony devices may include telephones, fax machines, computers running telephony software, nodes, gateways, wired or wireless devices, hand held PDAs, or any other device capable of performing telephony functions over an IP network.

[0035] In particular embodiments, communication system 10 may receive and transmit data in a session initiation protocol (SIP) environment. SIP is an application-layer control protocol that includes primitives for establishing, modifying and terminating communication sessions. SIP works independently of underlying transport protocols and without dependency on the type of session that is being established. SIP also transparently supports name mapping and redirection services, which support personal mobility.

[0036] Although FIG. 1 illustrates a particular number and configuration of endpoints, IS and communication networks, communication system 10 contemplates any number or arrangement of such components for communicating media.

[0037] FIG. 2 illustrates interoperability system (IS) 50, in accordance with a particular embodiment. IS 50 may be similar to and provide the same functionality as IS 20 of FIG. 1. In the illustrated embodiment, IS 50 includes interface 51, gateways 52, operations management application (OMA) 54, multipoint conference system (MCS) 56, policy engine 58, authentication and security system 60, call manager 62, processor 64 and memory module 66. IS 50 is coupled to a PC endpoint 70 that may be used to access, configure and control various functionality provided by IS 50. PC endpoint 70 may run a client application for such access, configuration and control. The client application may enable a user of endpoint 70 to receive and monitor communications from various endpoints and virtual talk groups. In particular embodiments, other types of endpoints may be utilized to access, configure and control IS 50, such as IP phones, PDAs and mobile devices. IS 50 may be coupled to such endpoints (including PC endpoint 70) through one or more communication networks.

[0038] Interface 51 is used in the communication of audio, video, signaling and other data between IS 50 and other network components. For example, interface 51 may receive communications from endpoints such as endpoints of communication networks 24, endpoints 22 and endpoint 70. The communication may take place over IP networks thereby negating the need for dedicated wiring between the endpoints and the IS.

[0039] Gateways 52 may include any suitable gateways to provide network interoperability and back-end legacy application integration, such as LMR gateways, PSTN gateways and application gateways. Gateways 52 provide mapping between IP services and the interoperable networks, such as LMR network 24a of FIG. 1. In some cases gateways 52 may not be located within an IS but may be distributed throughout a communication system for enabling communications among various communication networks.

[0040] Operations management application (OMA) 54 includes functionality for configuration, management and control of IS 50, including conference and collaboration management, and may be accessed by a user via, for example, PC endpoint 70. In particular embodiments, OMA 54 may enable a user, such as dispatch personnel or administrators or a mobile user (e.g., a first responder mobile user) accessing IS 50 via a mobile endpoint, the ability to configure, manage and participate in one or more virtual talk groups and ad hoc conferences simultaneously. In particular embodiments, OMA 54 may be accessed through a web interface, functioning for example as a soft phone for radios. A screen display may be controlled using a mouse, keypad, touch screen, voice commands or any other suitable interface. OMA 54 screens may include any number of functional controls to provide interoperable communications. OMA 54 may authenticate a user and obtain user configuration information upon a user accessing the OMA. OMA 54 may monitor and provide communication ability for any number of channels at one time to provide the ability for an OMA user to communicate on and control multiple virtual talk groups at once.

[0041] Multipoint conference system (MCS) 56 provides collaboration and conference services for multiple endpoints of one or more networks. For example, users of multiple endpoints (such as LMRs of different networks (e.g., networks of different agencies or groups) and different types of endpoints of different networks) may be bridged together through MCS 56 to provide virtual talk group communications. MCS 56 may include any suitable number or type of conference bridges, ports, digital signal processors or other components to facilitate communications discussed herein.

[0042] Policy engine 58 includes policies for undertaking various operations and functionality upon the occurrence of various events to provide dynamic incident management. These policies may include both pre-determined and ad hoc policies. For example, upon the occurrence of a particular incident, the incident may include a unique identifier and may have basic incident attributes such as time of creation, name of user creating and status. A pre-determined policy may then be executed by an incident manager or dispatch personnel as action for the specific incident. In particular embodiments, policy engine may receive inputs from alarms and sensors to setup device agnostic communications interoperability and one-way video and data collaboration and to trigger additional events such as pagers, e-mails, notifications, dial-outs, recording and information escalation.

Appx01430    Motorola Solutions, Inc., Ex1005, p. 11

5

[0043] Authentication and security system **60** manages access, configuration and control privileges for users of IS **50** and those participating in interoperable communications. For example, different users may have different privileges assigned for interoperable communications. Some users may only have transmit or listen privileges with respect to one or more particular talk groups, while other users may have the ability to communicate in all talk groups or setup and configure various talk groups. User privileges may change dynamically upon the occurrence of particular events.

[0044] Call manager **62** maintains information regarding various users, such as users of IP networks for which interoperable communications are provided by IS **50**. This facilitates in the extension of PTT to IP networks and in the provision of voice and data interoperability across radio and non-radio networks. In particular embodiments, call manager **62** may maintain a listing, table, or other organization of information about users. The information may include a name or other identifier and contact information such as phone numbers and email addresses for the users. In particular embodiments call manager **62** may represent any appropriate combination of hardware, software and/or encoded logic distributed throughout a communication network coupled with IS.

[0045] Processor **64** may be a microprocessor, controller, or any other suitable computing device, resource, or combination of hardware, software and/or encoded logic operable to provide, either alone or in conjunction with other IS components such as OMA **54**, IS **50** functionality. Such functionality may include providing various features discussed herein to a user, such as a user of an endpoint accessing IS **50** through OMA **54**. Such features may include providing to the user endpoint location information of communicating endpoints of a plurality of monitored endpoints and/or virtual talk groups, enabling the user to listen to and/or participate in communications involving endpoints and/or virtual talk groups of a particular geographic area, presenting communications of endpoints of scene-related virtual talk groups according to preconfigured or received instructions and controlling various gateways and other network components to facilitate interoperable communications among various endpoints.

[0046] Memory module **66** may be any form of volatile or non-volatile memory including, without limitation, magnetic media, optical media, random access memory (RAM), read-only memory (ROM), removable media, or any other suitable local or remote memory component. Memory module **66** may store any suitable data or information, including software and encoded logic, utilized by IS **50**. In particular embodiments, memory module **66** may include data for user management, talk-group management, resource pool management, privileges, backup configuration and information and/or timestamp and activity tracking.

[0047] IS **50** may also include any number of switches, routers, firewalls, mobile access routers, access points, wireless bridges and other components in order to accommodate particular operational desires and needs.

[0048] In particular embodiments such as in the LMR network interoperability context, IS **50** may, through one or more components discussed above or through other components, encode received audio with a standard audio codec, such as G.711 or G.729. Those audio samples may be

packaged in standards-based real-time transport protocol (RTP) packets suitable for transport on an IP network. At this point, the communication element may be abstracted from the distinctive characteristics of each radio system. These audio packets can be sent across the network to other radio systems either individually (unicast) or as a group (multicast). The recipient of the audio packets may be a device capable of receiving and decoding the RTP stream, such as an IP telephone or PC with appropriate software. The IP network and IP-enabled devices can be used to allow users to monitor or transmit on a particular radio channel from a desk without issuing another radio.

[0049] As indicated above, IS **50** may facilitate communication among users of endpoints of various networks through virtual channels or talk groups. For example, a channel may comprise a unidirectional or bidirectional path for transmitting and/or receiving electrical or electromagnetic signals. This may comprise, for example, a conventional radio physical RF channel. A talk group in this context may be a subgroup of users (e.g., radio users) who share a common functional responsibility and typically coordinate actions amongst themselves without radio interface with other subgroups. For example, a municipality's police department network may include various talk groups.

[0050] A virtual talk group (VTG) represents interoperability of a group of channels, for example, as an audio conference or meeting. A virtual talk group may include an associated virtual channel and an ID. Virtual channels may comprise an address, such as an IP address, associated with a virtual talk group through which users may access the virtual talk group and/or through which communications from VTG member-endpoints are bridged. Various types of virtual talk groups may be utilized in particular embodiments, such as a multicast address usable by all endpoints of the VTG, a VTG comprising multiple talk groups (e.g., multiple radio sources from different frequencies whose communications are mixed), a unicast group and a combination unicast and multicast group.

[0051] As an example, a particular virtual talk group may comprise a conference or meeting of the following: (1) a channel or other multicast path used by certain users of a police department's radio network, (2) a channel or other multicast path used by certain users of a fire department's radio network, (3) a channel or other multicast path used by certain users of a corporation's security radio network and (4) a plurality of users of IP-enabled endpoints such as IP phones, IP-enabled PDAs or PCs. An operator of IS **50** may configure the virtual talk group using any suitable interface, such as by dragging and dropping the included channels and IP endpoints into a single area representing the virtual talk group. MCS **56** may provide the functionality for the conference of the virtual talk group members. In particular embodiments, multiple talk groups may be patched together on a dynamic, as needed basis. In some cases a virtual talk group may not necessarily include communications through an IS but may instead include member endpoints whose communications are mapped to IP addresses at gateways (such as LMR gateways) controlled by an IS.

[0052] Any number of virtual talk groups may be configured to provide any suitable audio, data, video and control network interoperability. Virtual talk groups may be created using any suitable user/endpoint groups or channels based

on location, organizational requirements, event requirements or any other suitable characteristic. An administrator or operator may configure channel details such as name, description, participants, multicast IP addresses, codec and latch options through, for example, OMA 54.

[0053] FIG. 3 illustrates an endpoint 80, which may comprise a mobile endpoint, in accordance with a particular embodiment. Endpoint 80 may be similar to, and may provide similar functionality to, other endpoints discussed herein.

[0054] In the illustrated embodiment, endpoint 80 includes a transmitter/receiver 82, a user interface 84, a processor 86 and a memory module 88. Transmitter/receiver 82 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 80 and also receives and transmits communications such as audio, video and other data to and from other network components. User interface 84 provides a mechanism through which a user of endpoint 80 may operate the endpoint and communicate with other network devices. Interface 84 may comprise a keypad, display, touch screen, audio input or any other suitable interface. Instructions may be submitted through speech recognition, collection of keystrokes, soft key or otherwise.

[0055] Processor 86 may be a microprocessor, controller, or any other suitable computing device, resource, or combination of hardware, software and/or encoded logic operable to perform endpoint functionality. Processor 86, either alone or in conjunction with other endpoint components, provides endpoint functionality discussed herein. Memory module 88 may be any form of volatile or non-volatile memory including, without limitation, magnetic media, optical media, random access memory (RAM), read-only memory (ROM), removable media, or any other suitable local or remote memory component.

[0056] In particular embodiments, communications from endpoints such as endpoint 80 may include GPS information indicating the location of the endpoint from which a particular communication is transmitted. The GPS information may be carried by both unicast and multicast communications. With this information, whenever a user utilizes an endpoint to communicate, the specific location from where the media (e.g., PTT or other communication) was transmitted may be identified, for example at PC endpoint 70 through IS 50. In some cases, a gateway may be used to bridge between media streams that include location information of a transmitting endpoint and media streams that do not include location information of a transmitting endpoint. For example, some legacy mobile devices may not be able to embed or otherwise include GPS information within a media stream.

[0057] In particular embodiments, endpoint 80 may be used by a command officer or other user and may run a client application of IS 50. In some cases endpoint 80 may receive communications from a plurality of endpoints, and processor 86 may filter out certain communications for presentation to a user of endpoint 80 based on the location of the transmitting endpoints of the communications. As discussed herein, communications received may include GPS or other location information identifying locations of their transmitting endpoints.

[0058] As discussed above, particular embodiments provide the ability to transport geographical location informa-

tion from mobile endpoints to each other and to an IS and the utilization of this information for displaying the location (e.g., as a street or block number within a city or in another manner) to other users, as well as presenting an icon associated with the specific mobile endpoint and with its location. In some embodiments GPS information may be appended to a multicast stream in a header of a packet transmission or to a unicast stream. GPS information may be carried by being steganographically embedded within a voice stream or in the header of IP packets. With the location information, whenever an end-user at a mobile station talks, rather than simply having an indicator show the VTG of the last communication, an icon or other indicator (e.g., on a map) may show the specific location from where the media (e.g., PTT media) arrived. In some cases, special attention may be given to conferencing when more than one speaker talks when, for example, SIP and unicast may be used. In this case the plurality of location information from all talkers may be embedded within the media stream, and all icons of all speakers may blink to indicate where the speakers are located. Particular embodiments also provide backwards compatibility to existing systems. For example, when a speaker from an unknown location speaks, the system may indicate the VTG over which the voice came, but the location of that speaker may not be presented on the map.

[0059] Furthermore, particular embodiments provide the ability of an endpoint such as endpoint 80 to filter communications presented to its user based on the location of transmitting endpoints of the communications. For example, an endpoint used by personnel monitoring a plurality of interoperable communications facilitated by an IS (such as endpoint 80 running a client application of IS 50) may receive many media streams from a variety of VTGs. The endpoint may present to its user only the media streams that originate from within a pre-defined neighborhood. As discussed above, communications may include GPS information of transmitting endpoints appended to multicast and/or unicast media streams. In some cases the user may draw an area of interest on a map, and the communications that originate with the area may be filtered for presentation to the user. For example, when a supervisor wants to listen to activities from a specific site, he can click on that area of the map and/or highlight a specific area on the map and select a "listen" or "participate" function. As discussed above, in one embodiment the filter steps may be performed at the user's endpoint. In some embodiments, the filter may be generated at an IS and downloaded to the relevant endpoint. This allows the filter to be stored and managed from a central IS. In some embodiments a user such as a policeman may want to obtain information from sensors in his area of interest. In this embodiment, GPS information may be embedded in the information stream from the specific sensors. In some cases, as the system establishes a conference of users or a VTG, the location information is used in the speaker selection algorithm. For example, in accordance with one embodiment, as the system selects the top three speakers, the speakers who are closest to the center of the event are given priority over users who are farther away from the center of the event.

[0060] Moreover, particular embodiments provide automated configuration of endpoints into VTGs based on their locations. GPS information is appended to multicast and/or unicast media streams. In one embodiment, a user through a client application may establish connection with an IS, such

Appx01432    Motorola Solutions, Inc., Ex1005, p. 13

US 2007/0036100 A1                                                           Feb. 15, 2007

7

as IS **50**, and may continuously update the IS regarding the user's location. Using GPS source location, the IS may configure endpoints as participants in a VTG that spans their neighborhood. In some embodiments, the neighborhood may be defined by a configurable distance from an event or as all endpoints who are in proximity to the user (e.g., within 4 miles from the user). In other embodiments, the neighborhood may be defined by drawing an area on a map on the user's endpoint display. By defining the area of the neighborhood, the client application user's endpoint may be automatically joined into a VTG with all users whose locations fall within the defined neighborhood. In addition, participant endpoints in the VTG may dynamically change (e.g., may be added and removed from the VTG) since the endpoints may be mobile and their locations may continuously change.

[0061]    In some cases, the IS may apply hysteresis. As a result, once a user joins the geographically defined VTG he may remain a member through the end of the event. In some cases, hysteresis may be utilized based on an area. For example, one a user is automatically added to a geographically defined VTG based on the user's location within a first area, the user may remain a member of the VTG despite leaving the first area as long as the user is within a second, larger area that includes the first area. Hysteresis may be applied to any of the functionality discussed herein, including the mere receipt of communications from endpoints within a particular area. In some cases, a user may elect to opt out of the VTG if he travels out of the area defined by the system as the event location area. Embodiments may automatically conference users who are joining the VTG via unicast with, e.g., SIP signaling. Some embodiments may also automatically and dynamically add and drop users into/from a conference bridge using hysteresis as a key part of an add/drop user algorithm. In one embodiment, users of endpoints may be requested to approve the automatic action of dropping them out of the VTG. In some cases, a user traveling through different areas may be coming in and out of multicast range. An IS in some embodiments may automatically switch the user between multicast connectivity and a nailed SIP connection to accommodate capabilities of a locally available network. In addition, in some cases if a user is continuously moving in and out of a multicast area, the IS may fix their connectivity to a VTG via a nailed dialed connection.

[0062]    FIG. 4 is an example display **200** of an endpoint, such as PC endpoint **70** or another mobile or non-mobile endpoint, accessing IS **50** through OMA **54**, in accordance with a particular embodiment. In the illustrated embodiment, display **200** includes location portion **202** and VTG control portion **204**; however, it should be understood that displays of endpoints accessing IS **50** in other embodiments may include additional or different information related to functionality of IS **50** and communications facilitated therethrough.

[0063]    In this embodiment, location portion **202** displays a particular geographical area showing multiple mobile endpoints **210a-210c**, **212a-212c** and **214a-214c**. VTG control portion **204** shows three virtual talk groups (**1**, **2** and **3**), each comprising a plurality of members. For example, VTG **1** comprises endpoints **210a-210c**; VTG **2** comprises endpoints **212a-212c**; and VTG **3** comprises endpoints **214a-214c**. As discussed above, particular endpoints of various

networks (e.g., various public safety agency networks) may be grouped together in virtual talk groups according to any number of factors. In the illustrated embodiment, endpoints **212a**, **212b** and **212c** make up VTG **2** and are associated with incident **213**, which may comprise a burglary, fire or other incident. For example, if incident **213** is a fire, a user of endpoint **212a** may be a city police officer and endpoint **212a** may be part of that city's police department network. A user of endpoint **212b** may be fire department personnel responding to the fire, and endpoint **212b** may typically communicate on a different fire department network. As also illustrated, endpoints **214a**, **214b** and **214c** form VTG **3** and are associated with incident **215**.

[0064]    As discussed, endpoints of each VTG may be a part of different networks, such as different radio networks of different public or private agencies or groups. For example, with respect to VTG **1**, endpoint **210a** may be a land mobile radio of a police officer from a particular municipality police network, endpoint **210b** may be a land mobile radio of a police officer from a different municipality police network and endpoint **210c** may be a cellular phone of a federal agency network. As discussed above, IS **50**, through Internet Protocol, enables various endpoints of different networks to communicate in talk groups using the technology of such networks. For example, communications among endpoints **210a-210c** may use PTT technology and may be facilitated by IS **50**.

[0065]    A user such as a command officer or dispatch personnel may use display **200** to monitor communications of various channels or talk groups, such as various talk groups composed of land mobile radio or other endpoint users. For example, a command officer may use display **200** to monitor communications on VTGs **1**, **2** and **3**. Whenever a particular mobile endpoint **210**, **212** or **214** user communicates through the endpoint, such as when a user communicates a PTT audio message, the endpoint of display **200** (e.g., PC endpoint **70**) may communicate the transmission through the PC endpoint. As indicated above, communications transmitted from a mobile endpoint may comprise audio, video or other data (including PTT messages, IMs, e-mails, streaming video, etc.). Display **200** indicates from which VTG and/or mobile endpoint the communication is transmitted. The communication from the mobile endpoint may also include location information (e.g., GPS information) identifying the location of the mobile endpoint transmitting the message. IS **50** may receive this location information and present to the command officer the location of the mobile endpoint as it communicates the actual message from the endpoint.

[0066]    For example, assume in the illustrated example that mobile endpoint **212a** is a police officer's land mobile radio and that its police officer user is communicating an audio message to other members of VTG **2**. These other members may include, for example, users of endpoints **212b** and **212c** as well as all other users, such as administrative, command or dispatch users, that have access privileges to receive communications of members of this virtual talk group. When transmitting the audio message, endpoint **212a** also transmits information identifying its location. This message may be communicated through a base station and other components of one or more communication networks and received at IS **50**. IS **50** then communicates the message to other endpoints of the talk group (e.g., endpoints **212b** and

8

212c) if such endpoints are not a part of the same radio network as endpoint 212a. In addition, when communicating the audio message from endpoint 212a, IS 50 may communicate the location information identifying the location of endpoint 212a. Thus, a user of an endpoint presenting display 200 using the endpoint and associated display to monitor communications on VTGs 1, 2 and 3 will know the location of endpoint 212a as the user receives communications from the endpoint.

[0067]    The communication of the particular VTG or endpoint identification of a particular communication as well as the endpoint's location may be performed in any of a variety of ways according to particular operational needs and desires. As an example, in display 200 a particular endpoint transmitting a message communicated to a user of IS 50 may be highlighted or otherwise identified in VTG control portion 204. In addition, the associated VTG number may be highlighted or otherwise identified as well. Moreover, as indicated, as the endpoint of display 200 transmits the audio message from endpoint 212a, display 200 may highlight endpoint 212a (as illustrated) and may identify the particular endpoint's location, such as identifying a street address location of the endpoint (as illustrated).

[0068]    The illustrated example shows locations of various endpoints 210, 212 and 214. In some cases, the locations of these endpoints may be updated when a user of the endpoint transmits an audio, video or other message through the endpoint since location information may be transmitted at that time (e.g., embedded within the media stream).

[0069]    As indicated above, display 200 is only one example of communicating information as described herein, and other embodiments may communicate endpoint location information of communicating endpoints of various networks and talk groups in any suitable manner. Endpoint location information may be transmitted with endpoint communications in any suitable manner, such as through GPRS or steganographically. In particular cases, the communications from mobile endpoints comprise multicast communications that are transmitted to other endpoints of the same network and to IS 50 for transmission to endpoints of other networks. In some embodiments, location information and other meta information, such as unit ID, priority and channel, may be communicated using a separate associated multicast port/channel.

[0070]    In some cases, location information may be transported in a real-time transport protocol (RTP) header extension. For example, RTP headers include a reserved area in the header to put a variable length header extension that could contain additional information about an RTP talker. As another example, location information may be transported using the real-time control protocol (RTCP) stream. The RTCP port is one higher than the RTP port by definition. In particular cases, other attributes about the endpoint may already be included using RTCP. The location information may comprise, for example, GPS latitude/longitude information or street and/or city information. In some embodiments, the associated RTP stream may include the location information. As an example, 239.1.1.1:21111 might be a RTP multicast address:port through which the voice stream is transported, and another address:port (for example, the RTP VOIP port+2 for the RTP signaling port) may be used to include the location information.

[0071]    In particular embodiments, the location information may be communicated to all original streams, such as via multipoint conference system 56 of IS 50 or directly between the endpoints without traversing through the IS. For example, GPS1, GPS2 and GPS3 may comprise GPS information from three separate endpoints involved in a talk group. In the case of the appended RTP header example, the multipoint conference system may combine and/or append the meta data components at the point of the mixing or bridging function. In the case of the separate control channel example, the streams may flow to all application aware endpoints, and an endpoint may recognize and determine the interesting or relevant GPS information from multiple meta streams. In the case of the RTCP model example, RTCP streams may be typically collected and terminated at each endpoint. Multipoint conference system 56 may terminate the RTCP meta information and regenerate an associated RTCP stream on the other side for transmission to endpoints of the virtual talk group. In some cases, either the RTP header extension or a new payload type may be used. In particular cases, a description field may be used. In a situation where MCS 56 mixes more than one media stream, the location description field may include the locations of a plurality of speaking endpoints. The RTP header may be sent for every packet and may be large overhead but may be best for real time changing information. The particular data, application and operational requirements and desires may dictate the best methodology for transmission of the location information.

[0072]    FIG. 5 is an example display 300 of an endpoint 302 which may comprise a mobile or non-mobile endpoint, in accordance with a particular embodiment. Display 300 also includes endpoints 304, 306, 308, 310, 312, 314 and 316, which may comprise any type of mobile or non-mobile endpoints of one or more communication networks, such as endpoints and communication networks described above. When transmitting communications, endpoints 304, 306, 308, 310, 312, 314 and 316 may include GPS information identifying their locations in a similar manner as discussed above with respect to FIGS. 3 and 4.

[0073]    Some of the illustrated endpoints are members of virtual talk groups configured through IS 50. Table 301 lists virtual talk groups 1-5 and current endpoint members of each such VTG. For example, VTG 1 includes endpoints 304a-304e, VTG 2 includes endpoints 306a-306b, VTG 3 includes endpoints 308a-308c, VTG 4 includes endpoints 310a-310e and VTG 5 includes endpoints 316a-316f. Currently, endpoints 312 and 314 are not included in any VTG of the IS.

[0074]    Endpoints 304, 306, 308, 310 and 316 may be assigned a VTG for any operational need, such as geography and/or event or incident. For example, endpoints 316a-316f may be grouped into a VTG (e.g., VTG 5) to respond to a particular incident. The incident may have occurred, for example, proximate endpoints 316a, 316d, 316e and 316f. While endpoints 316b and 316c are not currently in the immediate vicinity of the incident, it may be desired, for any particular reason, to include those endpoints so that they can participate in the VTG communications.

[0075]    The endpoints illustrated on display 300 may be part of different communication networks. For example, endpoint 310a may be a mobile endpoint of a police depart-

 Motorola Solutions, Inc., Ex1005, p. 15

US 2007/0036100 A1

9

Feb. 15, 2007

ment network that communicates on a particular radio frequency, and endpoint 310d may be a mobile endpoint of an ambulance service network that communicates on a different radio frequency. In some cases, endpoints of different communication networks may include endpoints that are communicating on different channels or frequencies (e.g., one endpoint may be communicating on a frequency reserved for police department A while another endpoint may be communicating on a frequency reserved for fire department B). IS 50 facilitates interoperable communications among such endpoints such that communications transmitted by endpoint 310a may be communicated, through one or more base stations or other network components, to endpoint 310d. In addition, IS 50 may convert communications received from these endpoints to IP packets for transmission and receipt by particular IP endpoints which may include, for example, other endpoints 310 of talk group 4 as well as command personnel accessing IS 50 through OMA 54. In some cases, IS 50 may control various gateways to facilitate the conversion of communications to IP packets.

[0076] Particular embodiments enable a user to listen, participate or otherwise communicate with particular endpoints or VTGs according to location. As indicated above, endpoint 302 presents display 300 to a user such as a command officer or dispatch personnel. In particular embodiments, such a user may configure endpoint 302 to listen to discussions or otherwise receiving communications in a particular geographical area of display 300. Such area may include any suitable geographical area identified by the user, such as an area within a particular radius of the current location of endpoint 302 or another area that does not include the current location of endpoint 302. For example, in some cases when a user of endpoint 302 desires to listen to activities from a particular site, the user may click on a particular area of the display map presented and/or highlight a specific area of the map and select a "listen" or "participate" function. As a result, IS 50 may automatically configure the user's endpoint to be a part of the VTGs active in this geographical area. The interface through which a user may identify and select a particular area may comprise any suitable interface according to operational needs and desires, such as a mouse, touch screen, key pad or audio command. In particular embodiments, a user may zoom in or out on a particular display to identify and select a geographical area of particular virtual talk groups or endpoints. In some cases, a display may be partitioned into multiple segments or portions for selection by a user.

[0077] As an example, a user of endpoint 302 may select a particular distance from endpoint 302 that defines a geographical area 320 so that the user of endpoint may be presented (by his endpoint) with communications from all endpoints included within this area, including VTGs that include endpoints within this area. Thus, in the illustrated embodiment, a user of endpoint 302 could listen to or communicate with endpoints 304b, 304e, 310b, 310d, 310e, 312, 316b and 316c. Endpoint 302 may receive GPS information from endpoints identifying their location to determine whether the endpoints are within area 320 such that their communications should be presented to its user. Endpoint 302 may receive communications from, for example, all endpoints of the display but may filter or otherwise select communications from endpoints within the selected area for presentation to its user. Such presentation may be made through, for example, a speaker, display or other interface.

In some embodiments, a policy engine of an IS may store pre-defined areas of interest that are invoked as part of a specific policy.

[0078] It should be understood that since endpoints 304b and 304e are part of VTG 1, endpoints 310b, 310d, and 310e are part of VTG 4 and endpoints 316b and 316c are part of VTG 5, in some cases the user of endpoint 302 may be able to communicate with endpoints of VTGs 1, 4 and 5 not included within geographical area 320. For example, assume endpoints 304a and 304b are a part of the same LMR network such that they communicate on the same radio frequency. To allow endpoint 302 to communicate with endpoint 304b (since endpoint 304b is within area 320), IS 50 would have to receive communications from endpoint 302 and transmit the communications to endpoint 304a on the applicable radio frequency that endpoint 304b may also be able to receive.

[0079] In particular cases, endpoint 302 may be a mobile endpoint such that when it moves, area 320 moves since area 320 is defined by a particular distance from endpoint 302. For example, if endpoint 302 moves eastward, then endpoint 304b, if stationary, may no longer be within area 320 such that a user of endpoint 302 may no longer be able to communicate with endpoint 304b according to this criteria.

[0080] As another example, a user of endpoint 302 may select a geographical area to communicate with that does not include the present location of endpoint 302. For example, a user of endpoint 302 may identify and select area 330. Endpoint 302 may then determine, based on GPS information received, that endpoints 310a and 310c and endpoints 316a, 316d, 316e and 316f are presently within area 330 and may ensure that the user of endpoint 302 is presented communications from such endpoints. In some cases, endpoint 302 may present all communications received by those endpoints within area 330. For example, endpoints 310a and 310c communicate in VTG 4 and may thus receive communications from other members of the VTG, such as endpoints 310b, 310d and 310e. If a user of endpoint 302 is configured to receive communications received by all endpoints within area 330, then the user may also receive communications from, for example, endpoint 310b since VTG 4 communications from this endpoint will be received by endpoint 310a which is within area 330.

[0081] In particular embodiments, in response to the selection of a geographical area, a virtual talk group comprising all endpoints currently in that area may be formed. As such endpoints leave the area, they may be removed from the VTG. Similarly, as other endpoints enter the selected area, they may be added to the VTG. In this manner, VTGs may be created based on location of endpoints. In some cases, only certain types of endpoints (e.g., such as only public security agency endpoints) may be added to a VTG defined by endpoints of a particular geographical area.

[0082] As discussed above, in particular embodiments a mobile endpoint may filter received communication streams according to the location from which the streams are transmitted. This may be accomplished, for example, when the media streams include the GPS or other location information of the transmitting endpoint. For example, a mobile endpoint such as endpoint 304b may receive all communications from each endpoint in VTG 1. Each such communication may include GPS information identifying the location of the

Appx01435    Motorola Solutions, Inc., Ex1005, p. 16

US 2007/0036100 A1

Feb. 15, 2007

10

communication's source endpoint. Endpoint 304b may include a processor, similar to that described above with respect to an IS, that filters out for communication to a user of endpoint 304b only those communications received from endpoints in a selected or predefined geographical area. Such geographical area may be selected and/or predefined by a user of endpoint 304b in a similar manners as in other embodiments described above with respect to endpoint 302. Thus, even though the endpoint may receive communications from various locations, the endpoint may examine the GPS information in such communications to play or otherwise present to its user only those communications coming from a particular location, region or area. While some embodiments discussed above discuss location information or GPS information filter functionality at an endpoint, it should be understood that this filter functionality may be performed at an IS and selected or filtered communications may then be transmitted to a user's endpoint for presentation to the user.

[0083] FIG. 6 is an example display 400 of an endpoint 420 which may comprise a mobile or non-mobile endpoint accessing IS 50 through OMA 54, in accordance with a particular embodiment. Display 400 also shows endpoints 402a-402d, 404a-404e, and 410a-410c, which may comprise any type of mobile or non-mobile endpoint of one or more communication networks, such as endpoints and communication networks described above. In addition, display 400 shows hospital network 406 and police station network 408 which each include one or more endpoints at the hospital and police station, respectively. When transmitting communications, the illustrated endpoints may include GPS information identifying their locations in a similar manner as discussed above.

[0084] Illustrated endpoints are members of virtual talk groups configured through IS 50. Table 401 lists virtual talk groups 1-4 and current endpoint members of each such VTG. For example, VTG 1 includes endpoints 402a-402d and hospital 406, VTG 2 includes endpoints 404a-404e and police station 408, VTG 3 includes endpoints 410a-410c and VTG 4 includes hospital 406. As discussed above, endpoints in particular embodiments may be assigned a VTG for any operational need, such as geography, scene or event or incident. As used herein, the terms scene, event or incident can be used interchangeably to describe one another. For example, a scene may include an event or incident. In this example, VTG 1 is associated with a scene 403, VTG 2 is associated with a scene 405, VTG 3 is associated with a scene 411 and VTG 4 is associated with hospital scene 406 which, as discussed above, includes one or more hospital endpoints. The endpoints illustrated on display 400, including hospital 406 and police station 408, may be part of different communication networks. Such different communication networks may include different LMR networks, LANs, cellular networks or any other type of communication network as discussed herein.

[0085] In particular embodiments, a user's endpoint may be configured to listen, participate or otherwise communicate with particular endpoints or VTGs according to scene, incident or event. As indicated above, endpoint 420 presents display 400 to a user such as a command officer or dispatch personnel. In particular embodiments, such a user may configure endpoint 420 to listen to discussions or otherwise receive communications according to a particular scene

using any suitable criteria or instructions. Configuration instructions may be received by an interface of IS 50 from a user through an endpoint interface or from a system operator, administrator or other personnel. In some cases, a user's endpoint may be preconfigured to listen to particular scene-related VTGs according to any suitable set of preconfiguration instructions.

[0086] As an example, assume that a user of endpoint 420 is a police command officer currently communicating on VTG 1 associated with a car accident scene 403. VTG 1 includes endpoints 402a-402d and hospital 406. Assume that scene 405 comprises a burglary and that the police command officer using endpoint needs to drive to the burglary scene. As indicated above, VTG 2 is associated with scene 405 and includes endpoints 404a-404e and police station 408. In particular embodiments, endpoint 420 is configured to automatically switch to VTG 2 of burglary scene 405 as endpoint 420 gets close to the scene. In some cases, endpoint 420 may switch to one or more VTGs of the closest scene to endpoint 420. For example, when endpoint 420 becomes closer to scene 405 than scene 403, the endpoint may switch to VTG 2. Similarly, if endpoint 420 was closest to scene 411, it would switch to VTG 3.

[0087] As another example, assume that a user of endpoint 420 is an ambulance driver at car accident scene 403. Endpoint 420 may thus be patched into VTG 1 associated with scene 403. The ambulance driver may need to take a victim of the accident to hospital 406. As indicated above, endpoints of hospital 406 may also be a part of another group, VTG 4, associated with the hospital. As endpoint 420 gets closer to hospital 406, the endpoint may be configured to automatically switch to VTG 4. This may be done because the driver may no longer need to speak with members of VTG 1 since he has left scene 403. Switching to VTG 4 which just includes hospital endpoints 406 may reduce unnecessary information flow to the ambulance driver and help him focus on delivering the patient promptly to the hospital. By removing communications from VTG members at the scene of the accident, overflow of irrelevant information to the driver is reduced and the driver is allowed to focus on hospital-specific information.

[0088] Instead of switching to a VTG associated with a closest scene, in some cases an endpoint 420 may be configured to switch to one or more VTGs of scenes within a particular distance of the endpoint. Thus, the endpoint may receive communications from a plurality of VTGs associated with a plurality of scenes. GPS information received by endpoint 302 may be used by IS 50 to determine the location of endpoint 302 and therefore the proper VTG(s) in which endpoint 302 would participate based on suitable instructions.

[0089] Endpoints may be configured to switch to VTGs of particular scenes according to any suitable criteria or instructions. In some cases, endpoint 302 may be configured to switch to all VTGs associated with scenes, events or incidents of a particular priority level. For example, if scenes 403, 405 and 411 comprised a hostage crisis, an armed robbery and a car accident, respectively, scenes 403 and 405 may be assigned a higher priority than scene 411. As such, endpoint 420 may be configured to automatically participate in VTGs 1 and 2 (associated with scenes 403 and 405). Various priority levels may be assigned to scenes in accor-

dance with particular needs. In addition, endpoint **420** may automatically switch to various VTGs dynamically as scenes, events and incidents occur in a similar manner as the switching of endpoint **420** to VTGs based on location.

[0090] As another example, in some cases endpoint **420** may be configured to switch to all VTGs associated with scenes, events or incidents of a particular type. For example, VTGs may exist for various types of incidents, such as police incidents, fire incidents, rescue incidents, federal incidents, investigation incidents and private organization incidents. In some cases, endpoint **302** may be configured to listen to all police incidents as they arise. In some cases, endpoint **420** may be configured to listen to all burglary scenes or all hostage scenes or all fire scenes or all car accidents as they arise. In other cases, a user of endpoint **420** may comprise a company security officer whose endpoint **420** automatically listens to all VTGs associated with security-related incidents. In some embodiments, the selection of scenes (e.g., by priority, type or other characteristic) may be combined with a particular geographical area. For example, endpoint **420** may be configured to listen to all high priority scenes in a particular geographic area or all car accident scenes in a particular area. Particular embodiments may enable an endpoint to be configured to listen to and/or communication with any of a variety of event, incident or scene-specific virtual talk groups according to any of a variety of factors, characteristics, or criteria. For example, a chief of police of Washington, D.C. may always be tuned into any communication originating from the vicinity of the White House.

[0091] As indicated above, endpoints whose communications are facilitated by an IS may include PTT endpoints. Since PTT endpoints are typically half duplex devices, one must "control the floor" in order to talk to other endpoints in a talk group. Particular embodiments may selectively provide floor control to an endpoint requesting to talk based on the distance of the endpoint to an incident or scene associated with a virtual talk group, particularly if more than one PTT endpoints is requesting to talk at the same time. For example, an IS may give floor control to the endpoint requesting to talk that is closest to an event associated with a VTG of which the endpoints requesting to talk are members. As is the case in other embodiments, the IS may analyze location information transmitted in communications or in the actual talk request control signal from the endpoints.

[0092] It will be recognized by those of ordinary skill in the art that endpoints and interoperability systems disclosed herein are merely example configurations in accordance with particular embodiments. These systems may include any number of interfaces, processors, memory modules, and other components to accomplish the functionality and features described herein. In addition, these components and other desired components for performing the above described functionality may be centrally located (local) with respect to one another, or distributed throughout communication systems and networks. In addition, one or more components of these systems and devices may work together in performing various functionality described herein.

[0093] FIG. 7 is a flowchart illustrating a method for providing interoperable communications with location information, in accordance with a particular embodiment.

The method begins at step **500** where communications from a plurality of virtual talk groups are received. The virtual talk groups may each comprise a plurality of endpoints of different communication networks. It should be understood that for purposes of the descriptions and claims herein, whenever a VTG is described as comprising a plurality of endpoints of different communication networks, in addition to including at least some endpoints of different communication networks, the VTG may also include some endpoints of the same communication network. For example, the VTG may include a plurality of endpoints of the same police department network in addition to one or more endpoints of other communication networks, such as other police or fire department or private company networks. Moreover, in some cases, endpoints of different communication networks may include endpoints that are communicating on different channels or frequencies. The different communication networks may comprise networks of different technologies, such as IP, cellular, PSTN, LMR, CDMA, GSM, TDMA, GPRS and satellite. In particular embodiments, at least some of the endpoints of the virtual talk groups may communicate through PTT technology. In addition, some of the endpoints may comprise IP endpoints. Moreover, the different communication networks may comprise networks of various safety and security agencies, whether public or private as well as networks of public and private groups, companies or organizations. The communications may be received at an interoperability system and/or at a client application of an interoperability system.

[0094] The communications may be received via a multicast stream whose header includes the location information or via a unicast stream with the location information. The virtual talk groups may include communications (from the various endpoints) that are facilitated by an IS by mapping the communications to a multicast IP address or by bridging the communications at a multipoint conference system of the IS.

[0095] At step **502**, a first communication is received from a first mobile endpoint of a first virtual talk group of the plurality of virtual talk groups. The first communication comprises a first media message and location information identifying a location of the first mobile endpoint. The location information may comprise GPS information. The message may comprise an audio, video, IM or other data message from the first endpoint, such as a push-to-talk communication from a land mobile radio.

[0096] At step **504**, the first media message is presented to a user. At step **506**, an identification of the first virtual talk group may be presented to the user. At step **508**, the location of the first mobile endpoint is presented to the user. The user may be receiving communication from endpoints of the monitored plurality of virtual talk groups, for example, through a PC, IP phone or other endpoint running a client application that accesses an IS. As the first message from the first mobile endpoint is presented to the user, an identification of the first virtual talk group of which the first mobile endpoint is a member may be transmitted to the user by an IS. This may aid a user who is presented information from multiple virtual talk groups to determine from which virtual talk group the first communication is transmitted. In addition, the location of the first mobile endpoint may be presented to the user by the IS. Such presentation of the first virtual talk group identification and location of the first

US 2007/0036100 A1

Feb. 15, 2007

12

mobile endpoint may be through a display of an endpoint through which the user accesses the IS using any suitable presentation method. In some embodiments, the location of the first mobile endpoint may be presented as a geographical address, such as a street address or longitude and latitude or other coordinate address.

[0097] FIG. 8 is a flowchart illustrating a method for communicating media based on location of media source, in accordance with a particular embodiment. The method begins at step 600 where communications comprising a media message and location information are received from a plurality of endpoints. The communications may be received at a user's mobile endpoint. In some cases an IS may facilitate the transmittal of the communications to the endpoint, such as by controlling LMR gateways or other components, by mapping communications to a multicast IP address, by bridging communications into a mixed stream or by other methods. In some cases the communications may be received from endpoints of different virtual talk groups. The communications may be received via multicast streams or nailed dialed connections, such as those using SIP protocol. In particular embodiments, at least some of the transmitting endpoints may communicate through PTT technology. In addition, some of the endpoints may comprise IP endpoints. The location information identifies a location of the endpoint communicating the message and may comprise GPS information.

[0098] At step 602, a selection of a geographical area is received from a user. The user may be a command officer or other user utilizing a mobile endpoint. The selection of a geographical area may be received by the user, for example, selecting the area on a display of his endpoint such as by drawing the area on a map shown on a touch screen display.

[0099] At step 604, location information of each communication is compared with the selected geographical area. Such comparison may be performed at the user's mobile endpoint. As indicated above, the location information identifies a location of the endpoint transmitting the communication. At step 606, the endpoint determines whether the location information of each transmitting endpoint is within the selected geographic area. For each endpoint whose location information indicates that the transmitting endpoint is not in the selected geographic area, the method ends. However, the method may continue to check whether other endpoints move into the selected geographic area or whether endpoints not in the area come to be within the area as a result of the area moving.

[0100] At step 608, for each transmitting endpoint whose location information indicates that the endpoint is within the selected geographic area, each message from each such endpoint is presented to the user by, for example, the user's endpoint. These messages may be communicated to the user through a display, speaker or other audio interface. The messages may comprise push-to-talk messages received from LMR endpoints within the selected geographic area. In particular embodiments, communications from the plurality of endpoints may be presented to the user as long as the various endpoints are within the geographical area. In addition, as other endpoints enter the selected geographical area, their communications may be presented to the user as well. Thus, some embodiments may send an audio stream to a user that mixes communications from all endpoints currently within an area, and the mixed stream may account for and dynamically include (and exclude) communications from endpoints as they enter and leave the area.

[0101] FIG. 9 is a flowchart illustrating a method for automatic configuration of virtual talk groups based on location of media source, in accordance with a particular embodiment. The method begins at step 700 where communications from a plurality of endpoints are monitored, such as at an interoperability system. Each communication may comprise a media message and location information identifying a location of its transmitting endpoint. At step 702, virtual talk group configuration instructions based on the locations of the mobile endpoints are received. In some cases virtual talk group configuration instructions may be received from a user accessing an OMA 54 of an IS through an IS client application. In some cases virtual talk group configuration instructions may be pre-loaded or pre-configured on the IS.

[0102] The virtual talk group configuration instructions may include, for example, instructions to configure a virtual talk group of mobile endpoints within a first distance of an event (e.g., a car accident, burglary, terrorist or other event), within a first distance of a particular user's mobile endpoint (e.g., such as a user accessing an IS through a client application) or within a geographic area selected on a map by a user. Virtual talk group instructions based on locations of mobile endpoints may include instructions to configure the virtual talk group based on any of a variety of suitable or desired operational factors or characteristics.

[0103] At step 704, a first group of mobile endpoints is selected according to the virtual talk group configuration instructions. For example, if the virtual talk group configuration instructions include instructions to configure a virtual talk group of all mobile endpoints within a particular distance of an event, then all such endpoint may be selected at step 704. At step 706, a first virtual talk group comprising the selected first group of mobile endpoints is configured to facilitate communications among the selected first group of mobile endpoints. The selected first group of mobile endpoints may include mobile endpoints of different communication networks. The communications among members of the virtual talk group may be facilitated by an IS by, for example, controlling LMR and other gateways coupling various types of communication networks. In some cases the communications may be mapped to one or more multicast IP addresses to enable the virtual talk group. In some cases communications from the various endpoints may be bridged by a multipoint conference system into a communication stream for transmission to endpoints of the virtual talk group.

[0104] As in other embodiments, a virtual talk group may comprise endpoints utilizing different technologies. In particular embodiments, at least some of the endpoints may communicate through PTT technology. In addition, some of the endpoints may comprise IP endpoints. Moreover, the different communication networks may comprise networks of various safety and security agencies, whether public or private as well as networks of public and private groups, companies or organizations.

[0105] Some of the steps illustrated in FIGS. 7, 8 and 9 may be combined, modified or deleted where appropriate, and additional steps may also be added to the flowcharts.

Appx01438    Motorola Solutions, Inc., Ex1005, p. 19

US 2007/0036100 A1　　　　　　　　　　　　　　　　　　Feb. 15, 2007

13

Additionally, steps may be performed in any suitable order without departing from the scope of the invention.

[0106] While various implementations and features are discussed with respect to multiple embodiments, it should be understood that such implementations and features may be combined in various embodiments. For example, features and functionality discussed with respect to a particular figure such as one of FIGS. 4-9 may be used in connection with features and functionality discussed with respect to another such figure according to operational needs or desires.

[0107] Although the present invention has been described in detail with reference to particular embodiments, it should be understood that various other changes, substitutions, and alterations may be made hereto without departing from the spirit and scope of the present invention. For example, although the present invention has been described with reference to a number of elements included within communication system 10 and illustrated endpoints and interoperability systems, these elements may be combined, rearranged or positioned in order to accommodate particular routing architectures or needs. In addition, any of these elements may be provided as separate external components to communication system 10 and illustrated endpoints and interoperability systems, or each other where appropriate. The present invention contemplates great flexibility in the arrangement of these elements as well as their internal components.

[0108] Numerous other changes, substitutions, variations, alterations and modifications may be ascertained by those skilled in the art and it is intended that the present invention encompass all such changes, substitutions, variations, alterations and modifications as falling within the spirit and scope of the appended claims.

What is claimed is:

1. A method for communicating media based on location of media source, comprising:

receiving communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint;

receiving a selection of a geographical area;

comparing the location information of each communication with the selected geographical area; and

presenting to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.

2. The method of claim 1, wherein:

receiving communications from a plurality of endpoints comprises receiving communications from a plurality of virtual talk groups each comprising endpoints of different communication networks; and

presenting to the user each message received from each endpoint of the plurality of endpoints located within the selected geographical area comprises presenting to the user messages from endpoints of different virtual talk groups.

3. The method of claim 1, wherein receiving communications from a plurality of endpoints comprises receiving communications from a plurality of endpoints via a multicast stream.

4. The method of claim 1, wherein receiving communications from a plurality of endpoints comprises receiving communications from a plurality of endpoints via a nailed dialed connection.

5. The method of claim 1, wherein receiving a selection of a geographical area comprises receiving a selection of a geographical area on a map presented to the user.

6. The method of claim 1, wherein comparing the location information of each communication with the selected geographical area comprises comparing the location information of each communication with the selected geographical area at an endpoint of the user.

7. The method of claim 1, wherein the location information comprises global positioning satellite (GPS) information.

8. The method of claim 1, wherein each media message comprises an audio message and the location information is steganographically embedded within the audio message.

9. The method of claim 1, wherein:

the plurality of endpoints comprise sensors; and

the media messages of the communications from the plurality of endpoints comprise information received at the sensors.

10. The method of claim 1, wherein the communications from the plurality of endpoints comprise push-to-talk communications.

11. The method of claim 1, wherein the plurality of endpoints located within the selected geographical area includes endpoints from at least two of: a police department communication network, a fire department communication network, an ambulance communication network and a company communication network.

12. The method of claim 1:

further comprising mixing each message received from each endpoint located within the selected geographical area into an output stream;

wherein presenting to the user each message received from each endpoint located within the selected geographical area comprises presenting the output stream to the user;

further comprising receiving from a first endpoint of the endpoints located within the selected geographical area a new communication comprising a new message and new location information identifying a new location of the first endpoint;

comparing the new location information with a second geographical area, the second geographical area larger than the selected geographical area and including the selected geographical area;

adding the new message to the output stream if the new location of the first endpoint is within the second geographical area; and

excluding the new message from the output stream if the new location of the first endpoint is not within the second geographical area.

Appx01439　　Motorola Solutions, Inc., Ex1005, p. 20

US 2007/0036100 A1

14

Feb. 15, 2007

13. A method for communicating media based on location of media source, comprising:

receiving communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint;

receiving a selection of a geographical area;

comparing the location information of each communication with the selected geographical area;

selecting endpoints of the plurality of endpoints based on their proximity to the selected geographical area; and

presenting to a user each message received from each selected endpoint.

14. The method of claim 13, wherein selecting endpoints of the plurality of endpoints based on their proximity to the selected geographical area comprises selecting a first number of endpoints closest to the geographical area.

15. The method of claim 13:

further comprising mixing each message received from each selected endpoint into an output stream;

wherein presenting to the user each message received from each selected endpoint comprises presenting the output stream to the user;

further comprising receiving from a first endpoint of the plurality of endpoints a new communication comprising a new message and new location information identifying a new location of the first endpoint;

comparing the new location information with the selected geographical area; and

adding the new message to the output stream based on the proximity of the new location of the first endpoint to the selected geographical area.

16. A system for communicating media based on location of media source, comprising:

an interface operable to:

receive communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint;

receive a selection of a geographical area; and

a processor coupled to the interface and operable to:

compare the location information of each communication with the selected geographical area; and

present to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.

17. The system of claim 16:

wherein an interface operable to receive communications from a plurality of endpoints comprises an interface operable to receive communications from a plurality of virtual talk groups each comprising endpoints of different communication networks; and

wherein a processor operable to present to the user each message received from each endpoint of the plurality of endpoints located within the selected geographical area

comprises a processor operable to present to the user messages from endpoints of different virtual talk groups.

18. The system of claim 16, wherein an interface operable to receive communications from a plurality of endpoints comprises an interface operable to receive communications from a plurality of endpoints via a multicast stream.

19. The system of claim 16, wherein an interface operable to receive communications from a plurality of endpoints comprises an interface operable to receive communications from a plurality of endpoints via a nailed dialed connection.

20. The system of claim 16, wherein an interface operable to receive a selection of a geographical area comprises an interface operable to receive a selection of a geographical area on a map presented to the user.

21. The system of claim 16, wherein a processor operable to compare the location information of each communication with the selected geographical area comprises a processor operable to compare the location information of each communication with the selected geographical area at an endpoint of the user.

22. The system of claim 16, wherein the location information comprises global positioning satellite (GPS) information.

23. The system of claim 16, wherein each media message comprises an audio message and the location information is steganographically embedded within the audio message.

24. The system of claim 16, wherein:

the plurality of endpoints comprise sensors; and

the media messages of the communications from the plurality of endpoints comprise information received at the sensors.

25. The system of claim 16, wherein the communications from the plurality of endpoints comprise push-to-talk communications.

26. The system of claim 16, wherein the plurality of endpoints located within the selected geographical area includes endpoints from at least two of: a police department communication network, a fire department communication network, an ambulance communication network and a company communication network.

27. The system of claim 16, wherein:

the processor is further operable to mix each message received from each selected endpoint into an output stream;

a processor operable to present to the user each message received from each selected endpoint comprises a processor operable to present the output stream to the user;

the interface is further operable to receive from a first endpoint of the endpoints located within the selected geographical area a new communication comprising a new message and new location information identifying a new location of the first endpoint; and

the processor is further operable to:

compare the new location information with a second geographical area, the second geographical area larger than the selected geographical area and including the selected geographical area;

Appx01440    Motorola Solutions, Inc., Ex1005, p. 21

15

add the new message to the output stream if the new location of the first endpoint is within the second geographical area; and

exclude the new message from the output stream if the new location of the first endpoint is not within the second geographical area.

28. A system for communicating media based on location of media source, comprising:

an interface operable to:

receive communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint; and

receive a selection of a geographical area; and

a processor coupled to the interface and operable to:

compare the location information of each communication with the selected geographical area;

select endpoints of the plurality of endpoints based on their proximity to the selected geographical area; and

present to a user each message received from each selected endpoint.

29. The system of claim 28, wherein a processor operable to select endpoints of the plurality of endpoints based on their proximity to the selected geographical area comprises a processor operable to select a first number of endpoints closest to the geographical area.

30. The system of claim 28, wherein:

the processor is further operable to mix each message received from each selected endpoint into an output stream;

a processor operable to present to the user each message received from each selected endpoint comprises a processor operable to present the output stream to the user;

the interface is further operable to receive from a first endpoint of the plurality of endpoints a new commu-

nication comprising a new message and new location information identifying a new location of the first endpoint; and

the processor if further operable to:

compare the new location information with the selected geographical area; and

add the new message to the output stream based on the proximity of the new location of the first endpoint to the selected geographical area.

31. A system for communicating media based on location of media source, comprising:

means for receiving communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint;

means for receiving a selection of a geographical area;

means for comparing the location information of each communication with the selected geographical area; and

means for presenting to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.

32. Logic embodied in a computer readable medium, the computer readable medium comprising code operable to:

receive communications from a plurality of endpoints, each communication comprising a media message and location information identifying a location of its transmitting endpoint;

receive a selection of a geographical area;

compare the location information of each communication with the selected geographical area; and present to a user each message received from each endpoint of the plurality of endpoints located within the selected geographical area.

* * * * *

Appx01441     Motorola Solutions, Inc., Ex1005, p. 22



US007113090B1

## (12) United States Patent
Saylor et al.

(10) Patent No.: **US 7,113,090 B1**
(45) Date of Patent: **Sep. 26, 2006**

(54) **SYSTEM AND METHOD FOR CONNECTING SECURITY SYSTEMS TO A WIRELESS DEVICE**

(75) Inventors: **Michael J. Saylor**, McLean, VA (US); **Alison Slavin**, Vienna, VA (US); **Jean Paul Martin**, Oakton, VA (US); **Stephen Scott Trundle**, Falls Church, VA (US)

(73) Assignee: **Alarm.com Incorporated**, McLean, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 11/190,016

(22) Filed: **Jul. 27, 2005**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 10/683,299, filed on Oct. 14, 2003, now Pat. No. 6,965,313, which is a continuation of application No. 09/840,302, filed on Apr. 24, 2001, now Pat. No. 6,661,340.

(51) Int. Cl.
*G08B 1/08* (2006.01)
(52) U.S. Cl. ............................. 340/539.18; 340/539.11; 340/5.33
(58) Field of Classification Search ............. 340/539.1, 340/539.18, 539.11, 5.33, 517, 531, 541, 340/506, 539.13
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,446,454 A | 5/1984 | Pyle | |
| 4,581,606 A | 4/1986 | Mallory | |
| 4,777,474 A | 10/1988 | Clayton | |
| 5,027,383 A | 6/1991 | Sheffer | |
| 5,195,126 A | 3/1993 | Carrier et al. | |
| 5,438,607 A | 8/1995 | Prygoda, Jr. et al. | |
| 5,499,014 A | 3/1996 | Greenwalt | |
| 5,621,385 A | 4/1997 | Carney | |
| 5,638,046 A | 6/1997 | Malinowski | |
| 5,777,551 A | 7/1998 | Hess | |
| 5,861,804 A | 1/1999 | Fansa et al. | |
| 5,867,105 A | 2/1999 | Hajel | |
| 5,892,442 A | 4/1999 | Ozery | |
| 6,032,036 A | 2/2000 | Maystre et al. | |
| 6,035,016 A | 3/2000 | Moore | |
| 6,049,272 A | 4/2000 | Lee et al. | |
| 6,049,273 A | 4/2000 | Hess | |
| 6,052,052 A | 4/2000 | Delmonaco | |
| 6,133,830 A | 10/2000 | D'Angelo et al. | |
| 6,211,783 B1 * | 4/2001 | Wang | 340/506 |
| 6,295,346 B1 | 9/2001 | Markowitz et al. | |
| 6,369,705 B1 | 4/2002 | Kennedy | |

* cited by examiner

*Primary Examiner*—Toan N. Pham
(74) *Attorney, Agent, or Firm*—Hunton & Williams LLP

(57) **ABSTRACT**

The present invention provides a personal security network where an individual's system or systems of security devices may be connected to a central security network. The central security network of the present invention may monitor a system's status and alert the individual when an alert situation occurs. The present invention provides a security network where a user may set up personalized alarms and alert services; identify various methods of contact; order at which to be contacted; individuals and entities to be contacted; type of situations to be alerted of and other relevant security and other information. The present invention may further provide a personalized web interface where authorized individuals may view current and historical security device status. A user may generate personalized reports based on aggregated historical data based on various user-defined factors. The reports may be displayed to the user in various formats, such as maps, graphs, statistics, and others.

**72 Claims, 18 Drawing Sheets**





FIG. 1

U.S. Patent          Sep. 26, 2006          Sheet 2 of 18          US 7,113,090 B1



FIG. 2

     Motorola Solutions, Inc., Ex1011, p. 3



FIG. 3



FIG. 4



FIG. 5

Appx01503    Motorola Solutions, Inc., Ex1011, p. 6

CURRENT STATUS
MODULE 610

PERSONAL REPORTS
MODULE 620

EQUIPMENT CONTROL
MODULE 630

FIG. 6

Appx01504    Motorola Solutions, Inc., Ex1011, p. 7



FIG. 7

**U.S. Patent** Sep. 26, 2006 Sheet 8 of 18 US 7,113,090 B1



FIG. 8

Appx01506 Motorola Solutions, Inc., Ex1011, p. 9

FIG. 9



FIG. 10

Appx01508     Motorola Solutions, Inc., Ex1011, p. 11



FIG. 11

Motorola Solutions, Inc., Ex1011, p. 12



FIG. 12A

Appx01510    Motorola Solutions, Inc., Ex1011, p. 13



FIG. 12B

Appx01511    Motorola Solutions, Inc., Ex1011, p. 14



FIG. 12C

Appx01512    Motorola Solutions, Inc., Ex1011, p. 15

FIG. 13

Appx01513    Motorola Solutions, Inc., Ex1011, p. 16



FIG. 14

Appx01514    Motorola Solutions, Inc., Ex1011, p. 17



FIG. 15

Appx01515　Motorola Solutions, Inc., Ex1011, p. 18



FIG. 16

Appx01516    Motorola Solutions, Inc., Ex1011, p. 19

US 7,113,090 B1

**1**

# SYSTEM AND METHOD FOR CONNECTING SECURITY SYSTEMS TO A WIRELESS DEVICE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation in part of U.S. patent application Ser. No. 10/683,299, filed Oct. 14, 2003, now U.S. Pat. No. 6,965,313, which is a continuation of U.S. patent application Ser. No. 09/840,302, now U.S. Pat. No. 6,661,340 B1, which are hereby incorporated by reference herein in their entirety.

## FIELD OF INVENTION

The present invention relates generally to the field of security systems, in particular to a system and method for connecting a security system to a wireless communication system to automatically inform an owner and other authorized entities in a manner predetermined by the user when alarm situations and/or alarm worthy situations occur.

## BACKGROUND OF THE INVENTION

Home security and personal safety are major concerns for individuals. People want to protect their valuables and provide a safe haven for family members and loved ones. Traditional home security systems generally alert neighbors and others within the vicinity with a loud noise warning the intruder or intruders that the invasion has been detected. In addition, home alarms generally inform a home security central system of the unauthorized entry. The home security central system then alerts the police and/or third party security companies that an unauthorized entry has occurred. Home security devices generally involve window detectors, door detectors, motion sensors and other devices.

High false alarm rates pose a serious problem in communities. False alarms deplete police resources and undermine the credibility of systems that appear to repeatedly malfunction. In response to the high number of false alarms (over 90% in some areas), counties and other localities may fine alarm owners whose systems repeatedly produce false alarms in an attempt to reduce staggering false alarm rates. In some communities, laws have been passed that prevent the police from responding to an alarm activated by a security system. As a result, alarm owners may be forced to employ expensive third party security companies to respond to alarm situations.

Some systems may place a confirmation call or communication to the owner before dispatching the police or other security entity. This may be helpful when the owner is at home to explain that the alarm was a false alarm thereby preempting the alarm and police dispatch. In other situations, the alarm may have been triggered inadvertently by a pet, falling branch or other innocent act while the home owner is away. In such an event, an attempt to make a confirmation call to the owner at home is ineffective. Traditional central alarm systems often fail to proactively contact a home owner while the home owner is in transit. In addition, power failures and other power cutoffs may prevent traditional alarm systems from contacting a user in the event of an alarm situation.

Currently, home security systems offer limited services. Generally, all alarm situations are treated in the same manner. The industry itself has remained stagnant and inflexible. Generally, current security services are confined

**2**

to sounding an alarm and/or dispatching the police or other security entity. Depending on the type of event detected, a user may desire responses in varying degrees of severity. Similar problems exist with other security systems for office buildings, cars, boats, vaults and other objects or locations.

These and other drawbacks exist with current systems.

## SUMMARY OF THE INVENTION

The present invention provides a security system connected to a wireless communication system which enables communication with a subscribed user when an alarm (or other defined) situation occurs. The security system may be applied to a user's home, office, vacation house or other location. The security system may also be applied to a user's mobile property, such as a car, boat or other personal property. In addition, a security system may encompass personal security devices for individuals, such as a panic device.

According to one embodiment, the present invention provides a personal security network where one or more security devices related to a subscriber may be connected to a central security network over wireless communication. The central security network of the present invention may monitor those security devices and alert a user when an alert situation occurs. The user may set up personalized alarms and alert services; identify various methods of contact; identify the order at which to be contacted; individuals and entities to be contacted; select the type of situations for which they want to be alerted and provide other relevant security and other information.

A personalized web interface (e.g., Internet, wireless web, PDA web, etc.) may also be provided through which a user and authorized individuals may view current and historical security device status. A user may initiate contact with a web interface to conveniently view and/or monitor data for registered alarm sensors at various locations, zones, etc. A user may also generate personalized reports or have those reports automatically generated for them from aggregated historical data and other information based on user defined factors, such as area of interest, type of event(s), time frame(s) and other factors. The reports may be displayed to the user in various formats, such as maps, graphs, statistics, and others formats.

According to this or other embodiment, the present invention may further provide a monitoring system for providing images (e.g., photos, pictures, video, diagrams, illustrations, etc.) where an alarm situation may be detected by comparing images. When a change in images (indicating motion) is detected, an alarm may be signaled. In addition, the image and other information may be conveyed to a central security network where identified individuals may be alerted via identified methods. The user may also view the images (e.g., video clips) remotely via the web or other remote access methods.

Users may also monitor and/or control appliances and objects remotely via a wireless channel, which may also be the channel used to send alarm events, alarm broadcasts and other information.

According to another embodiment of the present invention, the system of the present invention provides a wireless communication device at a home security system which relays a wireless communication from the home security device directly to the user's desired devices in such a way so that power failures and other power cutoff situations do not prevent the relay of information to the owner and other points of contact.

US 7,113,090 B1

3

Another embodiment of the present invention provides the ability to report an index of activity within an identified area. The identified area may include a house, one or more rooms within a house, an office, store location, warehouse, multiple locations, any identified area, etc. The area may also be defined by one or more sensor or other monitor devices. The index of activity may be based on data gathered from one or more sensor devices, such as contacts, motion sensors and/or other devices, at the identified area. The index of activity may be reported to a subscriber or other recipient. The information may be conveyed via one or more preferred modes of communication (e.g., wireless communication, broadband, landline, etc.). In addition, the index of activity may be displayed on an online interface, as a graphical representation or other display.

Another embodiment of the present invention provides the ability to identify anomaly information. A subscriber (or other recipient) may be alerted if activity patterns at a location differ from previous activity patterns. A subscriber may define an activity baseline through an interface or other mode of communication. The activity baseline may indicate a level of "normal" activity. Using the activity baseline, an embodiment of the present invention may identify whether or how much the activity varies from the activity baseline for an alert (or other message) to be delivered. A variance amount may be identified to detect when an alert message is transmitted. Recipients and their corresponding preferred communication methods may be identified.

An embodiment of the present invention is directed to a single interface for displaying security data for a plurality of locations. Devices (e.g., sensors, monitors, etc.) may be controlled across locations through this single interface. This feature of an embodiment of the present invention provides a single login and a single interface for viewing subsets of information for a plurality of locations at once. In addition, different security privileges may be assigned to different enterprise users for control of a security system, which may include one or more different locations. This action may be performed through the single interface. The security privileges may be assigned in a hierarchical format where one user can set the code for a group of users, separate from another user and another group of users.

An embodiment of the present invention enables a subscriber to arm a system (or identified group of sensors) automatically. An exemplary application may involve a situation where a system has been left disarmed by mistake. A typical application may involve a store where an owner/manager wants to ensure that a system is armed at night even if the last employee to leave the building forgets to arm the system.

An embodiment of the present invention is directed to moving functionality currently built into and enabled by circuitry and programming deployed inside each Security Control Panel into one or more centralized security servers, the Centralized Security Control Panel hosted at one or more central network operations centers (NOC). Currently, the requirement to deploy a Security Control Panel which contains and supports all of the logic of the Security Systems results in a more expensive deployment and less capable system than is often desired. Additionally, since the logic of the security system is physically deployed in a home or business, it is often very difficult or impossible to update the system with new capabilities without considerable installation and retrofit expense.

Through an embodiment of the present invention, all or most of the programming logic of the Security Control Panel is moved to Centralized Security Control Panel, hosted in a

4

NOC, where data (e.g., monitor data, event data, arming state, site configuration properties, security settings, user codes and user access privileges, alarm handling instructions, etc.) are gathered and maintained and used to direct the behavior of the security system at a remote physical site. The Security Control Panel does not host or maintain any of this information and is essentially virtual. Rather, the Security Control Panel is simply a messaging hub which receives messages from sensors which indicate the sensors state, and which in turn, routes those messages to the Centralized Security Control Panel where logic is applied to determine whether the messages constitute an event which might require a response (e.g., sounding a siren, disarming a set of sensors, sounding a chime, initiating an arming sequence, enabling a new user code, etc.).

According to another embodiment of the present invention, the sensors themselves may simply message their state (or other information) to a central system where a "security system" simply becomes a collection of sensors who send their state (and/or other information) to a central system via a network (e.g., wireless, broadband, etc.).

Additional advantages of the invention will be set forth in part in the description which follows, and in part will be apparent from the description, or may be learned by practice of the invention. The advantages of the invention may be realized and attained by means of the instrumentalities and combinations particularly pointed out in the appended claims.

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate various embodiments of the invention and, together with the description, serve to explain the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graphical representation of a security system with wireless access, according to an embodiment of the present invention.

FIG. 2 is an example of an alarm transmission, according to an embodiment of the present invention.

FIG. 3 is an example of alarm propagation, according to an embodiment of the present invention.

FIG. 4 is a flowchart illustrating a subscription process, according to an embodiment of the present invention.

FIG. 5 is a flowchart illustrating an alarm activation process, according to an embodiment of the present invention.

FIG. 6 is an example of a personal status page, according to an embodiment of the present invention.

FIG. 7 is an example of a current status report, according to an embodiment of the present invention.

FIG. 8 is an example of a personal report based on current, historical and other data, according to an embodiment of the present invention.

FIG. 9 is a flowchart illustrating a process for accessing a security system, according to an embodiment of the present invention.

FIG. 10 is a flowchart illustrating a process for accessing video images provided by a security system, according to an embodiment of the present invention.

FIG. 11 is an example of an alarm flow diagram, according to an embodiment of the present invention.

FIG. 12a is a schematic block diagram of a voice system, according to an embodiment of the present invention.

FIG. 12b is a schematic block diagram of an intelligence server, according to an embodiment of the present invention.

US 7,113,090 B1

**5**

FIG. 12c is a schematic block diagram of call server, according to an embodiment of the present invention.

FIG. 13 is an exemplary flowchart illustrating a method for activity index reporting, according to an embodiment of the present invention.

FIG. 14 is an exemplary flowchart illustrating a method for detecting anomalous activity, according to an embodiment of the present invention.

FIG. 15 is an exemplary flowchart illustrating a method for automatic arming of a security device or system, according to an embodiment of the present invention.

FIG. 16 is an exemplary diagram illustrating a system for a hosted security operating system, according to an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention may provide a security system where a user may personalize alert notifications for various security devices and/or systems. The present invention may also provide access to a web interface (e.g., personal web page) where a user may monitor current security status and other information. Historical data may also be available for the user to generate reports based on aggregate data from security systems within the network and/or other sources of data. A user may register security devices and/or systems with the central security network of the present invention. The central security network may access the user's personal preferences, profile information and/or other information which may be used to execute notifications in the manner specified by the user. For example, the user may identify various personal preferences, which may include contact information, contact individuals, methods of communication, order of contact, special instructions and other information.

For example, when an alert situation is detected, a security device may inform a local control panel, which may then inform a central security network. The user may be informed of an alarm situation and/or alarm worthy situations via web, WAP, voice and other methods of communication, depending on the user's preferences, permissions and/or other information.

According to an embodiment of the present invention, a central security system may include a network where a user may benefit from information from and connection to other users. For example, the system may immediately notify a user about burglar strikes (or other user identified alarm situation) in the user's neighborhood or defined area (radius of interest or other location). The present invention may further provide preventive information when a user is notified of alarm information or other predefined situations.

Users may sign up for services that contact the user (and/or other authorized individuals and/or entities) when an alarm goes off in the user's system, when an alarm worthy situation is predicted (or otherwise detected) by the network, when a neighbor is experiencing an alarm situation and/or at the occurrence of other events. The conditions setting off an alarm, the content of the alarm service, and list of recipients who may be contacted in the event of an alarm, may be personalized and updated through a web site (or other user interface system) of the present invention.

FIG. 1 is a graphical representation of a central security network system 100, according to an embodiment of the present invention. A user may register various types of security devices, including those associated with property 110, personal property 112 and/or individuals 114 with the

**6**

central security network 130 of the present invention. Alarm situations may be detected by a control panel 120, 122, 124 associated with and preferably local to each security device and/or system (e.g., property, personal property, individual, or combination). Control panels 120, 122, 124 may transmit alarm information to central security network 130. Central security network 130 may process the alarm situation, status data and/or other relevant information.

Databases 140, 142, 144 and 146 may store relevant information for personalized alarm services. While shown as separate databases, it should be appreciated that the contents of these databases may be combined into fewer or greater numbers of databases and may be stored on one or more data storage systems. User information may be obtained from user database 140. Alarm events and other information may be stored in alarm events database 142. A user may generate reports based on historical and/or other data which may be stored in reports database 144. Other information may be accessed and/or stored in other database 146. Based on user preferences and other information, the user may be notified via various methods of communication, as specified in the user's profile and preferences information. Alert notification may be communicated via the Internet 150, POTS 152, wireless communication portals, voice portals, and/or other methods. Contact individuals and/or entities 161₁–162_N identified by the user may also receive alert notification in an order determined by the user. The contact order and other actions may be predetermined. In addition, the user may select contact order and/or other actions through menu options at the time of alarm situation notification. An emergency entity 164, such as police, fire department, and/or rescue squads, may receive alert information.

A user may subscribe security systems associated with various objects within the central security network 130 of the present invention. The security system may be applied to property 110, personal property 112, individuals 114 and other objects. Property 110 may include user's home, office, vacation house or other locations. The security system may also be applied to a user's personal property 112, such as a car, boat or other mobile property. A security system may encompass personal security devices for individuals 114, such as a panic device. Other objects, locations, and property may be protected.

Various security devices may be associated with each location, item of personal property, or individual within the central security network of the present invention. For property 110, security devices may include sensors, detectors and/or other devices for detecting alarm situations. For personal property 112, security devices may include global positioning devices associated with devices capable of sensing and/or detecting alarm situations. For individuals 114, security devices may include a panic button or other similar device. Other security devices may be implemented with the system of the present invention. For example, wireless panic buttons with GPS transponders may be available as stand alone devices and may be built into mobile phones, cars, walkmen, bicycles, wristwatches and/or other portable or mobile devices. Thus, a user may alert the authorities any time the user is in danger, from anywhere, and transmit location information detailing the user's position and/or other information. Other variations may be implemented.

According to an embodiment of the present invention, security devices may be predominantly wireless and communicate locally over short-range radio or other modes of communication. Each of the sensors (or group of sensors) may be equipped with a transmitter and the control panel may be equipped with a receiver. A control panel of the

US 7,113,090 B1

present invention may receive regular status information from the sensors and may be alerted when a sensor detects an alarm situation. Other information may be received by the control panel. Transmission of regular status information may occur at predetermined intervals, as well. For example, the sensors may send digital data packets providing status and other data at 10 second intervals. Also, on or off status information may be conveyed to central security network **130**.

When an alarm situation is detected, a local control panel **120** or other similar device may communicate to a central security network **130** of the present invention. Control panels **120** may serve as a link between an alarm system (for each property, personal property, individual, or combination) and a central security network of the present invention. Communication may be established through various mediums. An example may include a radio modem (e.g., CreateaLink 2XT radio modem) which may transmit radio waves at a predetermined frequency (e.g., 900 MHz) which may then be received by central security network **130** or at an intermediary system that relays the signal over a secondary communication channel (e.g., TCP/IP system) to central security network **130**. Other examples of modes of communication may include POTS (plain old telephone service), cable modem, DSL (digital subscriber links), wireless (two-way pager, packet switched, telephone cellular networks) and others.

FIG. 2 is an example of an alarm transmission, according to an embodiment of the present invention. A location, such as home **210**, may include various security and/or other devices, such as panic button **212**, motion sensor **214**, motion contact **216**, home automation modules **218**, which communicate with control panel **220**. Control panel **220** may send a signal via radio modem **222** to radio receiver system **230**. For example, radio modem **222** may transmit alarm and other data at a frequency of approximately 900 Mhz. Other frequencies may also be transmitted and detected. Radio receiver system **230** may then communicate with central security server **130** via a TCP/IP connection. Other communication techniques may be implemented. Central security server **130** may then alert users and other identified entities via wireless and/or other devices, such as mobile device **240**, via a voice alarm, text message and other notifications. For example, alerts may be transmitted to the user via email or other form of electronic communication to a personal computer **242** or other device. In addition, users may check status and other data via mobile device **240**, computer **242** and other devices.

FIG. 3 is an example of alarm propagation, according to an embodiment of the present invention. The alarm system of the present invention provides an efficient method for transmitting an alarm situation and promptly notifying a user and/or other identified entity. According to an example of the present invention, alarm data may be transmitted from control panel **314** to a user's mobile or other device at approximately 30 seconds to approximately 3 minutes. At time T, control panel **314**, located at home **310** or other location, may communicate alarm data to radio modem **312**, at time T+0:05. Radio receiver system **320** may receive the transmitted data at time T+0:10 to 1:00. Communication to central security server **130** may be established at time T+0:15 to 1:10. Communication to radio receiver system **322** may be established at time T+0:20 to 1:20. At time T+0:30 to 3:00, alarm data may be transmitted to a user's device, such as a two-way pager **324**.

According to an embodiment of the present invention, the central security network may provide wireless backup for one or more communication connections. For example, the present invention may include a combination of a POTS connection with wireless back-up. In the event of an alarm, the control panel may attempt to use the phone line to transmit data to a central security network. If data transmission via POTS is unsuccessful (e.g., if someone were using the phone), the control panel may send the data wirelessly to the central security network. In another example, a user may integrate still or motion video into an alarm system through the use of a broadband landline (e.g., cable or DSL) for image transmission with a wireless connection to send alarm data. Other combinations may be implemented.

According to an embodiment of the present invention, control panel **120** may transmit alarm information to central security network **130** at the detection of an alarm situation. Various user defined options may be available. For example, control panel **120** may trigger an alarm sound when an alarm situation has been detected. Based on user defined preferences, a user may be notified before the sounding of an alarm and before contacting an emergency entity (e.g., police, ambulance, etc.) to reduce false alarm penalties and fees. In addition, control panel **120** may trigger an alarm sound and confirm with the user via notification methods where the user may terminate the alarm sound if determined to be false, before an emergency entity has been contacted. Thus, the user may specify that an alarm sound be triggered but police notification to be confirmed by the user before dispatch. In another example, if the user cannot be contacted for confirmation within a predetermined time frame, the system may automatically contact an emergency entity. The user may personalize various parameters and responses based on the alarm situations involved. Other variations may be implemented.

Central security network **130** may process the alarm situation. User profile information may be retrieved from user database **140**. User database **140** may contain user information, such as profile information, user preferences, contact information, special instructions and/or other information. User profile information may include one or more of name, identification information, address information, and other profile information. User preferences may include mode of communication, order of communication, contact information and other preferences. User preference information may be associated with each security device, group of devices, systems or other combinations. For example, different alarm situations that may be detected in various locations or systems may warrant different levels of response. In addition, a user may maintain a personal address book where contact information (e.g., phone, pager, mobile device, etc.) associated with various individuals may be stored and accessed based on various identified alarm situations and/or potential alarm situations. Special instructions may include information to be conveyed to entities reacting to the alarm for a particular location or object. For example, when a fire detector is activated, the user may want to inform the fire department that the user has two pets living at the user's primary residence. Other instructions for different registered locations, objects and/or individuals may be stored and conveyed to entities reacting to the alarm situation per the user's instructions or preferences.

In another embodiment of the present invention, the functions described herein for central security server **130** may be provided in each security device and/or control panel. In that embodiment, each individual security device and/or control panel may initiate notification wirelessly directly to the user based on user notification preferences and data detected at the security device(s). Information from

    Motorola Solutions, Inc., Ex1011, p. 23

US 7,113,090 B1

9 10

the individual security devices may still be transmitted to a central system to store as part of aggregate data discussed in more detail below.

Alarm events database 142 may contain historical alarm and/or other data. Alarm events database 142 may maintain data related to alarm events and other alarm worthy situations within a network and/or community. Other information may be stored and other sources of information may be accessed. This data may be used to generate reports based on aggregated data. For example, a user may request a report regarding home burglaries or other break-ins within a 10 mile radius of the user's primary home for the past 6 months. Other locations, time frames and factors may be identified in generating a report. Maps, charts and/or other graphics may be used to display historical alarm data based on user specifics.

Reports database 144 may contain a repository of user generated reports. These reports may be modified by the user at later times. Also, a user may request periodic updates on generated reports at predetermined intervals of time. Other information may also be requested.

Based on user information retrieved from one or more databases 140, 142, 144 and 146, central security network 130 may contact one or more users 160 or other identified contacts 162₁–162ₙ as specified by the user. Other identified contacts may include neighbors, family members, personal doctors, emergency entities 164, such as the police, fire department, hospital and others.

FIG. 4 is a flowchart illustrating a subscription process, according to an embodiment of the present invention. At step 410, a user may access a web site of the present invention. At step 412, a user may create a profile with customized options. At step 414, a user may create a personalized address of contact information. At step 416, it may be determined whether security devices are purchased from the web site. If so, security devices may be automatically registered, at step 418. If not, security devices may be registered with a central security network, at step 420. At step 422, functions may be assigned to each alarm device or group of alarm devices. At step 424, notification methods may be specified. The steps of FIG. 4 will be described in further detail below.

As illustrated by step 410, a user may access a web site or other user interface associated with a central security network of the present invention. A user may create a subscription with an operation of a central security network by accessing an associated web site via Internet 150. Other methods of connecting the central security network may also be implemented (e.g., telephone registration, mail registration, etc.). The user may select a login and password or other secure access and information retrieval associated with the user. Other security features may also be implemented.

The user may create a profile, at step 412, which may include user identification information (e.g., name), address information, contact information (e.g., phone number, mobile phone number, etc.), email address, billing information and other information.

At step 414, a user may create an address book, which may include a collection of contact information for various individuals or entities identified by the user. For example, the user may provide contact information for various neighbors. In the event of a fire alarm, the present invention may notify the neighbors of the location at which a fire has been detected. In the event that an elderly family member hits a panic button, a family doctor may be contacted and given relevant information regarding the patient's current status.

The user may have the option of purchasing an entire customized security system and/or individual security devices from the present invention. At step 416, it may be determined whether security devices or security systems are approved by (e.g., purchased from) a central security network (or other authorized entity associated with the central security network). If so, security devices or systems purchased from the central security network (or other authorized entity) may be automatically registered with central security network, as illustrated by 418. The user may receive the security devices and install such devices without having to register them specifically.

Device packages offering different levels of security may be available for purchase on the web site or through an independent provider. A user may purchase devices a la carte, in predefined packages at varying levels of security, or any combination. For example, if an individual purchases a system (individual device or combination of devices) from the web site, the system (individual device or combination of devices) may be automatically registered to that user.

If the user has an existing security system or devices or purchased such devices and/or systems from other entities, the user may register these security devices and/or systems, at step 420. For example, the user may register each security device, system or other combination for each property (e.g., house, business, vacation house, etc.), personal property (e.g., car, boat, mobile home, etc.), individual (e.g., spouse, child, grandparent, etc.) and others. For each identified property, personal property, individual or other, the associated security devices may be registered, at step 420.

For example, within a house, a user may have window and door contacts, smoke detectors and motion sensors, video cameras, key chain control, temperature monitors, CO and other gas detectors, vibration sensors, and others. A user may have flood sensors and other detectors on a boat. An individual, such as an ill or elderly grandparent, may have access to a panic transmitter or other alarm transmitter. Other sensors and/or detectors may also be included. The user may register security devices on a central security network by entering the identification code for each registered device and/or system. Other methods of identifying devices, control panels and systems may also be used.

Thus, the central security network of the present invention may also support users who already have an alarm system in their home, or want to buy a system from an alarm dealer and have it professionally installed. The central security network of the present invention may serve as a primary, secondary or other monitoring service.

At step 422, the user may assign various functions to each security device associated with each security system for property, personal property, individuals and others. A user may identify various alarm situations which may include fire (e.g., detected by a smoke alarm), intrusion or break-in (e.g., detected by motion sensors, window contacts, door contacts, etc.), tampering with valuables held in a safe or vault (e.g., detected by vibration sensor, motion sensors, contacts, etc.), assault or danger (e.g., detected by panic button, etc.), dangerous gas levels (e.g., detected by CO or other gas detector, etc.), and other alarm situations or alarm worthy situations.

The user may also request to receive network alerts. Network alerts may be based on alert notifications associated with property, personal property and/or individuals within a defined area or locality. For example, a user may request to receive alert notification that a house in the user's neighborhood was burglarized. This notification may be

US 7,113,090 B1

11

conveyed in an email or other personalized method of notification. Other variations and options may be implemented.

At step **424**, the user may identify notification specifics for each alarm or group of alarms for each system (e.g., property, personal property, individual, etc.). For example, notification specifics may include the methods of notification desired, the order of notification, a list of individuals and/or entities to be notified and other notification information. For example, in the event of a burglary or break-in, the user may request to be notified via cell phone (or other mobile device) where the system may continuously dial the cell phone number until the user answers to respond to the alarm. The user's response may include confirmation of the alarm event, cancellation of the alarm, and other action. The user may also specify that the system should attempt to contact the user through various forms of communication until an answer is received.

In addition, a user may indicate an order of notification or priority. For example, if a user (or owner) cannot be reached, the system may be instructed to contact the next contact entity on the user's order of notification, such as a spouse, relative or neighbor.

A user may also assign various methods of notification for each alarm event or group of alarm events. Methods of notification may include cell phone, regular phone, pager, PDA, email, instant messenger, or other form of communication.

Users may also have the option of inserting comments to be passed on to the authorities (or other emergency entity) should the central security network need to contact them. For example, if an ailing or elderly person hits their panic button, the central security network may call 911 (or other emergency unit) and pass on pertinent health information.

FIG. **5** is a flowchart illustrating an alarm activation process, according to an embodiment of the present invention. Wireless and other sensors may send status information to a local control panel. An alarm situation may be detected by one or more sensors, at **510**. The local control panel may communicate to a central security network of the present invention, at step **512**. Communication may be established via radio modems, landlines (e.g., phone, cable, etc.), wireless (e.g., cellular, etc.), satellite and/or other methods of communication. The alarm situation and other information may be conveyed via one or more data packets, as shown by step **514**. At step **516**, the central security network of the present invention may query one or more user databases to access user information. At step **518**, the alarm situation received by the central security network may be processed according to user-defined conditions and/or other information. The central security network of the present invention may then execute notifications and/or other information to one or more identified entities in the manner identified by the user and other relevant factors and data, as illustrated by step **520**.

According to another embodiment of the present invention, a wireless communication device at a home security system may relay a direct wireless communication from a home security device to a user's mobile device (e.g., cell phone, pager, PDA, etc.). This feature of the present invention may ensure communication to the user via wireless communication in the event of power failures and other power cutoffs.

A control panel may communicate with a central security network via various types of connections. The control panel may have a built-in modem or other communication device. A data packet (or other form of information) may send

12

various types of relevant information, such as one or more of identification number of the control panel, identification number of the device issuing the alarm, relevant information regarding the nature of the alarm, photos, video clips, images and/or other information to one or more receiving servers at the central security network. Upon receiving this data, the central security network may query a user (or other) database where the device ID may be associated with pertinent user information, including one or more of user's profile, preferences and/or permissions. Other relevant information may also be retrieved or made available. By retrieving this information, the central security network may determine how the system should react given a specific user and a specific type of alarm (e.g., smoke, motion, panic, etc.).

For example, when a smoke alarm goes off, a user may instruct a central security network to first contact the user's home to verify the alarm. If no one is home or the emergency situation was confirmed by someone at home, the central security network may directly contact a local fire department and provide the location, nature and/or other information related to the emergency. In addition, the central security network may notify the user's identified neighbors that they may be in danger in the event of an emergency, such as a fire alarm. A different set of conditions may apply if an aging relative with a heart condition activates a panic button or if an intruder were detected in the user's bedroom. Thus, a user may customize a response to an alarm situation or potential alarm situation, depending on various factors, such as the user's preferences, special needs and other relevant factors.

Alarm responses (e.g., alarm sound, emergency dispatch, notifications, etc.) may be based on user preferences and/or other factors and information. For example, an alarm may be activated at the detection of an alarm situation or after confirmation by the user. Also, the user may specify when emergency dispatch is to occur. For example, emergency dispatch may occur at the detection of an alarm situation, after confirmation by the user, after a predetermined period of time if the user cannot be reached or other user defined event or trigger. Thus, the present invention may assist the user in minimizing the penalties and fines associated with false alarms.

FIG. **6** is an example of a personal status page, according to an embodiment of the present invention. A user of the present invention may access a web site (or other user interface) through the Internet or other communication means. A user may also access the network via a voice portal where information may be communicated to the user in a voice message. For example, a user may access a personal status page where personal information may be observed and analyzed. The personal status page may include various modules and functions, which may include a current status report module **610**, personal reports module **620**, equipment control module **630**, and other modules and functions.

Current status report module **610** may enable a user or other authorized individuals or entities to view current security information for one or more registered security devices and/or systems. The current status page may include a current status report, showing each device on a system or network, device status and any relevant information about that device. For example, a user may select to view current information for an identified device, such as a motion sensor, at an identified location (e.g., house). An identified device may include motion sensors, door contacts, window contacts, etc. An identified location may include one or more of a house, office, vacation home, car, boat, family members or other individuals, and others. Summary information may be provided for situations that may be identified as alarm

US 7,113,090 B1

13

worthy events. This information may be personalized by the user. Further detailed information may be viewed for identified alarm situations and others. Detailed information may include video footage, photographs and other data.

An example of a current status report may be illustrated in FIG. 7. Report 700 is an example of a personalized current status report for a user as may be viewed from a web site. It should be appreciated that when a web-based example is used, other user interfaces may also be used including telephone interfaces, mobile web, PDAs, etc. For example, location column 710 may list one or more locations that have been registered with the central security network of the present invention. For example, locations may include home, office, car, family members and other individuals, and boat. Other locations, objects, individuals may be registered with the system of the present invention. Zone 720 may list one or more areas monitored by one or more security devices.

The zone definitions may be identified and/or personalized by the user. For example, a zone may include an area within an identified location. For example, for the home location, zones 720 may include one or more of basement, ground flood, upstairs, master bedroom, and yard. Zones may also be defined by the user, depending on the number and monitoring capabilities of security devices within a location. Zones may also be defined as the area and/or events covered by a single device or group of security devices. For example, zones may be defined as front door, back door, garage door, basement door, windows (first level), windows (second level), etc. Other zones may be defined as fire, flood, temperature, gas, etc. Thus, a user's ability to monitor may be more detailed or broader in scope, depending on the user's preferences, user-defined zones and other information.

For each identified zone or group of zones within a location, current status information may be displayed. Current status information may include whether an alarm situation has been identified. For example, terms, phrases, symbols, and/or identifiers may be used to warn the user of an alarm situation or other alarm worthy events, as defined by the user. Different terms, phrases, symbols and/or identifiers may be used to indicate varying degrees of severity.

For example, when an alert situation is detected, the status column 730 may indicate such an event to the user. In the example of FIG. 7, the term "ALERT" may be displayed. By clicking on or otherwise selecting the alert notification entry in column 730, the user may receive details regarding the alert. Details regarding the alert notification may also be displayed in summary column 740. For example, the user may be informed that a safe was tampered with. The user may also have the option to view photographs and/or video clips at the time of the alarm incident. Other detailed information may be provided. For example, icons or other images may indicate status information, such as alarm, open, tampering, no AC power, shut, sensor bypassed, battery low, siren if alarm, contact if alarm, monitor and other status data for each sensor, group of sensors, for example.

In another example, the user may be informed that all zones are secure and that elevated levels of carbon monoxide have been detected in the upstairs zone of the user's home, where CO levels are rising but not yet dangerous. Other detailed information may be viewed by accessing the alert notification (e.g., clicking on the term "ALERT"). For example, the user may view CO level readings and the relation of current CO levels with levels that may be considered harmful. The user may also access preventive

14

information, which may include instructions, contact information and other information to enable the user remedy the alert situation.

Other events may also be reported and tracked. For example, a user may generate reports for event types, such as the opening of the kitchen door, garage door, for example. Other actions and events may be tracked. Details and other data may be provided, such as date and time of the occurrence. Thus, a detailed log of events detected by security and other devices may be reported and tracked at user defined levels of detail. For example, a user may select or identify report factors, which may include type of event, type of device, unit or system, time period(s), display order, and/or other details. Type of event may include off, tripped, value, fire, battery, AC, malfunction, tamper, disarming, arming stay, arming away, arming failed, disarming failed, sensor bypassed, programming, open and others. Type of device may include smoke, heat, CO, radon, temperature, contact, motion, camera, breakage, sound, panic button, control, light and others.

In addition to the current status report, a user may generate personal reports for informative and precautionary purposes. Personal reports module 620 enable a user or other authorized individuals or entities to generate reports based on current and historical security information from one or more entities registered with the central security network of the present invention. Personalized reports may be generated based on variables, such as time and location. For example, a user may want to view a report showing motion detected in the yard (the location) over the past month (the time).

In another example, a user may request reports based on aggregate data. Aggregate data may include data and/or statistics from other sources within the central security network of the present invention. The user may want to view more general reports derived from the entire network, not just the user's own system. For example, a user may generate a report based on the break-ins within a 5 mile radius of the user's home address within the last 6 months. Other data and demographics may be used to display various graphs, chart, reports and other formats for analysis. An example of a network-dependent report may include a map (or other graphic) showing all of the burglaries that have taken place within 10 miles (or other distance) of the user's home (or other identified location) within the last six months (or other time period or event). Detail information for each alert event may also be provided. For example, a fire icon may represent a fire accident within a user defined location. Further details regarding the exact location of the fire, when the event occurred, police reports and other relevant data may be presented. Links to news bulletins, prevention data and other information may be provided as well. In addition, users may generate and save customized reports to be accessed through the web interface of the present invention. In another example, a user may request a map where recent assaults have occurred in or near the user's neighborhood in the last 3 months.

According to an embodiment of the present invention, the user may aggregate security and/or other data from various sources (e.g., external sources) to generate customized reports regarding issues of concern. Other sources of information may include public records, police reports and other data. This feature of the present invention provides users (and/or other authorized individuals and/or entities) the ability to analyze data on varying levels of detail and user-defined factors.

FIG. 8 is an example of a personal report based on current, historical and other data, according to an embodiment of the

US 7,113,090 B1

15

present invention. For example, a user may generate various reports, such as a home CO graph, office camera, backyard motion, car location, individual location, pet location, and safe intrusion, for example. Data regarding other events under surveillance by the user may be used to generate other user-defined graphs, charts and other formats of data.

In another example, the user may request scheduled services which may include a generation of regular reports about selected security issues or status information. For example, a user may request a report of local break-ins which may be generated and conveyed to the user at pre-determined intervals, such as every week. Reports may also be generated at the occurrence of a triggering event, such as an alarm situation. For example, at the occurrence of a police response to an alarm, the system may generate an updated report including the most recent police response or other identified trigger within the user's defined area of interest. Other triggers and user-defined preferences may be defined.

Equipment Control module 630 may enable a user to control various appliances and devices within a user's home or other location. For example, devices may include lights, televisions, VCRs, heating, ventilation, air conditioning, home entertainment units and other devices. Appliances may include stove, gas range, iron, and others. Through the present invention, the user may control these appliances and devices remotely. For example, while the user is away on an extended trip, the user may want the user's home to appear "lived-in." Thus, the present invention enables users to control appliances, devices and other objects remotely so that potential intrusions and/or burglaries may be avoided. For example, this feature of the present invention may also include the ability to turn devices on and off and manipulate lighting in the home or other location. The present invention may also enable the user to implement a schedule at which to activate one or more devices. For example, the heating may be turned on every morning at 6:00 a.m. and turned off every night at 10:00 p.m., as defined by the user's schedule. Also, the porch lights may be activated every night at 6:00 p.m. and turned off at 6:00 a.m.

FIG. 9 is a flowchart illustrating a process for accessing a security system, according to an embodiment of the present invention. At step 910, a user may be presented with an alarm notification and various options. The user may be notified via pre-selected methods of communication. For example, the user may request to be notified via pager, cell phone or other form of wireless and other communication. For example, the user may receive a notification with options where the options may include notifying a spouse, notifying neighbors and other options. At step 912, a user may access a central security network of the present invention, via various forms of communication, such as WAP, Internet, voice portal and other methods. At step 914, the user may be asked to confirm the user's identify for access authorization. For example, the user may be asked to provide a password, PIN or other form of identification. This information may be checked against the user's database and/or other subscriber information.

At step 916, the user may be permitted to navigate through the option menus to retrieve relevant and important information. Depending on the medium of communication (e.g., wireless, voice, Internet, etc.) the user may navigate through possible choices via voice, keypads, number selection and other selection methods. For example, a user may be alerted via a mobile device (e.g., a cell phone) that an intruder has been detected at the user's home. Menu options may include selecting (e.g., pressing or saying) 1 to alert the

16

authorities; selecting 2 to deactivate the alarm, and other options. In another example, a user may be alerted that an attempted burglary took place on the user's street last night. Menu options may include selecting 1 to notify the user's wife, selecting 2 to check the user's alarm system status and other options. Menu options may be predetermined based on user profile and other data. Menu options may also vary on the type of alarm event detected.

The present invention enables a user to monitor and automate home, business and other locations or objects from a remote location via a voice portal. For example, a user may perform various options, including the ability to arm and disarm security system and/or individual devices, turn lights on and off, and check current system status. The security service of the present invention allows a user to interact with a security system via voice messages. Voice shortcuts may also be created to enable users to punch in a code (e.g., 2 digit code) assigned by the user for certain tasks. For example, code 77 may turn off bedroom lights, code 78 may disarm the security system, and 79 may turn on the coffee maker. Features are customizable to a user's schedule and needs.

At step 918, the user may select the appropriate one or more actions. For example, the user may be notified of a possible break-in. The user may then select to view an image (e.g., photo, video, etc.) taken of the area associated with the alert at the time of the possible break-in. The user may then execute an appropriate action. For example, if the user views an image of a pet knocking over a lamp which falls and breaks a window, the user may cancel the alarm and emergency notification. Thus, police resources may be conserved and the user may avoid a penalty fine for a false alarm. Other actions may include a confirmation response where the user may confirm the emergency thereby allowing police (or other emergency) dispatch. The user may also provide feedback or request further information. Other options may also be available. To provide the functionality of a telephone-based output with user interaction, a voice delivery system, such as Microstrategy's Telecaster™ system, may be employed.

FIG. 10 is a flowchart illustrating a process for accessing video images provided by a central system network, according to an embodiment of the present invention. Users may monitor an identified location by using video or other similar recording device. The video feature of the central security network of the present invention may compare images. For example, if a change between images is detected, a recording may be triggered. The video clips of movement may be stored or sent to a server of a central security network. The user may then be notified according to predefined notification methods.

At step 1010, an identified location may be monitored by a video or other recording device. At step 1012, video images may be compared to detect motion or other event. For example, an image taken at time X+1 may be compared to a previous image taken at time X. The interval of comparison may be predetermined. In addition, the interval of comparison may be defined based on various factors, such as the importance of the property being monitored. For example, if motion is detected, an alarm may be triggered. In addition, the recorded images (e.g., video clips) may be compressed, at step 1016, to reduce the amount of data that may be stored in a database, as shown by step 1018, and/or sent to a central security network, as shown by step 1020. At step 1022, user information may be accessed to determine an appropriate response. For example, user information may include user profile, preferences, permissions and/or other

Appx01524    Motorola Solutions, Inc., Ex1011, p. 27

US 7,113,090 B1

17

information. At step 1024, the image (e.g., video clips) may be processed to determine whether certain user defined conditions are met for alarm triggers and other actions. Notifications and/or other actions may be executed at step 1026. At step 1028, the user may view video clips, images and/or other information remotely via various forms of communication, including wireless devices or the image may be automatically transmitted to the user at a selected device.

FIG. 11 is an example of an alarm flow diagram, according to an embodiment of the present invention. Alarm and other data may be transmitted from a location, such as home 1110, to subscriber 1120 or other identified entities via central security server 1150. Data from subscriber 1120 may also be communicated to home devices via central security server 1150. Wireless communication with home 1110 may be established via wireless network 1160, which may include a wireless provider 1142 for wireless notification and user interaction.

For alarm notification, security devices 1112, such as sensors, contacts, motion detectors, etc., may transmit alarm data to control panel 1114. Other devices may also be implemented for monitoring and other functions. For example, security and other devices may transmit data to control panel 1114 to indicate events, such as a door or window opening and/or closing. Other events may be monitored. Control panel 1114 may then transmit alarm and/or other data to radio modem 1116. Radio modem 1116 may wirelessly transmit data via a wireless provider 1142 to establish communication with central security server 1150. Wireless data may be transmitted to TCP/IP listener 1140, which may then communicate relevant data via relational database 1130. Profile and other data from database 1130 may then be transmitted to Broadcaster 1144 for the automatic generation of personalized output from an on-line analytical processing system, according to the functionality provided in U.S. Pat. No. 6,154,766, which is directed to Broadcaster™ provided by Microstrategy™. For electronic notification, data may be transmitted to subscriber 1120 via e-mail 1122, pager 1124 and other formats.

According to another embodiment of the present invention, voice alerts may be provided via Microstrategy Telecaster™ 1144, which proactively delivers personalized information from a data warehouse to a voice receiver, such as a cell phone, telephone, etc. Telecaster 1144 may transmit personalized voice data to Automated Call Center 1148 which then provides a voice message to a voice enabled device, as illustrated by 1126. The transmitted voice data may be interactive to enable the subscriber to respond to the voice data, via voice, keypad or other format.

In addition, subscriber 1120 may initiate a command, request monitor data, report data and other information via Browser 1128. For example, subscriber 1120 may view monitor and other data, submit requests and perform other operations via web site 1172 provided by central security server 1150. In addition, subscriber 1120 may submit a voice request, as illustrated by voice 1126, which may be accepted by Automated Call Center 1148 where voice messages may be sent or retrieved via voice site 1170. Status data, monitor data and other information may be accessed from database 1130. In addition, commands, such as activate alarm, turn off lights, etc., may be verbally or otherwise communicated to voice site 1170. User requests and other data may be transmitted from voice site 1170, web site 1172 and other user interface to database 1130 where user profile data and other relevant information may be retrieved.

18

If an action is requested by subscriber 1120, central security server 1150 may forward the request data to an identified location, such as home 1110, via TCP/IP listener 1140. A wireless request or other data may be transmitted via wireless provider 1142 to radio modem 1116. Control panel 1114 may then carry out the user's request, which may include an activation request and/or other operations.

According to the functionality provided in FIGS. 12a–12c, the system of the present invention provides deployment of personalized, dynamic and interactive voice services.

FIG. 12a depicts an embodiment of a voice system, according to an embodiment of the present invention. Preferably, the system comprises database system 12, a DSS server 14, voice service server 16, a call server 18, subscription interface 20, and other input/files 24.

Database system 12 and DSS server 14 comprise an on-line analytical processing (OLAP) system that generates user-specified reports from data maintained by database system 12. Database system 12 may comprise any data warehouse or data mart as is known in the art, including a relational database management system (RDBMS), a multidimensional database management system (MDDBMS) or a hybrid system. DSS server 14 may comprise an OLAP server system for accessing and managing data stored in database system 12. DSS server 14 may comprise a ROLAP engine, MOLAP engine or a HOLAP engine according to different embodiments. Specifically, DSS server 14 may comprise a multithreaded server for performing analysis directly against database system 12. According to one embodiment, DSS server 14 comprises a ROLAP engine known as DSS Server™ offered by MicroStrategy.

Voice service server (VSS) 16, call server 18 and subscription interface 20 comprise a system through which subscribers request data and reports e.g., OLAP reports through a variety of ways and are verbally provided with their results through an interactive voice broadcast (IVB). During an IVB, subscribers receive their requested information and may make follow-up requests and receive responses in real-time as described above. Although the system is shown, and will be explained, as being comprised of separate components and modules, it should be understood that the components and modules may be combined or further separated. Various functions and features may be combined or separated.

Subscription interface 20 enables users or administrators of the system to monitor and update subscriptions to various services provided through VSS 16. Subscription interface 20 includes a world wide web (WWW) interface 201, a telephone interface 202, other interfaces as desired and a subscriber API 203. WWW interface 201 and telephone interface 202 enable system 100 to be accessed, for example, to subscribe to voice services or to modify existing voice services. Other interfaces may be used. Subscriber API 203 provides communication between subscription interface 20 and VSS 16 so that information entered through subscription interface 20 is passed through to VSS 16.

Subscription interface 20 is also used to create a subscriber list by adding one or more subscribers to a service. Users or system administrators having access to VSS 16 may add multiple types of subscribers to a service such as a subscriber from either a static recipient list (SRL) (e.g., addresses and groups) or a dynamic recipient list (DRL) (described in further detail below). The subscribers may be identified, for example, individually, in groups, or as dynamic subscribers in a DRL. Subscription interface 20 permits a user to specify particular criteria (e.g., filters,

US 7,113,090 B1

19

metrics, etc.) by accessing database system 12 and providing the user with a list of available filters, metrics, etc. The user may then select the criteria desired to be used for the service. Metadata may be used to increase the efficiency of the system.

A SRL is a list of manually entered names of subscribers of a particular service. The list may be entered using subscription interface 20 or administrator console 161. SRL entries may be personalized such that for any service, a personalization filter (other than a default filter) may be specified. A SRL enables different personalizations to apply for a login alias as well. For example, a login alias may be created using personalization engine 1632. Personalization engine 1632 enables subscribers to set preferred formats, arrangements, etc. for receiving content. The login alias may be used to determine a subscriber's preferences and generate service content according to the subscriber's preferences when generating service content for a particular subscriber.

A DRL may be a report which returns lists of valid user names based on predetermined criteria that are applied to the contents of a database such as database system 12. Providing a DRL as a report enables the DRL to incorporate any filtering criteria desired, thereby allowing a list of subscribers to be derived by an application of a filter to the data in database system 12. In this manner, subscribers of a service may be altered simply by changing the filter criteria so that different user names are returned for the DRL. Similarly, subscription lists may be changed by manipulating the filter without requiring interaction with administrator console 161. Additionally, categorization of each subscriber may be performed in numerous ways. For example, subscribers may be grouped via agent filters. In one specific embodiment, a DRL is created using DSS Agent™ offered by MicroStrategy.

VSS 16 is shown in more detail in FIG. 12b. According to one embodiment, VSS 16 comprises administrator console 161, voice service API 162 and backend server 163. Administrator console 161 is the main interface of system 100 and is used to view and organize objects used for voice broadcasting. Administrator console 161 provides access to a hierarchy of additional interfaces through which a system administrator can utilize and maintain system 100. Administrator console 161 comprises system administrator module 1611, scheduling module 1612, exceptions module 1613, call settings module 1614, address handling module 1615, and service wizard 1616.

System administrator module 1611 comprises a number of interfaces that enable selection and control of the parameters of system 100. For example, system administrator module 1611 enables an administrator to specify and/or modify an email system, supporting servers and a repository server with which system 100 is to be used. System administrator 1611 also enables overall control of system 100. For example, system administrator module is also used to control the installation process and to start, stop or idle system 100. According to one embodiment, system administrator 1611 comprises one or more graphical user interfaces (GUIs).

Scheduling module 1612 comprises a number of interfaces that enable scheduling of voice services. Voice services may be scheduled according to any suitable methodology, such as according to scheduled times or when a predetermined condition is met. For example, the predetermined condition may be a scheduled event (time-based) including, day, date and/or time, or if certain conditions are met. In any event, when a predetermined condition is met for a given service, system 100 automatically initiates a call to

20

the subscribers of that service. According to one embodiment, scheduling module 1612 comprises one or more GUIs.

Exceptions module 1613 comprises one or more interfaces that enable the system administrator to define one or more exceptions, triggers or other conditions. According to one embodiment, exceptions module 1613 comprises one or more GUIs.

Call settings module 1614 comprises one or more interfaces that enable the system administrator to select a set of style properties for a particular user or group of users. Each particular user may have different options for delivery of voice services depending on the hardware over which their voice services are to be delivered and depending on their own preferences. As an example of how the delivery of voice services depends on a user's hardware, the system may deliver voice services differently depending on whether the user's terminal device has voice mail or not. As an example of how the delivery of voice services depends on a user's preferences, a user may chose to have the pitch of the voice, the speed of the voice or the sex of the voice varied depending on their personal preferences. According to one embodiment, call settings module 1614 comprises one or more GUIs.

Address handling module 1615 comprises one or more interface that enable a system administrator to control the address (e.g., the telephone number) where voice services content is to be delivered. The may be set by the system administrator using address handling module 1615. According to one embodiment, address handling module 1615 comprises one or more GUIs.

Voice service wizard module 1616 comprises a collection of interfaces that enable a system administrator to create and/or modify voice services. According to one embodiment, service wizard module 1616 comprises a collection of interfaces that enable a system administrator to define a series of dialogs that contain messages and inputs and determine the call flow between these dialogs based on selections made by the user. The arrangement of the messages and prompts and the flow between them comprises the structure of a voice service. The substance of the messages and prompts is the content of a voice service. The structure and content are defined using service wizard module 1616.

Voice service API 162 (e.g., MicroStrategy Telecaster Server API) provides communication between administrator console 161 and backend server 163. Voice Service API 162 thus enables information entered through administrator console 161 to be accessed by backend server 163 (e.g., MicroStrategy Telecaster Server).

Backend server 163 utilizes the information input through administrator console 161 to initiate and construct voice services for delivery to a user. Backend server 163 comprises report formatter 1631, personalization engine 1632, scheduler 1633 and SQL engine 1634. According to one embodiment, backend server 163 comprises MicroStrategy Broadcast Server. Report formatter 1631, personalization engine 1632, and scheduler 1633 operate together, utilizing the parameters entered through administrator console 161, to initiate and assemble voice services for transmission through call server 18. Specifically, scheduler 1633 monitors the voice service schedules and initiates voice services at the appropriate time. Personalization engine 1632 and report formatter 1631 use information entered through service wizard 1616, exceptions module 1613, call settings module 1614, and address module 1615, and output provided by DSS server 14 to assemble and address personalized reports that can be sent to call server 18 for transmission. According to one embodiment, report formatter 1631 includes an XML

Appx01526    Motorola Solutions, Inc., Ex1011, p. 29

US 7,113,090 B1

21

based markup language engine to assemble the voice services. In a particular embodiment, report formatter includes a Telecaster Markup Language engine offered by MicroStrategy Inc. to assemble the call content and structure for call server 18.

SQL engine 1634 is used to make queries against a database when generating reports. More specifically, SQL engine 1634 converts requests for information into SQL statements to query a database.

Repository 164 may be a group of relational tables stored in a database. Repository 164 stores objects which are needed by system 100 to function correctly. More than one repository can exist, but preferably the system 100 is connected to only one repository at a time.

According to one embodiment, a call server 18 is used to accomplish transmission of the voice services over standard telephone lines. Call server 18 is shown in more detail in FIG. 12c. According to one embodiment, call server 18 comprises software components 181 and hardware components 182. Software components 181 comprise call database 1811, mark-up language parsing engine 1812, call builder 1813, text-to-speech engine 1814, response storage device 1815 and statistic accumulator 1816.

Call database 1811 comprises storage for voice services that have been assembled in VSS 16 and are awaiting transmission by call server 18. These voice services may include those awaiting an initial attempt at transmission and those that were unsuccessfully transmitted (e.g., because of a busy signal) and are awaiting re-transmission. According to one embodiment, call database 1811 comprises any type of relational database having the size sufficient to store an outgoing voice service queue depending on the application. Call database 1811 also comprises storage space for a log of calls that have been completed.

Voice services stored in call database 1811 are preferably stored in a mark-up language. Mark-up language parsing engine 1812 accepts these stored voice services and separates the voice services into parts. That is, the mark-up language version of these voice services comprises call content elements, call structure elements and mark-up language instructions. Mark-up language parsing engine 1812 extracts the content and structure from the mark-up language and passes them to call builder 1813.

Call builder 1813 is the module that initiates and conducts the telephone call to a user. More specifically, call builder 1813 dials and establishes a connection with a user and passes user input through to markup language parsing engine 1812. In one embodiment, call builder 1813 comprises "Call Builder" software available from Call Technologies Inc. Call builder 1813 may be used for device detection, line monitoring for user input, call session management, potentially transfer of call to another line, termination of a call, and other functions.

Text-to-speech engine 1814 works in conjunction with mark-up language parsing engine 1812 and call builder 1813 to provide verbal communication with a user. Specifically, after call builder 1813 establishes a connection with a user, text-to-speech engine 1814 dynamically converts the content from mark-up language parsing engine 1812 to speech in real time.

A voice recognition module may be used to provide voice recognition functionality for call server 181. Voice recognition functionality may be used to identify the user at the beginning of a call to help ensure that voice services are not presented to an unauthorized user or to identify if a human or machine answers the call. This module may be a part of call builder 1813. This module may also be used to recog-

22

nize spoken input (say "one" instead of press "1"), enhanced command execution (user could say "transfer money from my checking to savings"), enhanced filtering (instead of typing stock symbols, a user would say "MSTR"), enhanced prompting, (saying numeral values).

User response module 1815 comprises a module that stores user responses and passes them back to intelligence server 16. Preferably, this is done within an active voice page (AVP). During a telephone call, a user may be prompted to make choices in response to prompts by the system. Depending on the nature of the call, these responses may comprise, for example, instructions to buy or sell stock, to replenish inventory, or to buy or rebook an airline flight. User response module 1815 comprises a database to store these responses along with an identification of the call in which they were given. The identification of the call in which they were given is important to determining what should be done with these responses after the call is terminated. User responses may be passed back to intelligence server 16 after the call is complete. The responses may be processed during or after the call, by the system or by being passed to another application.

Statistics accumulator 1816 comprises a module that accumulates statistics regarding calls placed by call builder 1813. These statistics including, for example, the number of times a particular call has been attempted, the number of times a particular call has resulted in voice mail, the number of times a user responds to a call and other statistics, can be used to modify future call attempts to a particular user or the structure of a voice service provided to a particular user. For example, according to one embodiment, statistics accumulator 1816 accumulates the number of times a call has been unsuccessfully attempted by call builder 1813. This type of information is then used by call server 18 to determine whether or not the call should be attempted again, and whether or not a voice mail should be left.

Call server 18 also comprises certain hardware components 182. Hardware components 182 comprise processor 1821 and computer telephone module 1822. According to one embodiment, processor 1821 comprises a Pentium II processor, available from Intel, Inc. Module 1822 provides voice synthesis functionality that is used in conjunction with Text to Speech engine 1814 to communicate the content of voice services to a user. Module 1822 preferably comprises voice boards available from Dialogic, Inc. Other processors and voice synthesizers meeting system requirements may be used.

The system and method of the present invention may form an integral part of an overall commercial transaction processing system.

According to one embodiment of the present invention, a system and method that enable closed-loop transaction processing are provided. The method begins with the deployment of an IVB by executing a service. As detailed above, this includes generating the content and combining this with personalization information to create an active voice page. Call server 18 places a call to the user. During the call, information is delivered to the user through a voice-enabled terminal device (e.g., a telephone or cellular phone).

During the IVB, a user may request a transaction, service, further information from the database or other request, e.g., based on options presented to the user. These will generically be referred to as transactions. The request may be, but is not necessarily, based on or related to information that was delivered to the user. According to one embodiment, the request comprises a user response to a set of options and/or input of information through a telephone keypad, voice

Appx01527    Motorola Solutions, Inc., Ex1011, p. 30

US 7,113,090 B1

23

input or other input mechanism. According to another embodiment, the request can be made by a user by speaking the request. Other types of requests are possible.

According to one embodiment, the user responses are written to a response collection, which along with information stored in the active voice page, can be used to cause a selected transaction to be executed. According to one embodiment, the active voice page comprises an XML-based document that includes embedded, generic requests, e.g., a request for a transaction, or a request for additional information (a database query). These embedded requests are linked with, for example option statements or prompts so that when a user enters information, the information is entered into the generic request and thus completes a specific transaction request. For example, in the example if a user exercises an option to buy a particular stock, that stock's ticker symbol is used to complete a generic "stock buy" that was embedded in the active voice page.

According to one embodiment, tokens are used to manage user inputs during the IVB. A token is a temporary variable that can hold different values during an IVB. When a user enters input, it is stored as a token. The token value is used to complete a transaction request as described above. According to one embodiment, the system maintains a running list of tokens, or a response collection, during an IVB.

In order to complete the requested transaction, the user responses (and other information from the active voice page) may need to be converted to a particular format. The format will depend, for example, on the nature and type of transaction requested and the system or application that will execute the transaction. For example, a request to purchase goods through a web-site may require the information to be in HTML/HTTP format. A request for additional information may require and SQL statement. A telephone-based transaction may require another format.

Therefore, the transaction request is formatted. According to one embodiment, the transaction is formatted to be made against a web-based transaction system. According to another embodiment, the transaction request is formatted to be made against a database. According to another embodiment, the transaction is formatted to be made against a telephone-based transaction system. According to another embodiment, the transaction is formatted to be made via e-mail or EDI. Other embodiments are possible.

In one embodiment, the formatted transaction request comprises an embedded transaction request. The system provides interactive voice services using TML, a markup language based on XML. Using TML active voice pages are constructed that contain the structure and content for a interactive voice broadcast including, inter alia, presenting the user with options and prompting the user for information. Moreover in connection with OPTION and PROMPT elements, active voice pages also can include embedded statements such as transaction requests. Therefore, the formatting for the transaction request can be accomplished ahead of time based on the particular types of transactions the user may select.

For example, in connection with an exemplary stock purchase, an active voice page can include an embedded transaction request to sell stock in the format necessary for a particular preferred brokerage. The embedded statement would include predefined variables for the name of the stock, the number of shares, the type of order (market or limit, etc.), and other variables. When the user chooses to exercise the option to buy or sell stock, the predefined variables are replaced with information entered by the user

24

in response to OPTION or PROMPT elements. Thus, a properly formatted transaction request is completed.

TML parsing engine in call server **18** includes the functionality necessary to generate the properly formatted transaction request as described above. For example, in connection with the embodiment described above, the TML parsing engine shown in FIG. **3**c reads the active voice pages. When the TML parsing engine reads an OPTION element that includes and embedded transaction request, it stores the transaction request, and defines the necessary variables and variable locations. When the user exercises that OPTION, the user's input is received by the TML parsing engine and placed at the memory locations to complete the transaction request This technique could be used, for example, to generate a formatted transaction request for web-site.

According to another embodiment, where the transaction request is made via a natural language, voice request, a formatted transaction request can be generated in a number of ways. According to one embodiment, speech recognition technology is used to translate the user's request into text and parse out the response information. The text is then used to complete an embedded transaction request as described above. According to another embodiment, speech recognition software is used to translate the request to text. The text is then converted to a formatted request based on a set of known preferences.

A connection is established with the transaction processing system. This can be accomplished during, or after the IVB. According to one embodiment, the transaction processing system comprises a remotely located telephone-based transaction site. For example, call server **18**, through the TML parsing engine **1812**, establishes a connection with a telephone-based transaction processing site.

According to another embodiment, the transaction processing system comprises a remotely based web-site. According to this embodiment, the formatted request includes a URL to locate the web-site and the system accesses the site through a web connection using the formatted request. Alternatively, the formatted request includes an e-mail address and the system uses any known email program to generate an e-mail request for the transaction.

After the connection is established, the transaction is processed by the transaction processing site and the user is notified of the status of the transaction. If the transaction is completed in real-time, the user may be immediately notified. If the transaction is executed after the IVB, the user may be called again by the system, sent an e-mail, or otherwise notified when the transaction has been completed.

According to one particular embodiment, the system comprises an interactive voice broadcasting system and the transaction is accomplished in real-time. In this embodiment, confirmation of the transaction is returned to TML parsing engine **1812** shown in FIG. **12**a-c and translated to speech in text-to-speech engine **1814** and presented to the user during the IVB. More specifically, and similar to the process described with respect to embedded formatted transaction requests, TML also enables embedding of a response statement. Thus, when the transaction is processed and confirmation of the transaction is returned to the system, an embedded confirmation statement is conveyed to the user through TML parsing engine **1812** after being converted to speech in text-to-speech engine **1814**.

The central security network of the present invention may operate through several distribution channels. For example, devices and/or services may be sold directly to end users over the Internet through an associated web site. The web site of the present invention may also be used to sell the

Appx01528    Motorola Solutions, Inc., Ex1011, p. 31

US 7,113,090 B1

25

alarm network service to individuals or entities who may already own alarm systems and are interested in the personalized monitoring feature of the present invention.

In another example, a distribution channel may involve an affiliate network which may include alarm dealers and installers. Because do-it-yourself wireless equipment may not meet everyone's needs, the present invention may have mini-partnerships with affiliates. Namely, the affiliate may retain the revenue for selling and installing the devices, and then refer the client to the alarm network of the present invention for monitoring and/or other services. As an incentive, an operator of a system according to the present invention may offer a referral program to reward affiliates for each client who subscribe to a service of the network.

In another example, the central security network may syndicate alarm services to current central monitoring stations, and thereby become an ingredient brand. For example, a major security entity may use services of the central security network as part of its service offering to the end consumer.

An embodiment of the present invention provides the ability to report an index of activity within an identified area. The identified area may include a house, one or more rooms within a house, an office, store location, warehouse, multiple locations, any identified area, etc. The area may also be defined by one or more sensor or other monitor devices. The index of activity may be based on data gathered from one or more sensor devices, such as contacts, motion sensors and/or other devices, at the identified area. This feature may involve some knowledge as to the nature and distribution of sensors within a location. The index of activity may be reported to a subscriber or other recipient. The information may be conveyed via one or more preferred modes of communication (e.g., wireless communication, broadband, landline, etc.). In addition, the index of activity may be displayed on an online interface, as a graphical representation or other display. Through this feature, a subscriber or other entity with access may view the data. The display may further enable the viewer to manipulate the data.

The term "wireless" may include long range wireless radio, local area wireless network such as 802.11 based protocols, wireless wide area network such as WiMax and/or other similar applications.

Activity index may provide information related to sensor activity. For example, a store may monitor how many times a front door of a store is opened, indicating an amount of traffic within a store, within a time frame (e.g., one day, one week, weekends, etc.). Other devices, such as motion detectors, may monitor an amount of movement, e.g., foot traffic, within a store or even a certain location (e.g., shoes section, etc.), in a store. This information may be used to monitor busy seasons (e.g., Christmas, Mother's Day, etc.), different locations (e.g., California store, New York store, DC store, etc.) and/or other factors. Also, the effectiveness of sales or other promotions and their ability to contribute to additional traffic, business, etc., may be monitored.

According to another example, an executive at a company may want to get a sense for when employees generally arrive at work without requesting time sheets, or implementing more intrusive technology. By reviewing an activity index, which may report a summary view of all or selected sensor activity, this executive may see when most employees arrive at work. According to another example, a parent who works or travels wants to know when their child might be hosting an event at their home. Typically, if the child is at home alone, the activity index will report a fairly modest value. However, when there are lots of people entering, exiting, and

26

moving throughout the home, the activity index value will be much higher. The parent may establish an alert to only be notified when activity index levels exceed the typical value. According to another example, a person may own a second home and wants to know if the home is being rented or is sitting idle. In this way, he/she can assure that he is being properly compensated by the property management firm for all weeks in which the property is rented. The owner of the second home, however, does not want to invade the privacy of his rental clients by installing video cameras or other detection devices. During a week in which the property is not rented, the activity index values will be low, as the property is only occasionally entered by maids, service technicians, and potentially by personnel who deliver fresh linens or food and snacks to the property. When the property is rented, activity index values will be much higher. The property owner may quickly validate that he/she is being paid for all weeks in which the property is rented by reviewing activity index values for each calendar week.

The compiled data may be displayed in various formats, where the level of detail of the activity may be specified. For example, a graphical indicator may display levels of activity, such as low, normal and high. The thresholds may be specified by the user or determined by an embodiment of the system. For example, the system may average the amount of traffic (which may be indicated by an amount of times the door is opened according to one exemplary application) over a time frame and use that average as a "normal" level. A certain amount of deviation may be determined for indicating a high level and a low level, as well as additional levels of activity. In addition, graphical display, such as color codes, bar graphs, etc. may be implemented. For example, red may indicate high level, green may indicate average and yellow may indicate low. Other graphics and display options may be implemented. Additional levels of detail may also be provided. For example, a marker for indicating a sales event may be used to explain a particular high level of activity. Other factors may also be displayed and considered as desired by the subscriber.

FIG. 13 is an exemplary flowchart illustrating a method for activity index reporting, according to an embodiment of the present invention. At step 1310, a location may be identified. The location may include a combination of sensors and/or other monitor device. The location may include a subset within a location (e.g., one or more rooms within a home, etc.). The location may include one or more locations (e.g., stores located at different areas, etc.). At step 1312, one or more sensors associated with the location may be identified. The sensors may include door contacts which may be used to indicate an amount of foot traffic within a store location. The sensors may also include motion detectors, video sources, vibration sensors, pressure mat sensors, turn style counters and/or other devices which may provide an indication of activity at the location. The sensors may also be used to monitor normal activity as well as no or low levels of activity. At step 1314, data from the sensors may be gathered. The data may include monitor data for gathering information concerning movement and/or other indicator of activity.

The gathered data may then be compiled and/or formatted, at step 1316. For example, a level of detail, granularity, and/or other defined specifics may be identified and applied to the gathered data. In addition, threshold events and/or levels may also be identified and applied. For example, data may be averaged over a time period to determine an average level of activity. A variance amount may be identified which may be used to determine a high level, a low level and/or

Appx01529     Motorola Solutions, Inc., Ex1011, p. 32

27

other levels of activity. At step 1318, the compiled and/or formatted data may be displayed to the subscriber and/or other authorized entities. The data may be displayed as a graphical display to highlight the level of activity. For example, the activity index may be displayed as a color coded display where red may indicate a high level of activity, green may indicate an average level of activity and yellow may indicate a low level of activity. Other graphical displays, such as bar graphs, line graphs, pie charts, and/or other displays may be used to display the information. According to another example, the compiled and/or formatted data may be forwarded to one or more recipients via one or more desired mode of communication. At step 1320, the information may be revised and/or modified as desired by the subscriber or other authorized entity. In addition, the information may be automatically updated. For example, the data collected may be used to continuously update an average level of activity and/or other indicia of activity. For example, as a store location gains popularity and more loyal customers, an average level of activity may be at a higher level.

Additional exemplary outputs may include markers for showing various types of activity. For example, activity index may indicate that a store is very busy today (high activity index), nobody is home (low/zero activity index), normal activity levels at store/home (average activity index) and/or other indicators of activity.

According to another embodiment of the present invention, a subscriber may access anomaly information. For example, a subscriber may be alerted if activity patterns at a location differ from previous activity patterns. A subscriber may define an activity baseline through an interface or other mode of communication. The activity baseline may indicate a level of "normal" activity. The normal activity may involve averaging historical data where previous activity patterns may be accessed from history data (e.g., an average of the last 14 days of activity, etc.). In another example, the normal activity may be an expected level of activity (e.g., expect no movement in the backyard at night time). Using the activity baseline, an embodiment of the present invention may identify whether or how much the activity varies from the activity baseline for an alert (or other message) to be delivered. A variance amount may be identified to detect when an alert message is transmitted. Recipients and their corresponding preferred communication methods may be identified.

History data may include sensor data which indicates movement (e.g., door opening, window opening, etc.) and/or any activity. History data may also include video data (e.g., images of back door, etc.). History data may also consider external sources of data, such as data from neighbors, recent local burglaries, police reports, and/or other information. For example, a store owner may monitor anomalous activity during closed hours. The store owner may also monitor whether a door is opened and closed around closing time to ensure that proper shut down procedures have taken place. In another example, any lack of movement for a predetermined period of time may also be monitored at a home (or a specific room) of an elderly person. For example, if there is no movement in the morning hours in the bedroom of an elderly relative, an alert may be triggered. The baseline of activity may be defined as some movement during the hours of 6 am and 9 am, assuming that the elderly relative usually wakes up during that time period. In another example, the amount of movement may be monitored and identified across time frames. Therefore, rather than having to keep track of morning habits, the system of an embodiment of the present invention may monitor and track movement so that it will automatically determine that movement occurs within the hours of 6 am and 8 am every morning.

28

According to another example, an office building is generally initially accessed by an employee or other person entering through the front or back door. That is, after the office building has remained idle (due to no people being present) for a period of time, the first event reported is always that the front or read door has been opened. Generally, an office building is not initially accessed by opening the ground floor window. Thus, even if the security system were disarmed, the system may generate a user alert or an alarm condition if the ground floor window were opened when there was no activity inside the office building.

According to another embodiment, the system of the present invention may self-configure and establish an activity baseline by observing regular activity for a period of time. Through this exemplary embodiment, security and/or activity monitoring may become a passive activity. For example, through an embodiment of the present invention, a building (or other location, such as home, store, rooms, etc.) may automatically determine an anomalous condition based on previous normal activity. The previous normal activity may be automatically determined by historical data or defined by a subscriber or other entity. In this example, a process using event analysis algorithms may be applied to determine an anomalous event or condition and how severe the anomaly might be. At a simple level, sensors at a residential location may continuously monitor state data. Therefore, rather than activating an alarm state, the sensors may monitor and detect an anomaly. In this example, the sensors may constantly monitor (in an "on" state) and report an alarm or message where there is a preponderance of events worthy of an alarm. Current systems require the consumer to actively manage their system by arming in order for the system to detect an unexpected or unwanted intrusion.

FIG. 14 is an exemplary flowchart illustrating a method for detecting anomalous activity, according to an embodiment of the present invention. At step 1410, an activity baseline may be identified. The activity baseline may indicate an average or normal level of activity. The activity baseline may be defined by a subscriber or other authorized entity. According to another example, the activity baseline may be automatically determined. For example, an average of historical data may be calculated. Other methods for determining a baseline of activity may be implemented. At step 1412, a variance and/or threshold may be identified. The variance and/or threshold may be used to identify an anomalous event. Other calculations, measurements, events and/or other defined triggers may be applied to determine anomalous activity. For example, an activity baseline may be identified and if monitored data differs from the activity baseline by a variance or threshold amount, an anomalous event may be detected. For example, an amount of movement or activity may be determined as average for the room or home of an elderly person. However, if a lack of movement is detected for an overextended period of time, an anomaly may be detected. This information may be forwarded to one or more identified recipients via one or more preferred methods of notification. Another example may include a door contact at closing time, which indicates that the last employee has left the store at closing time. In this example, the anomalous event may be an inactive door contact at closing time. The monitored activity may be activity, a lack of activity and/or an expected level of activity

Appx01530     Motorola Solutions, Inc., Ex1011, p. 33

US 7,113,090 B1

29

At step **1414**, sensor data may be gathered from one or more sensor devices at an identified location for anomaly detection. For example, sensor devices may include door contacts, window contacts, motion sensors and/or other device for monitoring activity. At step **1416**, the gathered sensor data may be compared to the activity baseline. Other methods for determining anomalous activity may also be applied. At step **1418**, it may be determined whether the gathered sensor data is above and/or below the activity baseline by a threshold amount. If so, an alert or other notification may be conveyed to one or more identified recipients via a preferred method of notification. If not, sensor data may be continuously gathered.

An embodiment of the present invention is directed to a single integrated interface for displaying security data for a plurality of locations. Devices (e.g., sensors, monitors, etc.) may be controlled across locations through this single interface. Currently, security systems are controlled by their users by interacting with a type of alphanumeric or other touchpad interface locally at the secured site. An embodiment of the present invention enables remote administration of a security system using a web interface where remote control and configuration of multiple security systems via a single integrated web based user interface may be implemented. This feature of an embodiment of the present invention provides a single login and a single interface for viewing subsets of information for a plurality of locations at once. For example, a subscriber may monitor activity levels across multiple locations through the single interface. A subscriber may also manipulate and control one or more security control panels across multiple locations.

Another aspect of this embodiment of the present invention involves the ability to assign different security privileges to different enterprise users for control of a security system, which may include one or more different locations. This action may be performed through the single interface. Currently, a panel has a master user code and user codes. Oftentimes, a business owner may want the ability to set his own code, and the code of his day shift and night shift managers. In this example, he may want each of those managers to be able to set the codes for each of their employees, but not for the other manager, the other manager's employees, or for the owner. A privilege hierarchy may apply to this exemplary application. According to an embodiment of the present invention, a central server of an embodiment of the present invention may control one or more user codes for an identified location. The control panel located at the location may then be updated to support the multiple levels of user codes as desired.

According to an embodiment of the present invention, a single interface may provide security data as well as control for a complex enterprise security system with hundreds or thousands of remotely deployed units. From this single command console interface, an operator may issue a global configuration command which will almost instantly, via a wireless conduit, reprogram select or all control panels. For example, a central security office may decide that all panels in all remote facilities should now automatically arm themselves every day at 8:15 pm instead of 8:00 pm. An embodiment of the present invention allows these functions from a single interface, thereby avoiding costly trips to each location. In addition, the central security office may decide that a former senior operations executive, who previously had access to all facilities, should no longer be able to disarm the security systems at any property. By using an enterprise

30

console web interface, this change may be wirelessly propagated across select or all security control panels in the enterprise.

An embodiment of the present invention enables a subscriber to arm a system (or identified group of sensors) automatically. An exemplary application may involve a situation where a system has been left disarmed by mistake. A typical application may involve a store where an owner/manager wants to ensure that a system is armed at night even if the last employee to leave the building forgets to arm the system. An embodiment of the present invention allows a system manager (or other entity) to configure arming supervision capabilities via an interface. In addition, the system manager may instruct the system to automatically arm under certain circumstances, even if the security control panel is not connected to the Central Station or other monitoring service via any wired connection. Further, the system manager may generate alerts that system was not armed or that system was auto-armed and send those alerts via any format (e.g., email, text message, phone call, etc.) desired by the system manager.

Subscribers may identify parameters for automatically arming a system. For example, a subscriber may identify a time period for arming a system, an activity, inactivity, an event, lack of an event and/or other trigger. For example, the time period may define how long a system will wait after the last activity was reported by one or more sensors before arming. A subscriber may designate an auto arming of a security system at a store (or other location), 30 minutes after closing time. In another example, a trigger time, such as 11:30 pm may be identified. The subscriber may designate different triggers for different days. Closing time may be later during the weekends, thereby requiring a delayed auto arming of the security system. In addition, holiday schedules, summer schedules and other variations in store hours may also affect the auto arming feature. Subscribers may also identify triggering activities. For example, the subscriber may identify that if no activity is detected for 15 minutes, during a time period (e.g., the midnight hours, etc.), the auto arming feature may be invoked.

In addition, a subscriber may specify an alert based on an arming condition. If the system is not armed at a specified level by a specified time, the subscriber may be alerted by a preferred method of communication. For example, if the system is not armed by 11 pm on Tuesday, then the customer receives a phone call at a preferred number (e.g., cell phone, home number, etc.). If a response is not received, a second attempt may be made after a predetermined waiting time (e.g., 15 minutes, etc.). If no answer is received, the system may invoke an automatic arming mode. Further, the automatic arming may be at a default level of security. An embodiment of the present invention allows a user to configure supervisory alerts via an interface, allows the user to receive the alerts via email, text message or phone medium where the messages may be received from the panel via a wireless network so that a phone line connection to the panel is not required to provide these capabilities.

Various conditions may also be identified. Rather than automatically arming the security system, the subscriber may be notified that the security system is not armed and allow the subscriber to decide whether to arm the system remotely. For example, the system may detect that the security system is not armed by 11:30 pm and notify the subscriber. The subscriber may elect to remotely secure the security system may selecting a button on the subscriber's phone, email, online interface or other interface.

US 7,113,090 B1

31

FIG. 15 is an exemplary flowchart illustrating a method for automatic arming of a security device or system, according to an embodiment of the present invention. At step 1510, an auto arming trigger may be identified. The auto arming trigger may be an event, circumstance or other trigger for initiating an automatic arming of a sensor, plurality of sensors, system or multiple systems. The automatic arming may also apply to a plurality of sensor devices (or other security devices) across multiple locations or systems, as well as any device or location. For example, the trigger may include a time period, trigger time or other time dependent event. In this example, the trigger may be 15 minutes after closing time, e.g., 11 p.m. Closing time may also vary day to day. A trigger may include an event, such as anomalous activity, discussed above in connection with FIG. 14. A trigger may also include no activity (e.g., motion sensor detecting no activity, etc.). A preferred level of auto arming may be identified, at step 1512. The level of auto arming may be applied to an identified location, a sensor or group sensors or other identified area. For example, there may be a default level of security, low level of security, high level of security, etc. In addition, one or more sensors may be individually activated.

At step 1514, it may be determined if a system (or other identified group of sensors) should be automatically armed. If so, the system (or other identified group of sensors) may be automatically armed to a desired level, at step 1516. Otherwise, a notification may be identified as well as a corresponding preferred method of notification, at step 1518. For example, a warning message may be conveyed via a preferred method of notification, at step 1520. The warning message may identify the anomalous activity—the level of detail to be received may be identified by the subscriber (or other recipient, etc) or may be based on the type of anomalous activity detected. The subscriber may also specify that if a response is not received from an intended recipient, automatic arming may be applied. In addition, the warning message may notify a recipient that a system will be automatically armed within a time period, e.g., 3 minutes left until automatic arming of system, etc. The notification content may be forwarded to one or more recipients via a preferred method or methods of notification. For example, a store owner may be notified via email that a trigger event has occurred (e.g., time period lapse, etc.). At step 1522, a subscriber or other authorized entity may be given the option to automatically arm a system and/or one or more sensors. This action may occur via a website, wireless communication (e.g., mobile device, phone, PDA, etc.) or other method of communication.

According to another embodiment of the present invention, Global System for Mobile Communications (GSM) or other wireless devices may report normal activity (e.g., doors opening, motion sensors activating, etc.) while the system is not armed. A GSM radio or similar device may be integrated into a control panel which transmits signals to a central monitoring station. Normal activity monitoring may involve any type of connection to a local control panel, which may include wired broadband, wireless broadband, two-way paging, WiMax, GSM/GPRS, or other mode of communication.

Another embodiment of the present invention is directed to normal activity event handling and normal activity event notifications. For example, intelligent normal activity notifications may involve defining a normal activity event as something as routine as a kitchen door opening. Sometimes the event may be of immense interest to a user, and at other times, it may be of no interest. Intelligent normal activity

32

notifications allow the user some control over who is notified of the event, and when they are notified. An embodiment of the present invention provides an interface in which the user may specify properties to govern normal activity notifications. For example, the use may specify to all subscribers of the normal activity event, one subscriber, several subscribers, or none at all. In this manner, each specific type of normal activity event may be directed at a specific intended audience. Therefore, a user may subscribe themselves or others to notifications for a specific normal activity event or alarm events, with notifications being driven by normal activity events.

Another embodiment of the present invention is directed to intelligent routing of normal activity data. For example, a sensor in a home or business may generate an unmanageable number of events. For example, a motion sensor, sitting in an elementary school may generate an event every time a person passes in its vicinity and throughout the day, may therefore generate a large number of events. This event traffic would otherwise be extremely taxing on the wireless network connection to the school, and would create data clutter that is of no use to the subscriber. Further, this sensor might inadvertently result in the user receiving thousands of unexpected emails, text messages, or phone calls in a day. An embodiment of the present invention may intelligently process the sensor data and apply logic to separate out meaningful data from meaningless data. In the example of the school, an embodiment of the present invention may automatically only report the first motion sensor event, and the last motion sensor event, filtering out all other data, but noting for the user that the motion detector was "active" during the period between the first and last event. In addition, an embodiment of the present invention may also support intelligent rule based subscriptions, scheduled normal activity notifications and/or other similar functions.

An embodiment of the present invention may display or send reports on normal activity, on a periodic, event and/or request driven basis. This may occur on a daily or weekly basis or based on certain trigger events. The reports may include normal activity and alarm events made up of events gathered through a local RF sensor network and the wireless communicator. An embodiment of the present invention enables users to obtain reports on normal activity events in addition to alarm and arming events; specify via an interface the contents of the report, delivery frequency and/or other features; obtain reports which may be generated from data collected via a wireless connection to one or a group of control panels and/or other devices; and allow end-user customers to directly subscribe to these reports and receive them via email in any format desired.

An embodiment of the present invention provides the ability to alert customers when no activity has been detected at the location for a specified period of time. Subscribers may specify day of the week, period of day, and a subset of sensors for participation in this determination. An embodiment of the present invention allows a user to use an intuitive web interface to establish which sensors should be monitored for no activity in the no activity trigger. In addition, a user may establish one or many no-activity triggers. Select or all data may be analyzed centrally in Network Operations Center. Even if the panel does not natively offer no-activity monitoring, an embodiment of the present invention may determine that there is no activity by centrally monitoring sensor events. Sensor event data may be collected wirelessly, via long range two-way wireless network. Given that activity levels may be monitored centrally using a central server, such as a network operations

US 7,113,090 B1

33

center (NOC), the presence of activity may be monitored in a collection of facilities, not just one facility. In addition, users may establish complex "no-activity rules" which are more detailed in their definition than traditional no-activity monitoring.

An embodiment of the present invention is directed to moving functionality built into or associated with security panels into one or more centralized security servers (e.g., centralized network operation centers (NOC)). Through an embodiment of the present invention, the abilities to manage the arming state (e.g., active alarm, armed, disarmed, armed stay, armed away, etc.) of the system, the user codes of the system, the security system logic including the definition of events or circumstances which constitute an alarm, the security system properties (e.g., arming delay, disarm window, sensor properties, sensor zones, sensor groups, etc.), the alarm reporting by the Control Panel, and other control panel capabilities, may be handled by software executing on one or more centralized security application servers. This security system architecture has many advantages to the consumer, including lower equipment costs, greater system capability, greater system reliability and maintenance, and more prompt updates of new capabilities and features.

Most current security systems require a clunky metal box that includes components for installation in each secured property. Most, if not all, of the control panel logic is programmed into the panel and resides at the panel. A significant update to the Control Panel capabilities or logic requires that the Panel be replaced with new equipment and therefore requires a service visit to the home or business where the Control Panel is deployed. An embodiment of the present invention provides a security panel that does not contain any sophisticated application logic or interfaces and which essentially functions as an antenna or other similar device for collecting and sending sensor state data to a central system. The security application exists as software, servicing multiple homes and businesses simultaneously, in a NOC. As such, the control panel capabilities and application logic may be easily updated and/or otherwise modified by updating the software operating at the NOC.

According to another embodiment, the sensors themselves may simply message their state (or other information) to a central system and the "security system" is essentially just a defined collection of sensors who send their state and unique identification (and/or other information) to the central system via a network (e.g., wireless, broadband, etc.). The same sensor may be defined to be included in several different security systems at the same time. For example, sensors 4, 5, 6 and 7 may together constitute the security system for a stock-room, while sensors 4, 6, 8, 9, 10, 11, 12 and 14 may represent the security system for a building. In the case of both systems, there is no traditional Security Control Panel involved as the sensors simply message their state and unique identity directly, or via a data hub, to the central security software operating at a central NOC and servicing multiple systems simultaneously.

According to another embodiment, video data may be correlated with security sensor events transmitted from a panel. An embodiment of the present invention may correlate specific video sequences with specific security panel or security sensor events in a relational database that may be analyzed for interesting and/or unusual activity. In this example, sensor data may be transmitted from one or more sensor devices at a subscriber location to a central server through a network connection (e.g., wireless, broadband, etc.). A subscriber may register for certain video clip notifications which are triggered when an event of interest

34

occurs. For example, a subscriber may request notification when a front door opens, and request that the notification include a video clip of the front door at the time it was opened. The subscriber may also request a video link or other image data when an unrecognized person enters. According to another example, if an internal motion is triggered but no door has opened and video analysis suggests that a human is inside, the subscriber may request an alert notification with a single frame clip.

FIG. 16 is an exemplary diagram illustrating a system for a hosted security operating system, according to an embodiment of the present invention. System 1600 is a variation of system 100 discussed in detail above. System 1600 may include a plurality of monitor devices of varying type that transmit data to a messaging hub 1620, which may be integrated with or separate from a control panel or other similar device. The monitor devices may include sensor 1610, contact 1612, motion detectors 1614, video recorder 1616 and/or other device 1618. The monitor devices may be located at the same location, affiliated location, remote location, etc. The monitor devices may span across multiple subscribers and/or across multiple locations.

The messaging hub 1620 may be local or remote from the sensors. The messaging hub 1620 in this embodiment functions essentially as an antenna for receiving data from the monitor devices and forwarding the data to a Central Security Server 1630. Messaging hub 1620 may gather monitor data and forward the monitor data to Central Security Server 1630. In addition, messaging hub 1620 may buffer the monitor data to facilitate data transmission. Messaging hub 1620 may transmit the monitor data via various modes of communication, including by way of example wireless communication, broadband, WiMax, etc. Other device 1618 may also include a user interface box, connected over a long range network or other network to central security server 1630 and/or messaging hub 1620.

According to another embodiment, the monitor devices may transmit data to Central Security Server 1630, thereby bypassing messaging hub 1620. Monitor devices (e.g., sensors 1610, contacts 1612, motion detector 1614, video 1616 and/or other device 1618, etc.) may communication individually to Central Security Server 1630 via various modes of communication, including wireless communication, broadband (wireless and/or wired) and/or other methods. Central Security Server 1630 may receive monitor data from the various remote devices for compiling, processing and/or responding. Other actions may also be taken in response to the data.

Databases 1640, 1642 may store relevant information for processing the monitor data as desired by a subscriber. Exemplary database information may include user information, alarm events, reports and/or other information. In addition, subscribers and/or other designated recipients, as shown by contact 1660 and 1662, may be alerted or notified of certain events, triggers, reports and/or other desired information, via various preferred modes, including by way of example, POTS, cable modem, DSL, wireless, broadband, etc.

Another embodiment of the present enables remote programming, configuration, and trouble-shooting of the Security Control panel via a wireless network connection, collectively "wireless toolkit enablement." As Security Control Panels are increasingly networked to a Central Monitoring Station via a wireless network (instead of a phone line), it is critical that a servicing security dealer (or other entity) still be able to remotely configure and trouble-shoot the Control Panel even though they are not able to "dial into" the panel

US 7,113,090 B1

35

and use the traditional "panel toolkit" that they have used for such purpose. An embodiment of the present invention is directed to providing remote programming capability through a two-way wireless connection to the Control Panel. Examples of toolkit capabilities that are enabled wireless by may include various functions, such as Get Panel Status; Send request for panel error codes; Create a new user; Delete a user from the panel; Change the behavior of a sensor (e.g., Arm Stay to Arm Away to Never Arm); Change arming behavior (e.g., delays prior to arming or after perimeter is breached); Disable a sensor; Assign sensor to a different partition; Enable/disable entry chimes; Enable/disable trouble beeps; Lock-down panel; terminate monitoring service as well as other features and functions.

An embodiment of the present invention may provide sensor based notifications. In this embodiment, a subscriber or other recipient may be alerted by a preferred mode of communication when one or more specific sensors identify an alert worthy event. For example, a homeowner may want to be alerted by wireless phone (or other mobile device) if the front door contact is triggered. A preferred mode of notification may be specified and correlated to a specific sensor. Therefore, when the specific sensor identifies an alarm event or other activity, a recipient may be alerted by the preferred mode of notification. In addition, the recipient may also receive reports of normal activity from the specific sensor. For example, person A may be alerted via email if the back door sensor opens, while person B may be alerted via mobile phone if the garage door opens. Also, the type of event may also determine which recipient receives a notification. For example, person C may be alerted if the door opens and person D may be alerted if the door sensor's battery is getting low. Other variations may be realized.

An embodiment of the present invention may provide schedule based notifications. In this embodiment, a subscriber or other recipient may identify a schedule at which alerts and/or other notifications may be transmitted. Many subscribers have a work schedule from Monday through Friday and a different weekend schedule for Saturday and Sunday. In addition, many stores have different hours of operation on the weekend (e.g., longer hours). Other subscribers may have weekly events (e.g., evening classes, book club meetings, etc.) as well as seasonal events (children's sporting events, etc.). Therefore, depending on when an alarm worthy event (or other trigger) occurs, the subscriber may prefer different messages, methods of notification and/or other criteria. An embodiment of the present invention provides an ability to set the day of the week and the period of the day when alerts (and/or other notifications) may be transmitted via a preferred mode of communication (e.g., wireless, mobile phone, voice message, etc.). For example, a subscriber may elect to receive an email if the front door opens during the day on weekdays, but not during weekends or during the night.

According to an embodiment of the present invention, a subscriber may select or identify which sensor will cause a notification (e.g., alarm or normal activity) through an online interface (e.g., website, etc.) by selecting each sensor listed on the page for the given location.

According to an embodiment of the present invention, a subscriber may define complex logic to dictate whether or not a normal activity notification is issued. For example, the subscriber may specify that a notification only be issued when sensor A is opened, and sensors B, C, and D have not opened in the last hour, and motion A is active, but Motion B is not active, and no notifications related to sensor A have

36

been issued in the last four hours, and today is a weekend day and the system is in an armed stay state.

Other embodiments, uses and advantages of the present invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. The specification and examples should be considered exemplary only. The intended scope of the invention is only limited by the claims appended hereto.

What is claimed is:

1. A computer implemented method for determining an index of activity within a security system, the computer implemented method comprising the steps of:

storing user profile information wherein the user profile information comprises user defined preferences;

gathering monitor data from one or more remote sensor located at a location;

compiling the monitor data based on at least one user defined preference, wherein the compiled monitor data indicates an index of activity; and

displaying the compiled monitor data.

2. The method of claim 1, wherein the compiled monitor data is displayed on an online graphical user interface.

3. The method of claim 1, wherein the index of activity is a numeric value that is displayed.

4. The method of claim 1, wherein the step of displaying the compiled monitor data is displayed remotely to a user on a remote device.

5. The method of claim 1, wherein the index of activity indicates an amount of traffic within the location.

6. The method of claim 1, wherein the index of activity indicates an amount of movement within the location.

7. The method of claim 1, wherein the step of compiling further comprising the steps of:

identifying a plurality of levels of activity; and

determining which level of activity the monitor data corresponds to, wherein the online graphical user interface displays the corresponding level of activity.

8. The method of claim 7, wherein the plurality of levels of activity are determined from historical monitor data.

9. The method of claim 1, wherein the compiled monitor data is displayed as one or more of a graphical index illustrating a variation in intensity of activity.

10. The method of claim 1, wherein the step of compiling further involves the step of identifying a level of granularity for display.

11. The method of claim 1, wherein the location comprises multiple locations.

12. The method of claim 1, wherein the monitor data is communicated via one or more of wireless communication and broadband communication.

13. A computer implemented method for detecting an anomalous event within a security system, the method comprising the steps of:

identifying an activity baseline wherein the activity baseline indicates a normal level of activity;

identifying a threshold level of activity;

gathering monitor data from one or more remote sensors located at a location;

comparing the monitor data with the activity baseline; and

determining an anomaly condition based on the step of comparing.

14. The method of claim 13, wherein the step of determining further comprises determining whether the monitor data is above or below the activity baseline by a variance amount, wherein the variance amount is predetermined.

US 7,113,090 B1

37

15. The method of claim 13, further comprising the step of sending a notification identifying the anomaly condition to one or more recipients via one or more preferred modes of communication.

16. The method of claim 13, wherein the activity baseline is identified by a subscriber.

17. The method of claim 13, wherein the activity baseline is determined by historical monitor data.

18. The method of claim 17, wherein the historical data comprises one or more of video data and image data.

19. The method of claim 13, wherein the location comprises multiple locations.

20. The method of claim 13, wherein the monitor data is communicated via one or more of wireless communication and broadband communication.

21. A computer implemented method for displaying and controlling physical site security characteristics based on user specified information, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices, across multiple locations, associated with a subscribed user;

processing the security device information from the one or more remote security devices, and

displaying the security device information through a single online user interface for the multiple locations.

22. The method of claim 21, further comprising the step of:

enabling remote issuance of at least one command that will change at least one physical site security characteristic for one or multiple locations.

23. The method of claim 21, further comprising the steps of:

assigning a first level physical site security access to one or more first level users for a group of the one or more remote security devices; and

assigning a second level physical site security access to one or more second level users for the group of the one or more remote security devices, wherein the second level security access is determined by one of the one or more first level users.

24. The method of claim 21, further comprising the step of:

assigning n level physical site security access to one or more n level users, where n represents a number of levels in a physical site security hierarchy, where the n level physical site security access is determined by one or more of the n−1 or higher level users.

25. The method of claim 21, wherein a master code controls the first level security access of the one or more first level users.

26. The method of claim 21, wherein each of the one or more first level users controls a respective one or more second level users.

27. The method of claim 21, wherein the steps of assigning occur over the single online user interface.

28. The method of claim 21, wherein physical site security access is assigned via the single online user interface and is automatically programmed into the one or more security devices, including specific user codes, via a wireless communication from a central network operations center wherein the one or more security devices confirms via wireless communication to the central network operations

38

center that the one or more security devices has received the security access via wireless communication.

29. A computer implemented method for automatically arming a security system, the method comprising the steps of:

identifying an arming trigger for the security system wherein the security system comprises one or more remote sensors;

gathering monitor data from the one or more remote sensors located at a location;

determining whether the arming trigger has occurred based on the monitor data from the one or more remote sensors; and

automatically arming the security system, in response to an occurrence of the arming trigger.

30. The method of claim 29, further comprising the steps of:

generating a notification message in response to an occurrence of the arming trigger; and

sending the notification message via a preferred method of notification, prior to the step of automatically arming the security system.

31. The method of claim 29, further comprising the step of:

enabling a subscriber to remotely arm the security system after receiving a trigger alert suggesting that the security system should be in an armed state.

32. The method of claim 29, wherein the arming trigger comprises one or more of a trigger time period, a trigger event and an absence of activity.

33. The method of claim 29, further comprising the step of:

identifying a level of security for the security system when the security system is automatically armed.

34. The method of claim 29, wherein the location comprises multiple locations.

35. The method of claim 29, wherein the monitor data is communicated via one or more of wireless communication and broadband communication.

36. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user when a security system associated with the one or more remote security devices is in an unarmed state; and

processing the security device information from the one or more remote security devices,

wherein the communications are received by one or more of wireless communication and broadband communication.

37. The method of claim 36, wherein the wireless communication comprises one or more of GSM and wireless broadband.

38. The method of claim 36, further comprising the step of:

remotely programming the one or more remote security devices.

39. The method of claim 36, further comprising the step of:

US 7,113,090 B1

39

remotely controlling the one or more remote security devices.

40. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user;

processing the security device information from the one or more remote security devices;

displaying the processed information wherein the processed information comprises a combination of normal activity and alarm events; and

automatically forwarding the processed information to the subscribed user associated with the remote security devices.

41. The method of claim 40, wherein the processed information is forwarded to the subscribed user at periodic intervals.

42. The method of claim 40, wherein the processed information is aggregated into a report to provide management data or summary security information about a remote site associated with a remote security device.

43. The method of claim 40, wherein the processed information is forwarded to the subscribed user based on one or more defined triggering events.

44. The method of claim 40, wherein the processed information is forwarded to the subscribed user at the subscribed user's request.

45. The method of claim 40, wherein the communications of sensor data are received by one or more of wireless communication and broadband communication.

46. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user;

processing the security device information from the one or more remote security devices; and

automatically notifying the subscribed user associated with the remote security devices when an absence of activity is detected by the one or more remote security devices.

47. The method of claim 46, wherein the communications are received by one or more of wireless communication and broadband communication.

48. The method of claim 46, further comprising the step of:

enabling the subscribed user to identify one or more remote security devices to be monitored for no activity.

49. The method of claim 46, wherein the subscribed user defines a no-activity trigger for the absence of activity.

50. The method of claim 46, wherein the step of processing the security device information occurs at a central network operations center.

40

51. The method of claim 46, wherein the one or more remote security devices are located across multiple locations.

52. A computer implemented method for implementing a hosted security operating system, the method comprising the steps of:

identifying a plurality of monitor devices located at a location;

receiving monitor data from each of the plurality of monitor devices, at a central server location;

processing the received monitor data, at the central server; and

storing the monitor data in one or more databases associated with the central server.

53. The method of claim 52, wherein the monitor data is received directly from each of the plurality of monitor devices.

54. The method of claim 52, wherein each of the plurality of monitor devices communicate monitor data to a virtual panel located at the location, wherein the virtual panel forwards the monitor data to the central server.

55. The method of claim 54, wherein a network data hub collects local monitor data and identifies urgent data and sends the urgent data to the central server while non-urgent data is buffered and transmitted to the central server in batch.

56. The method of claim 52, further comprising the step of:

updating at least one of the plurality of monitor devices remotely from the central server.

57. The method of claim 52, further comprising the step of:

remotely controlling at least one of the plurality of monitor devices from the central server.

58. The method of claim 52, wherein the monitor data comprises video data, wherein the video data is correlated with monitor data from the monitor devices in the one or more databases.

59. The method of claim 52, wherein the correlated data is analyzed for detecting an anomalous event.

60. The method of claim 52, further comprising the step of:

transmitting to an intended recipient a video image in an alert message when an alarm worthy event is detected by the one or more monitor devices.

61. The method of claim 52, wherein the location comprises multiple locations.

62. The method of claim 52, wherein the monitor data is communicated via one or more of wireless communication and broadband communication.

63. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user;

processing the security device information from the one or more remote security devices; and

automatically notifying the subscribed user associated with the remote security devices when an alarm event satisfying the user notification preferences is received from the one or more remote security devices;

US 7,113,090 B1

41

wherein the user notification preferences comprise notifying a specific recipient based on activity associated with a specific remote security device.

64. The method of claim 63, wherein additional recipients are alerted by a preferred mode of communication, wherein each recipient is alerted based on activity associated with each corresponding security device.

65. The method of claim 63, wherein the communications are received by one or more of wireless communication.

66. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user;

processing the security device information from the one or more remote security devices; and

automatically notifying the subscribed user associated with the remote security devices when a sensor event satisfying the user notification preferences is received from the one or more remote security devices, based on a specified schedule.

67. The method of claim 66, wherein the specified schedule determines whether or not the sensor event is relevant and where the specified schedule dictates a preferred mode of communication to one or more recipients based on a time period.

68. The method of claim 67, wherein the time period refers to a day of the week.

42

69. The method of claim 67, wherein the communications are received by one or more of wireless communication and broadband communication.

70. A computer implemented method for automatic notification of security information to subscribed users based on user specified information wherein the security information is communicated from security devices associated with the subscription, the method comprising the steps of:

storing user profile information based on a user subscription wherein profile information comprises notification preferences;

receiving communications that include security device information associated with one or more remote security devices associated with a subscribed user;

processing the security device information from the one or more remote security devices; and

automatically notifying the subscribed user associated with the remote security devices when a sensor event satisfying the user notification preferences is received from the one or more remote security devices;

wherein the subscribed user identifies a subset of the one or more remote security devices that will cause an automatic notification.

71. The method of claim 70, wherein the subscribed user identifies the subset through an online interface and determines the state of each sensor as it relates to the state of the other sensors in the subset in order to generate a trigger.

72. The method of claim 70, wherein the communications are received by one or more of wireless communication and wired or wireless broadband communication.

\* \* \* \* \*

Appx01537    Motorola Solutions, Inc., Ex1011, p. 40

Case: 25-1787    Document: 30    Page: 531    Filed: 04/29/2026

Appx03215

# Petitioner Motorola Solutions, Inc.'s Presentation for Oral Argument in IPR2023-01295

*January 21, 2025*



**BAKER BOTTS**

EXHIBIT - NOT EVIDENCE

Motorola Solutions, Inc. EX1039, p. 1
Motorola v. STA, IPR2023-01295

## A POSITA would have and could have combined Shaffer with Saylor

- But, as explained by Dr. Polish, Saylor does not explain *how* to convey notifications to recipients in different networks.

- Shaffer's IS *provides the needed mechanism* for interoperable communications to achieve Saylor's goals.

> 88. To implement these communications, Saylor describes that the central security network can identify relevant recipients in an "address book," (*id.*, 7:48-52), but does not explain *how* to convey notifications to recipients in different networks. A POSITA would have recognized that Shaffer's IS system provides the needed mechanism for interoperable communications to achieve Saylor's security goals. A POSITA would have understood that Shaffer's IS would have enabled security personnel or other responders to directly and seamlessly receive communications and information from surveillance cameras in a building utilizing Saylor's security network.

Ex[1002] (Polish Report) ¶88.

Pet. at 28; Ex[1011] (Saylor) 7:48-52; Ex[1002] ¶88.

Case: 25-1787   Document: 30   Page: 532   Filed: 04/29/2026

Appx03239

EXHIBIT - NOT EVIDENCE

Motorola Solutions, Inc. EX1039, p. 25
Motorola v. STA, IPR2023-01295

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

MOTOROLA SOLUTIONS, INC.,
Petitioner,

v.

STA GROUP LLC,
Patent Owner.

---

Case IPR2023-01295
U.S. Patent No. 8,994,830

---

**DECLARATION OF DR. ROBERT AKL
IN SUPPORT OF PATENT OWNER'S RESPONSE**

---

1

Appx03461

STA Group Exhibit 2006
Motorola Solutions Inc. v. STA Group LLC
IPR2023-01295

meet this standard." Ex. 1002 ¶46; *see* Pet. at 13.

30.    I understand that Patent Owner does not dispute the proposal provided by Petitioner and Dr. Polish as to who would qualify as a POSITA. I do not dispute this proposal either.  Under that proposal, I qualified as a POSITA at least as early as 1996, when I earned my Master's degree.  I am qualified to provide opinions concerning what a POSITA would have known and understood, and my analysis and conclusions herein are from the perspective of a POSITA under Petitioner and Dr. Polish's set of qualifications.

## VI.    OVERVIEW OF THE '830 PATENT

31.    The '830 Patent issued March 31, 2015 from an application filed August 8, 2008. Ex. 1001 at Cover.  The '830 Patent is directed to methods and apparatuses for providing access to video streams associated with communication channels in a communication network.  *Id.* at Abstract.  Independent claims 1 and 15 claim a method and apparatus for selecting channels including radio frequencies, which are associated with geographic zones, by a user of a mobile communication device.  *Id.* at claims 1, 15.  Claims 1 and 15 further claim a plurality of video feeds associated with each geographic zone.  *Id.*

32.    The user of a mobile communication device selects a radio frequency from multiple available radio frequencies, each associated with a geographical zone. *Id.* Instead of providing all the video feeds that are associated with and sourced from

the geographic zone, the claims recite that only one or some of the video feeds are identified for providing to the user based on a user policy. *Id.* The claimed user policy identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel. *Id.*

33.    Figure 9 depicts a graphical user interface ("GUI") that allows a user to select a communication channel and once that channel is selected, to select a communication frequency associated with that channel and the user's location from a drop-down menu. *Id.* at 1:55–57; 9:60–10:41; Fig. 9. Figure 8 similarly shows a schematic view of an exemplary GUI that allow a user to select a communication channel and associated frequency using policy rules 806, based on an access policy or a user's role, to identify which video feeds can be shown to the user. *Id.* at 1:55–57; 9:45–59; Fig. 8.

34.    The Petition asserts invalidity of the Challenged Claims based on Grounds 1 and 2, as detailed below (Pet. at 9–10):

| Ground | Basis for Challenge |
|:---:|:---|
| 1 | Claims 1-5, 7-19, and 21-24 are **obvious** based on Shaffer[1] in view of Saylor[2] |

---

[1] U.S. Pat. Pub. No. 2006/0281471 to Shaffer titled "Method and System for Communicating Using Position Information." Ex. 1004 ("Shaffer") at Cover.

[2] U.S. Pat. No. 7,113,090 to Saylor titled "System and Method for Connecting Security Systems to a Wireless Device." Ex. 1011 ("Saylor") at Cover.

| 2 | Claims 1-5, 8-19, and 22-24 are **obvious** based on Gogic[3] in view of Opitz[4] |

## VII.  CLAIM CONSTRUCTION

35.    I have been informed by counsel that because the Petition was filed after November 13, 2018, the proper claim construction standard to be applied is articulated in *Phillips v. AWH Corp.*  Therefore, I understand that the '830 Patent claims should be given their ordinary and customary meaning and the ordinary and customary meaning of a claim term is the meaning that the term would have to a POSITA in question at the time of the invention (August 2008), *i.e.*, as of the effective filing date of the patent application.

36.    I understand that in parallel district court litigation (Case No. 2:22-cv-00381-JRG-RSP), Petitioner and Patent Owner agreed on certain constructions, and that the district court has adopted these agreed constructions:

| Term | Agreed Construction |
|---|---|
| Order of Steps (Claim 1) | The "monitoring a selection of a communication channel" step must be performed before the "identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds" step. |

---

[3] U.S. Pat. Pub. No. 2007/0173273 to Gogic titled "System and Method for Forming Ad-Hoc Location-Based Multicast Group." Ex. 1006 ("Gogic") at Cover.

[4] U.S. Pat. No. 8,090,388 to Opitz titled "Method and Apparatus for Determining a Geographic Location." Ex. 1007 ("Opitz") at Cover.

| Term | Agreed Construction |
|------|---------------------|
| "Push-to-Talk (PTT) channel in a PTT communication network" (Claim 5) | "A channel for transmitting half-duplex communications in a Push-to-Talk communication network" |

Ex. 2001 at 7, 9–10.

I further understand that the Court construed certain claim terms as shown below:

| Term | Agreed Construction |
|------|---------------------|
| "wherein the at least one video feed is associated with the selected communication channel … the one or more video feeds being independent of the selected communication channel" (Claim 1) | "the one or more video feeds being capable of being associated with more than the selected communication channel" |
| "video stream association module" (Claim 15) | Plain and ordinary meaning; not subject to 35 U.S.C. § 112, ¶ 6 |

Ex. 2005 at 17–31.

## VIII.  OVERVIEW OF THE CITED PRIOR ART

37.    Here, I provide overviews of the prior art references relied on in the Petition and Dr. Polish's Declaration.  I discuss these references in more detail in connection with the claim limitations below.

### A.    Shaffer (Ex. 1004)

38.    Shaffer describes "a method for communicating using position information."  *Id.* at Abstract, ¶¶ 1, 5.  As a user moves from a first location to a second location, the method identifies the updated position of the user and

19

automatically adjusts communication parameters to join and communicate on a communication network at the second location. *Id.*

39.    Shaffer describes the migration to a second communication network as occurring automatically when the user moves into a new location. *Id.* at ¶¶ 6-7. Shaffer also describes an "endpoint 200" that "includes a transmitter/receiver 202, a user interface 204, a processor 206 and a memory module 208." *Id.* at ¶ 44. The "[t]ransmitter/receiver 202 obtains signals from GPS satellites or ground stations of a communication network in order to determine a position of endpoint 200" so that the endpoint can join the communication network for the geographic location it is presently in. *Id.* "User interface 204 provides a mechanism through which a user of mobile endpoint 200 may operate the endpoint and communicate with other network devices." *Id.*

40.    "Memory module 208 includes network communication parameter listings 210 which contains mappings of communication settings, such as radio frequencies and encryption keys, of communication networks by location." *Id.* at ¶ 46. As the user moves from a first location to a second location, the endpoint 200 finds the relevant radio frequency and encryption key for the new location and automatically selects those parameters to allow the endpoint to communicate on the communication network of the second location. *Id.* at ¶¶ 49-50, 52 ("As indicated above, technical advantages of particular embodiments of the present invention

include utilizing GPS information to adjust parameters of a mobile endpoint and automatically tune its parameters to match local network requirements.").

### B.    Saylor (Ex. 1011)

41.    Saylor "provides a personal security network where an individual's system or systems of security devices maybe connected to a central security network." Ex. 1011, Abstract.  Saylor allows users to set up "personalized alarms and alert services" that specify who is to be contact, the order and method of contact, and the type of situation to be alerted of. *Id.* at 2:26-31.  The system further monitors images, and if "a change in images (indicating motion) is detected, an alarm may be signaled" along with the images or video clips of the motion. *Id.* at 2:45-55.

42.    Saylor includes a set of databases that "may store relevant information for personalized alarm services." *Id.* at 6:9-14.  The user's profile can be created to specify how the user is to be notified in the event of a security alert. *Id.* at 6:19-32. Saylor further states that a notification may be sent to "police, fire department, and/or rescue squads" but that notification to these emergency services occurs after the user is notified and has confirmed the existence of the alert in order to prevent triggering false alarms. *Id.* at 8:16-28, 12:30-41.  The user preferences of Saylor relate to determining when, how, and who is contacted in the event of an emergency or security event. *Id.* at 11:4-28.

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

------------------------------------------------- x

MOTOROLA SOLUTIONS, INC.,

                    Petitioner,

v.

STA GROUP LLC,

                    Patent Owner.

IPR2023-01295

U.S. Patent No.: 8,994,830

------------------------------------------------- x

                              June 19, 2024

                              9:56 a.m.


    DEPOSITION of NATHANIEL POLISH, witness in the above-captioned matter, taken pursuant to Notice, held virtually online via Zoom, before Fran Insley, a Notary Public of the States of New York and New Jersey.

STA Group Exhibit 2008
Motorola Solutions Inc. v. STA Group LLC
IPR2023-01295

                              Page 1

The security system notifies a recipient, including emergency personnel, when it defects an 'alert situation'."  Do you see that?

A.    Yes.

Q.    So Saylor sends notifications to recipients including emergency personnel, right?

A.    Yes, that's what it says.

Q.    So is it your understanding that Saylor can send notifications via the internet or other methods to entities?

A.    Yes, it can send notifications via the internet among other methods.

Q.    If you look at column 6, line 19, please let me know when you're there.

A.    Yes, I'm there.

Q.    It says, "Based on user preferences and other information, the user may be notified via various methods of communication, as specified in the user's profile and preferences information.  Alert notification may be communicated via the Internet 150, POTS 152," which is plain old telephone service, "wireless communication portals, voice portals and/or other methods."  Do you see that?

Page 52

A.    Yes.

Q.    So, Saylor discloses how to convey notifications to recipients in a lot of different forms, right?

A.    Yeah, Saylor discloses that notifications can go out over a wide variety of different communication technologies, including the ones you just listed.

Q.    If you look at column 7, line 39, it says, "Other communication techniques may be implemented.  Central security server 130 may then alert users and other identified entities via wireless and/or other devices, such as mobile device 240, via a voice alarm, text message and other notifications.  For example, alerts may be transmitted to the user via e-mail or other form of electronic communication to a personal computer 242 or other device.  In addition, users may check status and other data via mobile device 240, computer 242 and other devices," right?

A.    Yes.

Q.    And additionally, if you go to column 11, line 24, it states, "A user may also assign various methods of notification for each

Page 53

alarm event or group of alarm events. Methods of notification may include cell phone, regular phone, pager, PDA, e-mail, instant messenger, or other form of communication," right?

A. That's right.

Q. So, Saylor discloses how to convey notifications to recipients in different networks in a myriad of ways, right?

A. Well, Saylor discloses that you can do it in lots of different ways and that it lists a bunch of examples.

Q. Returning to page 59 of your declaration, which is Exhibit 1002, paragraph 74.

A. Okay.

Q. This talks about in the second sentence as we read before that "The security system notifies a recipient, including emergency personnel, when it detects an 'alert situation'," right?

A. That's right.

Q. And we talked about previously that the user selects the list of recipients to receive security system notifications, right?

A. Well, it's based upon the database

Page 54

reach out to.

Q. If you go to page 68, paragraph 86.

A. Okay.

Q. About halfway through it starts with "A POSITA". "A POSITA would therefore have recognized that Shaffer's IS is designed to connect a network such as a video security system designed to monitor particular buildings with a different network that responds to incidents in those buildings, such as a security or emergency network. Indeed, interconnecting communication networks was and is a common practice, as I described above. Gateways, routers and bridges are commonly used for this purpose. I have employed such hardware in this way for decades for all manner of projects." Do you see that?

A. Yes.

Q. So before the disclosure in Saylor, interconnecting communication networks was common practice, right?

MR. WILLIAMS: Objection to form.

A. I mean, yes, interconnecting networks was a common thing, yes.

Q. If you go to paragraph 87. It's on

Page 61

Q.    As we talked about before, Saylor's databases store information identifying when to notify users and what to send them, right?

MR. WILLIAMS:  Objection to form.

A.    Yeah, I guess broadly that's true, yes.

Q.    So if you go to paragraph 113, you say on page 85, second full sentence, "It would have been obvious to a POSITA that Shaffer's IS could provide the tracked location information to Saylor's central security network, so that the central security network can implement a user policy of sending notifications based on location.  In this scenario, if an event occurs, Saylor's database can check to see if any user associated with the relevant audio communication channel is within the designated location."  Do you see that?

A.    Yes.

Q.    So you don't contend that Saylor discloses notification based on location, right?

MR. WILLIAMS:  Objection to form.

A.    So I don't think Saylor talks about specifically notifying or taking into account

Page 71

in notifying somebody where those -- where that somebody is. I think that that would have been obvious to do.

Q. Right, so I think you answered my question.

A. Yeah, I think I did.

Q. In paragraph 113, second sentence starts on 84 goes on to 85, you say, "In particular, Saylor discloses that the system can be configured to send notifications to users based on a defined area." Do you see that?

A. I'm sorry, so paragraph 113?

Q. Yeah. In the second sentence you say, "In particular, Saylor discloses that the system can be configured to send notifications to users based on a defined area"?

A. Yeah, I see that.

Q. You cite column 5, line 49, right?

A. (No response).

Q. Right?

A. Right. I'm just looking at the reference here.

Q. So taking you to column 5, line 47 of Exhibit 1011, it says, "For example, the

Page 72

**FORM 30. Certificate of Service**

**Form 30**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF SERVICE</u>

**Case Number** 2025-1787

**Short Case Caption** STA Group LLC v. Motorola Solutions Inc.

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See <u>Fed. R. App. P. 25(d)</u>; <u>Fed. Cir. R. 25(e)</u>. Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on __04/29/2026__

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Lauren J. Dreyer | lauren.dreyer@bakerbotts.com |
| Robert L. Maier | robert.maier@bakerbotts.com |
| Clarke Stavinoha | clarke.stavinoha@bakerbotts.com |
| Eliot D. Williams | eliot.williams@bakerbotts.com |
| Lori Ding<br>Katherine M. Burke | lori.ding@bakerbotts.com<br>katherine.burke@bakerbotts.com |

☐ Additional pages attached.

Date: __04/29/2026__

Signature: __/s/ Jason A. Engel__

Name: __Jason A. Engel__